**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UPSOLVE, INC. and REV. JOHN UDO-OKON, <br><br>                  Plaintiffs, <br><br>           -v- <br><br> LETITIA JAMES, in her official capacity as Attorney General of the State of New York, <br><br>                Defendant. | Case No. _____ <br><br> **COMPLAINT** |

**<u>NATURE OF THE ACTION</u>**

1.      Plaintiffs bring this action to vindicate their First Amendment rights to close a well-documented gap in access to justice for low-income New Yorkers who are faced with debt collection actions.

2.      Debt collection actions are one of the most common kinds of lawsuits in New York, and responding to such suits is straightforward: New York State itself provides a standard fill-in-the-blank form for responding to such lawsuits. But the vast majority of defendants are low-income individuals who cannot afford a lawyer, cannot find pro bono counsel, and face additional barriers that make it difficult to prepare and file an answer themselves. The result is that the large majority of low-income New Yorkers in such actions default. They never have a day in court and lose their lawsuits and their property—even where the cases against them lack merit. The result is often wage garnishment, damage to credit, and a cascading cycle of harm to people who are already vulnerable, which also comes at a cost to the public.

3.      Plaintiffs stand ready to respond to this access to justice crisis. Plaintiff Upsolve is a nonprofit organization with a mission and a track record of fighting to ensure that all Americans can access their legal rights. Upsolve has carefully designed, crafted, and obtained funding to implement a program—the American Justice Movement ("AJM")—to train professionals who are not lawyers to provide free legal advice on whether and how to respond to a debt collection lawsuit. All advice under the program would be reliable, free, straightforward, and narrowly circumscribed, provided on a strictly non-commercial basis to ensure that defendants can understand their rights and respond to the debt collection lawsuits against them. Plaintiff Rev. John Udo-Okon is a pastor in the South Bronx whose community is desperately in need of such free advice. Rev. Udo-Okon stands ready to associate with Upsolve to advocate for and provide free, narrowly circumscribed legal advice for the purpose of increasing access to the courts and thereby protecting the property and liberty of low-income New Yorkers who are currently unable to understand or access their legal rights when faced with a debt collection action.

4.      The only thing stopping Plaintiffs is the threat of prosecution under New York's rules governing the unauthorized practice of law ("UPL"). New York law is clear that individuals who are not lawyers may not provide legal advice, and that advising a person on how to respond to a lawsuit qualifies as legal advice even when the advice is free, straightforward, and simple. The UPL rules threaten anybody who does so—or anybody who solicits or aids in providing such advice—with criminal misdemeanor prosecution and civil penalties. Because AJM staff and Rev. Udo-Okon are not lawyers, they cannot provide truthful and non-misleading advice about how to answer a debt collection lawsuit without facing the risk of such punishment.

5.      The UPL rules put the many low-income New Yorkers who would receive AJM's advice in a devastating bind. If they solicit legal advice from qualified and trusted advisors who

are not lawyers, they face a risk of criminal or civil prosecution themselves and also expose their

advisors to that same risk. But if they do not receive such advice, they will likely receive no advice

at all, default in their debt collection lawsuits, and face the risk of being wrongfully deprived of

their property and the risk of harmful and long-lasting follow-on consequences.

6.      Plaintiffs bring this action to vindicate their First Amendment rights to close this

gap in the access to justice, and to declare that New York's UPL rules cannot be validly applied to

prohibit the truthful and non-misleading advice they would provide.

7.      At the outset, application of the UPL rules here triggers First Amendment scrutiny.

The UPL rules are content-based because their application depends on the content of a person's

speech, and in particular whether one individual's speech to another includes advice about how to

respond to a lawsuit. They also impede on the Plaintiffs' associational rights, as "collective activity

undertaken to obtain meaningful access to the courts is a fundamental right within the protection

of the First Amendment" to the United States Constitution.  *In re Primus*, 436 U.S. 412, 426 (1978)

(quoting *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585 (1971)).

8.      New York's UPL rules are well intentioned and effective at combatting the risk of

unreliable advice in many applications, so would ordinarily withstand First Amendment scrutiny.

But they cannot withstand First Amendment scrutiny as applied under the narrow circumstances

of this case. As applied to Plaintiffs, those rules would be affirmatively counterproductive and

impede the very interests the UPL rules were adopted to protect. In particular, UPL rules are

designed to protect consumers from unreliable or fraudulent advice and to protect the integrity of

the courts and the public perception of the justice system. But Plaintiffs would be providing advice

for free, without any financial motivation. They would be advising individuals in an area where

New York has itself recognized an access to justice gap and that straightforward advice can be

reliably provided, as New York promulgates a standard form for filing such a response. And Plaintiffs have carefully crafted their program to ensure reliability—with third-party experts attesting that the program would help many New Yorkers. Conversely, without the free advice provided under Plaintiffs' program, many low-income New Yorkers would be left to fend for themselves without any advice at all about how to respond to a debt collection action: Low-income New Yorkers typically cannot afford a lawyer, especially to respond to relatively low-dollar demands, and pro bono counsel are in too short supply to fill the gap. Experience shows that many individuals will simply fail to respond, leading to default judgments entered without any adversarial testing, notwithstanding evidence that debt collection suits often lack merit or demand inflated payments. New York does not have a legitimate interest in increasing the number of default judgments and preventing people from obtaining help to respond to lawsuits using a form that New York has itself provided, particularly when Plaintiffs have carefully crafted a program to provide the requisite protections against uninformed, bad-faith, or false advice.

9.    This Court accordingly should enter a declaration that the UPL rules are unconstitutional as applied to Plaintiffs' participation in the American Justice Movement, and an injunction preventing the enforcement of the UPL rules against Plaintiffs' conduct, along with other relief necessary for Plaintiffs to vindicate their constitutional rights.

## THE PARTIES

10.    Plaintiff Upsolve, Inc., is a 501(c)(3) nonprofit, tax-exempt organization chartered in New York with the mission of helping Americans access their civil legal rights for free and engaging in widespread education and advocacy to that end. Upsolve is currently the largest nonprofit organization providing free bankruptcy-related resources in the United States and has confirmed relieving more than $400 million in debt for low-income self-represented debtors filing for simple, no-asset Chapter 7 bankruptcy. Upsolve also provides free online education on a

number of topics, including debt collection defense, student loans, wage garnishment, repossession, foreclosures, evictions, among others, and serves over 150,000 individuals per month. Coupled with its free online resources, Upsolve invests heavily in public advocacy to raise awareness around civil rights injustices, and the corresponding inability of millions of low-income families to access their legal rights.

11.    Upsolve's success has been widely recognized in the media. Upsolve has received funding support from major public-interest and philanthropic organizations, such as the Robin Hood Foundation and the Hewlett Foundation.

12.    The American Justice Movement is an Upsolve project.

13.    Plaintiff Reverend John Udo-Okon is a reverend at Word of Life Christian Fellowship International in the South Bronx. Rev. Udo-Okon and his congregation provide services to people in need. Many members of his community are facing credit issues and debt collection lawsuits and lack access to free counsel or legal advice they can afford.

14.    Defendant Letitia James is the Attorney General of the State of New York. Defendant James' official duties include the administration and enforcement of regulations governing the unauthorized practice of law. She is sued in her official capacity.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because this suit arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

16.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim have occurred or will occur in this judicial district.

## FACTS

**I.     Many New Yorkers lack the basic legal assistance they need to respond to debt collection lawsuits, which can result in severe long-term consequences.**

17.     The problem Plaintiffs seek to solve is widespread and severe: A restricted supply of free or low-cost civil legal assistance prevents low-income New Yorkers from understanding and accessing their legal rights when they are faced with debt collection actions, leading to wrongful deprivations of property and a cascade of other life-altering consequences.

18.     Debt collection actions are one of the most common kinds of lawsuit in New York State courts. Debt collection actions have been estimated to comprise approximately one quarter of all lawsuits in New York's courts.

19.     In the vast majority of debt collection lawsuits in New York State, the defendant fails to appear and thus faces a default judgment. Some estimates put this rate of default as high as 85-90%. A lower range of estimates puts it closer to 70%. Either way, the large majority of debt collection lawsuits end with a default judgment.

20.     Defendants can avoid a default judgment, and the adverse consequences flowing from such a judgment, only if they file a timely response to the debt collection action.

21.     Defendants who respond to debt collection lawsuits often obtain better outcomes, because many debt collection lawsuits lack merit or demand an amount that is too large. For example, one study by the Legal Aid Society of New York reviewed a sample of debt collection cases and estimated that more than a third were "clearly meritless."[1]

---

[1] The Legal Aid Society et al., *Debt Deception: How Debt Buyers Abuse the Legal System to Prey on Lower-Income New Yorkers*, at 8–10 & 26 n.91 (May 2010), https://www.neweconomy nyc.org/wp-content/uploads/2014/08/DEBT_DECEPTION_FINAL_WEB-new-logo.pdf.

22. By failing to answer and to assert available affirmative defenses, many defendants are deprived of their property without ever having their day in court. When defendants default, plaintiffs never have any need to prove their cases, and courts have no opportunity to assess the merits of their claims, even when a claim would fail were it subjected to adversarial testing.

23. Adverse judgements in debt collection actions can have devastating effect on the lives of low-income New Yorkers.

24. Defaulting in a debt collection lawsuit can lead to wage garnishment, eviction, repossession of an automobile, bank seizures, and lasting damage to a consumer's credit. This damage to credit can make it difficult for low-income New Yorkers to secure future financing—such as on a car they need to access employment opportunities—and can make it more difficult for them to rebuild their credit. For somebody living in precarious financial circumstances, even small-dollar lawsuits can snowball to have devastating consequences.

25. The stories of New Yorkers William Evertsen, Liz Jurado, and Christopher Lepre—all of whom defaulted in debt collection actions in which they received no legal advice—demonstrate the need for such advice and the serious long-term consequences New Yorkers can experience without it[2]:

- *William Evertsen*: William ("Tyler") Evertsen is a 60-year-old HIV-positive gay man living in Brooklyn. In 2017, Evertsen received harassing phone calls from a third-party debt buyer regarding a debt he did not owe. The third-party debt buyer sued him and got a default judgment against him for this debt he did not owe, which has contributed to his financial distress. Evertsen explained that "[t]he judgment made me feel like I was defrauded, because they never proved that I actually owed the debt [and] I was also powerless to do anything about it."

- *Liz Jurado*: In 2019, after her husband lost his job, Liz Jurado got a full-time job that would allow her to "provide for my kids and take care of my husband." But shortly

---

[2] Declarations from these three individuals describing their experiences are attached to the Silbert Declaration in Support of the Motion for a Preliminary Injunction. *See* Silbert Decl. Ex. 5 (Evertsen); Ex. 6 (Jurado); Ex. 7 (Lepre).

thereafter Jurado received a letter from the sheriff that they were going to garnish her wages because she had defaulted in a lawsuit to collect a surprise medical debt incurred in connection with the birth of one of her children. Jurado "knew that having my wages garnished would have severe effects for myself and my family" since they "were living paycheck-to-paycheck." Jurado received no legal advice because she "could not afford a lawyer" and "did not know of any resources that would provide me with legal assistance for free." As Jurado describes her experience, "I was facing permanent, life-altering consequences for something that I didn't even know how to do anything about."

- *Christopher Lepre*: In 2015, Christopher Lepre's car flipped over. Lepre, a U.S. Navy veteran, had "no choice but to take on a high interest loan" to purchase a new car. Lepre's car quickly stopped working. Lepre's auto lender demanded repayment, sued him on his debt, and he defaulted because he "didn't know what I needed to do in order to defend myself" and was unable to find a lawyer to help him. As Lepre explains, "I wish I had gotten my day in court . . . [but] the judge decided the case without hearing my side and without the [other side] ever having to prove their case." Lepre continues to suffer the "negative consequences of the lawsuit": his wages are being garnished at the rate of over $1000 per month; there were times he "could not afford to pay [his] rent"; he "cannot afford a car"; and his credit score is "further damaged."

26.    Access to basic free legal advice could make a big difference for many other debt collection defendants. Individual defendants who have legal assistance not only have their day in court, but also tend to secure more favorable outcomes. As a report from the National Center for State Courts explains: "Although plaintiffs are generally represented by attorneys, defendants in [lower-value] cases are overwhelmingly self-represented, creating an asymmetry in legal expertise that, without effective court oversight, can easily result in unjust case outcomes."[3]

27.    There is accordingly a pressing need among many low-income New Yorkers for legal advice about how to respond to a debt collection action to avoid a default judgment, obtain access to justice, and potentially obtain a better outcome by prevailing on the merits.

---

[3] National Center for State Courts, *Call to Action: Achieving Civil Justice for All*, at 34 (2016), https://www.ncsc.org/__data/assets/pdf_file/0029/19289/call-to-action_-achieving-civil-justice-for-all.pdf; *see also* The Pew Charitable Trusts, *How Debt Collectors Are Transforming the Business of State Courts*, at 14–15 (May 2020), https://www.pewtrusts.org/-/media/assets/2020/06/debt-collectors-to-consumers.pdf (collecting "analyses from jurisdictions across the country indicat[ing] that when consumers are represented by attorneys, they are more likely to secure a settlement or win the case outright").

28.    Despite this need for legal assistance, the vast majority of debt collection defendants in New York lack legal representation and many face default judgments as a result. Many low-income debt collection defendants cannot afford to pay for a lawyer to represent them in their case. And free lawyers are in too short supply to meet the immediate needs of many individuals in low-income communities.

29.    As a 2010 report by the Federal Trade Commission ("FTC") explained: Although "[f]undamental fairness dictates that the legal process afford consumers a reasonable opportunity to defend themselves[,]" "[m]ost alleged debtors fail to answer complaints or otherwise defend themselves in debt collection actions."[4] The FTC Report went on to note that "[t]here [is] broad consensus . . . that relatively few consumers who are sued for alleged unpaid debts actually participate in the lawsuits," and cited estimates that "sixty percent to ninety-five percent of consumer debt collection lawsuits result in defaults."[5]

30.    The rate of default is particularly high among communities of color. A study of judgments over a five-year period in St. Louis, Chicago, and Newark, New Jersey, found that, even

---

[4] Federal Trade Comm'n, *Repairing a Broken System: Protecting Consumers in Debt Collection Litigation and Arbitration*, at 6–7 (July 2010), https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-bureau-consumer-protection-staff-report-repairing-broken-system-protecting/debtcollectionreport.pdf.

[5] *Id.* at 7; *see also*, The Aspen Institute Financial Security Program, Aspen Inst., *A Financial Security Threat in the Courtroom: How Federal and State Policymakers Can Make Debt Collection Litigation Safer and Fairer for Everyone*, at 8 (Sept. 2021) ("Multiple studies have shown that more than 70 percent of debt collection lawsuits end in default judgments in the studies jurisdictions. This is despite the fact that the individuals being sued may have legitimate defenses.") https://www.aspeninstitute.org/wp-content/uploads/2021/09/ASP-FSP_Debt CollectionsPaper_092221.pdf.

after accounting for income, the rate of default judgments in mostly black neighborhoods was nearly double that of mostly white ones.[6]

31.     This high rate of default—which means that plaintiffs never have to prove their cases—is particularly problematic because many debt collection suits lack merit.

32.     A study by the Legal Aid Society of New York found that, in more than a third of a sample of debt collection cases reviewed, "the debt was the result of mistaken identity or identity theft, the debt had been previously paid, the debt had been discharged in bankruptcy, or the statute of limitations on the debt had expired."[7]

**II.    New York provides a form for responding to a debt collection action, but many low-income New Yorkers are unable to use it.**

33.     Responding to a debt collection lawsuit in New York is typically straightforward and does not require significant specialized legal training. Law school, however, takes three years and often comes at a significant cost.

34.     Indeed, New York State has provided a fill-in-the-blank answer form for debt collection defendants that allows them to respond to lawsuits and raise common defenses, asserting, for example, that they do not owe the debt, the amount is inaccurate, or the lawsuit is outside the statute of limitations.[8] A copy of the form is attached as Exhibit A to this complaint.

---

[6] Paul Kiel and Annie Waldman, *The Color of Debt: How Collection Suits Squeeze Black Neighborhoods*, ProPublica (Oct. 8, 2015), https://www.propublica.org/article/debt-collection-lawsuits-squeeze-black-neighborhoods.

[7] Legal Aid Society et al., *supra* note 1, at 10, 26 n.91.

[8] *See* New York State Unified Court System, *Answer Form*, https://nycourts.gov/LegacyPDFS/rules/CCR/forms/Consumer-Credit-Answer.pdf; *see also* New York State Unified Court System, *Common Defenses in a Debt Collection Case* (describing common affirmative defenses that can be raised on the Answer Form), https://www.nycourts.gov/courthelp/moneyproblems/defenses.shtml (last updated March 14, 2018).

35.     The one-page form is simple. Its heading provides labeled blank spaces in which to write the caption of the action. After that, the form offers a series of 24 labeled checkboxes that can be checked to raise particular defenses, for example, "I have paid all or part of the alleged debt" or "I had no business dealings with Plaintiff (Plaintiff lacks standing)." One of the checkboxes is labeled "Other Reasons" and provides a blank space in which additional answers can be written. The bottom of the form allows for verification and notarization.

36.     In providing this form, New York itself thus recognizes that the practical importance of responding to a debt collection action and that doing so is typically straightforward and simple.

37.     New York's form is inadequate, however, to close the gap in the access to justice.

38.     Even with this form, the large majority of low-income New Yorkers fail to respond to debt collection actions, or fail to do so accurately, and accordingly face default judgments.

39.     The high default rate despite the availability of New York's answer form confirms that barriers of legal complexity and fear (among others) prevent low-income New Yorkers from vindicating their rights on their own.

40.     For example, New York's form includes language that requires some measure of familiarity with the legal system and specialized terminology, which many low-income defendants lack. Among the checkboxes that the answer form offers are: "General Denial: I deny the allegations in the Complaint"; "I received the Summons and Complaint, but service was not correct as required by law"; "Unconscionability (the contract is unfair)"; "Statute of limitations (the time has passed to sue on this debt)"; "Unjust enrichment (the amount demanded is excessive compared with the original debt)"; and "Laches (plaintiff has excessively delayed in bringing this lawsuit to

my disadvantage).”[9] Many low-income New Yorkers are unfamiliar, however, with concepts of a general denial, the requirements of service of process under law, the meaning of unconscionability, the applicable statute of limitations to a debt collection action, or the application of laches in a debt collection suit.

41.     Low-income defendants often face language barriers and literacy and educational gaps. They also typically lack familiarity with the civil justice system and are often intimidated by, or anxious and uncertain about how to respond, when served with a debt collection lawsuit. Many people thus do not understand how the civil legal system works, much less how to respond to a lawsuit to defend their own rights, or are apprehensive to do so.

42.     What scholars have called the “costs of financial misery”—which cause people to “work overtime, forego basic necessities, face serious health consequences, deal with persistent debt collection calls, end up in court, lose homes, and sell what little they own”—further increase the barriers low-income New Yorkers face in vindicating their legal rights.[10] As the high rate of default indicates, especially when coupled with the high number of meritless collection actions, more assistance is needed to ensure that all New Yorkers are able to participate in the legal system and vindicate their rights in court.

43.     Low-income New Yorkers faced with debt collection lawsuits often cannot afford to hire paid counsel to represent them.

44.     Some attorneys provide free legal counsel, including for responding to debt collection actions. But the availability of free assistance from barred lawyers is in too short supply

---

[9] New York State Unified Court System, *Answer Form*.

[10] Pamela Foohey, Robert M. Lawless, Katherine M. Porter & Deborah Thorne, *Life in the Sweatbox*, 94 Notre Dame L. Rev. 219, 255 (2018).

to satisfy the demand. One study estimated that the leading nonprofit program in New York City for debt collection defense had the resources to assist fewer than 2% of all individuals sued on a debt in New York City Civil Court.[11]

45.     There is a constitutional right to free counsel is criminal cases, but no such right attaches in civil debt collection actions.

46.     Attorneys who provide free or low-cost services to debt collection defendants are frequently overloaded and often cannot provide enough assistance on the quick timeline on which such suits proceed.

47.     The result is that most low-income New Yorkers facing debt collection lawsuits are left without any representation at all, and instead must fend for themselves. By many estimates, over 90% of defendants in debt collection lawsuits—and by some estimates up to 99%—are left without any representation and must fend for themselves.[12]

48.     This problem has been exacerbated by the pressures of COVID-19, as a number of free legal aid programs have been curtailed due to the constraints of the pandemic. For example, New York's Civil Legal Advice and Resource Office ("CLARO") cancelled all in-person programming until further notice, due to the COVID-19 pandemic.[13] Additionally, the New York State Courts' Volunteer Lawyer for a Day Program—a program where which volunteer attorneys

---

[11] Legal Aid Society et al., *supra* note 1, at 17.

[12] The Pew Charitable Trusts, *supra* note 3, at 13–14.

[13] CLARO, *COVID-19 Notice*, http://www.claronyc.org/claronyc/default.html (last visited Jan. 20, 2022).

provide limited representation for unrepresented consumer debtors in state court in New York City—is now operating virtually and on a limited basis in some counties.[14]

49.    The lack of representation for debt collection defendants is often contrasted with sophisticated representation on the plaintiff side.

50.    In its November 2020 annual report, the State of New York's Permanent Commission on Access to Justice stated that "high-volume debt collection cases with frequent defaults" are "notorious for having over-zealous plaintiff attorneys and largely unrepresented defendants."[15]

51.    Because creditors often have (and debt buyers can purchase) large books of similar debts, they can take advantage of economies of scale to bring many lawsuits at a lower cost and pursue actions even for small-dollar debts. The high rate of defendant default means that creditor-plaintiffs will rarely have to prove their cases in court, creating a disincentive to invest the resources to investigate potential actions thoroughly before filing lawsuits. Individual defendants, by contrast, are faced only with a single suit—sometimes demanding less money than it would cost to hire a lawyer to defend the suit—and cannot take advantage of economies of scale. They instead face transaction costs that are effectively insurmountable for many low-income individuals, contributing to the high rate of default judgments. Absent free or low-cost legal advice, this asymmetry can have the effect of preventing low-income New Yorkers from defending their property against wrongful deprivation in a manner that is economically rational.

---

[14] New York State Unified Court System, *Access to Justice Volunteer Attorney Programs*, http://ww2.nycourts.gov/attorneys/volunteer/VAP/program_descriptions.shtml (last visited Jan. 20, 2022).

[15] Permanent Comm'n on Access to Justice, *Report to the Chief Judge of the State of New York*, at 10 (Nov. 2020), https://www.nycourts.gov/LegacyPDFS/accesstojusticecommission/20_ATJ-Comission_Report.pdf.

52.    The ability to bring a high number of cases with confidence that many defendants will default and the merits of the cases will never be examined also creates a risk of fraud and abuse of the legal process and in the origination of the loans whose collection ultimately results in such default judgments. For example, one process server in New York State pleaded guilty to fraud in connection with a failure to properly notify debt collection defendants that led to approximately 100,000 improper default judgments.[16] And the New York Attorney General and other state Attorneys General have investigated the origination and collection practices of lenders in connection with potential violations of federal and state consumer protection laws.[17]

53.    Debt collection lawsuits are emblematic of a broader access to justice gap that prevents low-income New Yorkers from understanding and accessing their civil legal rights.

54.    As the American Bar Association has concluded, "[d]espite sustained efforts to expand the public's access to legal services, significant unmet needs persist."[18] In a single year in

---

[16] N.Y. State Off. of the Att'y Gen., *The New York State Attorney General Andrew M. Cuomo Announces Guilty Plea Of Process Server Company Owner Who Denied Thousands Of New Yorkers Their Day In Court* (Jan. 15, 2010), https://ag.ny.gov/press-release/2010/new-york-state-attorney-general-andrew-m-cuomo-announces-guilty-plea-process.

[17] *See, e.g.*, Credit Acceptance Corporation, Quarterly Report (Form 10-Q), at 42 (Sept. 30, 2021) (describing a notification that that the New York State Attorney General was considering bringing claims against the company under the Dodd-Frank Wall Street Reform and Consumer Protection Act, New York Executive Law § 63(12), the New York Martin Act and New York General Business Law § 349 in connection with the Company's origination and securitization practices); *see also, e.g.*, *id.* at 43 (describing a settlement of $27.2 million in connection with a lawsuit by the Massachusetts Attorney General for unfair and deceptive trade practices).

[18] Am. Bar Ass'n Comm'n on the Future of Legal Services, *Report on the Future of Legal Services in the United States*, at 11 (2016) ("ABA Report"), https://www.americanbar.org/content/dam/aba/images/abanews/2016FLSReport_FNL_WEB.pdf.

New York, "1.8 million litigants in civil matters did not have representation for matters involving

housing, family, access to health care and education, and subsistence income."[19]

### III. Plaintiffs seek to provide free, narrowly circumscribed legal advice on how to respond to a debt collection lawsuit with the goal of helping low-income New Yorkers understand and access their legal rights.

55.     The Plaintiffs seek to help close this access to justice gap.

56.     Specifically, Plaintiffs seek to associate to provide free, narrowly circumscribed

legal advice to low-income New Yorkers to ensure that they can understand how to respond to the

debt collection lawsuits against them and help reduce wrongful deprivation of property and the

lasting harm it can cause. Plaintiffs also hope to improve public faith in the court system by

ensuring that all defendants rich and poor can have their day in court, courts can decide more cases

on their merits, and plaintiffs cannot secure default judgments on meritless claims simply due to

defendants' inability to vindicate their rights. Plaintiffs' intervention is carefully designed—and

reviewed and approved by experts on debt collection defense—to help individuals respond to debt

collection actions consistent with New York's form response, to ensure robust protections for the

communities Plaintiffs hope to serve, and to serve the public interest.

57.     Plaintiffs have developed and are prepared to implement the American Justice

Movement ("AJM"). AJM is a program to train and supervise "Justice Advocates," public-interest

professionals who are not lawyers, to provide free legal advice on responding to a debt collection

lawsuit. By training, empowering, and overseeing Justice Advocates to provide free, narrow, and

reliable legal advice, Plaintiffs hope to help overcome the educational, financial, structural, and

cultural barriers that low-income New Yorkers face in trying to access their legal rights when they

---

[19] *Id.* at 12 (citing Task Force to Expand Access to Just. to Civ. Legal Servs. in N.Y., *Report to the Chief Judge of the State of New York*, at 2 (Nov. 2014), http://ww2.nycourts.gov/sites/default/files/document/files/2018-05/CLS%20TaskForce%20Report%202014.pdf.

are faced with a debt collection lawsuit. Justice Advocates would be individuals who are already working in the public interest, are already embedded in low-income communities, and reflect the diversity of their communities.

58.     AJM has started to recruit, will continue to recruit, and is prepared to support and oversee the work of Justice Advocates.

59.     Because New York State already streamlines the process of responding to a debt collection lawsuit, the advice needed to help a defendant to do so can be reliably and consistently provided without the need for significant specialized legal training. For example, three years of law school often involves significant cost and creates a substantial barrier to entry.

60.     Justices Advocates will only provide advice for free. AJM will require that the Justice Advocate cannot receive and the client cannot provide any form of compensation in connection with the advice they give.

61.     By empowering Justice Advocates to provide straightforward advice that is in the served community's best interest, Plaintiffs hope to help support low-income New Yorkers facing debt collection actions who currently risk being wrongfully deprived of their property because they lack the knowledge or support to respond.

62.     Specifically, the Justice Advocates will: (1) determine whether the client could benefit from their advice; (2) confirm the limited scope of representation with the client; (3) advise the client whether it is in their best interest to answer the lawsuit against them; (4) advise the client on how to fill out the answer based on the client's answers to a series of straightforward questions; and (5) advise the client on how and where to file and serve the answer.

63.    AJM has prepared a robust step-by-step Training Guide to ensure that all of the advice that Justice Advocates are being directed to provide is in the clients' best interest. A copy of the AJM Training Guide is attached to this complaint as Exhibit B ("Training Guide").

64.    The Training Guide has been independently reviewed by third-party experts in consumer law and debt collection defense. Those experts have confirmed that advice provided according to the terms of the Training Guide will provide clients with substantial benefits at no cost and that the program minimizes the risk of unreliable or harmful advice. Declarations from Mr. Tashi Lhewa and Professor Pamela Foohey describing their credentials and their review and endorsement of the Training Guide are attached to the Silbert Declaration in Support of the Motion for a Preliminary Injunction.

65.    AJM will train all Justice Advocates to ensure that they understand the Training Guide and are willing to comply with its restrictions. Additionally, AJM will regularly review and, if necessary, update the Training Guide to ensure it is consistent with applicable law, ethical requirements, and the best interests of its advisees.

66.    The Training Guide describes a step-by-step process the Justice Advocate should follow and provides them with advice to give clients about whether and how to fill out their answer forms based on the client's answers to a series of questions with explanatory guidance the Justice Advocate can provide to advise the client about whether it is in the client's best interest to raise particular affirmative defenses.

67.    The Training Guide also includes an affidavit that Justice Advocates must sign and adhere to describing the limited scope of their responsibilities and the safeguards they must implement to provide advice under the auspices of AJM. Moreover, in designing the Training Guide, Plaintiffs carefully limited the issues on which Justice Advocates may advise to ensure that,

where more complex issues arise calling for legal advice that Justice Advocates are not equipped to reliably provide, Justice Advocates are required to refer clients to alternative sources of legal assistance.

68.    To participate in the American Justice Movement, clients will be required to sign a User Agreement, also included in the Training Guide, attesting to their understanding and acceptance of this limited arrangement and agreeing that they are joining AJM in its mission of increasing access to justice. The Agreement provides the clients with information about how to proactively contact AJM to report any misconduct or bad advice by a Justice Advocate. *See* Training Guide, Ex. B – User Agreement. AJM will also track all advice-giving encounters and will communicate with clients to confirm that the advice they received was helpful, accurate, and followed the strict requirements AJM imposes on Justice Advocates.

69.    Specifically, as the Training Guide describes, Plaintiffs have adopted a series of protections to minimize the risk of unreliable or unethical advice and ensure that all advice being provided is in the best interest of the clients, including but not limited to:

- Justice Advocates must successfully complete a training program provided by AJM explaining the Training Guide in order to be certified by AJM to provide legal advice.

- Justice Advocates must provide all advice for free and for the purpose of increasing access to justice, thereby avoiding the risk of any conflict-of-interest resulting from the possibility of compensation.

- All advice must be truthful, non-misleading, and provided in good faith.

- Justice Advocates must provide all advice only within the scope of the Training Guide that AJM has prepared and has vetted with attorney experts to ensure that all advice is in the client's best interest.

- Justice Advocates must clearly disclose and require clients to acknowledge the limited scope of the legal advice being provided and that Justice Advocates are not attorneys. Where a Justice Advocate is unable to advise a client, they must direct the client to alternative resources.

● Justice Advocates must adhere to the exact same confidentiality and conflict-of-interest restrictions that New York State imposes on lawyers providing pro bono services.

● AJM will closely monitor the conduct and behavior of Justice Advocates, including by tracking each client encounter and contacting clients to confirm that the advice they received was fully consistent with the strict guidance required by AJM's training materials.

● To the extent Justice Advocates are acting outside the scope of AJM's program or not strictly adhering to AJM's guidelines, AJM will sever ties with noncompliant Justice Advocates and, as necessary, refer them to government authorities for further investigation.

70.    AJM encourages clients to contact AJM about any misbehavior or deviation from these standards by Justice Advocates. AJM commits to investigating any complaints and, if necessary, removing Justice Advocates from the program. AJM also plans to track every interaction between a Justice Advocate and a client and to follow up with clients to confirm that the service provided was consistent with the terms AJM requires. As part of its preparations to launch AJM, Upsolve has already created web-based forms for both of these purposes.[20]

71.    AJM warns Justice Advocates that providing legal advice outside the narrow scope and strict terms of the program may expose them to prosecution for engaging in the unauthorized practice of law or under other fraud or consumer-protection laws, like N.Y. Gen. Bus. Law §§ 349, 350, which impose liability for "[d]eceptive acts or practices in the conduct of any business" and could potentially be used to prosecute false, misleading, or bad faith advice.

72.    Multiple third-party experts have reviewed the program and Training Guide and determined that AJM's clients will receive a substantial benefit from free legal advice from a Justice Advocate, and will be better off than they would have been had they received no advice at

---

[20] *See* Tracking Form, https://www.americanjusticemovement.org /tracking-form (last visited Jan. 20, 2022); Complaint Form, https://www.americanjusticemovement.org/complaint-form (last visited Jan. 20, 2022).

all and been forced to go it alone. As Professor Pamela Foohey explains: "Given the limited resources available to unrepresented individuals in debt collection proceedings, particularly during the continuing COVID-19 pandemic, when debt collection proceedings are predicted to increase, allowing individuals who are not lawyers to provide carefully tailored and circumscribed assistance will significantly enhance low-income New Yorkers' ability to assert their legal rights in court."[21]

73.    AJM gives life to recent recommendations by the American Academy of Arts & Sciences, the American Bar Association, and other leading groups that have "endorsed the expanded use of trained, supervised individuals," sometimes called "justice advocates," who lack full "formal legal education" but are nonetheless trained "to help people who would otherwise receive no legal assistance."[22]

74.    A number of successful programs already exist in a variety of states and in the federal system that allow professionals who are not lawyers to provide meaningful legal assistance within the civil justice system.[23]

75.    For example, a number of states, like Arizona and Utah, are developing licensing regimes for legal paraprofessionals.[24] Additionally, advocates who are not lawyers are allowed to

---

[21] Professor Foohey's declaration is attached to the Silbert Declaration in Support of the Motion for a Preliminary Injunction as Exhibit 4 ("Foohey Decl."). *See* Foohey Decl. ¶ 12.

[22] Am. Acad. of Arts & Scis., *Civil Justice for All*, at 15 (2020), https://www.amacad.org/sites/default/files/publication/downloads/2020-Civil-Justice-for-All_0.pdf; *see id.* at 15 & 47 nn. 44–45 (collecting sources); *also* ABA Report at 16, 40–41.

[23] *See id.* at 17 ("Some nonlawyer advocates already perform well-defined roles in civil justice.").

[24] *See* Ariz. Sup. Ct., *Arizona Supreme Court Makes Generational Advance in Access to Justice* (Aug. 27, 2020), https://www.azcourts.gov/Portals/201/Press%20Releases/2020Releases/082720 RulesAgenda.pdf; Utah Cts., *Licensed Paralegal Practitioners*, https://www.utcourts.gov/legal/lpp/index.html (last modified Feb. 6, 2021).

practice in a limited capacity in various federal forums, like "[A]ccredited [R]epresentatives" who may represent people in federal immigration proceedings, and other professionals who are not lawyers are empowered to represent claimants seeking Social Security disability benefits.[25]

76.     New York State itself allows qualified individuals who are not lawyers to practice before the New York State Workers' Compensation Board, provided they have "competent knowledge of the [relevant] law" and pass a written examination and participate in an orientation program.[26]

77.     New York nonetheless continues to prohibit similarly situated professionals with similar training and supervision from providing straightforward legal advice when it comes to advising on how to respond to a debt collection action, including advising people on how to responding using New York's own form.

**IV.     Plaintiffs are ready, willing, and able to implement this program.**

78.     Plaintiffs Upsolve and Rev. John Udo-Okon are prepared to launch AJM to help low-income New Yorkers understand and access their legal rights in debt collection proceedings.

79.     Upsolve is well situated to create and administer AJM and to recruit, train, and supervise Justice Advocates to provide free, narrow, and reliable legal advice to individuals facing debt collection actions.

80.     Upsolve's mission and activities as an organization are rooted in advocating for systemic change in America's legal and financial systems. Over the past five years, Upsolve's political advocacy has materialized in policy proposals, op-eds, speeches, conference and panel

---

[25] *See* 8 C.F.R. § 1292.1; 20 C.F.R. § 404.1705.

[26] *See* N.Y. Comp. Codes R. & Regs. tit 12, §§ 302-1.1– 302-1.4, 302-1.11.

presentations, media outreach, and conversations with elected officials, Bar Associations, judges, legal scholars, and state agencies.

81.    Upsolve and its co-founder and Chief Executive Officer, Rohan Pavuluri, have been widely lauded, including by the *New York Times*, the *Wall Street Journal*, and the *Washington Post*. Mr. Pavuluri's TED Talk discussing the access to justice crisis and Upsolve's work has been viewed more than 1.4 million times.

82.    Upsolve has already invested the time and resources to design AJM, prepare the Training Guide, consult with subject-matter experts to ensure that the advice provided is in the public interest, and recruit potential Justice Advocates, including Plaintiff Rev. Udo-Okon. Upsolve has secured funding to finance AJM and stands ready to implement the program immediately.

83.    Plaintiff Rev. John Udo-Okon is a pastor in the South Bronx who is ready and willing to serve as an AJM Justice Advocate. He believes that he can preach the gospel by providing various services to community members. Rev. Udo-Okon has witnessed firsthand the need for greater access to legal rights in his community.

84.    Members of Rev. Udo-Okon's community face many legal problems, including harassing calls from debt collectors. However, community members typically cannot afford to hire a lawyer to help them respond to debt collection actions, and doing so is too complicated and intimidating for individuals on their own.

85.    As a result, many individuals seek out Rev. Udo-Okon for assistance with their legal problems. However, Rev. Udo-Okon is not a lawyer. He knows that New York makes it unlawful for him to provide legal advice, so the only option that remains is to refer these individuals to outside agencies, which are more often than not overwhelmed with requests for free

legal assistance. Members of Rev. Udo-Okon's community are frequently put on long waiting lists before even getting the opportunity to receive legal advice, even though their situations can be quite time sensitive. The wait alone can result in losing the ability to access their rights.

86.     Through conversations with members of his community, Rev. Udo-Okon has learned that many of them are being regularly harassed by debt collectors. In some cases, they believe they do not owe the debts that are being demanded. Some people have lost their homes and had their credit scores damaged as a result of their failure to properly respond to these lawsuits, regardless of their merit.

87.     Rev. Udo-Okon is acutely aware of the urgency for a project like AJM in his community. Following a recent town hall meeting, more than one hundred community members signed a petition asserting that they want to receive this kind of advice from Rev. Udo-Okon. That response indicates both the size of the demand and that Rev. Udo-Okon could immediately begin helping people access the justice system as a Justice Advocate, if doing so were lawful.

## V.     The only barrier to Plaintiffs providing and receiving this critical service is the threat of civil sanction and criminal prosecution under New York's UPL rules.

88.     The only thing preventing Upsolve and Justice Advocates from associating and providing free legal advice under AJM, in furtherance of increasing their clients' access to courts and the justice system, is the threat of prosecution under New York's UPL rules.

89.     A number of statutes and rules governing the practice of law make it a crime and civilly sanctionable to engage in, solicit, or aid in the unauthorized practice of law. *See* N.Y. Jud. Law §§ 476-a, 478, 484, 485, 750, 753; *see also* N.Y. Penal Law § 20.00 (imposing criminal liability for "solicit[ing], request[ing] . . . . or intentionally aid[ing]" in unlawful conduct).

90.    The assistance AJM seeks to provide would violate New York's UPL rules, because it would involve providing individualized legal advice about whether and how to respond to ongoing litigation (and advertising that assistance to potential advisees).

91.    The risk of prosecution under these rules is acute because New York's UPL rules are vigorously enforced.

92.    As a result, as soon as AJM launches, Upsolve, Rev. Udo-Okon, potential clients, and any other individuals who aid in this project would face the risk of criminal and civil prosecution for engaging in the unauthorized practice of law. This risk is chilling Upsolve from launching the program. Indeed, the only thing stopping Rev. Udo-Okon from associating with Upsolve and providing this legal advice is the threat of being prosecuted for violating New York's UPL rules.

93.    The low-income New Yorkers who would receive Rev. Udo-Okon's and other future Justice Advocates' advice are also in a bind. They cannot afford a paid lawyer and cannot find free counsel, but if they solicit this kind of advice from a non-lawyer they face the risk of prosecution, and they do not know how to go it alone. Without legal help, they are likely to default and face the risk of wrongful deprivation of their property and significant follow-on harms.

94.    The experts who reviewed and endorsed the Training Guide limited the scope of their review "[i]n part," as Professor Foohey explained, "to avoid any possibility of liability under rules governing the unauthorized practice of law." This illustrates that industry experts likewise fear prosecution under UPL rules. Foohey Decl. ¶ 11.

95.    But applying New York's UPL rules to bar Plaintiffs' advocacy and expressive association violates Plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution.

96.     *First*, application of the UPL rules here would trigger strict scrutiny. The Supreme Court has held that "collective activity undertaken to obtain meaningful access to the courts"— just like the activity Plaintiffs plan to undertake—"is a fundamental right within the protection of the First Amendment['s]" guarantee of the Freedom of Association. *In re Primus*, 436 U.S. 412, 426 (1978) (quoting *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585 (1971)).

97.     Furthermore, application of New York's UPL rules triggers strict scrutiny under the First Amendment's protection of Free Speech. "Above all else, the First Amendment means that government generally has no power to restrict expression"—or the hearing of that expression—"because of its message, its ideas, its subject matter, or its content." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (quoting *Police Dep't. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)) (internal quotation marks omitted). And application of the UPL rules here is content-based, because it depends on the content of speech and in particular whether it includes individualized advice about whether and how to respond to a debt collection action.

98.     *Second*, application of the challenged rules to Plaintiffs cannot survive First Amendment scrutiny.

99.     Application of the UPL rules in this context has the effect of preventing many low-income New Yorkers from receiving advice that would help them avoid the risk of wrongfully losing their property (and more), even where, as here, trained professionals who are not lawyers are already embedded in low-income communities and are acting in the public interest to provide truthful, free, and carefully circumscribed legal advice on terms that mirror those on which pro bono lawyers may provide similar advice.

100.     The application of the UPL rules to Plaintiffs is particularly unjustified because the American Justice Movement will advance the very interests underlying the rules. New York's UPL

rules are designed to protect consumers from the risk of unreliable or unscrupulous representation and thereby increase public faith in the justice system. These rules serve these salutary aims in many applications.

101.    By providing free, reliable, and helpful information about how low-income New Yorkers can access their legal rights, Plaintiffs seek to protect consumers and help to bolster faith in the justice system and thereby avoid the significant harm that currently results from low-income New Yorkers' inability to understand and access their legal rights. Far from undermining the State's interest, Plaintiffs seek to help New Yorkers fill out a form that the state itself has provided, confirming the state's own recognition of the significance of responding to debt collection actions and the need to support the many defendants who currently are unable to do so. By doing so, Plaintiffs hope to help ensure that every low-income New Yorker is able to access and exercise their legal rights and avoid paying a debt they do not owe or that a plaintiff has no right to collect.

102.    Plaintiffs accordingly bring this action to vindicate those rights and ensure that no more Americans will be deprived of their property and their civil rights due to the lack of free assistance to help them access and vindicate those rights.

## CAUSES OF ACTION

### COUNT ONE

### 42 U.S.C. § 1983: Violation of the Freedom of Speech

103.    Plaintiffs repeat and allege paragraphs 1–102 as if fully set forth herein.

104.    The First Amendment's protection of Free Speech protects Plaintiffs' activity against the application of New York's UPL rules because the government "generally has no power to restrict expression"—or the hearing of that expression—"because of its message, its ideas, its subject matter, or its content." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335,

2346 (2020) (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)) (internal quotation marks omitted).

105.   New York's UPL rules, as applied to Plaintiffs, punish Plaintiffs' truthful, non-commercial, and non-misleading speech on the basis of its content.

106.   New York's UPL rules, as applied to Plaintiffs, cannot satisfy strict scrutiny because they are not narrowly tailored to a compelling government interest. Nor can they satisfy any lesser level of scrutiny that might apply. To the contrary, Plaintiffs' carefully designed program to provide free, reliable, truthful, and non-misleading legal advice to low-income New Yorkers advances the State's interests in consumer protection and preserving the integrity of the legal system that underlie the UPL rules.

107.   In implementing and enforcing the UPL rules against Plaintiffs, Defendant is, under color of state law, depriving Plaintiffs of their constitutional rights.

## COUNT TWO

### 42 U.S.C. § 1983: Violation of the Freedom of Association

108.   Plaintiffs repeat and allege paragraphs 1–107 as if fully set forth herein.

109.   The Supreme Court has held that "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment" to the United States Constitution. *In re Primus*, 436 U.S. 412, 426 (1978) (quoting *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585 (1971)).

110.   New York's UPL rules, as applied to Plaintiffs, would prevent Plaintiffs from associating to engage in collective activity for the purposes of expressing their personal beliefs in access to justice and ensuring that low-income New Yorkers can access their rights to be heard in court.

111.    New York's UPL rules, as applied to Plaintiffs, cannot satisfy strict scrutiny because they are not narrowly tailored to a compelling government interest. To the contrary, Plaintiffs' carefully designed program to provide free, reliable, truthful, and non-misleading legal advice to low-income New Yorkers advances the State's interests in consumer protection and preserves the integrity of the legal system that underlie the UPL rules.

112.    In implementing and enforcing the UPL rules against Plaintiffs, Defendant is, under color of state law, depriving Plaintiffs of their constitutional rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and grant the following relief:

A.    A declaration that application of New York's UPL rules to Plaintiffs' truthful, non-misleading, and good faith legal advice provided through the American Justice Movement would violate Plaintiffs' protected rights under the First and Fourteenth Amendments of the United States Constitution;

B.    A preliminary and permanent injunction enjoining Defendants and other state agencies— as well as their agents, offices, and employees—from taking any action that would interfere with Plaintiffs' intended activities.

C.    Nominal damages of $1.00 to remedy the past violation of Plaintiffs' constitutional rights.

D.    An award of Plaintiffs their reasonable costs, litigation expenses, and attorney's fees associated with this litigation pursuant to 42 U.S.C. § 1988; and

E.    Any other relief the Court deems just and proper.

Dated: New York, New York                     WEIL, GOTSHAL & MANGES LLP
       January 25, 2022

                                              _/s/ Gregory Silbert_____
                                              Gregory Silbert
                                              Robert B. Niles-Weed
                                              Elena De Santis
                                              WEIL, GOTSHAL & MANGES LLP
                                              767 Fifth Avenue
                                              New York, New York 10153
                                              (212) 310-8000

Zachary D. Tripp*
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW
Washington, DC 20036
(202) 682-7000

*_Pro hac vice_ motion forthcoming

_Counsel for Plaintiffs_