**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| UPSOLVE, INC. and REV. JOHN UDO-OKON, |
| Plaintiffs, |
| -v- |
| LETITIA JAMES, in her official capacity as Attorney General of the State of New York, |
| Defendant. |

Case No. _____


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**


WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Attorneys for Plaintiffs*


January 25, 2022

## TABLE OF CONTENTS

Page

**Contents**

Preliminary Statement ........................................................................................... 1

Background ........................................................................................................... 3

I.  A limited supply of affordable legal assistance prevents low-income New Yorkers
from understanding their legal rights and causes widespread harm ................................ 3

II.  Plaintiffs are prepared to provide free, narrowly circumscribed legal advice on
whether and how to respond to debt collection lawsuits ..................................................... 5

III.  New York's vigorously enforced UPL rules are the only barrier to Plaintiffs
providing this advice ............................................................................................ 7

Jurisdiction ........................................................................................................... 9

Argument ............................................................................................................. 9

I.  Plaintiffs are likely to succeed on the merits ...................................................... 9

    A.  The First Amendment's protections of speech and association demand that
the UPL rules, as applied to Plaintiffs' activity, must satisfy strict scrutiny ........ 10

        1.  The First Amendment protects Plaintiffs' truthful and non-
misleading speech ................................................................................. 10

        2.  The First Amendment protects Plaintiffs' right to associate to
provide free, carefully circumscribed legal advice for the purpose
of increasing access to the courts ........................................................... 12

    B.  The application of the UPL rules to Plaintiffs cannot survive heightened
scrutiny .................................................................................................. 16

II.  The remaining preliminary injunction factors support an injunction ............................... 19

Conclusion ........................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Ashcroft*,
    322 F.3d 240 (3d Cir. 2003)................................................................................20

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
    141 S. Ct. 2485 (2021) (per curiam)..................................................................20

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
    140 S. Ct. 2335 (2020)........................................................................................10

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
    492 U.S. 469 (1989)............................................................................................11

*Boddie v. Connecticut*,
    401 U.S. 371 (1971)............................................................................................15

*Brotherhood of R.R. Trainmen v. Virginia. ex rel. Va. State Bar*,
    377 U.S. 1 (1964)................................................................................................13

*Cap. Associated Indus., Inc. v. Stein*,
    922 F.3d 198 (4th Cir. 2019) ........................................................................14, 15

*El Gemayel v. Seaman*,
    72 N.Y.2d 701 (1988) .......................................................................................8, 18

*Elrod v. Burns*,
    427 U.S. 347 (1976)............................................................................................19

*Faretta v. California*,
    422 U.S. 806 (1975)............................................................................................18

*Jacoby & Meyers, LLP v. Presiding Justices of First, Second, Third, and Fourth
Dep't, Appellate Div. of Supreme Court of N.Y.*,
    852 F.3d 178 (2d Cir. 2017)..........................................................12, 13, 14, 15, 16

*Kraham v. Lippman*,
    478 F.3d 502 (2d Cir. 2007)...............................................................................16

*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001)............................................................................................11

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803).............................................................................20

*In re N.H. Disabilities Rights Ctr., Inc.*,
    130 N.H. 328 (1988) ..................................................................................................14, 15

*Matter of N.Y. Cnty. Lawyers Ass'n v. Dacey*,
    28 A.D.2d 161 (N.Y. App. Div. First Dep't 1967) ....................................................8

*NAACP v. Button*,
    371 U.S. 415 (1963) ........................................................................................12, 13, 19

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018) ...............................................................................................16

*Nat'l Org. for Marriage, Inc. v. Walsh*,
    714 F.3d 682 (2d Cir. 2013) .........................................................................................9

*N.Y. Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013).........................................................................9, 10, 19, 20

*Ohio State Bar Ass'n v. Watkins Glob. Network, L.L.C.*,
    159 Ohio St. 3d 241 (2020)........................................................................................18

*Ohralik v. Ohio State Bar Ass'n*,
    436 U.S. 447 (1978)............................................................................................11, 13

*People v. Alfani*,
    227 N.Y. 334 (1919) ...................................................................................................8

*Police Dep't of Chicago v. Mosley*,
    408 U.S. 92 (1972) ....................................................................................................10

*In re Primus*,
    436 U.S. 412 (1978)........................................................................................12, 13, 15

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)....................................................................................................10

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984)....................................................................................................12

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020) (per curiam) .............................................................................19

*Matter of Rowe*,
    80 N.Y.2d 336 (1992) ...............................................................................................8, 9

*Sure-Tan, Inc. v. NLRB*,
    467 U.S. 883 (1984)....................................................................................................15

*Turner v. Rogers*,
    564 U.S. 431 (2011) ................................................................................................15

*United Mine Workers, Dist. 12 v. Illinois State Bar Ass'n*,
    389 U.S. 217 (1967) ................................................................................................13

*United Transp. Union v. State Bar of Mich.*,
    401 U.S. 576 (1971) ..........................................................................................12, 13

*Vt. Right to Life Comm., Inc. v. Sorrell*,
    221 F.3d 376 (2d Cir. 2000) .....................................................................................9

*Williams-Yulee v. Florida Bar*,
    575 U.S. 433 (2015) ................................................................................................19

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .....................................................................................................9

**Statutes**

28 U.S.C. § 1331 ...............................................................................................................9

28 U.S.C. §1343 ................................................................................................................9

28 U.S.C. § 2201(a) ..........................................................................................................9

N.Y. Jud. Law § 476-a .....................................................................................................8

N.Y. Jud. Law § 478 .........................................................................................................8

N.Y. Jud. Law § 484 .........................................................................................................8

N.Y. Jud. Law § 485 .........................................................................................................8

N.Y. Jud. Law § 750 .........................................................................................................8

N.Y. Jud. Law § 753 .........................................................................................................8

N.Y. Penal Law § 20.00 ....................................................................................................8

**Other Authorities**

6A N.Y. Jur. 2d, Attorneys at Law § 54 ..........................................................................8

Br. Of Appellees, *Jacoby & Meyers*, No. 15-2608, 2016 WL 692945 (2d Cir. Feb.
    18, 2016) ................................................................................................................14

Neil Gorsuch, *A Republic, If You Can Keep It* 257 (2019) .............................................4

Letitia James, *Attorney General James Urges Consumers to Be Aware of Rights When Faced with Attempts to Collect on Consumer Debt* (Dec. 1, 2021)........................16, 17

1 F. Pollock & F. Maitland, The History of English Law (2d ed. 1909) .......................................18

Lauren Sudeall, *The Overreach of Limits on "Legal Advice"*, 131 Yale L.J.F. 637 (2022)...............................................................................................................................................17

## PRELIMINARY STATEMENT

Plaintiffs are seeking to fight a serious problem: many low-income New Yorkers are unable to understand and access their civil legal rights when they face a debt collection lawsuit and as a result many suffer wrongful deprivation of property and serious downstream consequences. New York State itself has recognized that responding to such a lawsuit is both straightforward and important, as New York State provides a one-page fill-in-the-blank form for doing so. But many defendants still cannot and do not answer without legal assistance. The vast majority of debt collection defendants are low-income individuals who cannot afford a lawyer, and pro bono advice is in too short supply. As a result, the large majority of debt collection defendants are left to fend for themselves and fail to respond, thus leading to entry of a default judgment, even when they might have asserted an affirmative defense that could have prevented the wrongful deprivation of their property. This access to justice gap is well-documented, disproportionately harms low-income individuals and people of color, and is exacerbated by the COVID-19 pandemic.

Plaintiff Upsolve is a non-profit organization that has designed a program called the American Justice Movement to help close this access to justice gap by associating with individuals who are not lawyers—like Plaintiff Rev. John Udo-Okon—to provide narrowly-circumscribed and valuable advice about how to respond to a debt collection action. The aim of this expressive association is to fight the cycle of poverty and make the guarantee of equal justice under law a reality for individuals who risk losing their property because they lack the resources to understand and access their legal rights.

Third-party experts on consumer protection and debt collection have reviewed the program and determined that clients will receive substantial benefits at no cost and will benefit from many important protections in the program. Among these protections are that: (1) all advice will be strictly limited to advising low-income New Yorkers on whether and how to fill out and file the

state-provided debt collection lawsuit answer form; (2) all advice will be provided for free with no expectation of private commercial gain; (3) all advice-givers, called "Justice Advocates," will be carefully vetted, trained, and supervised by Upsolve; (4) Justice Advocates will provide advice only pursuant to the terms of a strict, expert-approved "Training Guide;" (5) Justice Advocates will provide robust disclosures to clients about the nature of their service and will abide by conflict-of-interest and confidentiality restrictions; and (6) Upsolve will monitor the Justice Advocates' performance and remove Justice Advocates who do not follow the program's strict rules or live up to its consumer-protective values.

Plaintiffs are chilled from engaging in this important advocacy and association, however, because New York's rules governing the unauthorized practice of law ("UPL") prohibit individuals who are not lawyers from providing individualized advice about whether or how to respond to a lawsuit, even when that advice is straightforward and simply involves assisting a person in filling out and filing a state-provided form to answer a complaint. The effect of applying these rules to Plaintiffs is to deny low-income New Yorkers the ability to understand and access their legal rights and deny Plaintiffs their constitutional rights to advocate and associate. Moreover, without such advice, more debt collection defendants will default, depriving courts of the chance to subject such claims to testing and undermining public perception of the justice system.

At bottom, barring Plaintiffs from implementing AJM will frustrate the very interests the UPL rules are meant to advance. Plaintiffs have carefully designed their program to ensure that clients will receive substantial benefits at no cost and will be better off with the benefit of the free, limited assistance that Plaintiffs would provide than they would be were they forced to represent themselves. Allowing Plaintiffs to provide this narrow, non-commercial, non-misleading, and free legal advice would empower low-income New Yorkers to assert their rights and enable courts to

properly exercise their judicial power, thereby advancing consumer protection and strengthening the integrity of New York State's legal system and the public's perception of it. This Court should enter a preliminary injunction to enable Plaintiffs to put this program into operation.

## BACKGROUND

### I.  A LIMITED SUPPLY OF AFFORDABLE LEGAL ASSISTANCE PREVENTS LOW-INCOME NEW YORKERS FROM UNDERSTANDING THEIR LEGAL RIGHTS AND CAUSES WIDESPREAD HARM.

Debt collection actions are among the most common kinds of lawsuits in New York's courts. When low-income New Yorkers face a debt collection action, however, they often cannot afford to hire a lawyer and free lawyers are often unavailable. *See* Compl. ¶¶ 26, 43–48. As a result, such low-income New Yorkers often have no choice but to go it alone. In practice, without legal advice, ordinary individuals simply fail to respond, even when they have potentially meritorious defenses to liability. *See id.* ¶ 2. Indeed, self-represented debt collection defendants face default judgments at overwhelming rates. *See id.* ¶¶ 2, 19.

Research has shown that many such suits lack merit or seek the wrong amount of money, meaning that many defendants are wrongfully deprived of property without ever having their day in court. *See id.* ¶¶ 21, 32. And the consequences of this wrongful deprivation of property extend further than the initial debt, as a default judgment can cause lasting harm to an individual's credit score and result in bank account seizure, wage garnishment, automobile repossession, or eviction—thereby undermining low-income New Yorkers' ability to participate fully in the state's economy. *See id.* ¶ 24. As declarations from New Yorkers who have suffered default judgments illustrate, the consequences of such a default can be severe and long-lasting. *See* Exs. 5–7 (declarations of William Evertsen, Liz Jurado, and Christopher Lepre)[1]; Compl. ¶ 25.

---

[1] Exhibits cited herein are attached to the Silbert Declaration in Support of the Motion for a Preliminary Injunction.

Leading institutions have proposed a variety of solutions to the inadequate supply of individualized legal assistance. Recently, the American Academy of Arts and Sciences released a report advocating for increased opportunities for professionals who are not lawyers—"Justice Advocates"—to provide carefully circumscribed legal assistance. *See* Compl. ¶ 73. In doing so, the Academy recognized that a variety of states and federal agencies had successfully experimented with non-lawyer advocacy. *See id.* ¶¶ 73–74. As Justice Neil Gorsuch put it, "nonlawyers already perform—and have long performed—many kinds of work traditionally and simultaneously performed by lawyers," making it "entirely unclear why exceptions should exist to help [] niche (and, some might say, financially capable) populations but not be expanded in ways more consciously aimed at serving larger numbers of lower- and middle-class clients." Neil Gorsuch, *A Republic, If You Can Keep It* 257 (2019); *see id.* (finding it "well past time to reconsider our sweeping unauthorized practice of law prohibitions")*.*

New York State itself recognizes the problem of default judgments in debt collection actions, as it provides a simple one-page form for responding to such cases. *See* Compl. ¶¶ 2, 34–36. The form includes a number of labeled checkboxes allowing defendants to select affirmative defenses, such as, "I had no business dealings with Plaintiff (Plaintiff lacks standing)" or "Unconscionability (the contract is unfair)." *See* Compl. Ex. A. But the form is insufficient. Even with it, low-income New Yorkers face language and educational barriers and may be unfamiliar with or intimidated by the legal system and the legal concepts mentioned in the form. *See* Compl. ¶¶ 37–42. Without legal assistance, they fail to respond or respond inaccurately. *Id.* ¶ 38. The rate of default remains sky high.

Whereas debt collection defendants are typically unrepresented and fail to appear, debt collection plaintiffs are often repeat players who can benefit from economies of scale to bring

many such suits at low cost, making it economical to pursue even small-dollar claims. *Id.* ¶¶ 49–52. The high rate of default also reduces the incentive for plaintiffs to carefully develop cases, as the large majority of such claims are never subjected to adversarial testing. *See id.* ¶ 51. The access to justice gap is thus severe and pervasive.

## II.   PLAINTIFFS ARE PREPARED TO PROVIDE FREE, NARROWLY CIRCUMSCRIBED LEGAL ADVICE ON WHETHER AND HOW TO RESPOND TO DEBT COLLECTION LAWSUITS.

Plaintiffs have developed a program to help close this gap by empowering non-profit professionals already embedded in low-income communities to provide free, narrowly circumscribed, and straightforward legal advice about whether and how to respond to a debt collection lawsuit. Plaintiffs have carefully limited the program's scope and imposed strict requirements to minimize the risk of bad advice. Plaintiffs are associating in this common cause with a common goal: to express their belief in free and fair access to the courts and fight the cycle of poverty by ensuring that all Americans can understand and access their civil legal rights. *Id.* ¶ 3.

Plaintiff Upsolve is a non-profit organization with a mission and successful track record of helping Americans access their legal rights for free and engaging in widespread education and advocacy aimed at expanding access to justice. Upsolve has advocated for systemic changes to the American legal and financial systems that directly improve people's lives by developing policy proposals; communicating Upsolve's policy agenda with elected officials, judges, bar associations, and legal scholars; publishing op-eds; giving speeches, panel presentations, and appearing at conferences; developing a robust technology platform for self-represented individuals filing for personal bankruptcy; and expanding public awareness through community education and outreach, social media engagement, and earned media appearances. *See id.* ¶ 80.

Upsolve designed and is prepared to launch the American Justice Movement ("AJM"), a project designed to recruit and train non-profit professionals who are not lawyers—Justice

Advocates—to provide free advice to low-income Americans in their communities facing debt collection lawsuits and in need of assistance. *See id.* ¶¶ 57–58, 78–79.  Upsolve has committed its own resources to developing AJM and has secured a financial grant to support the program, which will allow it to fund a staff member to vet, train, and supervise Justice Advocates. *See id.* ¶ 82.

AJM has prepared a detailed Training Guide in consultation with experts in consumer finance and debt collection law to dictate to Justice Advocates how to provide free, narrow, and straightforward legal advice within a framework with robust guardrails to protect clients from risk of harm. *See id.* ¶¶ 63–69. Both Professor Pamela Foohey—an expert in commercial law and consumer law at Benjamin N. Cardozo School of Law—and Mr. Tashi Lhewa—Supervising Attorney of the Legal Aid Society's Consumer Law Project—reviewed the Training Guide and confirmed that advice provided pursuant to the guide will be in clients' best interests. *See.* Ex. 4 (Foohey Declaration); Ex. 3 (Lhewa Declaration).

AJM's Training Guide prescribes strict criteria to which Justice Advocates and their clients must adhere. *See* Compl. Ex. B. Justice Advocates may advise only on the narrow question of whether and how to respond to a debt collection action; where a client's needs exceed this mandate, Justice Advocates must direct them to alternative sources of assistance. AJM requires that all advice be provided for free and in service of the mission to increase access to justice; that all advice remain within the narrow scope of issues described in the Training Guide; that Justice Advocates clearly disclose and secure acknowledgement from their clients of the limited nature of the advice being provided; and that Justice Advocates adhere to the conflicts-of-interest and confidentiality standards that apply to New York lawyers doing pro bono work. *See* Compl. ¶¶ 62, 67–69. AJM will use a web-form to track every advice-giving encounter and routinely follow up with clients to ensure that the advice they received was fully consistent with the program's strict guidelines and

limited scope. AJM also encourages clients to contact AJM directly about any misbehavior or deviation from these standards by Justice Advocates. AJM commits to investigating these complaints and, if necessary, removing Justice Advocates from the program. *See id.* ¶¶ 68–70.

AJM warns Justice Advocates that providing legal advice outside the narrow scope and strict terms of the program may expose them to prosecution for engaging in the unauthorized practice of law or under other state and federal consumer-protection laws. *See id.* ¶ 71. Justice Advocates providing false, misleading, or bad faith advice will thus not be operating under the auspices of AJM and can be prosecuted for their misconduct.

Plaintiff Rev. John Udo-Okon is committed to serve as a Justice Advocate with AJM. He is a pastor in the South Bronx who believes in preaching the gospel by providing social services to his disproportionately Black and poor community. *See id.* ¶ 83. As described in his declaration, Rev. Udo-Okon attests that he is ready and willing to act as an AJM Justice Advocate and provide free legal advice on responding to debt collection actions to members of his community with the goal of expanding access to the courts and ensuring that all members of his community can access their legal rights. *See* Ex. 2 (declaration of Rev. Udo-Okon). Rev. Udo-Okon further asserts that the need for such advice is urgent and exacerbated by the COVID-19 pandemic: after a recent town hall meeting, more than one hundred community members signed a petition asserting that they want to receive this kind of advice from Rev. Udo-Okon. *See id.*; Ex. 2A (attaching the petition). He thus could provide valuable, important, and free legal advice to his community under the American Justice Movement starting immediately.

## III. NEW YORK'S VIGOROUSLY ENFORCED UPL RULES ARE THE ONLY BARRIER TO PLAINTIFFS PROVIDING THIS ADVICE.

Plaintiffs are chilled from providing advice through AJM, however, because of the threat of prosecution under New York's UPL rules. *See* Ex. 1, Pavuluri Decl. ¶¶ 32–33; Ex. 2, Udo-Okon

Decl. ¶ 21. New York makes it a misdemeanor and civilly sanctionable for an individual not admitted to the bar to engage in the "unlawful practice of law" or to hold herself out as able to do so, and for a person to seek or assist in the providing of such legal advice. *See* N.Y. Jud. Law §§ 476-a, 478, 484, 485, 750, 753 (proscribing the unauthorized practice of law and providing for the enforcement of this prohibition); *see also* N.Y. Penal Law § 20.00 (imposing criminal liability for "solicit[ing], request[ing] . . . or intentionally aid[ing]" in unlawful conduct). "A person is practicing law when the person gives legal advice, drafts legal documents, or otherwise holds himself or herself out as authorized to practice law in New York State." 6A N.Y. Jur. 2d, Attorneys at Law § 54 (footnotes omitted); *see id.* (collecting cases). In particular, "[t]he practice of law involves the rendering of legal advice and opinions directed to particular clients." *Matter of Rowe*, 80 N.Y.2d 336, 341–42 (1992); *see generally Matter of N.Y. Cnty. Lawyers Ass'n v. Dacey*, 28 A.D.2d 161, 174–76 (N.Y. App. Div. First Dep't 1967) (Stevens, J., dissenting opinion, *adopted as the opinion of the New York Court of Appeals*, 21 N.Y.2d 694).

The purposes of New York's UPL rules are "to protect the public in this State from the dangers of legal representation and advice given by persons not trained, examined and licensed for such work" and thereby protect the integrity and public perception of the judicial system. *El Gemayel v. Seaman*, 72 N.Y.2d 701, 705 (1988) (citation omitted); *see also People v. Alfani*, 227 N.Y. 334, 339 (1919) (UPL rules aim to "protect the public from ignorance, inexperience, and unscrupulousness" in the conduct of legal affairs).

Plaintiffs' intended conduct—namely, providing free, individualized legal advice on whether and how to respond to a lawsuit—constitutes the practice of law under New York law. Although the advice they would give is straightforward, truthful, and narrow, Plaintiffs seek to render particularized advice to specific clients on whether and how to respond to debt collection

lawsuits. This type of direct and individualized advice about how to respond to a lawsuit constitutes the practice of law under New York law, without regard to how straightforward, truthful, or careful the advice is, or whether it is free. *See, e.g.*, *Matter of Rowe*, 80 N.Y.2d at 341–42. New York's UPL rules also prevent Plaintiffs from speaking out to advertise the free legal advice they hope to provide or soliciting, aiding, or abetting others who would provide such advice. *See supra* at 7–8.

As the declarations from Rohan Pavuluri, Upsolve's Co-Founder and Chief Executive Officer, and Rev. Udo-Okon attest, the fear of prosecution under New York's UPL rules is the only thing stopping Plaintiffs from implementing AJM. *See* Ex. 1, Pavuluri Decl. ¶¶ 32–33; Ex. 2, Udo-Okon Decl. ¶ 21. The UPL rules chill Plaintiffs' intended communication and association.

## JURISDICTION

This Court has jurisdiction because Plaintiffs' claims raise federal questions under 28 U.S.C. §§ 1331 and 1343. *See also* 28 U.S.C. § 2201(a) (authorizing declaratory relief). Plaintiffs' claims are ripe for review, as they have "alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013) (quoting *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000)).

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). All four factors weigh in favor of an injunction here.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

"[I]n the First Amendment context[,] the likelihood of success on the merits is the

dominant, if not the dispositive, factor." *Id.* at 488. Here, Plaintiffs are likely to prevail in proving that their First Amendment speech and association rights bar the application of New York's UPL rules.

To be clear, Plaintiffs do not seek facial invalidation of New York's UPL rules, nor do Plaintiffs seek to prevent application of such rules where they serve their intended purposes of helping to protect the public. Rather, Plaintiffs seek only a ruling that New York's UPL rules violate the Constitution as applied to Plaintiffs' plan to provide free, truthful, non-misleading, and carefully circumscribed legal advice through AJM for the purpose of resolving an urgent problem the state has recognized using tools the state itself provides. Indeed, application of the UPL rules to Plaintiffs' planned speech and association would affirmatively impede the interests in consumer protection and integrity of the courts that the UPL rules were adopted to advance.

### A. The First Amendment's protections of speech and association demand that the UPL rules, as applied to Plaintiffs' activity, must satisfy strict scrutiny.

1. <u>The First Amendment protects Plaintiffs' truthful and non-misleading speech.</u>

"Above 'all else, the First Amendment means that government' generally 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). To that end, "[c]ontent-based laws are subject to strict scrutiny." *Id.* (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015)). "[A] law is content-based if 'a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys.'" *Id.* (quoting *Reed*, 576 U.S. at 163).

Under New York's UPL rules, the legality of Plaintiffs' speech turns on its content and, in particular, whether it contains legal advice. Plaintiffs seek to provide person-to-person advice— AJM is distributing written materials for Justice Advocates to read and rely on to provide verbal

legal guidance to clients—and what matters is what that advice is about: Because it is advice about whether and how to respond to a lawsuit, it is barred by the UPL rules. *See* Compl. ¶ 90. For example, Rev. Udo-Okon may provide individualized emotional counsel to a member of his church being sued by a debt buyer for a debt she does not owe and may pray with her for relief. But Rev. Udo-Okon would violate the UPL rules if he changed the content of his speech by also giving straightforward advice about how to answer the lawsuit in court. The parishioner could face liability as well if she had solicited such advice. *See id.* ¶¶ 92–93.

The harm to protected First Amendment interests is particularly severe given that Plaintiffs are not pursuing commercial interests. Plaintiffs are engaging in a project of political advocacy— and, in the case of Rev. Udo-Okon, also religious belief and ministry—to ensure that all New Yorkers can access their legal rights with the goal of fighting the cycle of poverty and drawing attention to the shortcomings of the justice system for low-income New Yorkers. *Cf. Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989) (describing "'commercial speech['s] . . . subordinate position in the scale of First Amendment values'" (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978))).

The harm is more acute because denying Plaintiffs their right to provide legal advice harms the court system's ability to fairly adjudicate debt collection actions. When debt collection defendants default, courts are left with no opportunity to evaluate the merits of the claims. The result is that applying the UPL rules to Plaintiffs serves only to "prohibit[] speech and expression upon which courts must depend for the proper exercise of judicial power." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001). The current state of affairs causes "the courts and the public to question the adequacy and fairness" of the system, and banning Plaintiffs' political speech only further "threatens [to] impair[] the judicial function." *Id.* at 546. By contrast, allowing Plaintiffs to

11

help provide courts with accurate and good-faith answers will allow the courts to better exercise their power and help bolster public faith in the judicial system. *See, e.g.,* Compl. ¶ 101.

Because the UPL rules depend on the content of Plaintiffs' communications, the application of those rules in this context must withstand strict scrutiny.

2.  The First Amendment protects Plaintiffs' right to associate to provide free, carefully circumscribed legal advice for the purpose of increasing access to the courts.

Strict scrutiny is additionally warranted because the application of the UPL rules abridges Plaintiffs' protected associational rights. The First Amendment protects the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition." *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984). Thus, "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." *In re Primus*, 436 U.S. 412, 426 (1978) (quoting *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585 (1971)).

The Supreme Court and Second Circuit have accordingly recognized that state restrictions on the practice of law trigger strict scrutiny where they prevent non-profit associations from advising the public of their legal rights and how to access those rights. *See Jacoby & Meyers, LLP v. Presiding Justices of First, Second, Third, and Fourth Dep't, Appellate Div. of Supreme Court of N.Y.*, 852 F.3d 178, 191 (2d Cir. 2017) (explaining that strict scrutiny applies "when a challenged regulation imposes severe burdens on associational rights" (citation omitted)).

In *NAACP v. Button*, 371 U.S. 415 (1963), the Supreme Court held that a Virginia law barring organizations from retaining attorneys to represent third parties infringed on the rights of the NAACP and its members "to associate for the purpose of assisting persons who seek legal redress for infringements of their . . . rights." 371 U.S. at 428. The Court emphasized that while the state may be interested in "insur[ing] high professional standards," it "may not, under the guise

of prohibiting professional misconduct, ignore constitutional rights." *Id.* at 439. Similarly, in *In re Primus*, the Court held that South Carolina could not, under the guise of regulating the practice of law in the state, discipline an ACLU attorney for advising a potential plaintiff of her rights and informing her of the ACLU's willingness to provide free legal representation. 436 U.S. at 432–39. Although the Court recognized—in a case decided the same day as *Primus*—that "States may vindicate legitimate regulatory interests through proscription" of "in-person solicitation for pecuniary gain," the Court expressly distinguished "offer[s] of free assistance" that are "undertaken to express personal political beliefs and to advance the civil-liberties objectives of [a non-profit association]," which may not be so restricted. *Id.* at 422 (citing *Ohralik*, 436 U.S. 447).[2]

The Second Circuit recently clarified *Button*'s reach, confirming that the UPL rules must satisfy heightened scrutiny if they are to be applied to Plaintiffs here. Although the Second Circuit rejected a for-profit law firm's First Amendment challenge to New York's prohibition on non-attorney investment in law firms, the court recognized that *Button* and its progeny protect associations' "expressive rights in the causes they pursue—when those causes implicate expressive values," and that laws restricting such rights must satisfy strict scrutiny. *Jacoby & Meyers*, 852 F.3d at 185–86. The Second Circuit distinguished the for-profit activity at issue in that case from non-for-profit advocacy activity like Plaintiffs' here: "Neither [of the plaintiffs] is a not-for-profit political advocacy organization engaging in its own expression," rather, the plaintiffs in that case were "engaged in the practice of law *as a business*" for the purpose of commercial gain, meaning

---

[2] The Supreme Court has further interpreted *Button* to protect the rights of unions and their members to associate to ensure "meaningful access to the courts" by "obtain[ing] affordable and effective legal representation." *United Transp. Union*, 401 U.S. at 585–86. To that end, the Supreme Court has held that states cannot prevent unions from: (1) recommending lawyers to members for workers' compensation suits, *Brotherhood of R.R. Trainmen v. Virginia. ex rel. Va. State Bar*, 377 U.S. 1, 8 (1964); (2) employing attorneys to represent members, *United Mine Workers, Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 221–22 (1967); or (3) recommending attorneys who had agreed to a maximum fee to members, *United Transp. Union*, 407 U.S. at 585–86.

that "[they] can be regulated as businesses" without "automatically trigger[ing] strict scrutiny." *Id.* at 188 (emphasis added). By contrast, the Attorney General's brief in that case explained the import of the *Button* line of cases for parties like Plaintiffs here: "[I]n every case the real party in interest was the expressive organization or its members, and the critical part of the Court's holding was to recognize the rights of these organizations or their members to access the courts, and to strike down measures that effectively impeded that right of access." Br. for Appellees, *Jacoby & Meyers*, No. 15-2608, 2016 WL 692945, at *33 (2d Cir. Feb. 18, 2016).

Precedent from both the Fourth Circuit and the New Hampshire Supreme Court is in accord that the UPL rules, as applied to Plaintiffs, must satisfy strict scrutiny. In a recent "admittedly close" case, the Fourth Circuit identified three key considerations in holding that restrictions on the practice of law as applied to a trade association seeking to provide legal services to its members need not satisfy strict scrutiny: "First, what [the trade association] seeks to accomplish would be for commercial ends[,] . . . [s]econd, it would not facilitate access to the courts[,] [a]nd third, it would pose ethical concerns not present in the *Button* cases." *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 206 (4th Cir. 2019). By contrast, Plaintiffs here fall on the other side of the Fourth Circuit's line on each factor: Plaintiffs seek to "associate for political or otherwise public goals" not to "practice law for commercial ends," Plaintiffs aim to "facilitate access to justice," and, by providing advice for free, Plaintiffs' "proposed practice . . . does [not] raise ethical concerns" or risk "compromis[ing] the independence and professional judgment of [those] involved." *Id.*

The New Hampshire Supreme Court, in an opinion by Justice David Souter, similarly recognized that a nonprofit's "members and employees have an associational right under the [F]irst [A]mendment to engage in advocacy on behalf of the disabled," which precluded the application of state statutes barring corporations from providing certain legal services. *In re N.H. Disabilities*

*Rights Ctr., Inc.*, 130 N.H. 328, 339 (1988). "When such advocacy may reasonably include the provision of legal advice," the court explained, "the organization may itself provide legal representation to its members or beneficiaries despite State regulations restricting legal practice . . . provided that the organization and its lawyers do not engage in the specific evils that the general State regulations are intended to prevent." *Id.* So too here.

Plaintiffs' activity thus fits within *Button* as interpreted by the Second Circuit and other courts and is protected by the First Amendment. First, AJM is a "not-for-profit political advocacy organization engaging in its own expression," *Jacoby & Meyers*, 852 F.3d at 188, to ensure that all low-income New Yorkers can understand and vindicate their rights to have a "meaningful opportunity to be heard," *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971), and "access [the] courts for redress of wrongs," *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896–97 (1984) (citation omitted). *See generally Turner v. Rogers*, 564 U.S. 431, 449 (2011) (finding a violation of due process where a party receives "neither counsel nor the benefit of [adequate] alternative procedures"). Second, Plaintiffs' activity is not "for commercial ends." *Stein*, 922 F.3d at 206. Rather, all advice is provided for free and Justice Advocates are prohibited from receiving any compensation. And third, Plaintiffs' activity does not "raise ethical concerns," *id.*, or involve "the specific evils that the general State regulations are intended to prevent," *N.H. Disabilities Rights Ctr.*, 130 N.H. at 339. To the contrary, Plaintiffs designed AJM to avoid the risk of consumer harm and advance the interests underlying New York's UPL rules—and multiple third-party experts have confirmed that Plaintiffs have done so successfully. *See supra* at 6–7 (describing the numerous consumer-protective safeguards Plaintiffs will implement). Because Plaintiffs are engaging in "collective activity undertaken to obtain meaningful access to the courts," the UPL rules that would abridge this fundamental right must satisfy strict scrutiny. *Primus*, 436 U.S. at 426.

**B. The application of the UPL rules to Plaintiffs cannot survive heightened scrutiny.**

Because the UPL rules, as applied to Plaintiffs, burden protected First Amendment interests, the regulations may "survive[] only if [they are] narrowly drawn to advance a compelling state interest." *Jacoby & Meyers*, 852 F.3d at 191 (quoting *Kraham v. Lippman*, 478 F.3d 502, 506 (2d Cir. 2007)). The UPL rules cannot satisfy this high standard of strict scrutiny. Indeed, the UPL rules cannot even satisfy any lesser, intermediate level of scrutiny that may apply, as their application to Plaintiffs fails to directly advance any substantial state interest. *See, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2375–76 (2018) (acknowledging the "possibility that some [] reason exists" for applying intermediate scrutiny and alternatively concluding that the challenged law "cannot [] survive intermediate scrutiny").

The state has no significant interest in banning Plaintiffs' advocacy and association. Ordinarily, UPL rules serve important interests "in regulating attorney conduct and in maintaining ethical behavior and independence" to ensure consumer protection and preserve the integrity of the legal system. *Jacoby & Meyers*, 852 F.3d at 191; *see supra* at 8 (describing the state's interests). But those interests cannot justify application of the UPL rules here, because doing so would affirmatively impede those interests.

First, by advising low-income New Yorkers whether and how to fill in a *state-provided* answer form, Plaintiffs would be working to resolve an urgent problem the state itself has recognized by facilitating accurate, timely, and clear responses to debt collection actions and ensuring that New Yorkers exercise their rights rather than being forced to pay debts they may not owe or which a creditor has no right to collect. *See* Letitia James, *Attorney General James Urges Consumers to Be Aware of Rights When Faced with Attempts to Collect on Consumer Debt* (Dec. 1, 2021) ("No consumer should be sued over a debt they do not legally owe or which a creditor has no right to collect, but as we recover financially from COVID-19, we are seeing more and

16

more debt collectors come out of the woodwork with outrageous claims."), https://ag.ny.gov/press-release/2021/consumer-alert-attorney-general-james-urges-consumers-be-aware-rights-when-faced; *see generally* Lauren Sudeall, *The Overreach of Limits on "Legal Advice"*, 131 Yale L.J. F. 637, 650 (2022) ("[I]t is hard to see what interest the government would have in preventing users of the judicial process from knowing about and potentially exercising the very rights and defenses it has created."). By helping to provide accurate and good-faith answers and facilitating full and fair adjudication of debt collection actions on the merits, Plaintiffs seek to provide courts with information they need to reach decisions that will increase public faith and trust in the courts.

Second, Plaintiffs have taken substantial precautions to protect the state's interest in avoiding false, unethical, or inaccurate advice. Plaintiffs' advice would be provided for free, without commercial motivation. It would be provided only on a narrow, straightforward issue—whether and how to file New York's own standard answer form for a debt collection lawsuit. *See supra* at 1–2, 5–6. AJM would train Justice Advocates on how to advise people about the use of the form and whether they should respond, thus providing Justice Advocates with the relevant (yet narrow) body of knowledge. AJM would require Justice Advocates to attest that they are providing only truthful and non-misleading advice on the strict terms AJM's Training Guide requires, which include robust disclosures to the clients and impose confidentiality and conflict-of-interest restrictions. *See* Compl. ¶¶ 62, 66–69. AJM would also monitor Justice Advocates, who could be expelled from the program and face additional consequences if they provide inaccurate or unfounded advice. Third-party experts have reviewed AJM's Training Guide and determined that it would provide the requisite protections to ensure that individuals will receive substantial benefits from advice under the program. Plaintiffs thus have designed their program to avoid the "dangers of legal representation and advice given by persons not trained, examined and licensed for such

work." *El Gemayel*, 72 N.Y.2d at 705 (citation omitted). And Plaintiffs seek relief to protect only advice that is truthful, non-misleading, and made in good faith.

Application of the UPL rules here would not be narrowly tailored. The rules are over-inclusive, as other jurisdictions allow trained professionals who are not lawyers to provide limited legal services.[3] That experience confirms that the consumer- and court-protective aims of the UPL rules can be achieved without restricting Plaintiffs rights and restricting the supply of free legal advice-givers to a degree that results in widespread denial of low-income Americans' days in court and the wrongful deprivation of their property. *See* Compl. ¶¶ 74–77; *cf. Ohio State Bar Ass'n v. Watkins Glob. Network, L.L.C.*, 159 Ohio St. 3d 241, 254 (2020) (DeWine, J., concurring in part and dissenting in part) ("Lawyers don't have a monopoly on something just because the law touches it."). The UPL rules are under-inclusive, too, as they allow lawyers without specialized training to advise on any area of the law, meaning that a corporate real estate attorney could advise on how to respond to a debt collection lawsuit even if they have less knowledge or expertise in that area than would AJM's Justice Advocates. And the state has ample alternative means to adequately protect against the risk of consumer harm. As AJM's Training Guide makes clear, to the extent Justice Advocates provide fraudulent advice or advice outside the scope of the program, they remain vulnerable to prosecution under the UPL rules and numerous other consumer-protection laws (as well as ordinary civil liability for, *e.g.*, fraud). *See* Compl. ¶ 71.

Far from protecting the public, the application of the UPL rules to Plaintiffs' truthful and non-misleading advocacy would cause public harm by preventing low-income New Yorkers from

---

[3] Plaintiffs' activity finds support in historical precedent, too, as legal assistance provided by individuals who are neither trained nor barred as lawyers is deeply rooted in the nation's history and the history of the common law. *See Faretta v. California*, 422 U.S. 806, 820 n.16 (1975) (requiring litigants to proceed with counsel "would sever the concept of counsel from its historic roots," because "[t]he first lawyers were personal friends" and "often lack[ed] any professional training." (citing 1 F. Pollock & F. Maitland, The History of English Law 211–13 (2d ed. 1909))).

accessing free legal advice they need to understand and vindicate their rights and avoid wrongful deprivation of property and the harmful consequences that result. While the UPL rules bar Plaintiffs' actions as the unauthorized "practice of law," the Supreme Court in *Button* made clear that "a State cannot foreclose the exercise of constitutional rights by mere labels" where—as here—the Plaintiffs' actions involve the exercise of protected constitutional rights and contribute to the aims motivating the state's regulation in the first place. 371 U.S. at 429.

To be sure, other applications of the UPL rules may serve the important purpose of protecting consumers from the risk of bad advice and protecting the integrity of the court system and may be sufficiently tailored to doing so that they satisfy heightened scrutiny. *Cf. Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015) (upholding a restriction against strict scrutiny). But where, as here, the UPL rules restrict Plaintiffs' political, truthful, and non-misleading speech on the basis of its content and prevent Plaintiffs from associating to advocate and educate low-income New Yorkers about their legal rights and those rules serve no corresponding public purpose, due to the protections the Plaintiffs have adopted and New York's own recognition of the problem, they infringe Plaintiffs' First Amendment rights and cannot be validly applied.

## II.    THE REMAINING PRELIMINARY INJUNCTION FACTORS SUPPORT AN INJUNCTION.

While Plaintiffs' likelihood of success on the merits of their claims is "the dominant, if not the dispositive, factor" in determining the need for an injunction, the remaining injunction factors further confirm the need for preliminary relief. *N.Y. Progress & Prot. PAC*, 733 F.3d at 488. First, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Plaintiffs' inability to provide free and reliable legal advice prevents them from engaging in this

essential form of political advocacy and would also harm the communities they serve, as the lack of free legal advice results in the practical denial of access to the justice system, the wrongful deprivation of property, and severe follow-on consequences. *See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (per curiam) ("risk of irreparable harm" from "depriv[ation] of [money] with no guarantee of eventual recovery").

Second, an injunction will cause the state no cognizable harm because "[t]he Government does not have an interest in the enforcement of an unconstitutional law." *N.Y. Progress & Prot. PAC*, 733 F.3d at 488 (citing *ACLU v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)). That is especially so here because, as explained above, applying the UPL rules to Plaintiffs would not advance the government interests those rules are meant to protect. *See supra* at 16–19.

Finally, awarding an injunction is in the public interest for much the same reasons. As a threshold matter, "securing First Amendment rights is in the public interest." *N.Y. Progress & Prot. PAC*, 733 F.3d at 488. More still, the application of the UPL rules to prevent Plaintiffs from providing free, truthful, and quality-controlled advice causes grave harm to the public: Thousands of New Yorkers are deprived of the opportunity to assert their rights in court when facing debt collection lawsuits and may face significant and long-lasting harm as a result—and courts are deprived of the opportunity to ever evaluate those claims. Meanwhile, the public would see no corresponding benefit from applying the UPL rules here, which would not serve the rules' intended ends. As applied to Plaintiffs and their carefully cabined program, the UPL rules harm rather than help New Yorkers and risk undermining public perceptions of the judiciary's ability to "do equal right to the poor and to the rich." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 180 (1803).

## CONCLUSION

For the foregoing reasons, this Court should grant a preliminary injunction enjoining the application of New York's UPL rules to Plaintiffs' intended conduct.

Dated: New York, New York
   January 25, 2022

Respectfully submitted,

 /s/ Gregory Silbert     
Gregory Silbert
Robert B. Niles-Weed
Elena De Santis
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Zachary D. Tripp*
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW
Washington, DC 20036
(202) 682-7000

*Pro hac vice motion forthcoming

Counsel for Plaintiffs