## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UPSOLVE, INC., and<br>REV. JOHN UDO-OKON,<br><br>                    Plaintiffs,<br><br>v.<br><br>LETITIA JAMES, in her official capacity as<br>Attorney General of the State of New York,<br><br>                    Defendant. | Case No. 1:22-cv-00627-PAC |

**BRIEF OF AMICI CURIAE THE NAACP AND THE NAACP NEW YORK STATE CONFERENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Joseph Rostain Schottenfeld
(*pro hac vice pending*)
NAACP | EMPOWERMENT PROGRAMS
4805 Mount Hope Drive
Baltimore, MD 21215
(203) 444-9577
jschottenfeld@naacpnet.org

Daniel A. Rubens
Jodie C. Liu (*pro hac vice pending*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000
drubens@orrick.com
jodie.liu@orrick.com

Sarah H. Sloan (*pro hac vice pending*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, D.C. 20005
(202) 339-8400
ssloan@orrick.com

*Counsel for Amici Curiae*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...........................................................................................ii

INTERESTS OF AMICI CURIAE................................................................................. 1

INTRODUCTION .......................................................................................................... 2

ARGUMENT .................................................................................................................. 3

I.      The Application Of UPL Rules To Prohibit Plaintiffs From Providing Legal Advice In Debt Collection Actions Disproportionately Harms The Black Community. ..........................................................................................................3

II.      UPL Rules Limit NAACP Programs And Advocacy. ...........................................5

III.      By Prohibiting Plaintiffs And The NAACP From Providing Limited Advice In Debt Collection Actions, New York's UPL Rules Violate Their First Amendment Freedom Of Association Rights..........................................................7

     A.      The First Amendment protects Plaintiffs'—and the NAACP's—right to associate for the purpose of ensuring meaningful access to the courts........7

     B.      As applied to Plaintiffs, the UPL rules do not survive strict scrutiny........14

CONCLUSION............................................................................................................. 16

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bates v. City of Little Rock*,
    361 U.S. 516 (1960)...................................................................................................14

*Bates v. State Bar of Arizona*,
    433 U.S. 350 (1977)...........................................................................................8, 9, 14

*Bill Johnson's Rests., Inc. v. NLRB*,
    461 U.S. 731 (1983).....................................................................................................8

*Brotherhood of R.R. Trainmen v. Virginia ex rel. Va. State Bar*,
    377 U.S. 1 (1964).........................................................................................................9

*Buckley v. Valeo*,
    424 U.S. 1 (1976).......................................................................................................14

*Burns v. Ohio*,
    360 U.S. 252 (1959).....................................................................................................8

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972).....................................................................................................9

*Ga. Conf. of the NAACP v. City of LaGrange*,
    No. 3:17-cv-67 (N.D. Ga. 2020)..................................................................................5

*Louisiana ex rel. Gremillion v. NAACP*,
    366 U.S. 293 (1961)...................................................................................................14

*Griffin v. Illinois*,
    351 U.S. 12 (1956).......................................................................................................8

*Ex parte Hull*,
    312 U.S. 546 (1941).....................................................................................................8

*Jacoby & Meyers, LLP v. Presiding Justs. of the First, Second, Third & Fourth Dep'ts, App. Div. of the Sup. Ct. of N.Y.*,
    852 F.3d 178 (2d Cir. 2017)...........................................................................12, 13, 14

*Johnson v. Avery*,
    393 U.S. 483 (1969).....................................................................................................8

*Lewis v. Casey*,
    518 U.S. 343 (1996).....................................................................................................8

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958).........................................................................................7, 8

*NAACP v. Button*,
    371 U.S. 415 (1963)....................................................................1, 2, 9, 10, 11, 13, 15

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982)..........................................................................................7

*Ohralik v. Ohio State Bar Ass'n*,
    436 U.S. 447 (1978)......................................................................................11, 12

*In re Primus*,
    436 U.S. 412 (1978)..................................................................8, 9, 11, 12, 13, 14

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)...........................................................................................7

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957)..........................................................................................10

*United States v. Stevens*,
    559 U.S. 460 (2010)...........................................................................................6

*United Transp. Union v. State Bar of Mich.*,
    401 U.S. 576 (1971)...........................................................................................9

**Statutes**

S.C. Code § 27-37-40.............................................................................................6

**Other Authorities**

*$50K & Beyond*, NAACP, https://naacp.org/campaigns/50k-beyond (last visited
    Feb. 28, 2022) ..............................................................................................5

Mark E. Blue & George F. Nicholas, *Another Voice: Debt law would fix an
    economic and racial injustice*, BUFFALO NEWS (Dec. 2, 2021),
    https://buffalonews.com/opinion/another-voice-debt-law-would-fix-an-
    economic-and-racial-injustice/article_dd29230e-5390-11ec-a0be-
    ef47acfc0f66.html .........................................................................................5

Khristopher J. Brooks, *Disparity in home lending costs minorities millions,
    researchers find*, CBS NEWS (Nov. 15, 2019),
    https://www.cbsnews.com/news/mortgage-discrimination-black-and-latino-
    paying-millions-more-in-interest-study-shows/.........................................................3

*Debt in America: An Interactive Map*, URB. INST. (Mar. 21, 2021),
   https://apps.urban.org/features/ debt-interactive-
   map/?type=overall&variable=pct_debt_collections .................................................4

Sara Sternberg Greene, *Race, Class, and Access to Civil Justice*, 101 IOWA L.
   REV. 1263 (2016) ...................................................................................................4

*How Debt Collectors Are Transforming the Business of State Courts*, PEW
   CHARITABLE TRUSTS (May 6, 2020), https://www.pewtrusts.org/en/
   research-and-analysis/reports/2020/05/how-debt-collectors-are-transforming-
   the-business-of-state-courts ....................................................................................4

Paul Kiel & Annie Waldman, *The Color of Debt: How Collection Suits Squeeze
   Black Neighborhoods*, PROPUBLICA (Oct. 8, 2015),
   https://www.propublica.org/article/debt-collection-lawsuits-squeeze-black-
   neighborhoods..........................................................................................................4

6A N.Y. Jur. 2d Attorneys at Law § 54 .......................................................................6

*Payday Lending in America: Who Borrows, Where They Borrow, and Why*, PEW
   9 (2012), http://www.pewtrusts.org/~/media/legacy/
   uploadedfiles/pcs_assets/2012/pewpaydaylendingreportpdf.pdf...............................3

## <u>INTERESTS OF AMICI CURIAE</u>

The National Association for the Advancement of Colored People (the "NAACP") is the country's oldest and largest civil rights organization. The New York State Conference of the NAACP is the NAACP's New York-affiliate. The NAACP and the NAACP New York State Conference (collectively, "NAACP" or "amici") strive to create a society free from racial discrimination. The NAACP has over two million supporters and members, including nearly 8,000 members in New York. For more than a century, the NAACP has used collective action and the legal process to champion equality and justice, including in landmark cases like *NAACP v. Button*, 371 U.S. 415 (1963).

The outcome of this case will have profound civil rights implications for NAACP members and for the NAACP's institutional interest in redressing injustice and inequality. People of color are more likely to face debt collection actions; they are more likely to do so without adequate legal information or the assistance of an attorney; and they are more likely to default in these actions. These disparities have grave individual consequences—ranging from diminished credit to wage garnishment, eviction, and even incarceration—that combine to entrench inequality further.

But New York's unnecessarily broad unauthorized practice of law ("UPL") rules prevent Plaintiffs and the NAACP and its members from fully and effectively using collective action to provide the legal advice necessary to create meaningful access to the courts and prevent or remedy the inequalities that result from debt collection actions. Most NAACP members are not lawyers. Instead of helping these members accurately to assist their fellow community members in responding to debt collection actions, the NAACP must provide advice and training designed to ensure that they do not run afoul of UPL rules—counsel that protects the NAACP and its members from liability, but limits the efficacy of the NAACP's advocacy. As a result, the UPL

rules that Plaintiffs challenge significantly limit the scope of the aid that the NAACP can provide to defendants in debt collection actions.

## INTRODUCTION

As the Supreme Court has recognized, "a statute broadly curtailing group activity leading to litigation may easily become a weapon of oppression," the mere existence of which "could well freeze out of existence all such activity on behalf of the civil rights of Negro citizens." *NAACP v. Button*, 371 U.S. 415, 435-36 (1963). That is the situation here, where New York's UPL rules prohibit Plaintiffs and the NAACP from providing free, truthful, and narrowly circumscribed legal advice to defendants in debt collection actions. In that way, the UPL rules prevent Plaintiffs and the NAACP from fully pursuing their expressive political objectives or meaningfully assisting Black defendants in debt collection actions.

The right of meaningful access to the courts is a core underpinning of the American justice system. That right, however, is not realized for thousands of low-income defendants in debt collection actions in New York who cannot obtain legal representation. Because nearly all of these defendants lack legal assistance, most actions result in default judgments. Moreover, a disproportionate number of these defendants are people of color, rendering the access to justice gap particularly stark for communities of color. Debt collection actions thus exacerbate the racial disparity in access to justice that the NAACP seeks to eliminate.

By prohibiting the provision of free and straightforward legal advice to defendants in debt collection actions, the UPL rules not only perpetuate racial and socioeconomic disparities in the judicial system, they also threaten one of the bedrock guarantees on which this Nation's form of government was founded: the right to freely form political associations. For the NAACP, ensuring meaningful access to the courts is a form of political expression that is critical to its core objective of eliminating racial inequalities. But the UPL rules severely restrict the advice

and programs that the NAACP and Plaintiffs can provide.  The UPL rules thus burden the NAACP's and Plaintiffs' First Amendment right to associate for the purpose of espousing their political beliefs, as well as ensuring meaningful access to the courts. And the application of the rules to the types of advice and programs that Plaintiffs and the NAACP seek to provide cannot survive strict scrutiny.

The need for assistance in debt collection actions is dire. Not only do Plaintiffs and the NAACP stand ready to provide such assistance, doing so is the expression of their core belief in the need to ensure meaningful access to the courts. As applied here to Plaintiffs' provision of free, truthful, and carefully circumscribed legal advice regarding debt-collection actions, the UPL rules violate the First Amendment right to associate with others in providing access to the courts.

## **ARGUMENT**

**I.**      **The Application Of UPL Rules To Prohibit Plaintiffs From Providing Legal Advice In Debt Collection Actions Disproportionately Harms The Black Community.**

The application of New York's UPL rules to a program designed to provide accurate and limited legal advice about debt collection actions disproportionately affects New York's Black community. Debt weighs more heavily on and carries greater consequences for the Black community. Black individuals typically pay higher interest rates on their debt, seemingly regardless of the size of that debt. *See Payday Lending in America: Who Borrows, Where They Borrow, and Why*, PEW CHARITABLE TRUSTS  9, 13 (July 2012), *available at* http://www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2012/pewpaydaylendingrepor tpdf.pdf; Khristopher J. Brooks*, Disparity in home lending costs minorities millions, researchers find*, CBS NEWS (Nov. 15, 2019), https://www.cbsnews.com/news/mortgage-discrimination-black-and-latino-paying-millions-more-in-interest-study-shows/. They are more likely than their white counterparts to fall behind on their debt—in New York, 29% of residents in communities

of color are delinquent on their debt; only 19 % of residences in predominantly white neighborhoods are. *Debt in America: An Interactive Map*, URB. INST. (Mar. 31, 2021), https://apps.urban.org/features/debt-interactivemap/?type=overall&variable=pct_debt_ collections. And they are more likely to be subject to collection actions for their debt. *See How Debt Collectors Are Transforming the Business of State Courts*, PEW CHARITABLE TRUSTS 17 (May 6, 2020), https://www.pewtrusts.org/en/research-and-analysis/reports/2020/05/how-debt-collectors-are-transforming-the-business-of-state-courts.

When faced with these actions, Black defendants are also far more likely to default than other defendants, even when accounting for income. Paul Kiel & Annie Waldman, *The Color of Debt: How Collection Suits Squeeze Black Neighborhoods*, PROPUBLICA (Oct. 8, 2015), https://www.propublica.org/article/debt-collection-lawsuits-squeeze-black-neighborhoods. In general, "black families [have] grossly fewer resources to draw on when they come under financial pressure." *Id.* But higher default rates also arise specifically from the fact that communities of color have particularly uneven and inadequate access to legal information and legal representation. Low-income individuals rarely have legal representation in debt collection actions; low-income Black individuals are particularly unlikely to seek legal help or to find it when they do. *See id.*; Sara Sternberg Greene, *Race, Class, and Access to Civil Justice*, 101 IOWA L. REV. 1263, 1268 (2016) ("[B]lack respondents in this study were less likely than white respondents to have sought, or considered seeking, legal help for their civil legal problems."). Local NAACP leaders grapple with this dynamic directly: As members and leaders of their respective communities, they interact frequently with community members who are unsure of where to turn for legal help; there are often no lawyers to whom they can be referred.

The consequences of default are severe. A default judgment often triggers automatic interest rates and court fees, *see How Debt Collectors Are Transforming the Business of State Courts*, *supra*, at 2, 17, and allows creditors to seek wage garnishment. Over time, default judgments contribute to job loss, housing instability, and even incarceration—issues that disproportionately affect the Black community.

In short, by constraining access to accurate legal advice, New York's UPL rules further limit the resources available to New York's Black community to respond to debt collection actions. And, in so doing, the UPL rules exacerbate the very racial inequalities the NAACP strives to remedy.

## II.    UPL Rules Limit NAACP Programs And Advocacy.

New York's UPL rules prevent the NAACP, like Plaintiffs, from fully using its freedom to associate to redress unjust debt collection actions and their consequences. The NAACP uses all lawful forms of advocacy to end race-based injustices and inequality. With respect to debt-related inequalities, the NAACP has, among other efforts, launched a campaign to advocate for student loan forgiveness. *See $50K & Beyond*, NAACP, https://naacp.org/campaigns/50k-beyond (last visited Feb. 28, 2022). The NAACP has sued to end unjust debt collection practices. *See, e.g.*, *Ga. Conf. of the NAACP v. City of LaGrange*, No. 3:17-cv-67 (N.D. Ga. 2020) (successfully challenging city's policy of cutting off utility services to residents who do not pay court debts). And the NAACP has supported and helped pass new legislation in New York to lower interest rates on judgments against debtors who lose a consumer debt action. *See* Mark E. Blue & George F. Nicholas, *Another Voice: Debt law would fix an economic and racial injustice*, Buffalo News (Dec. 2, 2021), https://buffalonews.com/opinion/another-voice-debt-law-would-fix-an-economic-and-racial-injustice/article_dd29230e-5390-11ec-a0be-ef47acfc0f66.html.

But New York's UPL rules limit the ways in which the NAACP can use advocacy to prevent Black and low-income debtors from losing those debt collection actions in the first place. New York's UPL rules expressly prohibit nonlawyers from "giv[ing] legal advice, draft[ing] legal documents, or otherwise hold[ing] himself or herself out as authorized to practice law in New York State." 6A N.Y. Jur. 2d Attorneys at Law § 54. So, the NAACP cannot empower its lay members to provide legal advice—no matter how simple, tailored, and accurate—about how to respond to debt collection actions to avoid default. Nor can the NAACP encourage its members, including individuals in the South Bronx, to join Plaintiffs' program or help Plaintiffs replicate their program beyond the South Bronx. As applied to the provision of straightforward, truthful advice in debt collection actions, then, the UPL rules make the NAACP's advocacy less effective—they stop NAACP members from helping to prevent defaults in debt collection actions.[1]

The NAACP limits its approach to advocacy regarding debt collection actions regardless of whether UPL rules have previously been enforced against NAACP members or the NAACP itself, and regardless of any promises by enforcement agencies not to enforce these rules against what would otherwise be protected NAACP activity. As long as the UPL rules remain applicable to the provision of advice in debt collection actions, there exists a risk of prosecution for

---

[1] The NAACP specifically tailors programming around UPL provisions. For example, the NAACP runs a community-based housing program in South Carolina that strives to expand meaningful access to the courts by providing tenants facing eviction actions with basic information and referrals. Under South Carolina's housing laws, tenants who have an eviction action filed against them "must appear and show cause"—*i.e.*, request a hearing—within ten days of the filing to prevent a magistrate judge from summarily issuing a writ of ejectment. S.C. Code § 27-37-40. In practice, most tenants facing an eviction action in South Carolina default. Because of South Carolina's UPL rules, the NAACP trains its community volunteers to provide only general information about the hearing process, and not concrete advice about how and why to request a hearing.

providing such advice. Neither the lack of past prosecution nor promises of non-enforcement can adequately protect the NAACP and its members. *See United States v. Stevens*, 559 U.S. 460, 480 (2010) (unconstitutional statute cannot be upheld because government "promise[s] to use it responsibly"). The UPL rules thus force the NAACP to limit its efforts to help defendants respond to debt collection actions.

### III.    By Prohibiting Plaintiffs And The NAACP From Providing Limited Advice In Debt Collection Actions, New York's UPL Rules Violate Their First Amendment Freedom Of Association Rights.

Because New York's UPL rules burden Plaintiffs', and the NAACP's, First Amendment right to associate for the purpose of ensuring meaningful access to the courts, the rules must satisfy strict scrutiny. They do not.

#### A.    The First Amendment protects Plaintiffs'—and the NAACP's—right to associate for the purpose of ensuring meaningful access to the courts.

It is well-established that the First Amendment protects "the right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). The NAACP is intimately familiar with the importance of this right. Indeed, landmark Supreme Court precedent on the freedom of association involve past efforts to silence the NAACP and its civil rights allies. *See, e.g., NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 924-33 (1982) (reversing judgment against NAACP and NAACP leaders for NAACP-led boycott because "one of the foundations of our society is the right of individuals to combine with other persons in pursuit of a common goal by lawful means"); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) (holding that NAACP members' "right … to pursue their lawful private interests privately and to associate freely with others" barred civil contempt judgment against NAACP for refusing to produce membership lists in lawsuit challenging NAACP's registration as a foreign corporation under state law).

7

At issue here are two fundamental and protected purposes of the right to associate. It has long been recognized that the First Amendment right to associate extends to associating for the purpose of "petition[ing] for the redress of grievances." *Roberts*, 468 U.S. at 618; *see also id.* ("[T]he Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances …."). And it is likewise "beyond debate" that the First Amendment guards the "freedom to engage in association for the advancement of beliefs and ideas." *Patterson*, 357 U.S. at 460. Encompassed within that associational freedom are "certain forms of 'cooperative, organizational activity,' including litigation." *In re Primus*, 436 U.S. 412, 438 n.32 (1978) (internal citation omitted). Here, the associational activities of Plaintiffs—and the NAACP— implicate both of these cardinal rights and thus merit the strongest form of First Amendment protection.

The right of access to the courts is "well-established" as an aspect of the First Amendment right to petition. *Lewis v. Casey*, 518 U.S. 343, 350 (1996); *see also Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983) ("[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances."). Indeed, the Supreme Court has recognized the value of pursuing legal action, rather than "suffer[ing] … silently." *Bates v. State Bar of Ariz.*, 433 U.S. 350, 376 (1977). To that end, the Supreme Court has "protected" the right of access by prohibiting state officials from interfering with individuals' attempts to prepare or file legal documents and from imposing certain fees on the indigent. *Casey*, 518 U.S. at 350 (citing *Johnson v. Avery*, 393 U.S. 483, 484, 489-90 (1969); *Burns v. Ohio*, 360 U.S. 252, 258 (1959); *Griffin v. Illinois*, 351 U.S. 12, 19 (1956); *Ex parte Hull*, 312 U.S. 546, 547-49 (1941)). For example, in *Johnson v. Avery*, the Supreme Court held that a rule

that eliminated the only available assistance for illiterate and poorly educated prisoners to file habeas corpus petitions was unconstitutional, because the rule "effectively" prohibited those prisoners from filing such petitions and thus "in effect, denied access to the courts."  393 U.S. at 487–88.

Given the constitutional dimensions of the right of access to the courts, "collective activity undertaken to obtain meaningful access to the courts is protected under the First Amendment." *Bates*, 433 U.S. at 376 n.32; *see also United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585 (1971) (same); *Brotherhood of R.R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1, 5 (1964) ("[T]he First Amendment's guarantees of free speech, petition and assembly give [petitioners] the right to gather together for the lawful purpose of helping and advising one another in asserting the rights Congress gave them …."). The Supreme Court has made clear that "[t]he right to petition the courts cannot be … handicapped" by rules preventing laymen from "associat[ing] together to help one another to preserve and enforce rights granted them" under the law.  *Brotherhood of R.R. Trainmen*, 377 U.S. at 7; *see also Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972) ("[I]t would be destructive of rights of association and petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view …."). The Court has thus invalidated state rules that "have a distinct potential for dampening the kind of cooperative activity that would make advocacy of litigation meaningful." *Primus*, 436 U.S. at 433; *see also id.* at 432 ("The First and Fourteenth Amendments require a measure of protection for advocating lawful means of vindicating legal rights …."). And the Court has underscored the critical importance of "the

aggrieved receiv[ing] information regarding their legal rights and the means of effectuating them." *Bates*, 433 U.S. at 376 n.32.

In addition to recognizing the constitutional significance of meaningful access to courts, the Supreme Court has specifically addressed, in a body of cases beginning with *NAACP v. Button*, 371 U.S. 415 (1963), how the right to associate protects organizations that advance their political beliefs through our courts. In many of these cases, the organizations sought to associate by providing communities with legal assistance and other services, but laws governing legal practice restricted their ability to do so. In addressing the constitutionality of these laws, the Supreme Court and lower courts established a clear theme: Associating for the sole purpose of political expression, as opposed to the advancement of commercial interests, lies in the heartland of the First Amendment's protection.[2] Here, organizations like Upsolve and the NAACP seek to associate precisely for the purpose of political expression—to voice a political stance on abuse of state-enabled debt collection mechanisms, particularly as that abuse disproportionately affects communities of color and low-income individuals.

In *Button*, the NAACP challenged the application of Virginia laws regulating legal solicitation to prohibit the NAACP from assisting Black communities in litigation that furthered the NAACP's mission. *See* 371 U.S. at 419-26. In holding that Virginia's laws "unduly inhibit[ed]" the NAACP's freedoms of expression and association, the Supreme Court emphasized that the NAACP's activities are "a form of political expression," aimed at "achieving the lawful objectives of equality of treatment by all government … for the members

---

[2] Although these cases largely dealt with laws regarding legal solicitation rather than laws regarding the unauthorized practice of law, the core lesson from these cases did not depend on the precise language of the laws at issue.  It depended on the fact that the laws restricted an organization's ability to associate freely for political purposes.

of the [Black] community in this country." *Id.* at 429, 437. Indeed, the Court continued, the "right to engage in political expression and association" is a foundational "premise" on which "[o]ur form of government is built," for "[e]xercise of the[] basic freedoms" "enshrined in the First Amendment" "has traditionally been through the media of political associations." *Id.* at 431 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) (plurality opinion)).

The Supreme Court reiterated *Button*'s core message in *Primus*, which involved South Carolina's attempt to prohibit the ACLU from seeking potential clients in litigation to further the ACLU's political objectives. *In re Primus*, 436 U.S. 412 (1978). Drawing comparisons to the NAACP's activities in *Button*, the *Primus* Court described the ACLU's work "as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public." *Id.* at 431. And "much like the NAACP," the Court continued, the ACLU engages "'in extensive educational and lobbying activities' and 'also [devotes] much of [its] funds and energies to an extensive program of assisting certain kinds of litigation on behalf of [its] declared purposes.'" *Id.* at 427 (quoting *Button*, 371 U.S. at 419-20). As in *Button*, that kind of activity "is 'a form of political expression' and 'political association'" protected by the First Amendment's "freedom to engage in association for the advancement of beliefs and ideas." *Id.* at 428, 438 n.32 (quoting *Button*, 371 U.S. at 429, 431).

In holding that South Carolina had abridged the ACLU's freedom of association, the Court explicitly distinguished between association as a mode of political expression and association in furtherance of pecuniary objectives. Indeed, on the same day it decided *Primus* in favor of the ACLU, the Court decided in a companion case that Ohio did not violate a private attorney's associational freedoms by prohibiting the attorney from soliciting personal-injury clients for profit. *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 454, 468 (1978). The key

11

distinction between *Primus* and *Ohralik*, the Court stressed, was the purpose for which the

ACLU and the private lawyer, respectively, sought to associate: In *Primus*, the ACLU's actions

had been "undertaken to express personal political beliefs and to advance the civil-liberties

objectives of the ACLU, rather than to derive financial gain." *Primus*, 436 U.S. at 422; *see also*

*id.* at 438 n.32. The private attorney in *Ohralik*, meanwhile, "was not engaged in associational

activity for the advancement of beliefs and ideas" but for "the advancement of his own

commercial interests." *Id.* at 438 n.32; *see also Ohralik*, 436 U.S. at 459. When it comes to

purely commercial activities, the Court explained, it may be "appropriate" in "certain

circumstances" for the State to "regulate in a prophylactic fashion." *Primus*, 436 U.S. at 437. "In

the context of political expression and association, however, a State must regulate with

significantly greater precision." *Id.* at 437-38.

      Over and again since *Button* and *Primus*, courts have emphasized the heightened

protection afforded to not-for-profit organizations seeking to associate as a means of political

expression. In *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth*

*Departments, Appellate Division of the Supreme Court of New York*, 852 F.3d 178 (2d Cir.

2017), for instance, the Second Circuit rejected an attempt by "for-profit law firms" to deny that

"a distinction [had been] drawn in [the] case law between the rights and interests of private, for-

profit attorneys and not-for-profit political advocacy organizations." *Id.* at 188. Noting that the

law firms' argument "misconstrue[d] precedent," the Second Circuit explained that "the Supreme

Court has taken pains to differentiate the protections that the Constitution affords" those "acting

in a for-profit setting," on the one hand, and those acting in a not-for-profit context, advocating

political causes in which [they] themselves share," on the other. *Id.* And because neither of the

law firms in *Jacoby & Meyers* was a "not-for-profit political advocacy organization engaging in

its own expression, nor a collection of individuals seeking redress of their own grievances or vindication of their own rights," the Second Circuit concluded that regulations of the law firms "as businesses … do not automatically trigger strict scrutiny." *Id.*

The principles enshrined in the right of access to the courts and the right to associate demonstrate that strict scrutiny must apply here. Upsolve is a not-for-profit organization that seeks to associate with the aim of pressing its political and ideological views about the social injustices perpetuated by the corporate debt collection apparatus. It does so by reaching out to disadvantaged communities and providing them tools to seek redress. In that way, its mission and activities are highly akin to those of "advocacy group[s] like the ACLU or the NAACP" that "have recognized associational rights." *Jacoby & Meyers*, 852 F.3d at 186. In fact, Upsolve's agenda overlaps closely with aims of the NAACP, which, as explained, also associates with communities heavily affected by improper debt collection practices. As in *Button* and *Primus*, therefore, Upsolve's efforts to aid underrepresented communities is associational activity that "come[s] within the right 'to engage in association for the advancement of beliefs and ideas.'" *Primus*, 436 U.S. at 424 (quoting *Button*, 371 U.S. at 430).

Protecting not-for-profit organizations' associational freedoms is particularly vital where, as here, these organizations seek to provide legal resources to communities and litigation offers the only effective recourse for members of those communities—in this instance, because they have become targets of debt collection actions. As the Supreme Court explained of the NAACP's work in *Primus*, "the efficacy of litigation as a means of advancing the cause of civil liberties often depends on the ability to make legal assistance available to suitable litigants." 436 U.S. at 431. Here, given the necessarily judicial nature of debt collection actions, it is not enough to say that "litigation may well be the sole practicable avenue open to a minority to petition for redress

13

of grievances." *Button*, 371 U.S. at 430. By the time a debt collection has been instituted in

court, litigation simply *is* the only option for fighting against the often racially discriminatory

abuses of the system that produced and attend the action. For that possibility to pan out,

however, courts must zealously safeguard the associational rights of not-for-profit organizations

like Upsolve and the NAACP to provide communities with resources to vindicate their legal

rights.

  **B.  As applied to Plaintiffs, the UPL rules do not survive strict scrutiny.**

  Because the UPL rules restrict protected First Amendment associative activity and thus

are subject to strict scrutiny, they can survive only if the State can "demonstrate 'a subordinating

interest which is compelling' and that the means employed in furtherance of that interest are

'closely drawn to avoid unnecessary abridgment of associational freedoms.'" *Primus*, 436 U.S. at

432 (quoting *Bates v. City of Little Rock*, 361 U.S. 516, 524 (1960); *Buckley v. Valeo*, 424 U.S.

1, 25 (1976)). As applied to Plaintiffs' provision of free, truthful, and narrowly circumscribed

legal advice, the State cannot meet that high bar.

  For the reasons explained by Plaintiffs, the State can have no legitimate, much less

compelling, interest in suppressing Plaintiffs' ability to provide resources that enable

communities to understand and defend their legal rights. *See* Pls.' Br. 16-18. If anything,

application of the UPL rules to Plaintiffs undercuts the State's interest in shielding its judicial

system from potential misuse by debt collectors. *See id.* at 16-17.

  While the UPL rules serve the State's "well-established interest in regulating attorney

conduct," *Jacoby & Meyers*, 852 F.3d at 191, it is equally well-established that "a State may not,

under the guise of prohibiting professional misconduct, ignore constitutional rights," *Button*, 371

U.S. at 439 (citing cases); *see also Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293, 297

(1961) ("[R]egulatory measures, … no matter how sophisticated, cannot be employed in purpose

or in effect to stifle, penalize, or curb the exercise of First Amendment rights.").[3] Here, Plaintiffs' constitutional rights of association are at their apogee: Plaintiffs seek to espouse their political and ideological beliefs and promote meaningful access to courts. *See supra* pp. 9-13. Meanwhile, the State cannot demonstrate any "substantive evils flowing from [Plaintiffs'] activities" of the sort that the UPL rules were designed to prevent. *Button*, 371 U.S. at 444.

Nor can the State show that the UPL rules are narrowly tailored as they apply to Plaintiffs. When it comes to protected freedoms of expression and association, "[b]road prophylactic rules … are suspect," and "[p]recision of regulation must be the touchstone." *Id.* at 437-38. The UPL rules flout these guiding principles. They are plainly overbroad, as they seek to prohibit Plaintiffs from engaging in virtually any activity that so much as touches the law. But lawyers do not have plenary control over all matters bearing on the law, nor the State power to deliver lawyers such control by fiat. Indeed, *Button* warned of the special harms that attend state efforts to widely enforce statutes regulating the unauthorized practice of law. Because such laws carry "the gravest danger of smothering *all* discussion looking to the eventual institution of litigation on behalf of the rights of members of an unpopular minority," they "may easily become a weapon of oppression." 371 U.S. at 434, 436 (emphasis added). The UPL rules, as applied to Plaintiffs' provision of free, truthful, and narrowly circumscribed legal advice, serve as precisely such a cudgel: They effectively sanction the existing system in which the only option available to debt collection targets is for-profit lawyers they cannot access or afford.

---

[3] Even when it comes to restrictions on commercial speech, such as bans on advertising within the legal profession, the Supreme Court has taken the view that the state's "strong interest in maintaining professionalism" does not support overly broad prophylactic bans on such commercial speech.  *See Bates*, 433 U.S. at 365.

## **CONCLUSION**

For the foregoing reasons, the NAACP respectfully requests that the Court grant

Plaintiffs' motion for a preliminary injunction.


Dated: New York, New York
        March 1, 2022


                                        Respectfully submitted,


                                        */s/ Daniel A. Rubens*

Joseph Rostain Schottenfeld            Daniel A. Rubens
(*pro hac vice pending*)               Jodie C. Liu (*pro hac vice pending*)
NAACP | EMPOWERMENT PROGRAMS           ORRICK, HERRINGTON & SUTCLIFFE LLP
4805 Mount Hope Drive                  51 West 52nd Street
Baltimore, MD 21215                    New York, NY 10019
(203) 444-9577                         (212) 506-5000
jschottenfeld@naacpnet.org             drubens@orrick.com
                                       jodie.liu@orrick.com

                                       Sarah H. Sloan (*pro hac vice pending*)
                                       ORRICK, HERRINGTON & SUTCLIFFE LLP
                                       1152 15th Street, N.W.
                                       Washington, D.C. 20005
                                       (202) 339-8400
                                       ssloan@orrick.com


                    *Counsel for Amici Curiae*