Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

UPSOLVE, INC. and REV JOHN UDO-OKON,

                Plaintiffs,

        v.

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York,

                Defendant.

_____

Case No. 22 Civ. 00627 (PAC)


**MEMORANDUM OF LAW ON BEHALF OF *AMICUS CURIAE*
NATIONAL CENTER FOR ACCESS TO JUSTICE AT FORDHAM
UNIVERSITY SCHOOL OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

David Udell (4762)
National Center for Access to Justice
150 West 62nd Street
New York, NY 10023
dudell@fordham.edu

Bruce A. Green
Louis Stein Center for Law and Ethics
150 West 62nd Street
New York, NY 10023
bgreen@fordham.edu

*Attorneys for Amicus*

March 1, 2022

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ............................................................................ 1

PRELIMINARY STATEMENT ................................................................................ 2

ARGUMENT ............................................................................................................ 3

I.   NEW YORK'S UPL LAWS PREVENT COMMUNITY MEMBERS FROM OBTAINING
THE BASIC LEGAL ADVICE THEY SEEK ............................................................ 3

II.   TRAINED NONLAWYERS ARE CAPABLE OF PROVIDING THE BASIC LEGAL
ADVICE COMMUNITY MEMBERS ARE SEEKING ................................................ 7

   A.   The Legal System has Recognized in Other Contexts that Nonlawyers have a Valuable
   Role to Play when the Legal Issues Requiring Attention are not Complex and when Lawyers
   are Scarce or Unavailable .................................................................................... 8

   B.   Nonlawyers Already Play Important Roles in the Federal and State Systems .................. 9

      1.   Nonlawyers Provide Legal Advice and More in Many Administrative Proceedings... 10

      2.   Regulatory Sandboxes and Other Initiatives Allow Safe Harbors for Nonlawyers to
      Provide Legal Advice and Assistance................................................................... 11

      3.   Despite Recognizing the Problem Posed by the Broad Prohibition on Nonlawyer Legal
      Advice, New York Has Failed to Reform its UPL Regime ................................... 12

III.   DEBT COLLECTION DEFENDANTS' FIRST AMENDMENT RIGHTS ARE
INFRINGED BY NEW YORK'S UPL LAWS WHICH PREVENT THEM FROM RECEIVING
BASIC LEGAL ADVICE....................................................................................... 16

   A.   The Right of Debt Collection Defendants to Receive Advice, a Form of Speech, is
   Protected under the First Amendment ...................................................................... 16

   B.   Citizens' First Amendment freedom to Understand and Protect their Legal Rights in our
   System of Laws is at Stake. .................................................................................. 18

CONCLUSION....................................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
    457 U.S. 853 (1982) ............................................................................ 17

*El Gemayel v. Seaman,*
    72 N.Y.2d 701 (1988) .................................................................... 18, 19

*Griswold* v. *Connecticut,*
    381 U.S. 479 (1965) ............................................................................ 17

*Hacking v. Arizona,*
    389 U.S. 143 (1967) .............................................................................. 9

*In re Primus,*
    436 U.S. 412 (1978) ............................................................................ 20

*Lamont* v. *Postmaster General,*
    381 U.S. 301 (1965) ............................................................................ 17

*Martin* v. *City of Struthers,*
    319 U.S. 141 (1943) ............................................................................ 17

*Matter of Gordon,*
    80 N.Y.2d 336 (1992) ........................................................................... 6

*Ohralik v. Ohio State Bar Ass'n,*
    436 U.S. 447 (1978) ............................................................................ 19

*People v. Alfani,*
    227 N.Y. 334 (1919) ..................................................................... *passim*

*Stanley v. Georgia,*
    394 U.S. 557 (1969) ............................................................................ 17

*Turner v. Rogers,*
    564 U.S. 431 (2011) .............................................................................. 9

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Counsel,*
    425 U.S. 748 (1976) ...................................................................... 17, 18

## STATUTES AND REGULATIONS

12 N.Y. Comp. Codes Rules & Regs, § 460.6 ......................................... 11

20 C.F.R. § 404.1705 ........................................................................................ 10

42 C.F.R. § 435.908(b)-(c) ............................................................................... 10

Judiciary Law §§ 476-a, 478, 484, 485 ......................................................... 6, 10

New York State Workers' Compensation Board, Licensed Representative Regulations §§ 302-1 & 302-2. ...................................................................................................... 11

**OTHER AUTHORITIES**

76 Fed. Reg. 45184, 45186-89 (July 28, 2011) ............................................... 10

American Bar Association, *Report on the Future of Legal Services in the United States, Commission on the Future of Legal Services* (2016) .................................................. 8

Andy Newman, *They Need Legal Advice on Debts. Should it Have to Come from Lawyers?,* N.Y. Times, Jan 25, 2022 ........................................................................................... 4

Arizona Supreme Court, *News Release* (December 9, 2021) ...................................... 12

Fact Sheet, New York State Unemployment Insurance Appeal Board, ...................................... 11

Laurel Rigertas, "Stratification of the Legal Profession, A Debate in Need of a Public Forum", Journal of the Legal Profession (2012) .................................................................. 8

Lauren Sudeall, *The Overreach of Limits on Legal Advice*, 131 Yale L.J. Forum 637 (2021/22) . 7

Law360, "Where 5 States Stand on Nonlawyer Practice of Law Regs" (Feb. 5, 2021) ............... 12

*Narrowing the "Justice Gap": Roles for Nonlawyer Practitioners* (2013) ................................ 15

NCAJ *"Unauthorized Practice of Law" Enforcement in California: Protection or Protectionism?* (2022) ........................................................................................... 7

NCAJ, *Working with Your Hands Tied Behind Your Back: Non-Lawyer Perspectives on Legal Empowerment* (2021) ............................................................................................... 6, 7

New York Courts, *Report and Recommendations of the Working Group on Regulatory Innovation,* ............................................................................................................... 15

New York's Consumer Credit Fairness Act (S.153/A.2382) ......................................... 4

Permanent Commission on Access to Justice, *Report to the Chief Judge of the State of New York,* (2020) ("2020 Report of the Permanent Commission") ............................................ 4

PEW Charitable Trusts, *How Debt Collectors are Transforming the Business of State Courts*, (May 6, 2020).................................................................................................................. 3, 4

*Prohibitions on Nonlawyer Practice: An Overview and Preliminary Assignment*, 50 Record 190, (1995)......................................................................................................................... 15

Rebecca L. Sandefur and Thomas M. Clarke, *Summary, Roles Beyond Lawyers, Recommendations and Research Report of an Evaluation of the New York City Court Navigators Program and its Three Pilot Projects* .................................................. 14

Task Force to Expand Access to Civil Legal Services, *Report to the Chief Judge of the State of New York* (2014) ....................................................................................................... 4

## INTEREST OF AMICUS CURIAE

The National Center for Access to Justice (NCAJ) is a non-profit organization based at Fordham University School of Law that brings rigorous research and analysis to the task of expanding access to justice in America. We work to secure access to justice: the basic freedom of people to learn about their rights, assert their legal claims and defenses, obtain a fair resolution under the rule of law, and enforce the result. We have studied and long supported the importance of making counsel available to those who cannot afford it when fundamental rights are at stake. We have also studied and support alternate means for providing some measure of access when, as is all too often the case, counsel is unavailable.

Our flagship project, the Justice Index, https://ncaj.org/state-rankings/2021/justice-index, analyzes and ranks states on their adoption of select best policies for assuring access to justice. We use the Justice Index to advocate that governments throughout the country establish these policies in order to make access to justice a reality for people with low incomes. For example, the Justice Index reports each state's count of civil legal aid lawyers, and identifies a set of best policies for "civil right to counsel laws" and for providing pro bono legal services. Recognizing that more civil legal aid lawyers are needed and that the aspiration for a broad civil right to counsel is not yet a reality, NCAJ also supports the freedom of people to obtain basic civil legal advice from individuals other than lawyers: in reports and testimony NCAJ has encouraged a substantial rethinking of the scope and application of unauthorized practice of law (UPL) laws to ensure that these laws do not prevent individuals from obtaining the basic legal advice they need to protect their legal rights. *See* https://ncaj.org/tools-for-justice/legal-empowerment.

To promote access to justice, NCAJ advocates for policies such as instructing judges and clerks to educate civil litigants about their rights, requiring use of plain language in courts,

assuring quality interpreting and translating services, providing notice of the right to accommodations for disabilities, and deploying innovative technologies like e-filing.  To that end, NCAJ collects, analyzes and publishes data, researches and writes reports, convenes experts across the field, and engages with reformers and regulators, including through formal comment on proposed regulatory and legislative reform. NCAJ submits this Memorandum of Law as *amicus curiae* to offer its perspective as an organization dedicated to promoting access to justice for low-income communities. In that capacity, NCAJ recognizes that Plaintiff Upsolve's approach – which would train nonlawyer professionals to provide legal advice to community members being pursued by debt collectors – addresses the urgent needs of communities whose concerns are at the heart of NCAJ's mission.

## PRELIMINARY STATEMENT

As a direct response to vast unmet legal need, Plaintiff Upsolve's American Justice Movement (AJM) would train local professionals to provide free civil legal advice to community residents being pursued by debt collectors. A striking, if unsurprising, element of the record is a petition signed by 114 South Bronx residents showing interest in receiving legal advice from their religious leader, Plaintiff John Udo-Okon. Rev. Udo-Okon explains that these individuals came forward in a single day, and that he is participating in this lawsuit to secure his right to respond to their call for help by providing legal advice to them and other members of his community.

The common-sense approach of training community professionals, such as Rev. Udo-Okon, and of enabling community members to rely on them for legal advice, draws on research, experimentation and practice that demonstrate that qualified nonlawyer professionals are capable of providing valuable, straightforward advice to people who, on their own, would have

2

substantial difficulty completing even the most basic court forms. It also reflects the reality that representation from a licensed attorney is not a viable option because attorneys are seldom available to these communities and unaffordable when they are.

NCAJ's research shows that librarians, social workers, and other social services professionals are commonly approached by community members with limited legal questions but must turn those individuals and their questions away because of the UPL laws. New York's UPL laws currently forbid – and would criminalize – Rev. Udo-Okon's potential conversations with community members about their debt collection proceedings and would do so despite the training and instruction from AJM to assure competent advice. The UPL laws thereby infringe the First Amendment rights not only of Plaintiffs Upsolve and Rev. Udo-Okon, but also of his community members and thousands of other New Yorkers who find themselves similarly pursued in consumer litigation. These debt collection defendants, whose financial survival is often at stake, have a pressing need for the basic legal advice Plaintiffs would provide to help respond to the (often invalid or inflated) debt collection claims asserted against them.

New York's UPL laws violate the First Amendment because they interfere with the provision and the receipt of this advice, but are not narrowly tailored to promote a compelling state interest. By leaving these defendants entirely uncounseled, the UPL laws harm the very consumer interests those laws are supposed to protect.

## ARGUMENT

### I.   NEW YORK'S UPL LAWS PREVENT COMMUNITY MEMBERS FROM OBTAINING THE BASIC LEGAL ADVICE THEY SEEK

Consumer debt collection cases starkly illustrate the scope and consequences of the justice gap. Nationwide, debt collection cases proliferate, comprising approximately a quarter of all civil cases filed in state courts. *See* PEW Charitable Trusts, *How Debt Collectors are*

*Transforming the Business of State Courts*, (May 6, 2020) ("Pew Report").[1]  The plaintiffs in

these cases, either creditors or bulk debt buyers, are almost universally represented by counsel,

whereas 90% of the defendants are unrepresented. *See id.* The imbalance is even more extreme

in New York, where approximately 95% of consumer debt defendants lack counsel. Andy

Newman, *They Need Legal Advice on Debts. Should it Have to Come from Lawyers?,* N.Y.

Times, Jan 25, 2022; Permanent Commission on Access to Justice, *Report to the Chief Judge of*

*the State of New York,* at 10 (2020) ("2020 Report of the Permanent Commission") (in 2019,

94% of the cases filed in Rochester City Court were debt collection cases, in less than 4% of

which defendants were represented). *See also* Task Force to Expand Access to Civil Legal

Services, *Report to the Chief Judge of the State of New York*, at 20 (2014) (96% of consumer

credit defendants are unrepresented in New York City and 97% are unrepresented outside of the

City).

      Without lawyers, defendants in these cases overwhelmingly fail to answer the complaints

against them and lose by default, often failing to assert valid defenses that would defeat the case

entirely or at least reduce the amount owed.[2] *See* Pew Report at 2 (citing nationwide 70% default

rate); Newman, N.Y. Times, Jan 25, 2022 (citing New York Citywide default rate of 88% during

2018-2019 period); 2020 Report of the Permanent Commission at 10 (only 13% answer rate in

2019 Rochester debt collection cases). While some observers might think the financial stakes are

---

[1] Available at https://www.pewtrusts.org/-/media/assets/2020/06/debt-collectors-to-consumers.pdf.

[2] Numerous initiatives have been adopted to address the default rate, including, most recently, New York's Consumer Credit Fairness Act (S.153/A.2382), which shortens the statute of limitations, requires additional notice to debtors and more detail about the alleged debt in the complaint and in any motion for default. When this law goes into effect in Spring 2022, it should reduce some of the abuses in debt collection litigation while also increasing defendants' rights in these cases, emphasizing the importance of legal advice on how to assert these rights.

low, the life consequences for the alleged debtors are dire. Most are poor, or working poor, for whom every dollar matters. Some teeter on the brink of financial disaster, facing repossession of vehicles necessary for their work, and frozen bank accounts and wage garnishment when they are already struggling to make ends meet. They face damage to their credit, housing crises, and other cascading consequences that frequently harm their children and other family members. This scene plays out hundreds of thousands of times a year in New York alone. The injustice is plain, and the staggering societal consequences are intolerable.

The AJM project would provide a meaningful, manageable way for alleged debtors to obtain help from professionals in their community whom they already know and trust, and who, with basic training and oversight, could responsibly advise them. For example, Reverend Udo-Okon and others like him could encourage members of his congregation to appear in person on their court dates and advise them how to check the boxes on the Answer form to preserve their defenses, keeping their cases alive for consideration by a judge. More specifically, with the benefit of training, nonlawyer professionals could show each defendant, where applicable, how to fill out the form to assert that: (i) the plaintiff must verify the debt amount; (ii) the defendant does not owe the debt if a victim of mistaken identity; (iii) the action is time-barred if the debt is outside the applicable statute of limitations; (iv) the defendant was not served properly; or (iv) the defendant's income or assets are protected. The advice could also include guidance about how to submit the completed answer form. *See* Action Plan: The American Justice Movement (attached as Exhibit 1A to Declaration of Rohan Pavuluri), Dkt 7-1, at p. 16 of 20.

The only thing standing between community members who would benefit from this basic legal advice and the Reverend and other qualified social services providers who are well positioned to provide it is New York's UPL regime, which prohibits, indeed criminalizes, the

provision of legal advice by nonlawyers. *See* New York Judiciary Law §§ 476-a, 478, 484, 485; *People v. Alfani*, 227 N.Y. 334, 337 (1919) (the practice of law "embraces the preparation of pleadings and other papers"); *Matter of Gordon*, 80 N.Y.2d 336, 341-42 (1992) ("The practice of law involves the rendering of legal advice and opinions directed to particular clients.").

New York's UPL laws often deprive residents of low-income communities of legal advice they sorely need. For example, NCAJ interviewed social workers, librarians, community organizers and other local leaders who routinely receive requests to help answer basic legal questions from individuals with whom they work. Community members seek them out on such basic law-related matters as attending court appearances, interacting with landlords and employers, and checking boxes to preserve legal positions. These providers often have language skills, education, and relevant cultural knowledge that equip them well not only to help select and fill out forms, navigate websites, and organize and synthesize evidence, but also to communicate effectively with those who need their assistance. *See* generally, NCAJ, *Working with Your Hands Tied Behind Your Back: Non-Lawyer Perspectives on Legal Empowerment* (2021).[3]

Rarely consulted for their views on the UPL laws or their ideas for UPL reform, these individuals have important insights. For example, one New York librarian told us:

> Many [library patrons] ask for help from filling out forms to understanding the content and import of those forms—that would put librarians dangerously close to the line on prohibited legal advice. For example . . . "What is good advice for trying to get your court date moved up? That's a common one. Who should they talk to? What should they say?"

---

[3] Available at https://ncaj.org/sites/default/files/2021-06/NCAJ%20Working%20With%20Your%20Hands%20Tied%20Behind%20Your%20Back.pdf.

*Id.* at 13. This librarian, and other people interviewed by NCAJ, believe that they could be trained to provide basic legal advice. "When someone really needs help," he said, "the last thing you want to do is just turn them away." *Id*. at 14.

These otherwise willing and able social services providers, and the institutions that employ them, are deterred from helping even when asked, for fear that they will run afoul of UPL laws that prohibit nonlawyers from providing individualized legal advice. Because the prohibition on the "practice of law" is not defined in any statute or rule, nonlawyer professionals, including court clerks, hesitate to offer information that could be viewed as prohibited "advice." *See generally,* Lauren Sudeall, *The Overreach of Limits on Legal Advice*, 131 Yale L.J. Forum 637 (2021/22).[4]

UPL enforcement has a deterrent sweep that can stifle nonlawyers' ability to provide individualized legal advice, including when the advice would be beneficial. *See* generally NCAJ *"Unauthorized Practice of Law" Enforcement in California: Protection or Protectionism?* (2022) (describing UPL enforcement process in California against individuals alleged to have provided legal advice, where harm is neither alleged nor investigated).[5]

## II.   TRAINED NONLAWYERS ARE CAPABLE OF PROVIDING THE BASIC LEGAL ADVICE COMMUNITY MEMBERS ARE SEEKING

Uncounseled community members facing financial ruin at the hands of well-represented, legal adversaries cannot wait for New York to change its UPL rules. Nor should they have to. The UPL laws were not intended to leave community members to solve their legal problems alone when the basic legal advice they need is available from qualified nonlawyers.

---

[4] Available at  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4001988#.
[5] Available at https://ncaj.org/sites/default/files/2022-02/Cease%20and%20Desist%20Report%20-%20%20Final%2C%202-14-22%20pdf.pdf.

A.   **The Legal System has Recognized in Other Contexts that Nonlawyers have a Valuable Role to Play when the Legal Issues Requiring Attention are not Complex and when Lawyers are Scarce or Unavailable**

Just as in the field of medicine where it is accepted that a patient is not required to rely on a physician when someone with lesser training is available to draw blood or make a simple diagnosis, there is growing awareness in the field of law that while representation by counsel can be essential in complex matters, there is no reason to prohibit those with less advanced training from providing help in certain simple matters.[6] *See* American Bar Association, *Report on the Future of Legal Services in the United States, Commission on the Future of Legal Services* (2016) at 24.[7]

The decision in *People v. Alfani*, 227 N.Y. 334 (1919), is commonly cited for its observation that UPL laws "protect the public from ignorance, inexperience and unscrupulousness." *Id*. at 339. But the Court did not hold that *only* lawyers could help protect the public. Instead, the Court noted that the UPL statute did not require reliance on counsel for people seeking to represent themselves, and offered this observation: "Probably [a person] may ask a friend or neighbor to assist him" with a legal matter. *Id*. at 341. Despite leaving open the possibility that it would not violate the UPL statute for nonlawyers such as friends and neighbors to provide basic legal advice, in the century since *Alfani*, New York's UPL statutes and the caselaw interpreting them have defined "legal advice" so broadly that people with simple legal issues who cannot afford a lawyer cannot obtain any helpful advice at all. There is no compelling reason to define the practice of law so broadly.

---

[6] For additional background on stratification of roles in medicine, as contrasted with law, see Laurel Rigertas, "Stratification of the Legal Profession, A Debate in Need of a Public Forum," at 99, Journal of the Legal Profession (2012).

[7] Available at
https://www.americanbar.org/content/dam/aba/images/abanews/2016FLSReport_FNL_WEB.pdf).

Consider the decision of the Supreme Court in *Turner v. Rogers*, 564 U.S. 431 (2011), which declined to "automatically" appoint counsel for a parent accused of refusing to pay child support. Noting that a determination of indigency is "sufficiently straightforward" and not "an unusually complex case," the Court observed that "sometimes assistance other than purely legal assistance (here, say, that of a neutral social worker)" could provide a sufficient constitutional safeguard – even for a defendant facing incarceration. *Id*. at 448. The Court's assumption that social workers are available to help people with legal problems – including people who face judicial proceedings and potential incarceration – shows how out of step New York's UPL prohibition is when applied to prevent community members from obtaining legal advice from Reverend Udo-Okon and other trained nonlawyer professionals.

More than fifty years ago, Justice Douglas, in yet a different context, recognized that in the absence of representation by counsel, equal justice may actually depend on volunteer efforts such as those prohibited by New York's UPL law here:

> It may well be that until the goal of free legal assistance to the indigent in all areas of the law is achieved, the poor are not harmed by well-meaning, charitable assistance of laymen. On the contrary, for the majority of indigents, who are not so fortunate to be served by neighborhood legal offices, lay assistance may be the only hope for achieving equal justice at this time.

*Hacking v. Arizona,* 389 U.S. 143, 152 (1967) (Douglas, J., dissenting from dismissal for lack of federal question).

**B.    Nonlawyers Already Play Important Roles in the Federal and State Systems**

Qualified nonlawyers have a proven track record of successfully advising people about far more involved and extensive legal issues than the relatively simple tasks of assisting debt defendants at issue here. In federal and state agency proceedings, these nonlawyers routinely provide a broad array of individualized legal services. Additionally, as states begin to experiment

with limited carve-outs to the UPL laws, nonlawyers are engaging in diverse forms of legal advocacy and assistance.

### 1. Nonlawyers Provide Legal Advice and More in Many Administrative Proceedings

The provision of legal assistance by nonlawyers has a long history in agency settings. For example, under the Medicaid program, nonlawyer advocacy is authorized by federal regulation that preempts state UPL laws. States "must allow individual(s) of the applicant or beneficiary's choice to assist in the application process or during a renewal of eligibility." 42 C.F.R. § 435.908(b). The Medicaid regulations contemplate certification of volunteers to offer assistance ranging from "providing information on insurance affordability programs and coverage options, helping individuals complete an application or renewal, working with the individual to provide required documentation, submitting applications and renewals to the agency, interacting with the agency on the status of such applications and renewals, assisting individuals with responding to any requests from the agency, and managing their case between the eligibility determination and regularly scheduled renewals." *Id*. at § 435.908(c). An applicant or beneficiary may also be represented at any hearing before the agency by counsel, or by "a relative, a friend, or other spokesman." *Id*. at § 431.206(b)(3).[8]

In New York, qualified nonlawyers may represent clients in Unemployment Insurance appeals and before the Workers Compensation Board.[9] The State Unemployment Insurance

---

[8] In addition to permitting unpaid lay representatives to assist claimants seeking Social Security disability insurance benefits, 20 C.F.R. § 404.1705, the Social Security Administration also permits the representatives to seek compensation if they meet various educational and training standards, maintain professional liability insurance and pass a criminal background check. 76 Fed. Reg. 45184, 45186-89 (July 28, 2011), available at http://www.gpo.gov/fdsys/pkg/FR-2011-07-28/pdf/2011-19026.pdf.

[9] New York's UPL laws do not apply to administrative proceedings. *See, e.g.,* Judiciary Law §§ 478, 484 (prohibiting nonlawyers from appearing or preparing pleadings in a "court of record.").

Appeals Board maintains a list of "registered representatives" who may present a claimant's case, introduce evidence, cross-examine opposing parties and their witnesses, and give a closing argument. Such nonlawyer representatives must be of good moral character, have a high school degree or its equivalent, and have at least 16 hours of relevant work or academic experience. The nonlawyer may have to pass an exam, must submit a resume and references and be interviewed by the Board. The applicant must also indicate whether she intends to engage full-time in representing claimants for a fee and, upon certification, must obtain a surety bond of $500.[10]

Similarly, the New York State Workers' Compensation Board licenses nonlawyers to practice before it. Applicants must be at least 18 years old, have a high school diploma or its equivalent, and reside in or have a regular place of business in New York. They must have knowledge of the relevant law and regulations and must pass a written exam and submit to possible oral review by the Board. New York State Workers' Compensation Board, Licensed Representative Regulations §§ 302-1 & 302-2.

> ### 2.   Regulatory Sandboxes and Other Initiatives Allow Safe Harbors for Nonlawyers to Provide Legal Advice and Assistance

Recently, several states have begun to develop new roles for nonlawyers outside of the administrative setting. For example, Arizona recently adopted an explicit exemption to its UPL laws permitting licensure of "legal paraprofessionals" (LPs) to provide a broad array of legal

---

[10] *See* Fact Sheet, New York State Unemployment Insurance Appeal Board, http://www.labor.ny.gov/sites/ui-appeal/pdf/RegisteredRepresentativeFactSheet.pdf. The Board controls and supervises the compensation that both lawyers and nonlawyers may charge for representing claimants. Registered representatives may charge a fee only if their client has won an award. Payments are limited to $75 per hour for nonlawyers and $100 per hour for lawyers. 12 N.Y. Comp. Codes Rules & Regs, § 460.6; Unemployment Insurance Appeals Board, Attorney and Registered Representative Fee Schedule, available at http://www.labor.ny.gov/sites/ui- appeal/pdf/Attorney-and-Registered-Representative-Fee-Schedule.pdf.

services and advice in select areas, including debt-collection litigation. LPs must meet eligibility

requirements including core-skills and subject-matter examinations, satisfy education and

experience combination requirements, and follow a code of conduct.[11]  Similarly, Utah has

created a "regulatory sandbox" for which its Office of Legal Services Innovation reviews and

approves or disapproves of applications for experimental approaches to the provision of legal

services (including by nonlawyers) that would otherwise be prohibited under the State's UPL

laws.[12] California, New Mexico and Illinois are exploring potential changes to their UPL laws

that would increase opportunities for nonlawyers to provide certain types of legal advice. *See*

Law360, "Where 5 States Stand on Nonlawyer Practice of Law Regs" (Feb. 5, 2021).[13]

### 3.   Despite Recognizing the Problem Posed by the Broad Prohibition on Nonlawyer Legal Advice, New York Has Failed to Reform its UPL Regime

Recognizing that tens of thousands of New Yorkers lack meaningful access to civil

justice, New York's judiciary has made some limited efforts to increase access to justice by

expanding nonlawyers' roles. In 2010, New York's former Chief Judge Jonathan Lippman, an

ardent advocate for increasing access to justice, formed a Task Force to Expand Access to Civil

Legal Services in New York, which was converted to a Permanent Commission on Access to

Justice in 2015. This body has focused on a wide range of measures, including increasing the

number of lawyers and law students providing legal services, promoting dispute resolution

mechanisms, and developing simplified procedures for pro se litigants. Among its priorities, it

---

[11] *See* Arizona Supreme Court, *News Release* (December 9, 2021)
(https://www.azcourts.gov/Licensing-Regulation/Legal-Paraprofessional-Program).
[12] *See* https://utahinnovationoffice.org/about/what-we-do/.
[13] Available at https://www.law360.com/access-to-justice/articles/1352126/where-5-states-stand-on-nonlawyer-practice-of-law-regs.

has taken some limited initial measures to address the problem created by New York's prohibition on nonlawyers providing individualized legal assistance to litigants.

To date, these initiatives have focused on creating avenues for the provision of legal information by nonlawyers and volunteer lawyers, but they have left in place New York's prohibition on the provision of individualized legal advice by nonlawyers. For example, in 2014, the New York Courts authorized a limited role for nonlawyers to provide information to litigants in certain court settings. Under the New York City Court "Navigators" program, litigants (primarily tenants in housing disputes, but also debt collection defendants in one borough) may obtain one-on-one assistance from nonlawyers with no prior formal legal training.[14] Navigators work only in the courthouse. The program formally prohibits the provision of legal advice, yet it permits nonlawyers to offer information and otherwise assist people in understanding and navigating the legal proceedings. Thus, nonlawyers may help people to access and complete court-required forms, attend settlement negotiations, and even accompany litigants into the courtroom. While they may not advise or advocate for the litigant in court, they may answer questions put to them by the judge. *See* Administrative Order of the Chief Administrative Judge of the Courts.[15] A report evaluating the program found that "tenants assisted by a Housing Court Answers Navigator were 87 percent more likely than unassisted tenants to have their defenses recognized and addressed by the court." *See* Rebecca L. Sandefur and Thomas M. Clarke,

---

[14] The Executive Director of NCAJ served as a Co-chair of the Subcommittee on Regulatory Reform that developed the proposal for the Navigators program.

[15] Available at https://nycourts.gov/courts/nyc/SSI/pdfs/AO-42-14.pdf.

*Summary, Roles Beyond Lawyers, Recommendations and Research Report of an Evaluation of the New York City Court Navigators Program and its Three Pilot Projects*, at 16.[16]

New York also permits an additional courthouse program that gives students a role in helping to provide information to debt collection defendants. "CLARO" (the Civil Legal Advice and Resource Office) is hosted by the New York State Unified Court System's Access to Justice Program. Before the pandemic, CLARO operated court-based, walk-in clinics staffed by volunteer attorneys who supervised law school and college students. CLARO teams explain court processes and help draft court filings. With attorneys directly involved in meetings with litigants, CLARO teams assist in selecting forms, creating answers, and preparing motions to reopen default judgments. These debtors are not represented by CLARO's attorneys or its attorney-supervised students in their court proceedings, but are representing themselves.[17] Since the pandemic, all CLARO offices are closed and very limited telephone advice has been available.[18]

The Unified Court System also offers useful direct assistance to consumer debt defendants on the Court's website, including by providing the standardized form Answer that AJM's trained nonlawyer professionals would assist in completing.[19] The Court also specifically empowers the Civil Court Clerk to assist debtor defendants in completing a pre-printed form that provides a list of defenses. The Clerk's role is limited and passive; the Clerk may only enter onto

---

[16] Available at http://www.americanbarfoundation.org/uploads/cms/documents/new_york_city_court_navigators_report_final_with_final_links_december_2016.pdf.

[17] *See* http://www.claronyc.org/claronyc/default.html.

[18] *See, e.g.*, http://www.claronyc.org/claronyc/Manhattan/Manhattan.html (announcing closure of in-person CLARO services and 2 hours per week of telephone advice for Manhattan's CLARO program).

[19] The standardized form Answer is available on the Court's website.  *See* https://www.nycourts.gov/COURTS/nyc/civil/consumercredit.shtml.

the Answer form the specific information that a litigant has told the Clerk. The Court then sends
the Answer to the plaintiff and advises the debtor of the hearing date. *Id.* The Court recognizes
the limitations of these self-help tools. Along with the advice provided on the website, the Court
also advises: "It is a good idea to get legal assistance." *Id.* The fact that so many debtors default
without even filing an answer demonstrates that these programs alone are not sufficient.

These state-sponsored approaches for informing litigants are all well-intended and
beneficial measures, but New York has failed to meet the legal needs of the community members
whose concerns are at issue in this lawsuit. Calls to expand nonlawyers' roles are longstanding.
In 1995, the Professional Responsibility Committee of the New York City Bar Association
issued a report citing still earlier reports in reaching its preliminary endorsement of creating
greater nonlawyer practice. *Prohibitions on Nonlawyer Practice: An Overview and Preliminary
Assignment*, 50 Record 190, 209 (1995). In 2013, the same committee released another report
surveying the landscape of models for expanding roles of nonlawyer practitioners and advocating
for such options in New York. *See Narrowing the "Justice Gap": Roles for Nonlawyer
Practitioners* (2013).[20] More recently, a New York Court System Commission to Reimagine the
Future of New York's Courts, established by Chief Judge DiFiore, through its Working Group
on Regulatory Innovation, explored authorizing social workers to provide legal advice, and
unanimously adopted the Working Group's recommendation to take this step forward. See New
York Courts, *Report and Recommendations of the Working Group on Regulatory Innovation*.[21]

---

[20] Available at https://www2.nycbar.org/pdf/report/uploads/20072450-
RolesforNonlawyerPractitioners.pdf. NCAJ's executive director served as Chair of the
Subcommittee that authored the report.
[21] Available at https://www.nycourts.gov/LegacyPDFS/publications/RWG-
RegulatoryInnovation_Final_12.2.20.pdf.

The principal drawback to New York's approaches to date – in addition to the state's failure to respond to repeated calls to reconsider the broad prohibition on nonlawyers providing legal advice – is that its programs to assist litigants are almost all located inside the courthouses. Once a litigant finds her way to the courthouse, she can get limited forms of help from court clerks, Navigators or CLARO (when operational), and some protection from the courts themselves, all of which improve both outcome and experience. Simplified forms and useful information on the courts' websites are also valuable for those who know how to find and use these resources. But for many people – including the overwhelming number of defendants in debt collection proceedings – even getting to the courthouse door presents an insurmountable obstacle and the simplified procedures are still too daunting to be of practical significance.

Upsolve's AJM program would help address this need by allowing community members to meet with qualified professionals in the community – in the clinic, the library, the social services office, the church, or in numerous other settings where daily interactions are part of community life. These professionals have familiar faces, an established reservoir of trust and confidence with the community members, and are well-positioned to hear community members' questions and advise them about the forms they need to complete. The training and oversight offered by the AJM program provides additional assurance that the advice will be communicated with competence and integrity.

## III.   DEBT COLLECTION DEFENDANTS' FIRST AMENDMENT RIGHTS ARE INFRINGED BY NEW YORK'S UPL LAWS WHICH PREVENT THEM FROM RECEIVING BASIC LEGAL ADVICE

### A.   The Right of Debt Collection Defendants to Receive Advice, a Form of Speech, is Protected under the First Amendment

The First Amendment protects both Reverend Udo-Okon's freedom to communicate with

community members who are being pursued by debt collectors,[22] and the freedom of those

community members to speak with the Reverend and to benefit from the exchange of ideas,

information and advice they could receive. The right to receive information is a bedrock aspect

of the First Amendment. By 1969, the Supreme Court already recognized as "well established"

the Constitutional "right to receive information and ideas" and that the freedom of expression

enshrined in the First Amendment "necessarily protects the right to receive" information. *Stanley*

*v. Georgia*, 394 U.S. 557, 563 (1969) (citing *Martin* v. *City of Struthers*, 319 U.S. 141, 143

(1943)); *Griswold* v. *Connecticut*, 381 U.S. 479, 482 (1965); *Lamont* v. *Postmaster General*, 381

U.S. 301, 307-308 (1965) (Brennan, J., concurring). *See also* *Bd. of Educ., Island Trees Union*

*Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) ("[T]he right to receive ideas follows

ineluctably from the sender's First Amendment right to send them.").

     In *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Counsel*, 425 U.S. 748,

758 (1976), the Court struck down a law restricting advertising of prescription drug prices

because it interfered with the consumer's First Amendment interests in obtaining such

information. In recognizing the public's right to receive the information, the Court stressed the

impact of the restriction on the neediest members of the population. "Those whom the

suppression of prescription drug price information hits the hardest are the poor, the sick, and

particularly the aged. . . When drug prices vary as strikingly as they do, information as to who is

charging what becomes more than a convenience. It could mean the alleviation of physical pain

---

[22] Plaintiffs' Motion for a Preliminary Injunction explains that the UPL laws as applied to AJM impermissibly prevent Plaintiffs from exercising their First Amendment rights to freedom of expression and association and that, as content-based restrictions on speech, the UPL laws must withstand strict scrutiny. *See* Plaintiffs' Memorandum of Law, Dkt. 6, at p. 10 of 21. The UPL laws fail that test because they are not narrowly drawn (to the contrary, they indiscriminately sweep all potential legal assistance into the bucket of prohibited conduct) and advance no legitimate state interest as they do not protect the putative recipients of Plaintiffs' advice.

or the enjoyment of basic necessities." *Id*. at 764. Like the drug consumers in *Virginia State Bd. of Pharmacy,* the litigants in this matter – members of the public at risk of injury from debt collection litigation – have a compelling interest in receiving the information Plaintiffs seek to impart. This is amply evidenced by the fact that more than 100 people signed a document requesting the opportunity to receive legal advice from the Reverend Udo-Okon in this case. *See* Udo-Okun Declaration, at ¶ 20, Dkt. 7-2, at p. 6 of 9; *id*. at Ex. 2A (collecting signatures), Dkt. 7-3, at p 1, Dkt. 7-4, p. 11 (collecting additional signatures).

Without individualized advice about how to answer the complaints against them, which defenses might apply to their cases, and how to preserve their rights (including by appearing in court), these individuals will suffer devastating, often avoidable loss. The advice offered by Reverend Udo-Okon and other trained neighborhood professionals would be for many the only effective route to asserting viable defenses in court. New York's blanket restriction on that speech is the only thing standing between these individuals and the advice they seek. Their constitutional interest in receiving this advice is thus an independent basis on which the Court should grant the relief Plaintiffs seek enjoining application of New York's UPL laws to the Plaintiffs.

**B.     Citizens' First Amendment freedom to Understand and Protect their Legal Rights in our System of Laws is at Stake.**

The UPL laws challenged here are not carefully drawn to advance New York's interest in protecting consumers. To the contrary, as applied to the Plaintiffs, these laws thwart the community members' interest in receiving narrow, straightforward and informed advice about how to answer debt collection complaints against them. The UPL laws therefore harm the very people these laws are supposed to protect. *People v. Alfani*, 227 N.Y. at 339 (purpose of UPL laws is "to protect the public from ignorance, inexperience and unscrupulousness"); *El Gemayel*

*v. Seaman*, 72 N.Y.2d 701, 705 (1988) (UPL laws are intended "to protect the public in this State from the dangers of legal representation and advice given by persons not trained, examined and licensed for such work…"). By broadly proscribing, and thereby chilling, speech essential to debt collection defendants, the UPL laws deprive these individuals of much needed guidance on how to act in an informed manner to protect their rights.

The situation is exacerbated because the statutes contain no definition of what does or does not constitute "practice of law," no definition of the speech that is authorized, and no procedure for granting exemptions for activities consistent with the purposes of the statutes, or even for issuing interpretations on which those willing to provide free advice can rely. No one disputes that there are many legal services that only lawyers qualified by licensing and regulation should provide. Indeed, for precisely this reason, *amicus* NCAJ has always advocated strongly for more public funding of lawyers – through civil legal aid programs, and through establishment of civil rights to counsel – who can provide legal services to indigent persons in complex court proceedings and/or in matters implicating fundamental human needs. But the services only lawyers can usefully provide do not encompass all potential legal assistance.

New York seeks to proscribe Plaintiffs' speech based on its content – the provision of simple legal advice to people who cannot afford counsel.  There is no justification for this restriction.  To be sure, when a state prohibits commercial speech involving communications with prospective clients, such regulations likely pass constitutional muster as a reasonable regulatory effort to protect consumers from the unscrupulous passing themselves off as lawyers or the incompetent selling more than they can deliver. *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 457-58 (1978).  But that is not this case.  Here, New York prohibits the discussion of individual legal problems and solutions between the Plaintiffs and community

members that reflect not mere commercial speech but instead Plaintiffs' efforts to achieve social justice.  *See In re Primus,* 436 U.S. 412, 434-48 (1978) (subjecting comparable restrictions to strict scrutiny).  New York's UPL laws fail such scrutiny because they are not narrowly tailored to protect a compelling state interest.  Indeed, the opposite is true:  the challenged laws sweepingly bar speech that, in fact, would *serve* the State's interest in protecting its citizens.

The state cannot prohibit the discussion of individual legal problems between the Plaintiffs and community members. It cannot leave the Reverend and parishioners in the position of halting conversation with one another about their legal rights, on threat of criminal punishment.  Ultimately, access to justice is at stake: whatever decision the Court may reach must assure protection of the First Amendment freedom of all citizens to understand their legal rights and to act upon those rights to protect their families in our system of laws.

### CONCLUSION

For the reasons stated above, and for those contained in the Plaintiffs' Memorandum of law, the Court should grant Plaintiffs' Motion for a Preliminary Injunction and enjoin application of New York's UPL laws to Upsolve's AJM project.

Dated: New York, New York
        March 1, 2022

Respectfully Submitted,

__/s_____
David Udell (4762)
 National Center for Access to Justice

Bruce Green
Louis Stein Center for Law and Ethics