# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UPSOLVE, INC. and REV. JOHN UDO-OKON, | |
| Plaintiffs, | Case No. 1:22-cv-627-PAC |
| v. | |
| LETITIA JAMES, in her official capacity as Attorney General of the State of New York, | |
| Defendant. | |

## *AMICUS* BRIEF OF PROFESSOR REBECCA L. SANDEFUR
## IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Whitney Cloud (*not admitted*)
DLA PIPER LLP (US)
One Liberty Place
1650 Market Street Suite 5000
Philadelphia, Pennsylvania  19103-7300
(215) 656-2440
whitney.cloud@dlapiper.com

Peter Karanjia
Paul D. Schmitt (*not admitted*)
DLA PIPER LLP (US)
500 Eighth Street, N.W.
Washington, D.C.  20004
(202) 799-4135
peter.karanjia@us.dlapiper.com

*Counsel for Amica Curiae Professor Rebecca L. Sandefur*

# TABLE OF CONTENTS

IDENTITY AND INTEREST OF *AMICA CURIAE* ........................................................1

PRELIMINARY STATEMENT ......................................................................................2

ARGUMENT ...................................................................................................................3

    I.   The Crisis of Access to Civil Justice.................................................................3

        A.   Impact on Individuals Facing Debt Collection Actions...........................3

        B.   Impacts on the Courts and the Justice System ........................................8

   II.  Social Science Research Demonstrates the Safety and Effectiveness of Legal
       Services and Solutions Provided by Nonlawyers...........................................10

        A.   Common Law Countries Outside the United States Have Demonstrated
             Success in Responding to Access to Justice Issues with Nonlawyer Solutions
             .......................................................................................................11

        B.   Communities in the United States Have Also Begun To Successfully Rely on
             Trained Nonlawyers To Address the Access to Justice Gap...................17

CONCLUSION ............................................................................................................18

CERTIFICATE OF SERVICE.....................................................................................20

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Penson v. Ohio*,
    488 U.S. 75 (1988) .................................................................................................9

*Turner v. Rogers*,
    563 U.S. 431 (2011) .............................................................................................17

**Other Authorities**

American Bar Association, *Legal Needs and Civil Justice: A Survey of Americans*
    (1994),
    https://www.americanbar.org/content/dam/aba/administrative/legal_aid_indig
    ent_defendants/downloads/legalneedstudy.pdf .....................................................4

American Bar Association, *Supporting Justice: A Report on the Pro Bono Work
    of America's Lawyers* (2017),
    https://www.americanbar.org/content/dam/aba/administrative/probono_public
    _service/ls_pb_supporting_justice_iv_final.pdf .....................................................6

Anna E. Carpenter, Alyx Mark, & Colleen F. Shanahan, *Trial and Error: Lawyers
    and Nonlawyer Advocates*, 42 LAW & SOC. INQUIRY 1023 (2017) ......................................16

Citizens Advice, *Who We Are and What We Do*,
    https://www.citizensadvice.org.uk/about-us/about-us1/introduction-to-the-
    citizens-advice-service/ ......................................................................................12

Congressional Research Service, *Unemployment Rates During the Covid-19
    Pandemic* (2021), https://sgp.fas.org/crs/misc/R46554.pdf ...............................7, 8

Federal Trade Commission, *Repairing a Broken System: Protecting Consumers in
    Debt Collection Litigation and Arbitration* (2010),
    https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-
    commission-bureau-consumer-protection-staff-report-repairing-broken-
    system-protecting/debtcollectionreport.pdf...........................................................5

Hazel Genn and Yvette Genn, *The Effectiveness of Representation at Tribunals*
    (London: Lord Chancellor's Department 1989) .............................................11, 13

Gillian K. Hadfield, *Higher Demand, Lower Supply? A Comparative Assessment
    of the Legal Resource Landscape for Ordinary Americans*, 37 FORDHAM
    URBAN L.J. 129 (2010)...........................................................................................6

Institute for the Advancement of the American Legal System, *Justice Needs and Satisfaction in the United States of America* (2021) ......................................................4, 7, 8

Paul Kiel and Annie Waldman, *The Color of Debt: How Collection Suits Squeeze Black Neighborhoods*, ProPublica, Oct. 8, 2015, https://www.propublica.org/article/debt-collection-lawsuits-squeeze-black-neighborhoods ...........................................................................................................................7

Herbert M. Kritzer, *Legal Advocacy: Lawyers and Nonlawyers at Work* 113 (1998) .................................................................................................................................. 16, 18

The Legal Aid Society et al., *Debt Deception: How Debt Buyers Abuse the Legal System to Prey on Lower-Income New Yorkers* (2010), https://www.neweconomynyc.org/wp-content/uploads/2014/08/DEBT_DECEPTION_FINAL_WEB-new-logo.pdf..................5, 10

Legal Services Corporation, *The Justice Gap: Measuring the Unmet Civil Legal Needs of Low-income Americans* (2017), https://www.lsc.gov/sites/default/files/images/TheJusticeGap-FullReport.pdf.............................................................................................................................6

Leslie C. Levin, *The Monopoly Myth and Other Tales About the Superiority of Lawyers*, 82 Fordham L. Rev. 2611 (2014) ..................................................................17, 18

Sharon Miki, *Lawyer Statistics for Success in 2022*, Clio Blog, Dec. 21, 2021, https://www.clio.com/blog/lawyer-statistics/ ................................................................5, 6

Money & Pensions Service Financial Capability Secretariat, *Legal Services Commission's 'Money Advice Outreach Pilot'*, https://www.fincap.org.uk/en/evaluations/legal-services-commission-s-money-advice-outreach-pilot#key-findings..........................................................................12

National Center for State Courts, *State of the State Courts in a (Post) Pandemic World: Results from a National Public Opinion Poll* 4-5 (2020), https://www.ncsc.org/__data/assets/pdf_file/0005/41000/COVID19-Poll-Presentation.pdf........................................................................................................................10

Andy Newman, *They Need Legal Advice on Debts. Should It Have to Come From Lawyers?*, NY Times, Jan. 25, 2022, https://www.nytimes.com/2022/01/25/nyregion/consumer-debt-legal-advice.html.......................................................................................................................................5

New York City Small Claims Court, https://nycourts.gov/COURTS/nyc/smallclaims/welcome.shtml ...........................................9

iii

The Pew Charitable Trusts, *How Debt Collectors Are Transforming the Business of State Courts* (2020), https://www.pewtrusts.org/-/media/assets/2020/06/debt-collectors-to-consumers.pdf ...................................................4, 5

Rebecca L. Sandefur, *Access to What?*, 148 DAEDALUS 49 (2019) ...............................................4

Rebecca L. Sandefur and James Teufel, *Assessing America's Access to Civil Justice Crisis*, 11 U.C. IRVINE L. REV. 753 (2021). .................................................4

Rebecca L. Sandefur, *The Fulcrum Point of Equal Access to Justice: Legal and Nonlegal Institutions of Remedy*, 42 LOYOLA L.A. LAW REV. 949 (2009) ...........................15

Rebecca L. Sandefur, *The Impact of Counsel: An Analysis of Empirical Evidence*, 9 SEATTLE J. SOC. JUST. 51 (2010) ......................................................11

Rebecca L. Sandefur, *Lawyers' Pro Bono Service and Market-Reliant Legal Aid*, in *Private Lawyers and the Public Interest: The Evolving Role of Pro Bono in the Legal Profession* (Oxford Univ. Press 2009) ...................................................6

Rebecca L. Sandefur, *Legal Advice from Nonlawyers: Consumer Demand, Provider Quality, and Public Harms*, 16 STANFORD J. CIVIL RIGHTS & CIVIL LIBERTIES 283 (2020) ..................................................11, 13, 14, 17, 18

Sheldon Krantz, *There Is No Justice When Low & Modest Income DC Residents Are Forced to Represent Themselves in Civil Cases*, 24 U.D.C. L. Rev. 18 (2021). ..................................................14

Marisol Smith and Ashish Patel, *Money Advice Outreach Evaluation: Cost and Effectiveness of the Outreach Pilots* (2008), http://www.infohub.moneyadvicetrust.org/content_files/files/debtoutreachcosteffectiveness.pdf...........................................................12

Social Security Administration, *Your Right to Representation* (2020), https://www.ssa.gov/pubs/EN-05-10075.pdf.......................................18

Task Force to Expand Access to Civil Legal Services in New York, *Report to the Chief Judge of the State of New York* (2014), http://ww2.nycourts.gov/sites/default/files/document/files/2018-05/CLS%20TaskForce%20Report%202014.pdf ...................................5

## IDENTITY AND INTEREST OF *AMICA CURIAE*[1]

Dr. Rebecca L. Sandefur is a leading scholar and sociologist with expertise in access to civil justice. She is Professor in the College of Liberal Arts and Sciences at Arizona State University and Faculty Fellow at the American Bar Foundation (ABF), an independent, non-partisan research organization focused on the study of law and legal processes. In 2018, Professor Sandefur was named a MacArthur Fellow for her development of a new evidence-based approach to access to civil justice for low-income people.

Professor Sandefur has served on a number of commissions exploring ways to improve access to justice in the U.S. and globally, including with the American Bar Association, the American Academy of Arts and Sciences, the Organisation for Economic Co-operation and Development (OECD), and the World Bank. She co-chaired a project at the American Academy to improve the collection and use of data about civil justice in the United States. Her work, which has been funded by the National Science Foundation, has received numerous awards, including from the National Center for Access to Justice (2015) and the National Center for State Courts (2020). In 2013, she was The Hague Visiting Chair in the Rule of Law.

In this *amicus* brief, Professor Sandefur reviews social science research that supports plaintiffs' claim that qualified nonlawyers can perform an essential role in helping people to protect their rights in debt collection proceedings. Professor Sandefur's knowledge of the field is a product of her research over several decades on the barriers that prevent people from securing access to justice.

---

[1] No counsel for a party authored Professor Sandefur's *amicus* brief in whole or in part, and no party or party's counsel contributed money to fund preparing or submitting the brief.

1

Specifically, Professor Sandefur provides the Court with data that documents the gravity of this problem, including its detrimental effects on not only the individuals directly involved, but also on the courts and the justice system more broadly. Professor Sandefur also discusses the effectiveness of alternative solutions, such as plaintiff Upsolve's "Justice Advocates" program, that rely on trained nonlawyers. The evidence shows that these nonlawyers can be highly effective in providing quality advice to help bridge the access to justice gap, especially where legal aid and *pro bono* legal representation are in short supply.

## PRELIMINARY STATEMENT

Echoing broader national trends, New York faces an increasingly acute crisis of access to civil justice that places hundreds of thousands of people in debt collection proceedings without any representation and undermines the legitimacy of the courts, as well as the rule of law itself.

Like countless others across the country, the vast majority of New Yorkers facing debt collection actions cannot afford counsel and are unable to adequately represent themselves. As a result, they frequently fail to appear in court to assert their legal rights, and state courts routinely enter default judgments against them. This crisis was already severe before the Spring of 2020, when the COVID-19 pandemic commenced. Since then, it has reached emergency proportions. A relentless onslaught of legal challenges continue to severely burden ordinary Americans, including proceedings involving debt enforcement, as well as employment matters, and disputes over rent and healthcare coverage. This crisis has hit low-income households and racial minorities particularly hard, and it has magnified the already deeply entrenched social and economic inequalities in this country.

One underexplored option for addressing the justice gap is the use of trained nonlawyers who, the evidence shows, can rapidly become experts in legal processes unfamiliar even to many attorneys (including, for example, handling actions in small claims court).  Research concerning programs in other States and common law jurisdictions demonstrates the success of trained nonlawyers in helping overcome three access to justice barriers: 1) helping the individuals involved in these proceedings recognize the legal nature of their problems; 2) increasing the likelihood that these individuals will more actively engage with the legal process, including attending their court hearings; and 3) helping overburdened courts decide more cases on the merits, thereby improving procedural justice and the rule of law.

In each of these ways, plaintiff Upsolve's program likewise can improve the fairness and effectiveness of our civil justice system.  Given the scarcity of legal aid and *pro bono* resources for the hundreds of thousands of New Yorkers who cannot afford to hire counsel to vindicate their rights in civil debt collection proceedings, Upsolve should be allowed to deploy its well-designed and focused nonlawyer training to substantially improve access to justice for those who desperately need it.

## ARGUMENT

I. **The Crisis of Access to Civil Justice**

   A.  **Impact on Individuals Facing Debt Collection Actions**

   The access to justice crisis in this country has existed for decades and persists to this day, including in New York.  In 1992, the American Bar Association commissioned a landmark study (Legal Needs and Civil Justice) that found approximately half of American households surveyed "faced some situation that raised a legal issue[,]" with 47% of low-income households and 52%

of moderate-income households reporting at least one legal need.[2]  Of those households facing legal issues, 41% of low-income households and 42% of moderate-income households were forced to deal with them without legal assistance, and an additional 38% of low-income households and 26% of moderate-income households took no action at all.[3]  Only 29% of low-income households turned to the civil justice system to attempt to resolve their issues, and only 39% of moderate-income households did so.  According to the report, "[t]he predominant reasons for low-income households not seeking legal assistance were a sense that it would not help and that it would cost too much."[4]

Thirty years later, the situation is unfortunately no better.  For example, a 2020 study commissioned by the Institute for the Advancement of the American Legal System (IAALS) surveyed over 10,000 Americans nationally.  The IAALS study found that Americans experience over 250 million civil justice problems annually, of which fully 120 million go unresolved.[5]

Cases involving consumer debt are emblematic of this broader trend.  According to Pew, each year approximately four million Americans are sued in debt collection matters.  Of those, over 90% receive no legal representation at all.[6]  The problem is even more acute in New York

---

[2] American Bar Association, *Legal Needs and Civil Justice: A Survey of Americans* 9 (1994), https://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent_defendants/downloads/legalneedstudy.pdf.

[3] *Id.*

[4] *Id.*

[5] IAALS 2021, *Justice Needs and Satisfaction in the United States of America* 7 (2021); *see also* Rebecca L. Sandefur, *Access to What?*, 148 DAEDALUS 49, 49-55 (2019); Rebecca L. Sandefur and James Teufel, *Assessing America's Access to Civil Justice Crisis*, 11 U.C. IRVINE L. REV. 753, 753 (2021).

[6] The Pew Charitable Trusts, *How Debt Collectors Are Transforming the Business of State Courts* 1 & 14 (2020), https://www.pewtrusts.org/-/media/assets/2020/06/debt-collectors-to-consumers.pdf.

State, where in 2018 and 2019, a total of 265,000 consumer debt suits were filed in city and

district civil courts; in over 95% of them, the defendants were not represented by a lawyer, and

88% did not even respond to the suit.[7]  This is in line with other reports, reflecting that the

default rate in New York for debt collections has been as high as 85% to 90%.[8]  Again, this

echoes the broader crisis across the country, with over 70% of Americans losing debt collection

suits by default.[9]

 This lack of representation is not surprising.  With attorneys' average hourly rates of

$300 by early 2021,[10] finding counsel is out of reach for many.  And both in New York and

nationwide, legal aid and *pro bono* resources are simply insufficient to meet the acute need.  The

leading nonprofit program in New York City for debt collection defense had the resources to

---

[7] Andy Newman, *They Need Legal Advice on Debts. Should It Have to Come From Lawyers?*,
NY TIMES, Jan. 25, 2022, https://www.nytimes.com/2022/01/25/nyregion/consumer-debt-legal-
advice.html.  In this respect, debt collection proceedings reflect a broader access to justice gap
that persists in this State.  In a single year in New York alone, according to a report to the Chief
Judge of the State of New York by the Permanent Commission on Access to Justice, "1.8 million
litigants in civil matters did not have representation for matters involving housing, family, access
to health care and education, and subsistence income."  Task Force to Expand Access to Civil
Legal Services in New York, *Report to the Chief Judge of the State of New York* 2
(2014), http://ww2.nycourts.gov/sites/default/files/document/files/2018-
05/CLS%20TaskForce%20Report%202014.pdf.

[8] The Legal Aid Society et al., *Debt Deception: How Debt Buyers Abuse the Legal System to
Prey on Lower-Income New Yorkers* 8-9 (2010), https://www.neweconomynyc.org/wp-
content/uploads/2014/08/DEBT_DECEPTION_FINAL_WEB-new-logo.pdf.

[9] The Pew Charitable Trusts, *supra* at 2.  *See also* Federal Trade Commission, *Repairing a
Broken System: Protecting Consumers in Debt Collection Litigation and Arbitration* 7 (2010),
https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-bureau-
consumer-protection-staff-report-repairing-broken-system-protecting/debtcollectionreport.pdf
(Federal Trade Commission estimate that, nationwide, between "sixty percent to ninety-five
percent of consumer debt collection lawsuits result in defaults.").

[10] Sharon Miki, *Lawyer Statistics for Success in 2022*, CLIO BLOG, Dec. 21, 2021,
https://www.clio.com/blog/lawyer-statistics/.

assist *fewer than 2%* of all individuals sued on a debt in New York City Civil Court.[11]  And other research confirms that *pro bono* assistance nationwide does not come close to bridging the access to justice gap.  Economist and legal scholar Gillian Hadfield, for example, estimates that to offer just one hour of legal advice to every American facing civil legal problems, every one of the nation's more than one million lawyers would need to volunteer 150 hours annually.[12]  Yet, according to a 2016 study by the American Bar Association, only half (52%) of all lawyers engaged in any *pro bono* work—the equivalent of an average 37 *pro bono* hours per lawyer.[13]

   Although access to justice is a widespread concern, it hits certain households and groups in a more pernicious and pervasive manner.  According to the Legal Services Corporation, lower-income households bear the brunt of this hardship.  In 2017, 71% of low-income households experienced a civil legal problem (for example, a debt collection complaint or eviction proceeding), and 86% of those problems received inadequate or no legal help.[14]

---

[11] *Id.*

[12] Gillian K. Hadfield, *Higher Demand, Lower Supply? A Comparative Assessment of the Legal Resource Landscape for Ordinary Americans*, 37 FORDHAM URBAN L.J. 129, 156 (2010).

[13] American Bar Association, *Supporting Justice: A Report on the Pro Bono Work of America's Lawyers* at v (2017), https://www.americanbar.org/content/dam/aba/administrative/probono_public_service/ls_pb_supporting_justice_iv_final.pdf (analyzing *pro bono* commitments in calendar year 2016).  A further challenge is that lawyers' *pro bono* contributions are often counter-cyclical with respect to legal need:  When the economy contracts and lost employment and income leads Americans to have more problems with issues such as debt, the extent of lawyers' *pro bono* service decreases.  Rebecca L. Sandefur, *Lawyers' Pro Bono Service and Market-Reliant Legal Aid*, in *Private Lawyers and the Public Interest: The Evolving Role of Pro Bono in the Legal Profession* 99-114 (Oxford Univ. Press 2009).

[14] Legal Services Corporation, *The Justice Gap: Measuring the Unmet Civil Legal Needs of Low-income Americans* (2017), https://www.lsc.gov/sites/default/files/images/TheJusticeGap-FullReport.pdf.

The impact on low-income households is more pronounced for racial minorities, especially Black Americans.  For example, even before the pandemic, elevated levels of default judgments against residents of predominantly Black communities were apparent.  One study, which surveyed judgments over five years in St. Louis, Chicago, and Newark, New Jersey, concluded that "even accounting for income, the rate of judgments in mostly black neighborhoods was twice as high in mostly black neighborhoods as it was in mostly white ones."[15]

The COVID-19 pandemic has exacerbated the legal problems faced daily by ordinary Americans.  The pandemic has caused widespread job loss and the many cascading problems that emerge when people lose income—from unemployment insurance claims to unpaid bills and debts to unpaid rent and missed mortgage payments.  During the pandemic, unemployment rates rose as high as 14.8%,[16] and U.S. consumer debt rose by $800 billion (by 6%, the highest annual growth rate recorded in a decade) to a record high of $14.88 trillion.[17]  More generally, in 2020, 33% of Americans facing money problems attributed those problems to the pandemic.[18]

The pandemic has also accentuated the disproportionate effect of the access to justice crisis on racial minorities and low-income households.  According to one study, in 2020, "Black and Hispanic Americans experienced higher unemployment rates during the pandemic than other

---

[15] Paul Kiel and Annie Waldman, *The Color of Debt: How Collection Suits Squeeze Black Neighborhoods*, PROPUBLICA, Oct. 8, 2015, https://www.propublica.org/article/debt-collection-lawsuits-squeeze-black-neighborhoods.

[16] Congressional Research Service, *Unemployment Rates During the Covid-19 Pandemic* 2 (2021), https://sgp.fas.org/crs/misc/R46554.pdf.

[17] IAALS Study, *supra*, at 211.

[18] *Id.* at 202.

groups,"[19] and "[p]oorer Americans, women, Black, Hispanic Americans, and young people were more likely to identify an employment problem as their most serious legal problem."[20] Overall, during the same period, multiracial (non-Hispanic) and Black (non-Hispanic) Americans encountered legal problems at higher rates than other racial/ethnic groups, at 74% and 71%, respectively.[21]  And Black Americans typically experienced the most serious problems, including precarious housing, job losses, and lost income.[22]

In sum, the extraordinary hardships inflicted by the pandemic have exacerbated longstanding inequalities, including the acute lack of representation experienced by low-income—and, in particular, minority—communities in debt collection and other proceedings that have serious implications for their livelihoods.  When people do not assert their legal rights (including, for example, by raising defenses to meritless collection actions), the result is adverse judgments that often cause a snowball effect on their lives and their communities, including mushrooming debt and, potentially, bankruptcy and housing insecurity.

### B.  Impacts on the Courts and the Justice System

These profound consequences of the access to justice crisis are not limited to the individuals named as defendants in debt collection proceedings.  They also extend to the courts and the justice system as a whole.

"The paramount importance of vigorous representation follows from the nature of our adversarial system of justice.  This system is premised on the well-tested principle that truth—as

---

[19] *Id.* at 195.

[20] *Id.* at 11.

[21] *Id.* at 36.

[22] *Id.* at 29, 60.

well as fairness—is 'best discovered by powerful statements on both sides of the question.'"
*Penson v. Ohio*, 488 U.S. 75, 84 (1988) (quoting Kaufman, *Does the Judge Have a Right to Qualified Counsel?* 61 A.B.A.J. 569, 569 (1975)).  While there is no constitutional right to counsel in most categories of civil (rather than criminal) matters, it remains the case that justice and the rule of law are advanced in our adversarial system when courts are able to hear competent arguments on both sides of a dispute.  Yet where, as here, the overwhelming majority of debt collection cases heard by New York courts—by some counts, more than 85%[23]—result in default judgments because the defendant failed to appear in court to assert any defense, the system is not working as it should.

The lack of *any* legal assistance for these individuals (including, for example, the nonlawyer Justice Advocates that plaintiffs seek to provide) does a great disservice to the courts struggling to adjudicate the tidal wave of these cases.[24]  In particular, it places a greater burden on these courts (which already manage very heavy case-loads[25]) to determine, without the benefit of hearing from the alleged debtor defendant, whether the collection action in question suffers from jurisdictional or other legal defects, such as a statute-of-limitations bar.

Our courts deserve better.  In particular, they would benefit from having defendants appear and assert relevant defenses—aided by trained and experienced Justice Advocates—

---

[23] *See* notes 7 & 8, *supra*.

[24] *See supra* at p. 5 (noting that more than 265,000 debt collection actions were filed in New York courts in 2018 and 2019).

[25] The Small Claims Court of the New York City Civil Court is "one of the busiest Small Claims Courts in the world."  *See Welcome*, New York City Small Claims Court, https://nycourts.gov/COURTS/nyc/smallclaims/welcome.shtml (last visited Feb. 28, 2022). With over 40,000 cases filed each year, divided evenly among the 140 Civil Court judges, each judge would have an annual docket of 333 new cases.  *See also id.*, *Judges.*

rather than attempting to do justice in a one-sided system where repeat-player attorneys for debt collection firms outmatch unrepresented and low-income individuals who do not understand the complexities of the legal process they must navigate and consequently often fail to appear.  As noted, there is simply not sufficient legal aid and *pro bono* representation available for individuals in these sorts of state court proceedings.  Thus, there can be no doubt that the advice provided by trained Justice Advocates is superior to no representation at all.  Indeed, as discussed below, these nonlawyer representatives can provide high-quality assistance that may be superior to that of attorneys who are not specialists in the relevant field.

The currently one-sided system also undermines public confidence in our justice system and the rule of law.[26]  Where more than eight out of ten defendants have default judgments entered against them without the court hearing any defense or explanation of their side of the case,[27] the public cannot have confidence that the system is working as it should.

## II.   Social Science Research Demonstrates the Safety and Effectiveness of Legal Services and Solutions Provided by Nonlawyers

The access to justice problem is large and complex—but it is not without potential solutions.  Those solutions are found in the nonlawyer practice currently utilized by millions of people in other countries, as well as growing numbers of people within the United States.  As

---

[26] Public confidence in the courts is already especially weak among many historically marginalized communities, including those who most acutely experience the lack of representation in legal proceedings.  According to the National Center for State Courts' 2015 survey, for example, "only 32% of African Americans believe state courts provide equal justice to all."  National Center for State Courts, *State of the State Courts in a (Post) Pandemic World: Results from a National Public Opinion Poll* 4-5 (2020), https://www.ncsc.org/__data/assets/pdf_file/0005/41000/COVID19-Poll-Presentation.pdf.  And as discussed, Black Americans experience a disproportionate number of default judgments for economic issues.

[27] Legal Aid Society, *supra*, at 8-9.

discussed below, nonlawyers have provided high-quality representation that courts have commended—and they have routinely done so without the involvement of any lawyers.

Broadly speaking, "legal advice" is the application of knowledge about law, legal principles, or legal processes to specific facts or circumstances; creating an analysis of the situation (a diagnosis of its legal aspects); and suggestions about courses of action (proposed treatments).[28]  Nonlawyers are well equipped to provide legal advice in many straightforward, routine settings.  Indeed, the studies examining these practices in various contexts outside and within the United States reflect a consistent theme: nonlawyer providers can be highly effective when they are (1) trained and specialized, and (2) the issues at hand do not raise complex questions of substantive law.  That is precisely the situation that Upsolve rightly seeks to target.

### A.     Common Law Countries Outside the United States Have Demonstrated Success in Responding to Access to Justice Issues with Nonlawyer Solutions

The United States is certainly not alone in experiencing a lack of access to justice.  In the late 1970s, the United Kingdom began to study its own access to justice problems and consider creative solutions.[29]  Research in the U.K. showed that access to justice problems not only affected individual citizens' relationships with the law, but also had far-reaching effects: increasing expenditures on public benefits for loss of employment; increasing expenditures on medical services; and increasing public expense for temporary housing following evictions.[30]

---

[28] Rebecca L. Sandefur, *Legal Advice from Nonlawyers: Consumer Demand, Provider Quality, and Public Harms*, 16 STANFORD J. CIVIL RIGHTS & CIVIL LIBERTIES 283, 286-87 (2020).

[29] Hazel Genn and Yvette Genn, *The Effectiveness of Representation at Tribunals* (London: Lord Chancellor's Department 1989).

[30] Rebecca L. Sandefur, *The Impact of Counsel: An Analysis of Empirical Evidence*, 9 SEATTLE J. SOC. JUST. 51, 55 (2010).

The U.K. helped narrow the access to justice gap—in large part, by enabling individuals involved in routine but specialized legal proceedings (such as social security proceedings) to benefit from the advice of nonlawyers who have experience with these specific proceedings. A range of both voluntary sector and commercial services offer legal advice. The most well-known are "Citizens Advice" offices, lay-staffed community advice offices throughout the country. These offices now advise millions of people (including in person, online, and by telephone[31]) on justice issues at more than 2,500 locations in the U.K.[32] The civil justice issues on which they advise include a wide range of matters, including debt, public benefits, employment, and family matters.[33]

In 2008, the Legal Services Research Centre studied the impact of nonlawyer advice services on debt in a program that used "partner agencies," including, among others, "community-based organisations" and housing support services.[34] The study found that the "projects were very successful at delivering advice to clients who had not sought advice before," thus reaching many groups who had previously failed to assert their rights in debt claims.[35] The services delivered resulted in "approximately £6m of debt … [being] written off" across 5,863 closed cases, or a debt reduction that averaged over £1,000 (about $1,340) per client.

---

[31] Citizens Advice, *Who We Are and What We Do*, https://www.citizensadvice.org.uk/about-us/about-us1/introduction-to-the-citizens-advice-service/ (last visited Feb. 24, 2022).

[32] *Id.*

[33] *Id.*

[34] Money & Pensions Service Financial Capability Secretariat, *Legal Services Commission's 'Money Advice Outreach Pilot,'* https://www.fincap.org.uk/en/evaluations/legal-services-commission-s-money-advice-outreach-pilot#key-findings (last visited Feb. 28, 2022).

[35] Marisol Smith and Ashish Patel, *Money Advice Outreach Evaluation: Cost and Effectiveness of the Outreach Pilots* 31 (2008), http://www.infohub.moneyadvicetrust.org/content_files/files/debtoutreachcosteffectiveness.pdf.

Alongside legal advice providers, the United Kingdom has long permitted a range of nonlawyer advocates to appear in certain fora, such as social security hearings, immigration hearings, industrial tribunals, and mental health review tribunals.  A landmark study conducted by a commission chaired by the Lord Chancellor found that lay specialists had a positive impact in all four types of administrative proceedings and were second to lawyers only in "industrial" (i.e., employment) disputes.[36]  The judges presiding over these hearings agreed: "There was little agreement about the need for legal skills, although all tribunals agreed that specialist skills were required.  In social security appeals, the view of tribunals was overwhelmingly that specialist lay advisers were *as good, and probably better, than the solicitors* who occasionally represented appellants."[37]

For social security hearings in the U.K., the study found that access to legal advice from nonlawyer advisors almost doubled their odds of success on appeal.  "In cases where appellants had not obtained advice before their hearing, appeals were allowed in just over one-quarter of cases (26%).  Where appellants had obtained advice before their hearing, appeals were allowed in about 46% of cases."[38]  And this was not the only benefit:  Another advantage of obtaining pre-hearing advice was "to increase appellants' chances of succeeding by increasing the likelihood that they will attend their hearing."[39]

Canada is another common law country that has successfully expanded the use of nonlawyer resources.  Since 2007, Ontario has allowed licensed paralegals to engage in the

---

[36] Sandefur, *Legal Advice*, *supra*, at 305.

[37] Genn & Genn, *supra*, at 216 (emphasis added).

[38] *Id.* at 68.

[39] *Id.* at 68-69.

limited independent practice of law.  A study five years into the licensing scheme surveyed 1,000 people who had used these services for "traffic, small claims, landlord/tenant, worker's compensation, real estate, probate, and family issues."[40]  Those surveyed stated that they went to paralegals because their services were more affordable, their matters were too simple to require a lawyer, and they believed the paralegals were experienced specialists.[41]

Research also suggests that removing antiquated barriers to the use of nonlawyer specialists can increase the likelihood that people will take action on their civil justice issues.  For example, Professor Sandefur has compared studies addressing how people confronting civil access to justice issues respond to those problems in the United States and the U.K.  As shown below, the results (whether they reported (i) doing nothing, (ii) using nonlawyer resources, or (iii) retaining lawyers) are striking:

---

[40] Sandefur, *Legal Advice*, *supra*, at 294.

[41] *Id.*  Another prominent example of a non-lawyer assistance program is South Africa's Community Advice Offices, which are staffed by paralegals and have a "long history of providing advice and information services to people who are marginalized through poverty, social circumstances, and geographical locations dating back to the apartheid era" on legal issues such as benefits, water sanitation, and housing.  Sheldon Krantz, *There Is No Justice When Low & Modest Income DC Residents Are Forced to Represent Themselves in Civil Cases*, 24 U.D.C. L. Rev. 18 (2021).



**A Comparison of How People Handle Civil Justice Problems Involving Money and Housing: United States (1992) and England and Wales (2004)**

Data for the United States are based on 1,077 problems involving housing, real property, personal finances, and consumer needs from a sample of 3,087 households. The reference period for problems is one year.[93]  Data for England and Wales are based on 453 problems involving livelihood, other sources of household income, housing security, housing conditions, and debt and credit from a sample of 4,667 individuals. The reference period for problems is three years or since the respondent turned eighteen.[94]

**FIGURE 4**

Rebecca L. Sandefur, *The Fulcrum Point of Equal Access to Justice: Legal and Nonlegal Institutions of Remedy*, 42 LOYOLA L.A. LAW REV. 949, 969 (2009).

The chart above shows that in the United States, people with access to justice problems are nearly as likely to do nothing, as to seek help from a legal resource.  By contrast, respondents in the U.K. (specifically, England and Wales) often availed themselves of nonlawyers, such as the Citizens Advice offices.

This research supports plaintiffs' claims in this case that Justice Advocates who are trained by Upsolve would be a valuable resource, likely to markedly improve the current

problem of underrepresentation (even taking into account the limited extent of legal aid and *pro bono* assistance that is available to New Yorkers). *First*, it makes sense that trained nonlawyers who have experience with a specialized legal process (e.g., debt collection proceedings or housing court proceedings) would be capable of providing more practical and effective legal advice than many attorneys, especially attorneys who have not handled such matters. A Justice Advocate who has handled 50 debt collection matters, for example, would likely provide better representation than a patent lawyer who has never set foot in small claims court and last looked at a consumer contract issue when studying for the bar exam.[42]

*Second*, even setting aside the ways in which Justice Advocates may be *more effective* than many lawyers, for the hundreds of thousands of individuals facing debt collections actions who cannot afford counsel (or find *pro bono* counsel), representation by these nonlawyers is plainly better than no representation at all. And supervision of Justice Advocates by *pro bono* counsel is neither necessary nor feasible to effectively address this problem, as the above studies have shown.

*Third*, the research discussed above shows that a simple but powerful benefit of access to free representation by Justice Advocates (or similar nonlawyer representatives) is that the individuals concerned become more invested in their cases and are much more likely to engage with the judicial process (including appearing in court). In this way, too, the Upsolve program

---

[42] Studies have shown that the effectiveness of lawyers versus nonlawyers turns more on specialized experience than formal qualifications such as a bar license. Herbert M. Kritzer, *Legal Advocacy: Lawyers and Nonlawyers at Work* 113 (1998); Anna E. Carpenter, Alyx Mark, & Colleen F. Shanahan, *Trial and Error: Lawyers and Nonlawyer Advocates*, 42 LAW & SOC. INQUIRY 1023, 1028 (2017).

not only helps the individuals facing debt collection actions, but also the courts hearing these cases and the justice system more broadly.

> **B.      Communities in the United States Have Also Begun To Successfully Rely on Trained Nonlawyers To Address the Access to Justice Gap**

Courts, civil justice advocates, and scholars across the United States are starting to recognize the access to justice gap and the appeal of nonlawyer solutions. *See, e.g.*, *Turner v. Rogers*, 563 U.S. 431, 448 (2011) (refusing to grant a categorical right to counsel in child custody hearings in part because "assistance other than purely legal assistance" can help ensure fairness). Many states have responded with models that echo the success of the Citizen Advice offices in the U.K. And when nonlawyers are available, people use them.

In Wisconsin, for instance, nonlawyers are permitted to help individuals involved in certain legal proceedings. In 1991, 22% of all employee representatives in Wisconsin unemployment compensation appeals were nonlawyers; 38% of representatives in state tax appeals were nonlawyers.[43] Other states are in various stages of expanding their own licensed legal practitioners. Limited-license legal technicians can help with document preparation and family law advice in Washington, while certified legal preparers can prepare legal documents in Arizona and California.[44]

The federal government also allows representation by nonlawyers in certain administrative hearings. For immigration hearings, over 2,000 federally accredited nonlawyer immigration representatives deal with all sorts of legal matters faced by their clients, including

---

[43] Sandefur, *Legal Advice*, *supra*, at 290.

[44] Leslie C. Levin, *The Monopoly Myth and Other Tales About the Superiority of Lawyers*, 82 FORDHAM L. REV. 2611, 2615-16 (2014).

representation in immigration court and before the Board of Immigration Appeals.[45]  The Social

Security Administration advises claimants appealing determinations of their right to

representation, but it does not require that those representatives be licensed attorneys.[46]

To be sure, nonlawyers are not the solution for every case (including in complex cases

that present novel questions of law),[47] but this does not mean that they are not a good solution

here.  To the contrary, the social science research suggests that Justice Advocates will

significantly help the hundreds of thousands of New Yorkers who otherwise would be likely to

default in response to debt collection actions.  This will lead to more just outcomes.  It will also

help overburdened state courts decide more cases on the merits—rather than on the happenstance

of which defendants are unable to afford counsel or otherwise unable to mount their own

defense.  And it will further public confidence and trust in our legal system.[48]

## <u>CONCLUSION</u>

Like lawyers, nonlawyers need to study and train to properly advise people on their legal

problems.  The program developed by Upsolve, which includes comprehensive training,

proposes to do just that.  For the sake of the hundreds of thousands of New Yorkers in dire need

of these services, and the state court judges drowning in these cases, this Court should grant

plaintiffs' motion for a preliminary injunction (and ultimately grant declaratory and permanent

---

[45] Sandefur, *Legal Advice*, *supra*, at 290.

[46] Kritzer, *supra*, at 113; *see also* Social Security Administration, *Your Right to Representation* (2020), https://www.ssa.gov/pubs/EN-05-10075.pdf.

[47] Professor Sandefur's research suggests that the benefit of representation (as defined strictly by case outcome) varies significantly with the complexity at issue.  Sandefur, *Legal Advice*, *supra*, at 306; Levin, *supra*, at 2618.

[48] *See* Sandefur, *Legal Advice*, *supra*, at 301-02.

injunctive relief on the merits) in favor of allowing Upsolve and its Justice Advocates to provide

these much-needed services without running afoul of New York's restrictions on the

unauthorized practice of law.

 March 2, 2022                                      Respectfully submitted,


                                                   */s/ Peter Karanjia*
                                                   Peter Karanjia
                                                   Paul D. Schmitt (*not admitted*)
                                                   DLA PIPER LLP (US)
                                                   500 Eighth Street, N.W.
                                                   Washington, D.C.  20004
                                                   (202) 799-4135
                                                   peter.karanjia@us.dlapiper.com

                                                   Whitney Cloud (*not admitted*)
                                                   DLA Piper LLP (US)
                                                   One Liberty Place
                                                   1650 Market Street Suite 5000
                                                   Philadelphia, Pennsylvania  19103-7300
                                                   (215) 656-2440
                                                   whitney.cloud@dlapiper.com

                                                   *Counsel for Amica Curiae*
                                                   *Professor Rebecca L. Sandefur*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of New York by using the court's CM/ECF system on March 2, 2022.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the court's CM/ECF system.

*/s/ Peter Karanjia*
Peter Karanjia