UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UPSOLVE, INC., and
REV. JOHN UDO-OKON,

*Plaintiffs*,

v.

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York,

*Defendant*.

No. 22-cv-627 (PAC)

**OPINION & ORDER**

---

"The orderly functioning of our judicial system and the protection of our citizens require that legal advice should be offered only by those who possess the requisite qualifications and authorization for the practice of law.  At the same time, one of the most fundamental principles of our system of government prohibits any restraint on a citizen's right to disseminate his views on important public issues."  *Dacey v. New York Cty. Lawyers' Ass'n*, 423 F.2d 188, 189 (2d Cir. 1969).  Sometimes these two principles conflict, and one must yield to the other.

This case exemplifies that conflict.  Plaintiffs—a non-profit organization and a non-lawyer individual—seek to encroach upon a small part of what has heretofore been the exclusive domain of members of the Bar.  Plaintiffs have crafted a program that would train non-lawyers to give legal advice to low-income New Yorkers who face debt collection actions.  Specifically, Plaintiffs want to help those New Yorkers fill out checkboxes on a one-page answer form provided by the State, in the hopes that more people will avoid defaulting outright in such actions.  The legal advice would be free and confined to helping clients complete the State's one-page form.

Plaintiffs' proposal faces one problem: by giving legal advice as non-lawyers, their activities would constitute the unauthorized practice of law ("UPL") under several New York

1

statutes.  They risk being sued by the Defendant in this case, the New York State Attorney General.  Thus, Plaintiffs seek an injunction that prevents the Attorney General from enforcing the UPL rules against them.

The Court concludes a preliminary injunction is warranted.  The UPL rules cannot be applied to Plaintiffs' program because the First Amendment protects their legal advice as speech, and the UPL rules are not narrowly tailored to satisfy strict scrutiny in this context.  Further, the balance of equities favors an injunction because Plaintiffs' program would help alleviate an avalanche of unanswered debt collection cases, while mitigating the risk of consumer or ethical harm.  And enjoining enforcement against Plaintiffs alone, whose activities are carefully limited to out-of-court advice, will not threaten the overall regulatory exclusivity of the legal profession.

## BACKGROUND

### I.    Debt Collection Actions in New York State

Debt collection actions are extremely common in New York.  By one estimate, they comprise approximately a quarter of all lawsuits in the State's court system.  *See* Compl., ECF No. 1, at ¶ 18.

These debt collection actions have been the subject of commentary and regulatory reform.  Many of these lawsuits are viewed as "clearly meritless," where the defendants sued do not actually owe the amount claimed, or any amount at all.  *See id.* ¶ 21.[1]  Nonetheless, everyone agrees the vast majority of New Yorkers default when faced with debt collection actions.  Plaintiffs provide estimates of the default rate that range from over 70% to up to 90%.  *See id.* ¶ 19.

---

[1] Quoting *The Legal Aid Society et al., Debt Deception: How Debt Buyers Abuse the Legal System to Prey on Lower-Income New Yorkers*, 8–10, 26 n.91 (May 2010), https://www.neweconomynyc.org/wp-content/uploads/2014/08/DEBT_DECEPTION_FINAL_WEB-new-logo.pdf.

Three such New Yorkers have submitted declarations describing their own default judgments. All three were sued on consumer debts such as credit card expenses, medical bills, or auto loans. *See* Evertsen Decl., ECF No. 7-7, at ¶ 9; Jurado Decl., ECF No. 7-8, at ¶ 17; Lepre Decl., ECF No. 7-9, at ¶ 6. However, none of them received notice they were being sued, so they all defaulted. *See* Evertsen Decl. at ¶¶ 12–14; Jurado Decl. at ¶¶ 14–15; Lepre Decl. at ¶¶ 9–11. They subsequently faced default judgments—and collateral consequences including wage garnishment, lowered credit scores, and bankruptcy—because they had failed to answer the lawsuits against them. *See* Evertsen Decl. at ¶ 17; Jurado Decl. at ¶¶ 18, 24; Lepre Decl. at ¶¶ 14, 17, 22.

Since at least 2015, New York has responded to this debt collection problem by providing a one-page answer form that defendants can download, complete, and submit in their cases. *See* Compl. ¶¶ 34–35; *id.* Ex. A, ECF No. 1-1 (the "State-Provided Answer Form"). The form includes checkboxes allowing a defendant to assert affirmative defenses, such as, "I did not receive a copy of the Summons and Complaint," "I had no business dealings with Plaintiff (Plaintiff lacks standing)," or "Unconscionability (the contract is unfair)." *See* State-Provided Answer Form at 2. A defendant can submit a notarized copy of the State-Provided Answer Form themselves, i.e., pro se.

## II.     Plaintiffs and their AJM Program

Plaintiff Upsolve, Inc. is a non-profit organization that seeks to "ensure that all Americans can access their legal rights." Compl. ¶ 3. The organization "hope[s] to improve public faith in the court system by ensuring that all defendants rich and poor can have their day in court, courts can decide more cases on their merits, and plaintiffs cannot secure default judgments on meritless claims simply due to defendants' inability to vindicate their rights." *Id.* ¶ 56. More specifically,

Upsolve seeks "to provide free, narrowly circumscribed legal advice to low-income New Yorkers to ensure that they can understand how to respond to the debt collection lawsuits against them and help reduce wrongful deprivation of property and the lasting harm it can cause." *Id.*

To that end, Upsolve has "designed, crafted, and obtained funding to implement a program—the American Justice Movement ('AJM')—to train professionals who are not lawyers to provide free legal advice on whether and how to respond to a debt collection lawsuit." *Id.* Upsolve has not yet implemented the AJM program. *See id.* ¶ 92.

Under the AJM program, volunteer trainees—referred to as "Justice Advocates"—would use a training guide to help clients complete the State-Provided Answer Form. *See* Compl. Ex. B, ECF No. 1-2 (the "Training Guide"). The Training Guide provides several steps for a Justice Advocate to follow when counseling a client. Those steps include: (1) determining whether the client could benefit from their advice; (2) confirming the limited scope of representation with the client; (3) advising the client whether it is in their best interest to answer the lawsuit against them; (4) advising the client on how to fill out the answer's 24 checkboxes based on the client's answers to a series of questions; and (5) advising the client on how and where to file and serve the answer themselves. *See* Training Guide at ECF pagination 5–13. Upsolve designed the Training Guide with the help of lawyers and law professors who have experience in debt collection practice. *See* Lhewa Decl., ECF No. 7-5; Foohey Decl., ECF No. 7-6.

The Training Guide also limits the scope of legal assistance provided. Justice Advocates must sign an affidavit attesting that the advice they provide will be free of charge. They promise to abide by New York's Rules of Professional Conduct regarding client conflicts of interest, confidentiality, and informed consent. And they promise to refer clients to lawyer organizations if those client's needs exceed the scope of the advice authorized by the Training Guide. *See*

Training Guide at ECF pagination 3–4, 15.  If Justice Advocates violate the Training Guide's rules, their membership in the AJM program will be terminated.  They are also warned they could be prosecuted for the unauthorized practice of law or other consumer-protection laws if they violate the AJM program's rules.  *See id.* at 4.

One such Justice Advocate would be Reverend Udo-Okon, the other plaintiff in this case. Reverend Udo-Okon is a pastor in the South Bronx.  *See* Udo-Okon Decl., ECF No. 7-2, at ¶ 3. He is not a lawyer, but would like to help members of his community who frequently come to him with their legal problems, including debt collection lawsuits.  *See id.* at ¶¶ 11, 13.  Reverend Udo-Okon "would welcome the opportunity to be trained by the American Justice Movement," and "would be willing to comply with the relevant ethical obligations, including confidentiality and conflict-of-interest protections, for the individuals seeking [his] advice."  *See id.* at ¶ 23.  He declares that his advice would be free to those who receive it.  *See id.*  Reverend Udo-Okon has gathered signatures from dozens of his constituents who say they would be willing to receive free legal advice from him.  *See id.* Ex. 2A, ECF Nos. 7-3, 7-4.

## III.   New York's UPL Statutes

New York makes it civilly and criminally punishable for someone who is not admitted to a State Bar Association to engage in the "unlawful practice of law."  *See* N.Y. Jud. Law §§ 476-a, 478, 484, 485.  A court may also hold a non-lawyer who practices law in civil or criminal contempt. *See id.* §§ 750, 753.  The Attorney General is authorized to sue "any person, partnership, corporation, or association" who engages in the unauthorized practice of law.  *Id.* § 476-a.

Defining the "practice of law," however, is an elusive endeavor.  New York courts have held that one clear category "involves the rendering of legal advice and opinions directed to particular clients."  *Matter of Rowe*, 80 N.Y.2d 336, 341–42 (1992).  Others include "appearing in

court and holding oneself out to be a lawyer." *El Gemayel v. Seaman*, 72 N.Y.2d 701, 706 (1988). By contrast, giving generalized advice to the public—where judgment is not exercised on behalf of a particular client—is not considered the practice of law. *See Rowe*, 80 N.Y.2d at 342; *El Gemayel*, 72 N.Y.2d at 706.

In this case, both sides agree that Justice Advocates in the AJM program would be "practicing law" in New York. Justice Advocates would give clients advice on how to complete an answer form based on those clients' individual circumstances; those clients would then file their answers in court. *See, e.g.*, *Sussman v. Grado*, 746 N.Y.S.2d 548, 552–53 (Dist. Ct. Nassau Cty. 2002) (paralegal who used independent judgment to help a client fill out a form, without attorney supervision, engaged in the unauthorized practice of law). The UPL rules therefore apply to Plaintiffs' activities.

The question, then, is whether the UPL rules are constitutional in that application.

## ANALYSIS

### IV.   Subject Matter Jurisdiction

#### A.   Plaintiffs have Standing to Seek Injunctive Relief

The Court must first assess the threshold issue of Article III standing. Here, even though no one has yet sought to enforce the UPL rules against them, Plaintiffs have established standing.

"[I]n order to seek injunctive relief, a plaintiff must show the three familiar elements of standing: injury in fact, causation, and redressability." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)). At the preliminary injunction stage, "a plaintiff cannot rest on such mere allegations, as would be appropriate at the pleading stage but must set forth by affidavit or other evidence specific facts" supporting the three

standing elements.   *Cacchillo*, 638 F.3d at 404 (cleaned up) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).[2]

Plaintiffs have not provided any legal advice would expose them to prosecution under the UPL rules, raising questions as to the "injury in fact" element of Article III standing.   Yet such pre-enforcement challenges are regularly entertained by federal courts.   Where a plaintiff asserts injury based on the threat of prosecution, that plaintiff need not "expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced."   *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) (collecting cases).   Plaintiffs here could face civil or criminal prosecution under the UPL rules by the Attorney General.

In a pre-enforcement challenge, "[c]ourts are generally 'willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund.'" *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (quoting *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013)).   This presumption "sets a low threshold and is quite forgiving to plaintiffs seeking such preenforcement review," *Cayuga Nation*, 824 F.3d at 331 (quoting *Hedges*, 724 F.3d at 197), especially when First Amendment rights are at issue.   *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013).

New York's UPL rules are hardly moribund; they are frequently enforced against lawyers and non-lawyers alike.   *See, e.g.*, *Spiegel v. Ahearn*, No. 101251/2016, 2018 WL 4743366, at *4 (Sup. Ct. N.Y. Cty. 2018) (non-lawyer engaged in the unauthorized practice of law "by discussing

---

[2] "An evidentiary hearing is not required . . . when the disputed facts are amenable to complete resolution on a paper record" or a part "waive[s] its right to an evidentiary hearing."   *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998).   Plaintiffs have submitted several affidavits in support of their motion; the Court has also heard oral argument from both sides.   Accordingly, the Court reviews this motion on a paper record without an evidentiary hearing.

Defendants' legal problems with them and advising them what they needed to do to resolve those problems"); *People v. Jakubowitz*, 710 N.Y.S.2d 844, 845 (Sup. Ct. Bronx Cty. 2000) (criminal charges under UPL rules against disbarred attorney).  Just a few months ago, the Attorney General charged a non-lawyer in Buffalo for allegedly posing as an attorney and representing clients at legal proceedings.[3]  That non-lawyer faces a possible felony under the UPL rules.

To be sure, the Attorney General has not announced an intention to prosecute the Plaintiffs for implementing the AJM program.  But as discussed above, Plaintiffs' activities would clearly run afoul of the UPL rules.  *See Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019).  Moreover, the Attorney General declined to disavow enforcement against Plaintiffs at oral argument.[4]  *See Walsh*, 714 F.3d at 691 (political non-profit had pre-enforcement standing, despite Government's suggestion that it *might* not enforce a statute, when that statute "clearly applie[d]" to non-profit's activities, and Government had conceded at oral argument that it regulated thousands of other political committees); *Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d

---

[3] *See Press Release: Attorney General James and State Police Superintendent Bruen Announce Arrest of Phony Attorney*, NEW YORK STATE ATT'Y GENERAL, Mar. 9, 2022, https://ag.ny.gov/press-release/2022/attorney-general-james-and-state-police-superintendent-bruen-announce-arrest.

[4] *See* Oral Argument Tr., ECF No. 66, at 27:5–17:

> THE COURT:  Let me interrupt you.  Is there any doubt that the Attorney General would enforce this law against the plaintiffs?
>
> MR. LAWSON:  It's hard to make a determination on that question simply because it's a hypothetical question, and the issue of the unauthorized practice of law is a fact-based inquiry that depends on what actually happens in a given circumstance.
>
> THE COURT:  You think this is not the practice of law?
>
> MR. LAWSON:  For the purpose of this motion, your Honor, the state is not disputing that the conduct that they state that they would participate in would likely constitute unauthorized practice of law.

376, 383 (2d Cir. 2000) (noting "there is nothing that prevents the State from changing its mind" about enforcement).  The Attorney General has not rebutted the presumption of enforcement.

Plaintiffs have also buttressed their standing by showing exactly how they would violate the UPL rules.  *See Wembley, Inc. v. Superba Cravats, Inc.*, 315 F.2d 87, 90 (2d Cir. 1963) ("Major stress should be placed on the 'definite' intention of the plaintiff to take 'immediate' action to utilize its potential and this intention should be 'evident' from the preparatory steps outlined in its complaint.").  Upsolve has provided a fully fleshed-out Training Guide.  It has identified willing Justice Advocate trainees (such as Reverend Udo-Okon) and willing clients (such as the signatories to the Reverend's petition) that could implement that Training Guide immediately.  Plaintiffs' injury is thus sufficiently concrete to meet Article III's requirements.

With injury-in-fact established, the causation and redressability elements of standing are easily satisfied in this case.  As to causation, Plaintiffs have alleged that the only thing preventing them from acting is the threat of UPL enforcement.  *See* Udo-Okon Decl. ¶¶ 17–18, 21 ("One such religious leader in the South Bronx was accused of practicing law without a license because he was trying to help members of his community out with their legal issues.  I fear that I would face the same consequences if I tried to help members of my own community out with their debt collection lawsuits.").  And relatedly, an injunction against enforcement of the UPL rules would remove the threat to Plaintiffs' planned activities, satisfying the redressability requirement.

### B.    Plaintiffs' Challenge is As-Applied

The nature of Plaintiffs' pre-enforcement challenge presents another threshold question: whether the Court should treat that challenge as one that is "facial" or "as-applied."  A facial challenge would seek to declare New York's UPL rules unconstitutional for everyone, while an as-applied challenge only seeks to hold those rules unconstitutional as to Plaintiffs' own activities.

"Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984).   Given their breadth, facial challenges are highly disfavored.   *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008); *accord Dickerson v. Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010).

Plaintiffs characterize their suit as an as-applied challenge—they do not seek to strike down the UPL rules whole cloth—and the Attorney General does not argue otherwise.   Yet the pre-enforcement timing of Plaintiffs' lawsuit unsettles their conclusion.   After all, how is the Court to resolve the application of the UPL rules to Plaintiffs if they have not yet violated anything?

Some Second Circuit precedent would seem to suggest that Plaintiff's lawsuit must be construed as a facial challenge.   In *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Departments*, non-lawyer plaintiffs who wanted to invest in law firms sued before taking any action to violate the UPL rules.   852 F.3d 178, 191 (2d Cir. 2017).   The Second Circuit noted that the plaintiffs' suit "constitute[d] a facial, rather than as-applied challenge" because they had brought a "pre-enforcement appeal before they have been charged with any violation of law . . . ." *Id.* (quoting *N.Y.S. Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015) (internal quotation marks omitted)).   Likewise here, because Plaintiffs have not been charged with violating the UPL rules, *Jacoby & Meyers* would suggest their action should be construed as a facial challenge.

The Supreme Court, however, has eschewed any such bright line rule.   It has permitted pre-enforcement, as-applied challenges under the First Amendment.   *See Holder v. Humanitarian*

*Law Project*, 561 U.S. 1, 14–16 (2010); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 234, 248–49 (2010).

While these two lines of authority are admittedly in "some tension," *Geller v. Cuomo*, 476 F. Supp. 3d 1, 17 (S.D.N.Y. 2020), it is more sensible to frame Plaintiffs' challenge as an as-applied one.  Adjudicating their claims will not extend relief to non-parties outside of their organization, as the specifics of Plaintiffs' legal advice can be adjudicated on the factual basis of AJM Training Guide.  They seek to allow members of a specific group to give legal advice about a specific legal topic—debt collection cases—with specific parameters about how those members would go about giving that advice.  This analysis does not require adjudication of every possible application of the UPL rules based on hypothetical facts about other groups of non-lawyers.  *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (on a facial challenge, "the challenger must establish that no set of circumstances exists under which the [statute] would be valid").

Moreover, there is no tension at all surrounding the federal courts' general preference for as-applied challenges.  As-applied challenges serve the foundational interest of judicial restraint.  They allow for incremental decisions, based on actual cases or controversies, about the constitutionality of our laws.  *See Kane v. De Blasio*, 19 F.4th 152, 174 (2d Cir. 2021).

The Court shall therefore examine the constitutionality of the UPL rules as applied to Plaintiffs alone.

This framing carries important consequences.  A facial challenge would impose a heavy burden on Plaintiffs to prove the UPL rules lack a "plainly legitimate sweep," *Washington State Grange*, 552 U.S. at 449 (citation and quotation marks omitted)—an especially trying task considering that the UPL rules are one of the cornerstones of the modern practice of law in New York State.  Instead, with an as-applied challenge, Plaintiffs need not challenge the legitimacy of

the UPL rules in the abstract; they need only address the UPL rules with respect to their own activities. An as-applied challenge also guarantees that any relief would be narrow, affecting only the Plaintiffs and not the entire universe of non-lawyers. *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502 (1985) (noting that "a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it").

With the scope of Plaintiffs' challenge to the UPL rules made clear, the Court turns to the merits.

## V.      MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs seek a preliminary injunction that prevents the Attorney General from enforcing the UPL rules against them for implementing the AJM program.

### A.      Legal Standard

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). To obtain this remedy, Plaintiffs must demonstrate three factors. Where, as here, "a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme," the party seeking the preliminary injunction must demonstrate "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) (citation and quotation marks omitted). More generally, "[t]he movant also must show that 'the balance of equities tips in his [or her] favor.'" *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

"To warrant a preliminary injunction, Plaintiffs need not show that there is a likelihood of success on the merits of all of their claims for relief. Rather, Plaintiffs must show a likelihood of

success on the merits of at least one of their claims."  *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018) (alterations and quotation marks omitted).

One wrinkle: Plaintiffs in this case seek an injunction that *alters* the status quo by allowing them to give legal advice for the first time.  Thus, Plaintiffs seek a "mandatory" injunction (which alters the status quo) rather than a "prohibitory" injunction (which maintains the status quo).  *See Kosinski*, 960 F.3d at 127.  For a "mandatory" injunction, Plaintiffs must also: (1) make a "strong showing" of irreparable harm, and (2) demonstrate a "clear or substantial likelihood of success on the merits."  *Id.* (citations omitted).  Because the Court concludes Plaintiffs would prevail under either the "mandatory" or "prohibitory" standard, it does not distinguish between the two for purposes of this Opinion.  *See id.*

### B.  Likelihood of Success on the Merits

Much rises and falls on the likelihood of Plaintiffs' success on the merits.  "Because the deprivation of First Amendment rights is an irreparable harm, in First Amendment cases 'the likelihood of success on the merits is the dominant, if not the dispositive, factor'" in granting a preliminary injunction.  *Agudath Israel*, 983 F.3d at 637 (quoting *Walsh*, 733 F.3d at 488).

"It is fundamental that the First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 (2001) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964)).

Plaintiffs advance two theories under the First Amendment.  First, they claim the UPL rules infringe on their right to associate with potential clients and access the courts.  Second, they claim the UPL rules infringe on their right to give legal advice under the Free Speech Clause.  Although their first theory likely lacks merit, their second theory is likely to succeed on the merits.

i)   <u>Right of Association Claim</u>

The Court first addresses, and dismisses, Plaintiffs' associational theory.  Plaintiffs allege the UPL rules unconstitutionally prevent them, and their clients, from accessing the courts and expressing their political beliefs.  They argue that debt collection lawsuits affect poor and minority Americans more than other groups, and that by responding to those lawsuits, they can express their beliefs about every New Yorker's right to be heard in court.  *See* Compl. ¶ 56.

Two threads of Supreme Court precedent are often invoked in this associational context. The first line of cases involves non-profits that seek to advocate politically through litigation.  In *NAACP v. Button*, 371 U.S. 415 (1963), the NAACP sought to recruit clients to battle racial segregation in court.  However, a state statute had prevented organizations like the NAACP from using attorneys to represent third-party clients.  *Id.* at 423–24.  The Supreme Court held that NAACP's efforts were "modes of expression and association protected by the First and Fourteenth Amendments . . . ."  *Id.* at 428–49.  The Court emphasized that "no monetary stakes [were] involved" in the NAACP's mission, such that "there [was] no danger that the attorney [would] desert or subvert the paramount interests of his client to enrich himself or an outside sponsor."  *Id.* at 443–44.  The NAACP's attorney advocacy was therefore a "mode[] of expression and association protected by the First and Fourteenth Amendments."  *Id.* at 428–49.

*Button*'s rationale was echoed in *In re Primus*, 436 U.S. 412 (1978).  In *Primus*, the Supreme Court struck down a law that prevented the ACLU from soliciting a client who had received an allegedly unconstitutional sterilization.  *Id.* at 422.  Again, the Court emphasized the organization's non-financial motives by contrasting the ACLU's activities from those in another case decided the same day, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 458 (1978), which upheld a state law barring a lawyer from solicitating a client in-person for paid representation.

*Primus*, 436 at 422.  Although the *Primus* Court concluded the state's interests may be stronger in circumstances where a commercial transaction is proposed, they were not sufficiently tailored in application to organizations such as the ACLU.  *Id.*

The second relevant line of cases involves lawyers who seek to represent union members. *See United Transp. Union v. Michigan*, 401 U.S. 576 (1971); *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217 (1967); *Brotherhood of R. R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1 (1964).  In those cases, the Supreme Court has held the First Amendment protected union members' right to "associate with each other to obtain counsel and further their litigation ends, and to the union as a proxy for the workers in their exercise of associational rights." *Jacoby & Meyers*, 852 F.3d at 185.  States therefore could not "prevent efforts of a union to provide its members practical and economical access to courts to press work-related personal injury claims" by framing laws "in the guise of regulating the practice of law."  *Board of Education v. Nyquist*, 590 F.2d 1241, 1244 (2d Cir. 1979).

The "common thread" of these two lines of cases is the principle that "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment."  *United Transp.*, 401 U.S. at 585.  And the cases have clearly differentiated between "activities of lawyers acting in a for-profit setting and those acting in a not-for-profit context, advocating political causes in which the attorneys themselves share . . . ." *Jacoby & Meyers*, 852 F.3d at 188.  Hence, Plaintiffs' non-profit status holds some superficial appeal in this action.

But the cases share another common thread which cuts against Plaintiffs: in each one, "clients and *attorneys* [sought] each other out to pursue litigation."  *Id.* at 185 (emphasis added). Here, by contrast, non-lawyers would seek out clients.  Accordingly, both the non-profit and the

union lines of caselaw are fundamentally distinguishable: neither confronted a non-lawyer's purported associational right to represent a client.  In that respect, no precedent, binding or otherwise, appears to support Plaintiffs' position.

This Court doubts, moreover, that the rationale of *Button* and *Primus* extends so far as to justify non-lawyer legal advice merely because doing so would express a political belief.  The lawyers in those non-profit cases sought to vindicate constitutional rights, such as equal protection against discriminatory laws, because such causes "implicate[d] expressive values" for both the lawyers and their clients.  *Id.* at 185–86.  Here, Plaintiffs would express their belief in ending cycles of poverty by assisting their clients in debt collection cases.  But the only constitutional right they seek to vindicate is their *clients'* right to access the courts.[5]  Promoting access to the courts—a right shared by every client—would allow any non-lawyer, so long as they do not charge a fee, to bootstrap a right to practice law.  *See id.* at 187 ("We are not aware of any judicial recognition of such an interest, however, when it comes to the lawyer's generic act of pursuing litigation on behalf of any client.").  Clients in any type of civil lawsuit would thus enjoy the right to full non-lawyer representation.  The Court declines to endorse this broad associational theory to warrant a preliminary injunction.

ii)      Free Speech Claim

Plaintiffs' stronger theory is based on their *own* right to free speech.  On this second claim, they have demonstrated a likelihood of success on the merits.

At the outset, the Court underscores that an abstract "right to practice law" is not at issue in this narrow challenge.  The Court does not question the facial validity of New York's UPL rules

---

[5] Given that Plaintiffs have not included any clients in their lawsuit, they also risk creating a third-party standing problem by asserting constitutional rights on behalf of hypothetical clients.  *See Jacoby & Meyers*, 852 F.3d at 189 n.7.

to distinguish between lawyers and non-lawyers in most settings, and to regulate all sorts of non-lawyer behavior.[6]  Instead, the issue here is a narrow one: whether the First Amendment protects the precise legal advice that Plaintiffs seek to provide, in the precise setting in which they intend to provide it.  The Court holds that it does.

(1)     *Plaintiffs' Legal Advice is Content-Based Speech*

Plaintiffs' claim hinges on whether the act of giving legal advice should be conceptualized as conduct or speech.  The two concepts often blur, given that "the practice of law has communicative and non-communicative aspects."  *Capital Associated Indus., Inc. v. Stein*, 922 F.3d 198, 208 (4th Cir. 2019).  But "[w]hile drawing the line between speech and conduct can be difficult, [the Supreme] Court's precedents have long drawn it, and the line is long familiar to the bar."  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2373 (2018) (citations and quotation marks omitted) ("*NIFLA*").

The distinction between speech and conduct matters because it determines the level of scrutiny that the Court must apply.  On the one hand, for regulations of professional conduct that *incidentally* involve speech, courts apply intermediate scrutiny.  *See id.* at 2372 (citing *Ohralik*, 436 U.S. at 456–57 (remarking that where "speech is an essential but subordinate component" of a transaction, "[w]hile this does not remove the speech from the protection of the First Amendment" altogether, "it lowers the level of appropriate judicial scrutiny")).  On the other hand,

---

[6] A recent motion by a non-party illustrates the limits of the Court's holding.  A non-lawyer, Erwin Rosenberg, has moved for permissive intervention in this case.  *See* ECF No. 64.  Rosenberg was apparently disbarred but remains "interested in practicing law in New York courts."  *Id.* at 1.  He pushes the Court to address the broad question of "whether the New York lawyer licensing and disciplinry [*sic*] system violates the First Amendment."  *Id.*  In other words, Rosenberg seeks to assert a facial challenge—a "general constitutional attack"—on New York's ability to "admit, suspend and/or disbar a lawyer."  *Id.* at 5.  Rosenberg's challenge to the UPL rules is nothing like the Plaintiffs' challenge here, and the Court can confidently predict his challenge to the State's licensing scheme would fall within the myriad of cases upholding UPL statutes generally.

a regulation invites strict scrutiny when it "'targets speech based on its communicative content'— that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (alteration omitted) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

There is no doubt: lower courts have overwhelmingly concluded that UPL statutes regulate professional "conduct" and merely burden a non-lawyer's speech incidentally. These authorities, however, have never addressed the narrow—and novel—question the AJM program presents here.

For example, many UPL cases have focused on specific "*conduct*" that non-lawyers sought to undertake. Non-lawyers have been excluded from "drafting" pleadings and "filing" legal documents.[7] Conduct could also include "representing" clients in a courtroom or proceeding.[8] These conduct-focused cases are inapposite, as Plaintiffs do not seek to do any of these activities. The AJM program does not allow Justice Advocates to file pleadings, represent clients in court, or handle client funds. Their counsel is limited to out-of-court verbal advice.

Other distinguishable cases have addressed *facial* challenges to UPL rules. Rather than focusing on discrete types of speech that non-lawyers could provide, these cases have concluded that the abstract practice of law does not implicate First Amendment scrutiny as a general matter.[9]

---

[7] *See, e.g.*, *People v. Shell*, 148 P.3d 162, 170 (Colo. 2006); *State v. Niska*, 380 N.W.2d 646, 648 (N.D. 1986); *Fla. Bar v. Furman*, 376 So. 2d 378, 379 (Fla. 1979).

[8] *See, e.g.*, *Montana Supreme Ct. Comm'n on Unauthorized Practice of Law v. O'Neil*, 147 P.3d 200, 204 (Mont. 2006); *Adams v. Am. Bar Ass'n*, 400 F. Supp. 219, 225 (E.D. Pa. 1975); *Turner v. Am. Bar Ass'n*, 407 F. Supp. 451, 477 (N.D. Tex. 1975).

[9] *See, e.g.*, *Monroe v. Horwitch*, 820 F. Supp. 682, 683–86 (D. Conn. 1993), *aff'd*, 19 F.3d 9 (2d Cir. 1994) (table); *Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1386 (7th Cir. 1992) (but noting an as-applied challenge could implicate "many activities which lawyers routinely engage in which are protected by the First Amendment and which could not be constitutionally prohibited to laypersons"); *McDermott v. Langevin*, 587 B.R. 173, 184–85 (Bankr. N.D. Ga. 2018); *Howard v. Superior Ct.*, 52 Cal. App. 3d 722, 724 (1975).

That approach would be overinclusive here, given Plaintiffs bring an *as-applied* challenge about spoken advice they would give to clients.   Moreover, these cases have been called into serious doubt by *NIFLA*,[10] which applied intermediate scrutiny to professional conduct regulations at the very least—not rational basis review, or indeed complete lack of First Amendment scrutiny, as the Attorney General proposes.   *See NIFLA*, 138 S. Ct. at 2375; *see also Stein*, 922 F.3d at 208–09 (concluding, after *NIFLA*, that intermediate scrutiny applied to a UPL rule that generally regulated conduct, and noting the rule at issue did not "target the communicative aspects of practicing law, such as the advice lawyers may give to clients").

Overall, none of these cases have dealt with (1) an as-applied challenge to a UPL statute where (2) a plaintiff sought to give pure verbal speech.   That combination is novel.   And where both these elements are present, modern Supreme Court doctrine has foreclosed a reductive

---

[10] *NIFLA* provided an example of a professional conduct regulation that only incidentally burdened speech from *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 884 (1992).   In *Casey*, doctors were required to provide information to a woman deciding whether to proceed with an abortion—a so-called "informed-consent" provision—before performing that procedure. *NIFLA*, 138 S. Ct. at 2373.   Although the informed-consent provision affected what licensed medical providers were required to say in specific contexts with their patients, the *NIFLA* Court emphasized the regulation only "incidentally burden[ed]" speech in the context of professional conduct: before a medical *procedure*. *Id.*   By contrast, the state regulation in *NIFLA* required organizations offering pregnancy services (but not provide abortion procedures) to provide notice about abortion options in the state, untethered from any larger conduct-dominated context; in other words, it "regulate[d] speech as speech," not speech as an auxiliary to a professional procedure. *Id.* at 2374; *see also EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 447 (6th Cir. 2019) (Donald, J., dissenting).

The professional conduct in *Casey*—and its "incidental" effect on speech—is far removed from a UPL regime that, as applied to these Plaintiffs, *only* affects speech: barring legal advice by non-lawyers.   Just as the Court distinguished the notice requirement in *NIFLA* from the informed-consent provision in *Casey*, here the bar on legal advice "is not tied to a procedure at all.   It applies to all interactions between [a non-lawyer] and [their] clients, regardless of whether [legal advice] is ever sought, offered, or performed." *NIFLA*, 138 S. Ct. at 2373.

approach where laws that are *generally* directed at conduct would avoid First Amendment scrutiny when applied to a particular plaintiff's speech.

Instead, for as-applied challenges, the Court in *Holder v. Humanitarian Law Project* adopted a "refined" approach to the speech/conduct problem. 561 U.S. at 28. The plaintiffs in *Humanitarian Law* challenged a statute that forbade providing "material support" to designated terrorist organizations, which included "expert advice or assistance" that was "derived from scientific, technical or other specialized knowledge." *Id.* at 12–13. The government, like the Attorney General here, argued that the law permissibly regulated the *conduct* of providing material support, and that any incidental effect on plaintiffs' own speech was not actionable under the First Amendment. The Court disagreed with the government, and in so doing, set forth the proper analytical framework for this case.

The *Humanitarian Law* Court set forth the following rule: for as-applied challenges, courts ask whether plaintiffs' own speech is directly or incidentally burdened, *not* whether the statute on its face imposes an incidental burden on speech. *See id.* at 27–28 (rejecting government's argument that "material support statute" "should nonetheless receive intermediate scrutiny because it generally functions as a regulation of conduct"). Thus, if a "generally applicable law" is "directed" at a plaintiff "because of what his speech communicated"—that is, the communication violates the statute "because of the offensive content of his particular message," then that law directly burdens plaintiff's speech. *Id.* at 28; *see also Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 865 (11th Cir. 2020) ("[T]here is a real difference between laws directed at conduct sweeping up incidental speech on the one hand and laws that directly regulate speech on the other. The government cannot regulate speech by relabeling it as conduct."). At that point, the burden is no longer "incidental."

Although it diverged on other issues, the *Humanitarian Law* Court unanimously concluded the giving of expert advice was speech, not conduct. On its face, the statute was "described as directed at conduct" of providing material support, "but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message." *Humanitarian Law*, 561 U.S. at 28. Although the Court diverged on other issues, it was unanimous on this point. *See id.* at 61 (Breyer, J., dissenting) ("[T]he majority properly rejects the Government's argument that the plaintiffs' speech-related activities amount to 'conduct' and should be reviewed as such."). To show how expert advice was speech, the Court pointed to the content-based distinctions in the material support prohibition:

> Plaintiffs want to speak to [designated terrorist organizations], and whether they may do so under [the material support prohibition] depends on what they say. If plaintiffs' speech to those groups imparts a "specific skill" or communicates advice derived from "specialized knowledge"—for example, training on the use of international law or advice on petitioning the United Nations—then it is barred. On the other hand, plaintiffs' speech is not barred if it imparts only general or unspecialized knowledge.

*Id.* at 27 (majority opinion) (citation omitted).

That logic applies seamlessly to the statute at issue here. On its face, New York's UPL rules "may be described as directed at conduct" of acting as a lawyer, "but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message." *Id.* at 28. In other words, Plaintiffs' violation of the law "depends on what they say" to their clients. *Id.* at 27. If Justice Advocates provide non-legal advice about a client's debt problem (by, for example, advising that person to cut down on spending to pay off debts), the UPL rules do not apply. But if they provide legal advice about how to respond to the client's debt problem (by advising that person on how they should fill out the State-Provided Answer Form, based on their

specific circumstances), the UPL rules forbid their speech. Their actions are therefore, by definition, content-based speech.

Concluding that Plaintiffs' legal advice is content-based speech is not only in line with modern First Amendment authority; it is also the intuitive result. At its core, Plaintiffs' action is indisputably speech, not conduct. "If speaking to clients is not speech, the world is truly upside down." *City of Boca Raton*, 981 F.3d at 866. The Court shall not ignore common sense by construing Plaintiffs' legal advice as something it is not.

The UPL rules are also speaker-based, and "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2347 (2020) (quoting *Reed*, 576 U.S. at 170). Importantly, as in *Barr*, there is such a content preference, because the UPL rules do not merely focus on the identity of the speaker, but also "focus[] on whether the [speaker] is speaking *about a particular topic*." *Id.* (emphasis added); *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563–64 (2011) (holding that a state statute restricting a particular set of speakers' ability to express a particular type of message was content-based). Therefore, because the UPL rules "'do[] not simply have an effect on speech, but [are] directed at certain content and [are] aimed at particular speakers'" they are content-based. *Barr*, 140 S. Ct. at 2347 (alterations added) (quoting *Sorrell*, 564 U.S. at 567).

(2)    *Plaintiffs' Speech is Analyzed No Differently under a Licensing Regime*

Lurking under this speech/conduct muddle is the fact that the UPL rules constitute a licensing regime for lawyers. Some courts have concluded that generally applicable professional licensing regimes—and the speech that they burden—are outside of the First Amendment. But as will be explained, the "characterization of the licensing requirement as a professional regulation

22

cannot lower that bar. The Supreme Court has consistently rejected attempts to set aside the dangers of content-based speech regulation in professional settings." *Brokamp v. D.C.*, No. CV 20-3574 (TJK), 2022 WL 681205, at *1 (D.D.C. Mar. 7, 2022) (alterations omitted) (quoting *City of Boca Raton*, 981 F.3d at 861).

Courts endorsing the theory that licensing requirements can permissibly burden speech have relied on Justice White's concurrence in *Lowe v. SEC*, 472 U.S. 181 (1985). In that case, which involved an investment advisor who wrote an advice column in securities newsletters, Justice White drew a distinction between advice offered to the general public versus advice personalized to a particular client to infer that licensing regimes do not pose major First Amendment problems. He began by defining what he believed "the practice of a profession" to be: where someone "takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances . . . ." *Id.* at 232 (White, J., concurring). So far, so good. *Lowe*, after all, was about whether the investment advisor had given general or client-based speech. But Justice White then went further to reach a *constitutional* conclusion about licensing regimes. He stated that, so long as a "personal nexus" exists between a professional and client, the government can "enact[] generally applicable licensing provisions limiting the class of persons who may practice the profession" without infringing on anyone's freedom of speech. *Id.* (White, J., concurring).[11]

Some courts have extended Justice White's proposed "personal nexus" test to legal advice offered to clients by unlicensed laymen. *See, e.g.*, *Rowe*, 80 N.Y.2d at 342 ("The courts may, in the public interest, prohibit attorneys from practicing law and that prohibition may incidentally

---

[11] Even Justice White did not believe licensing regimes should receive *no* First Amendment scrutiny; in a later dissent, he proposed they should receive rational basis review. *See Thornburgh v. Am. College of Obstetricians & Gynecologists*, 476 U.S. 747, 802 (1986) (White, J., dissenting).

affect the attorney's constitutional right to free speech by forbidding the giving of advice to clients."). More generally, some circuits—but, notably, not the Second Circuit—have crystallized Justice White's concurrence to uphold other types of licensing regimes that impact speech. *See, e.g.*, *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1221 (11th Cir. 2022) (rejecting a non-licensed person's free speech bid to give dietary advice).

Despite these cases, this Court is not persuaded by Justice White's concurrence in *Lowe*, and by extension, the assumption that licensing regimes can bar non-professionals' speech without any constitutional consequence. Justice White's discussion of licensing—joined only by two other Justices—was unquestionably dicta, and has never been referenced by the Supreme Court or the Second Circuit. *See Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 107 (2d Cir. 2000) ("*Lowe*'s holding was based on the Investment Advisers Act, not the Constitution. It therefore does not provide a framework for analysis of the constitutional issues raised on this appeal."). The Court is not bound by the *Lowe* concurrence.

Moreover, the Supreme Court recently undermined Justice White's theory that licensing requirements are somehow *sui generis* under the First Amendment merely because they target professionals. Under *Humanitarian Law*, the mere fact that speech "derive[s] from 'specialized knowledge'" does not remove it from the First Amendment's ambit. 561 U.S. at 27. And *NIFLA* rejected a lower-court doctrine—a so-called "professional speech" doctrine—that closely resembled Justice White's concurrence in *Lowe*. Some circuits had "define[d] 'professionals' as individuals who provide personalized services to clients and who are subject to 'a generally applicable licensing and regulatory regime.'" *NIFLA*, 138 S. Ct. at 2371 (citation omitted); *see also id.* at 2375 ("All that is required to make something a 'profession,' according to these courts, is that it involves personalized services and requires a professional license from the State."). But

24

the Supreme Court in *NIFLA* noted that such regimes would "give[] the States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement," an untenable result. *Id.* at 2375. *NIFLA* therefore undermines the premise that licensing regimes can somehow transform pure speech and evade First Amendment scrutiny altogether.[12]

To be sure, there are special categories of pure speech that the government can regulate without scrutiny. But legal advice does not appear to be one of them. Those special categories— for example, defamation, incitement, fraud, and obscenity—are tightly limited in number. *See NIFLA*, 138 S. Ct. at 2372 (noting that the Supreme Court "has been especially reluctant to exempt a category of speech from the normal prohibition on content-based restrictions") (alteration and citation omitted). To qualify, a type of speech must be historically rooted in a tradition of regulation going back to the Founding. *See NIFLA*, 138 S. Ct. at 2372; *United States v. Stevens*, 559 U.S. 460, 468–71 (2010).

Legal advice lacks that clear history of regulation. In the colonial period, courts "adopted UPL rules to control those who appeared before them," but "nonlawyers were free to engage in a wide range of activities which would be considered UPL today, such as giving legal advice and preparing legal documents." Derek A. Denckla, *Nonlawyers and the Unauthorized Practice of Law: An Overview of the Legal and Ethical Parameters*, 67 FORDHAM L. REV. 2581, 2583 (1999). That practice continued unabated through the post-colonial and Reconstruction eras. *See* Robert Kry, *The "Watchman for Truth": Professional Licensing and the First Amendment*, 23 SEATTLE UNIV. L. REV. 885, 954–57 (2000). "Simply put, the historical practices at the time of the ratification of the First and Fourteenth Amendments show that the rendering of personalized advice

---

[12] Although the Court in *NIFLA* did "not foreclose the possibility" that "some . . . reason exists" to afford professional speech some special First Amendment exemption, 138 S. Ct. at 2375, it has not identified any such reason.

to specific clients was not one of the 'well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any constitutional problem.'" *Id.* at 957 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942)).   Without an established historical basis to do so, courts today cannot treat pure legal advice as a *sui generis* category of speech that is immune to constitutional scrutiny.

(3)     *Strict Scrutiny Applies*

As a content-based regulation of Plaintiffs' speech, the UPL rules trigger strict scrutiny. *See, e.g.*, *Barr*, 140 S. Ct. at 2347.   Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."  *Reed*, 576 U.S. at 171 (citation omitted).   The Government has the burden of proving the UPL rules satisfy strict scrutiny.   *See id.* at 163 (noting that content-based laws are "presumptively unconstitutional").     This is a demanding—though not insurmountable—standard for the Government to meet.   *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) (providing examples, including *Humanitarian Law*, where content-based statutes have been upheld against strict scrutiny).

"A court applying strict scrutiny must ensure that a compelling interest supports *each application* of a statute restricting speech."  *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 478 (2007) (emphasis in original).   Likewise, "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."   *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000); *accord Green Party of Conn. v. Garfield*, 616 F.3d 189, 209 (2d Cir. 2010).   Thus, the State must demonstrate that it has a compelling interest in criminalizing Plaintiffs' AJM program, and that it has no less restrictive alternative than the UPL rules that it could use to regulate that program.

26

In the abstract, New York undoubtedly has a compelling interest in enforcing the UPL rules. In general, "[s]tates have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975). In the context of the UPL rules, New York has a "well-established interest in regulating attorney conduct and in maintaining ethical behavior and independence among the members of the legal profession." *Jacoby & Meyers*, 852 F.3d at 191. Such rules are designed to protect the public "from the dangers of legal representation and advice given by persons not trained, examined and licensed for such work, whether they be laymen or lawyers from other jurisdictions." *El Gemayel*, 72 N.Y.2d at 705 (citation and quotation marks omitted). Beyond the consumer-projection justification, the State also has an interest the UPL rules' promotion of judicial integrity and efficiency, as lawyers are "officers of the courts." *Goldfarb*, 421 U.S. at 792. Given these compelling interests, it is little wonder that the UPL rules have consistently withstood legal challenges.

Yet these justifications for the UPL rules appear less compelling in the context of Plaintiffs' specific, narrow mission. Plaintiffs' program has anticipated many of the State's consumer protection concerns and erected preventative limits on what Justice Advocates may do. Justice Advocates must attend a training—designed by lawyers—and be approved under the AJM program criteria.[13] They must abide by State ethical guidelines for assisting clients, including for

---

[13] Relying on Plaintiffs' limited legal training would logically protect clients' interests better than trusting those clients to complete their own forms pro se, with no legal training at all. And there is some common-sense truth to the notion that a non-lawyer "who has handled 50 debt collection matters, for example, would likely provide better representation than a patent lawyer who has never set foot in small claims court and last looked at a consumer contract issue when studying for the bar exam." Brief of Amicus Curiae Rebecca L. Sandefur, ECF No. 38-1, at 21 (footnote omitted).

conflicts of interest and confidentiality. They cannot make money at their clients' expense. They must refer clients to licensed lawyers if those clients' needs exceed the scope of the Training Guide. And they cannot appear in court or file documents, thus eliminating any risk of providing bad advice in more complex or adversarial settings.

Nor does the UPL rules' other emphasis on judicial integrity provide a compelling reason to ban Plaintiffs' program. To the contrary, courts typically depend on a complete and accurate presentation of a dispute through the adversarial process. *See Velazquez*, 531 U.S. at 545; *Penson v. Ohio*, 488 U.S. 75, 84 (1988). By implementing the AJM program, more New Yorkers will respond to their lawsuits and begin that adversarial process, rather than default entirely. And answering those lawsuits with Plaintiffs' help does not risk additional legal error once their clients are through the courthouse doors; at that point, those clients will either retain a licensed lawyer (perhaps using a pro bono organization) or go on to represent themselves pro se (as anticipated by the State's do-it-yourself checkbox form).

One group of amici nonetheless maintain the real cause of defaults in debt collection cases is "sewer service," or the lack of adequate service on defendants. *See* Brief of Amici Curiae Consumer Law Experts et al., ECF No. 57, at 11–13. "Sewer service" occurs when debt collector plaintiffs serve process on invalid addresses or on nonexistent cohabitants so that defendants never receive notice of the lawsuits against them in the first place. *See id.* Because New Yorkers are well-past the point of answering the complaint once they learn they have defaulted, these Amici argue, Plaintiffs' program does not address any genuine legal problem. *See id.* After all, the three New Yorkers who filed declarations in this case had defaulted after failing to receive any notice.

"Sewer service" might be the primary cause of the debt collection problem, but Plaintiffs can still increase access to the courts without needing to provide a cure-all solution. It seems

unlikely that every defendant in debt collection cases will default because of "sewer service" alone. And even if "sewer service" were truly universal, Plaintiffs' program has the potential to help even those clients who have defaulted.  The Training Guide instructs Justice Advocates that "[i]f the client has already had a default judgment entered against them, they may be able to have it vacated if they follow the directions" at a website link to another State-provided, do-it-yourself affidavit to vacate a default judgment.  Training Guide at ECF pagination 17.  Thus, Plaintiffs' program, at the very least, would provide another link in the informational chain to help unaware defendants vacate defaults from "sewer service."

A related objection contends Plaintiffs' program will not be effective because licensed lawyers—through pro bono organizations and courthouse programs—already assist low-income New Yorkers in debt collection cases, and do not turn away clients.  But again, Plaintiffs' program does not need to reach every potential client to strengthen the judicial system.  As courts have acknowledged for decades, "the problems of indigents—although of the type for which an attorney has traditionally been consulted—are too immense to be solved solely by members of the bar.  The supply of lawyer manpower is not nearby large enough."  *Hackin v. Arizona*, 389 U.S. 143, 146–47 (1967) (Douglas, J., dissenting).  And when the State's own forms encourage defendants to file their answers pro se, it seems clear that some New Yorkers lack the ability to fully access these lawyer services.

Aside from its less-than-compelling interests, the State has failed to narrowly tailor the statute.  In fact, the UPL rules could hardly be broader: New York could implement less restrictive alternatives to blanket ban on all unauthorized legal advice.  The Training Guide's disclaimers demonstrate how the State retains many tools to mitigate harmful speech in this arena.  *See Bery v. City of New York*, 97 F.3d 689, 698 (2d Cir. 1996) (ordinance not narrowly tailored when other

sections of the city code "already achieve" the city's goals "without such a drastic effect").  As Justice Advocates are warned, the State has created tort remedies, including breach of fiduciary duty, that could apply to non-lawyers who harm their clients.  Justice Advocates are also warned that the State still forbids non-lawyers from holding themselves out as licensed lawyers to the public.  *See* N.Y. Jud. Law § 478 ("It shall be unlawful for any natural person . . . to hold himself or herself out to the public as being entitled to practice law . . . ."); *id.* § 475-a (making it a Class E felony to do so while causing "material damage to the impairment of a legal right").  To further these ends, the State could, for example, tailor the UPL rules by requiring Justice Advocates to fully disclose their qualifications and experience, such that clients can make an informed decision about the quality of the legal advice they would receive.  Or the State might impose targeted trainings or educational standards on Plaintiffs short of a full Bar certification.  These types of measures would allow Plaintiffs to dispense a circumscribed level of speech while still protecting the public from dishonest or untrained legal assistance.

The Court recognizes that legislative developments in this area remain ongoing.  States are exploring ways to regulate non-lawyers who provide legal advice to clients.  *See, e.g.*, Brief of Amicus Curiae Rebecca L. Sandefur, ECF No. 38-1, at 17–18 (providing examples of non-lawyer assistance in states including Wisconsin, Washington, Arizona, and California, and in the federal government).  These developments suggest a narrower tailoring of New York's UPL rules is feasible.  *See McCullen v. Coakley*, 573 U.S. 464, 494 (2014) (strict scrutiny not satisfied where state had failed to show "it considered different methods that other jurisdictions have found effective").  But the Court does not short-circuit the State's legislative process merely because it references these developments.  It is not the Court's role to decide how to more narrowly tailor the

UPL rules, or to ask whether allowing non-lawyers to give legal advice is good policy. Even if there might be plenty of legitimate reasons to ban such advice outright,

> The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it.

*Stevens*, 559 U.S. at 470.

Because the UPL rules likely fail strict scrutiny as applied to the AJM program, Plaintiffs' have shown a likelihood of success on the merits of their First Amendment free speech claim. With the "dominant, if not the dispositive, factor" weighing in favor of an injunction, *Agudath Israel*, 983 F.3d at 637, the Court turns briefly to the remaining factors.

### C.    Irreparable Injury

Plaintiffs' irreparable injury also favors an injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Plaintiffs' irreparable injury necessarily follows from the likelihood of their success on the merits on the free speech claim.

### D.    Public Interest and Balance of Equities

Finally, the balance of equities and the public interest favor allowing Plaintiffs to commence their legal program. As for the public interest, the State "does not have an interest in the enforcement of an unconstitutional law." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (quoting *ACLU v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)). Rather, the Second Circuit has recognized that "securing First Amendment rights is in the public interest."

*Walsh*, 733 F.3d at 488. And largely for the reasons provided in the strict scrutiny analysis, the balance of equities favors an injunction.

*    *    *

Lawyers, as members of a "noble profession," play a unique role in our society. *Mallard v. United States Dist. Ct. for the Southern Dist. of Iowa*, 490 U.S. 296, 311 (1989) (Kennedy, J., concurring). But Plaintiffs have designed a unique program of their own. They have demonstrated a narrow exception, under the First Amendment, to New York's UPL rules, and they will be allowed to implement that program without the threat of prosecution.

## INJUNCTIVE RELIEF

Having concluded that a preliminary injunction shall issue, the Court must fashion relief that is "narrowly tailored" to this as-applied challenge. *Patsy's Ital. Res., Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011).

Accordingly, during the pendency of this action, the Attorney General and her officers, agents, and employees, and all other persons acting in concert with them, are enjoined from taking any of the following actions:

1. Enforcing the UPL rules against Plaintiffs or any Justice Advocates, to the extent Plaintiffs or Justice Advocates offer legal advice without a license to do so, to clients as contemplated in the AJM Training Guide. Of course, the Attorney General is not enjoined from enforcing the UPL rules to the extent Plaintiffs or any Justice Advocates provide legal advice beyond the limits of the AJM Training Guide.

2. Enforcing the UPL rules against any clients of the AJM program who solicit or aid Plaintiffs or any Justice Advocates who provide legal advice as contemplated by the AJM Training Guide.

3. Enforcing the UPL rules against the AJM program's legal advisors, Tashi Lhewa and Pamela Foohey, for having assisted in creating the Training Guide.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction is **GRANTED**. The parties are directed to jointly submit a Civil Case Management Plan in accordance with the Court's Individual Practices by June 3, 2022.

The Clerk of Court is respectfully directed to close the motion at ECF Number 5.

Dated: New York, New York
       May 2_, 2022

SO ORDERED

HONORABLE PAUL A. CROTTY
United States District Judge

33