UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UPSOLVE, INC. and REV. JOHN UDO-
OKON,

                              Plaintiffs,

              -v.-                                          22-CV-00627 (LAK)

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York,

                              Defendant.


**DEFENDANT LETITIA JAMES'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION TO REINSTATE PRELIMINARY INJUNCTION**


LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, NY 10005
Tel: (212) 416-8733


MATTHEW J. LAWSON
Assistant Attorney General
*Of Counsel*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

    A.   The UPL Statutes ........................................................................................... 2

    B.   Plaintiffs' Program for Providing Unlicensed Legal Advice ......................... 3

    C.   The Instant Lawsuit ....................................................................................... 6

ARGUMENT .......................................................................................................................... 7

I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON
    THE MERITS OF THEIR FREE SPEECH CLAIM BECAUSE
    THE UPL STATUTES WITHSTAND INTERMEDIATE SCRUTINY ......................... 8

    A.   The UPL Statutes Advance Important Governmental
        Interests Unrelated to the Suppression of Free Speech ................................. 9

    B.   New York's Interests in Enforcing the UPL Statutes Are
        Particularly Strong in the Context of Plaintiffs' Flawed Program ............................. 11

        1.   Plaintiffs Impose No Meaningful Educational
            Requirements on Their Nonlawyer Advocates, and Their
            Training Process and Training Guide Are Deeply Flawed ................................. 11

        2.   Plaintiffs' Program Lacks Meaningful Safeguards
            to Ensure Ethical Representation and Confidentiality ......................... 13

        3.   Plaintiffs' Program Requires Clients to Waive
            Their Remedies for Negligent Advice and Other Harms ..................................... 15

    C.   The UPL Statutes Do Not Burden Substantially More
        Speech Than Necessary to Further State's Interests ................................... 16

II.   PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON
    THE MERITS OF THEIR FREEDOM OF ASSOCIATION CLAIM ......................... 22

III.   PLAINTIFFS FAIL TO SHOW THAT THE
       REQUESTED INJUNCTION IS IN THE PUBLIC INTEREST ................................... 22

CONCLUSION........................................................................................................................ 24

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                                   **Page(s)**

*360 Virtual Drone Servs. LLC v. Ritter,*
   102 F.4th 263 (4th Cir. 2024) ...............................................................................21

*Bery v. City of New York,*
   97 F.3d 689 (2d Cir. 1996) .....................................................................................9

*Brokamp v. James,*
   66 F.4th 374 (2d Cir. 2023) ........................................................................ *passim*

*Campbell v. Greisberger,*
   865 F. Supp. 115 (W.D.N.Y. 1994) ...............................................................11, 12

*Capital Associated Industries, Inc. v. Stein,*
   922 F.3d 198 (4th Cir. 2019) ...........................................................................20, 21

*Clementine Co., LLC v. Adams,*
   74 F.4th 77 (2d Cir. 2023) ....................................................................................17

*Crownholm v. Moore,* No. 23-15138,
   2024 WL 1635566 (9th Cir. Apr. 16, 2024) ..........................................................22

*Del Castillo v. Sec'y, Fla. Dep't of Health,*
   26 F.4th 1214 (11th Cir. 2022*)* ............................................................................22

*Goldfarb v. Virginia State Bar,*
   421 U.S. 773, 95 S.Ct. 2004 (1975) ..................................................................9, 10

*Hill v. Colorado,*
   530 U.S. 703, 120 S.Ct. 2480 (2000)....................................................................17

*Holder v. Humanitarian Law Project,*
   561 U.S. 1, 130 S.Ct. 2705 (2010).........................................................................6

*Jacoby & Meyers, LLP v. Presiding Justices of First, Second, Third, and Fourth*
   *Dep't,*
   852 F.3d 178 (2d Cir. 2017) ..................................................................................10

*Jeffery v. City of New York,*
   113 F.4th 176 (2d Cir. 2024) ..................................................................................8

*McCullen v. Coakley,*
   573 U.S. 464, 134 S.Ct. 2518 (2014) ....................................................................9

*Ohralik v. Ohio State Bar Ass'n*,
  436 U.S. 447, 98 S.Ct. 1912 (1978)...................................................................10

*Polaski v. Lee*,
  759 F. Supp. 3d 683 (E.D.N.C. 2024) .................................................10, 15, 21, 22

*Sperry v. State of Fla. ex rel. Fla. Bar*,
  373 U.S. 379, 83 S.Ct. 1322 (1963) .................................................................. 10

*TikTok Inc. v. Garland*,
  604 U.S. 56, 145 S.Ct. 57 (2025) ................................................................16, 18

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622, 114 S.Ct. 2445 (1994) ............................................................... 11

*Upjohn Co. v. United States*,
  449 U.S. 383, 101 S.Ct. 677 (1981) ...............................................................3, 14

*Upsolve, Inc. v. James*,
  604 F. Supp. 3d 97 (S.D.N.Y. 2022),
  *vacated and remanded,*155 F.4th 133 (2d Cir. 2025) ...................................... *passim*

*Upsolve, Inc. v. James*,
  155 F.4th 133 (2d Cir. 2025) ........................................................................ *passim*

*Ward v. Rock Against Racism*,
  491 U.S. 781, 109 S.Ct. 2746 (1989).....................................................................18

*Winter v. Natural Res. Defense Council, Inc.*,
  555 U.S. 7, 129 S.Ct. 365 (2008).............................................................22, 23, 24

**State Cases**

*El Gemayel v. Seaman*,
  72 N.Y.2d 701 (1988) ...............................................................................2, 10, 20

*Lightman v. Flaum*,
  97 N.Y.2d 128 (2001) ..................................................................................14

*Matter of Barrett*,
  170 A.D.3d 69 (2d Dep't 2019) .......................................................................13

*Matter of Rosenberg*,
  202 A.D.3d 1271 (3d Dep't 2022) ....................................................................13

*Matter of Rowe*,
  80 N.Y.2d 336 (1992) ................................................................................16, 17

*People v. Alfani,*
  227 N.Y. 334 (1919) ............................................................................ 10, 11

*Rudolf v Shayne, Dachs, Stanisci, Corker & Sauer,*
  8 N.Y.3d 438 (2007) ................................................................................ 3, 15

*In re S.C. NAACP Hous. Advoc. Program,*
  897 S.E.2d 691 (S.C. 2024) ........................................................................ 20

*Spivak v. Sachs,*
  16 N.Y.2d 163 (1965) ............................................................................... 2, 10

*Wilmington Sav. Fund Soc'y, FSB v. Unknown Heirs at L. of Danny Higdon,*
  161 A.D.3d 1559 (4th Dep't 2018) .................................................................. 4

**Statutes and Laws**

Ch. 165, 1898 N.Y. Laws 309 .......................................................................... 2

N.Y.C. Civ. Ct. Act § 909 ............................................................................. 5

N.Y. Jud. Law § 90(1)(a) ............................................................................. 12

N.Y. Jud. Law § 478 .................................................................................... 2

N.Y. Jud. Law § 478(2) ............................................................................... 17

N.Y. Jud. Law § 484 .................................................................................... 2

N.Y. Jud. Law § 484(2) ............................................................................... 17

**Regulations**

22 N.Y.C.R.R. § 520.3 ............................................................................... 3, 12

22 N.Y.C.R.R. 1200.0 ................................................................................ 3, 12

**Federal Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................... 8

**State Rules**

CPLR § 213-d ................................................................................................................13

CPLR 3025 .....................................................................................................................5

CPLR 3211 .....................................................................................................................5

CPLR 3215 .....................................................................................................................5

CPLR 9404......................................................................................................................13

N.Y. Rule of Prof'l Conduct 1.1 ....................................................................................12

N.Y. Rule of Prof'l Conduct 1.6 ....................................................................................14

N.Y. Rule of Prof'l Conduct 1.7 ....................................................................................14

N.Y. Rule of Prof'l Conduct 1.8 ....................................................................................14

N.Y. Rule of Prof'l Conduct 1.9 ....................................................................................14

New York State Attorney General Letitia James respectfully submits this memorandum of law in opposition to Plaintiffs' motion to reinstate this Court's preliminary injunction.[1]

## PRELIMINARY STATEMENT

The Court's previous preliminary injunction, which had prevented the Attorney General from enforcing New York law to protect the public from an ill-conceived plan to furnish unlicensed legal advice, was properly vacated by the Second Circuit and should not be reinstated.

To obtain the "extraordinary" and "drastic" remedy of a preliminary injunction, a movant must show, among other things, that it is likely to succeed on the merits and that the requested relief would serve the public interest. Plaintiffs here have done neither. Plaintiffs cannot show they are likely to succeed on the merits of their free speech claim because the statutes they challenge—New York's unauthorized practice of law ("UPL") statutes—satisfy intermediate scrutiny as a matter of law. The intermediate scrutiny standard inquires, in the first instance, into whether the challenged law advances important governmental interests, a showing that is easily satisfied here. Indeed, a long line of cases—including multiple cases from the U.S. Supreme Court—establishes that New York's licensure requirement furthers interests that are not merely important, but compelling. As these cases recognize, UPL statutes serve both to protect the public from harm and to promote judicial integrity and efficiency.

Moreover, New York's interests in enforcing its UPL statutes are particularly strong when viewed in the context of Plaintiffs' flawed program for providing unlicensed legal advice.

---

[1]    As used herein, "Complaint" and "Compl." refer to Plaintiffs' complaint in this action, dated January 25, 2022 (ECF 1), and "Pl. Br." refers to the Memorandum of Law in Support of Plaintiffs' Motion to Reinstate Preliminary Injunction, dated October 10, 2025 (ECF 110). "Lawson Decl." refers to the Declaration of Matthew J. Lawson in Opposition to Plaintiffs' Motion to Reinstate Preliminary Injunction and in Support of Defendant Letitia James's Motion to Dismiss, dated November 25, 2025, and submitted together with this brief.

Among other problems, Plaintiffs' program bypasses crucial safeguards necessary to protect clients and is based on an error-ridden training guide likely to result in inaccurate—and harmful—advice.

It is also clear that New York's UPL statutes do not burden substantially more speech than necessary.  The UPL statutes are not unlimited in their reach.  Nonlawyers, including Plaintiffs, remain free to speak or write on legal matters, and even to give generalized advice to the public, so long as judgment is not exercised on behalf of a particular client.  And notwithstanding Plaintiffs' suggestion to the contrary, New York has considered—and even enacted—innovative alternatives that allow unlicensed practitioners to provide legal services in specific contexts, including statutory exemptions that have permitted the creation of multiple law school clinics across the state.  Further, the tailoring inquiry cannot be untethered from the harms the UPL statutes seek to prevent.  Given the profound flaws in Plaintiffs' program, there is no plausible "tailoring" that could allow that program to proceed without simultaneously undermining New York's critical interest in protecting the public.

## STATEMENT OF FACTS

### A.  The UPL Statutes

For well over a century, New York has required individuals who want to practice law to obtain and maintain a professional license. *See* Ch. 165, 1898 N.Y. Laws 309; *see also* N.Y. Jud. Law §§ 484, 478 (limiting the practice of law in New York to licensed attorneys).  New York's UPL statutes serve, *inter alia,* "to protect the public in this State from 'the dangers of legal representation and advice given by persons not trained, examined and licensed for such work.'" *El Gemayel v. Seaman*, 72 N.Y.2d 701, 705 (1988) (quoting *Spivak v. Sachs*, 16 N.Y.2d 163, 168 (1965)).  By limiting the practice of law to licensed attorneys, New York ensures, among other

2

things, that the individuals delivering legal advice to citizens: (i) will be properly trained and educated in the law;[2] (ii) will be subject to enforceable fiduciary and ethical duties;[3] (iii) can be held accountable for their negligence or legal malpractice;[4] and (iv) can supply their advice pursuant to the protections of the attorney-client privilege.[5]

### B. Plaintiffs' Program for Providing Unlicensed Legal Advice

Plaintiffs Upsolve, Inc. and the Reverend John Udo-Okon object to New York's UPL statutes, which they contend have hindered their plans to move forward with the "American Justice Movement" ("AJM"), an initiative for providing unlicensed legal advice to individuals sued in debt collection lawsuits. *See* Compl. ¶ 57. As part of this initiative, Plaintiffs seek to recruit an unspecified number of nonlawyer "Justice Advocates," including the Reverend Udo-Okon himself, to advise debtor defendants on how to answer or otherwise respond to the particular lawsuit against them. *Id.* ¶¶ 57, 82. New York State has adopted a "fill-in-the-blank answer form" that individual defendants can use when responding to certain debt collection lawsuits, *id.* ¶ 34 & Ex. A, and Plaintiffs assert that their nonlawyer advocates will advise clients, *inter alia*, on how to fill out that form. *Id.* ¶ 62.

Plaintiffs do not allege they will require their nonlawyer advocates to have any particular level of educational attainment (such as a high school diploma). Plaintiffs also do not allege that

---

[2]     *See, e.g.,* 22 N.Y.C.R.R. § 520.3 *et seq.* (addressing educational requirements for lawyers).

[3]     *See, e.g.,* N.Y. Rules of Prof'l Conduct (22 N.Y.C.R.R. 1200.0) (addressing attorneys' professional and ethical responsibilities).

[4]     *See, e.g., Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer,* 8 N.Y.3d 438, 442 (2007) (addressing attorney malpractice).

[5]     *See, e.g., Upjohn Co. v. United States*, 449 U.S. 383, 390, 101 S.Ct. 677, 682-83 (1981) (addressing the attorney-client privilege).

3

they will implement any procedure to assess the character and fitness of potential recruits. Despite these shortcomings, Plaintiffs contend that their program "minimizes the risk of unreliable or harmful advice" because, *inter alia*, the advice in question will be provided pursuant to an alleged "robust step-by-step Training Guide."  Compl. ¶¶ 63-64. However, that Training Guide, which Plaintiffs attach to their complaint, is anything but "robust."  It is only 18 pages long (including attachments), and it provides only cursory detail regarding the substantive legal matters about which the nonlawyer advocates will be providing advice to specific clients. *See* ECF 1-2.[6]

Plaintiffs do not disclose who drafted the Training Guide, and the guide contains fundamental errors that would not have been made by a New York lawyer experienced in debt collection matters.  For example, the Training Guide misstates the statute of limitations for medical debt as six years, ECF 1-2 at 8, instead of three years, under CPLR § 213-d (as of April 2020).  Further, the guide's initial question regarding a statute of limitations defense—"How long has it been since you last made a payment[?]," ECF 1-2 at 8—incorrectly measures the period between a client's last payment and his or her consultation with Upsolve, rather than the period between the client's payment <u>default</u> (*i.e.*, <u>missed</u> payment) and the date on which the action was commenced.[7]  Other aspects of the Training Guide similarly appear to be confusing, problematic, or incorrect.  For example:

---

[6]     Plaintiffs will no doubt claim that the Attorney General is relying on stale information, as Plaintiffs have allegedly "updated" their Training Guide.  *See, e.g.,* ECF 89 (Plaintiffs' letter mentioning such an update).  However, as of the date of this filing, Plaintiffs have never filed any such updated guide with the Court (or provided it to the Attorney General).  And of course, even if Plaintiffs had somehow managed to correct the multiple problems and errors in their Training Guide—a proposition for which there is no record support—the fact that such problems escaped Plaintiffs' notice in the first instance demonstrates the significant potential for consumer harm.

[7]     *See, e.g.*, *Wilmington Sav. Fund Soc'y, FSB v. Unknown Heirs at L. of Danny Higdon*, 161 A.D.3d 1559 (4th Dep't 2018).

- The Training Guide initially asserts that Upsolve's program is limited to assisting debtors sued in New York City Civil Court, ECF 1-2 at 4. A few pages later, however, the guide appears to ignore this limitation—and instructs the nonlawyer advocates to provide counsel to clients "sued in a county outside of New York City." *Id.* at 9.

- The guide states that a nonlawyer advocate can provide counsel only if the client "ha[s] been served with a Summons and/or Complaint," *id.* at 4, 12, but confusingly provides advice regarding potential defenses relating to failure to serve process. *Id.* at 6-7.

- The guide instructs that it is always "in [the client's] interest to file an answer," "even if th[e] deadline has elapsed," *id* at 5, disregarding that there are circumstances in which filing an answer may be detrimental to a client's interests.[8]

- The guide indicates that a client with an insufficient-service defense should "probably" file a motion to dismiss, *id.* at 7, but does not supply advice regarding such a motion. *See* CPLR 3211.

- The guide states that a nonlawyer advocate "cannot assist a client" if the client "ha[s] already filed an answer," *id.* at 12, but confusingly states that an advocate may assist a client with an amended answer. *Id.* at 4. The guide does not address the rules governing amendment of pleadings, which often requires a motion. *See See* N.Y.C. Civ. Ct. Act § 909; CPLR 3025.

The Training Guide also anticipates that nonlawyer advocates will attend only one "virtual training" before advising clients. ECF 1-2 at 2. Plaintiffs do not specify the duration of this lone training session, and they do not claim the training will be led by a lawyer. Similarly, while Plaintiffs allege that their nonlawyer advocates will be "supervised," they do not allege that lawyers will perform any such supervision. *See* Compl. ¶¶ 57, 79.

The clients receiving advice under Plaintiffs' program will be "required to sign a User Agreement" that is "included in the Training Guide." Compl. ¶ 68. Under the terms of this User Agreement—which is also included in the materials attached to Plaintiffs' Complaint—clients

---

[8]    For example, the best strategy may be to decline to answer where the complaint has not been properly served, or where the period for obtaining a default judgment has passed. *See* CPLR 3215(a)-(c).

5

must agree to a broad liability waiver provision stating that "[n]either the American Justice Movement nor the Justice Advocates assume any liability regarding the outcome of your case." *See* ECF 1-2 at Ex. B ("User Agreement").

### C. The Instant Lawsuit

Plaintiffs filed this lawsuit on January 25, 2022, along with a motion for a preliminary injunction. *See* ECF 1, 5. Plaintiffs' Complaint asserts two causes of action. "Count One" alleges that New York's UPL statutes, as applied to Plaintiffs, violate their First Amendment right to free speech. Compl. ¶¶ 103-07. "Count Two" alleges that the UPL statutes, as applied to Plaintiffs, violate their right of association under the First Amendment. *Id.* ¶¶ 108-112.

This Court (Crotty, J.) held a hearing on Plaintiffs' motion for a preliminary injunction, and it granted that motion on May 24, 2022, after determining, *inter alia,* that Plaintiffs' free speech claim was likely to succeed on the merits. *Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 111-121 (S.D.N.Y. 2022), *vacated and remanded,* 155 F.4th 133 (2d Cir. 2025).[9] Citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28, 130 S.Ct. 2705, 2724 (2010), the Court found that, as applied to Plaintiffs, the "conduct triggering coverage" under the UPL statutes "consists of communicating a message." *Upsolve,* 604 F. Supp. 3d at 114. Based on this finding, the Court held that the UPL statutes impose a content-based restriction on speech, *id.*, and thus trigger strict scrutiny. *Id.* at 117. The Court then found that the UPL statutes "likely fail strict scrutiny" because the Court (i) deemed New York's interests in enforcing those statutes "less compelling" when viewed in the context of Plaintiffs' "narrow mission," and (ii) concluded that New York had not met the rigorous tailoring requirements required by strict scrutiny. *Id.* at 117-20. In

---

[9]     Among other things, the resulting order enjoined the Attorney General from enforcing the UPL statutes as against Plaintiffs and their nonlawyer advocates to the extent such persons were providing advice subject to the limitations set forth in the Training Guide. *Id.* at 121.

contrast to the findings on the free speech claim, the Court held that Plaintiffs' right of association claim "likely lacks merit" and thus could not support an award of injunctive relief. *Id.* at 110-11.

The Attorney General appealed the preliminary injunction order, and the Second Circuit vacated that order. *Upsolve, Inc. v. James*, 155 F.4th 133, 144 (2d Cir. 2025). While the Second Circuit agreed that the UPL statutes regulate speech, it held that the restrictions imposed were "content neutral"—and not content-based, as this Court had previously found. *Id.* at 137. Accordingly, the Second Circuit held that the UPL statues are "subject only to intermediate scrutiny"—and not strict scrutiny. *Id.* The Second Circuit therefore remanded the case back to this Court to apply intermediate scrutiny, and to "assess whether the remaining factors— irreparable harm, the public interest, and the balance of the equities—support the grant of a preliminary injunction." *Id.* at 144.

## ARGUMENT

A "preliminary injunction is an extraordinary and drastic remedy" and is "never awarded as of right." *Upsolve*, 155 F.4th at 140 (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)). Where, as here, a movant seeks to enjoin "government action taken in the public interest pursuant to a statute or regulatory scheme," the movant must demonstrate "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Upsolve*, 155 F.4th at 141 (quoting *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 280 (2d Cir. 2021)).

Plaintiffs cannot satisfy this rigorous standard. Among other issues, Plaintiffs have not shown they are likely to succeed on the merits, and the relief requested here is contrary to the public interest.

7

**I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON
THE MERITS OF THEIR FREE SPEECH CLAIM BECAUSE
THE UPL STATUTES WITHSTAND INTERMEDIATE SCRUTINY**

Given the Second Circuit's determination that the UPL statutes are a content-neutral restriction on speech, the remaining question on the merits is whether those statutes withstand intermediate scrutiny. *Upsolve*, 155 F.4th at 137. A challenged restriction will withstand intermediate scrutiny if it "(1) advances important governmental interests unrelated to the suppression of free speech and (2) does not burden substantially more speech than necessary to further those interests." *Brokamp v. James*, 66 F.4th 374, 397 (2d Cir. 2023).

Plaintiffs' suggestion that this standard invariably imposes a "high evidentiary burden" on the government is incorrect. *See* Pl. Br. at 8. While intermediate scrutiny "will frequently require the government to identify evidence," *Brokamp,* 66 F.4th at 397, the Second Circuit made clear that this is not always the case. *See id.* Indeed, "in some circumstances"—like in *Brokamp* itself—the intermediate scrutiny determination "can be made on a motion to dismiss," *id.* at 397-98, a procedural posture that often involves no extrinsic evidence at all (or at least very limited evidence).

Applying these principles—and relying only on materials that could be considered on a motion to dismiss—the Court in *Brokamp* affirmed the Rule 12(b)(6) dismissal of a mental health counselor's lawsuit that claimed, *inter alia,* that the First Amendment gave her the right to practice "talk therapy" in New York without possessing the required license. *Id.* at 390-403. As *Brokamp* is the only Second Circuit case that evaluated whether a professional licensing statute satisfied intermediate scrutiny, it is controlling here. *See also Jeffery v. City of New York*, 113 F.4th 176, 196 (2d Cir. 2024) (holding, on a motion to dismiss, that a curfew challenged on constitutional "right to travel" grounds satisfied the more onerous strict scrutiny standard and

concluding that that "the requisite narrow tailoring is demonstrated as a matter of law by the totality of the pleadings and judicially noticeable facts").

And of course, *Brokamp* and *Jeffery* both arose on a motion to dismiss. Plaintiffs here seek a preliminary injunction—and <u>Plaintiffs</u> therefore bear the burden to show they are entitled to the "extraordinary" and "drastic" remedy they request. Imposing unduly onerous evidentiary requirements on the Attorney General to oppose a mandatory preliminary injunction motion on which Plaintiff bears such a high burden would be even more inappropriate.[10]

As set forth below, the UPL statutes pass muster under the intermediate scrutiny standard, as clarified by the Second Circuit's decision in *Brokamp*—and Plaintiffs therefore cannot succeed on the merits of their free speech claim.

### A. The UPL Statutes Advance Important Governmental Interests Unrelated to the Suppression of Free Speech

The first prong of the intermediate scrutiny test, which inquires into the existence of an "important governmental interest," is easily satisfied here. Indeed, as Judge Crotty previously acknowledged, New York's interest in enforcing the UPL statutes is not merely important—it is "compelling." *Upsolve*, 604 F. Supp. 3d at 117. This conclusion is supported by long line of cases, including *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792, 95 S.Ct. 2004, 2016 (1975), where the Supreme Court recognized that "states have a compelling interest in the practice of professions," including the practice of law, and "broad power to establish standards for licensing

---

[10]    Plaintiffs' reliance on *McCullen v. Coakley*, 573 U.S. 464, 134 S.Ct. 2518 (2014), and *Bery v. City of New York*, 97 F.3d 689 (2d Cir. 1996), is misplaced, as <u>neither</u> decision articulated any categorical rule about the evidence that might be required to satisfy intermediate scrutiny—and neither involved a challenge to a professional licensing statute. Moreover, while it is true that the Second Circuit cited *Billups v. City of Charleston*, 961 F.3d 673 (4th Cir. 2020), and *Hines v. Pardue*, 117 F.4th 769 (5th Cir. 2024), in its recent decision in this case, it cited those decisions <u>only</u> for the proposition that the UPL statutes regulate speech. *Upsolve*, 155 F.4th at 141-42. The Second Circuit did not mention, let alone endorse, any evidentiary principles articulated in those cases.

practitioners." *See also Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 460, 98 S.Ct. 1912, 1920 (1978) (describing the states' "strong" interests in "maintaining standards among members of the licensed professions" such as law and "protecting consumers"); *Sperry v. State of Fla. ex rel. Fla. Bar*, 373 U.S. 379, 383, 83 S.Ct. 1322, 1325 (1963) (recognizing that "Florida has a substantial interest in regulating the practice of law within the State").

The UPL statutes serve "to protect the public in this State from 'the dangers of legal representation and advice given by persons not trained, examined and licensed for such work.'" *El Gemayel,* 72 N.Y.2d at 705 (quoting *Spivak* 16 N.Y.2d at 168). New York courts have stressed the importance of this interest for over a century. *See, e.g., People v. Alfani*, 227 N.Y. 334, 339 (1919) (reasoning, in an unauthorized practice of law case, that "preparatory study, educational qualifications, experience, examination and license by the courts are required" to "protect the public" from "ignorance, inexperience and unscrupulousness"); *accord Polaski v. Lee*, 759 F. Supp. 3d 683, 689 (E.D.N.C. 2024) ("Restricting the practice of law, including the provision of legal advice, to lawyers who have training, oversight, confidentiality restrictions, and against whom clients have recourse, plainly fits within the State's substantial interest in protecting its citizens").

And beyond the consumer protection justification, New York also has an interest in the UPL statutes' promotion of judicial integrity and efficiency, as lawyers are "officers of the courts." *See Goldfarb*, 421 U.S. at 792, 95 S.Ct. at 2016; *see also Jacoby & Meyers, LLP v. Presiding Justs. of the First, Second, Third & Fourth Departments*, 852 F.3d 178, 191 (2d Cir. 2017) (recognizing "New York State's well-established interest in regulating attorney conduct and in maintaining ethical behavior and independence among the members of the legal

profession"). These fundamental interests are all "unrelated to the suppression of free speech," *see Brokamp,* 66 F.4th 398, and Plaintiffs have never attempted to claim otherwise.

**B. New York's Interests in Enforcing the UPL Statutes Are Particularly Strong in the Context of Plaintiffs' Flawed Program**

Despite acknowledging the "compelling" nature of New York's interests as a general matter, Judge Crotty concluded that those interests "appear less compelling in the context of Plaintiffs' specific, narrow mission." 604 F. Supp.3d at 118. This conclusion was based on the erroneous application of strict scrutiny, however. As set forth below, there is no basis for any such conclusion under the intermediate scrutiny standard.

As an initial matter, intermediate scrutiny only requires the government to demonstrate "important" governmental interests (and not "compelling" ones, as in a strict scrutiny case). *See Brokamp,* 66 F.4th at 397. Moreover, under intermediate scrutiny, the government's interests may properly be "viewed in the abstract" and evaluated without regard to the particular plaintiffs' circumstances. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662-63, 114 S.Ct. 2445, 2469-70 (1994). Equally important, Judge Crotty's conclusion would be incorrect in any event because the multiple flaws in Plaintiffs' program only underscore the importance of applying New York's unauthorized practice prohibition to them.

**1. Plaintiffs Impose No Meaningful Educational Requirements on Their Nonlawyer Advocates, and Their Training Process and Training Guide Are Deeply Flawed**

By limiting the practice of law to licensed lawyers, New York ensures that legal advice is rendered only by those who possesses the required "educational qualifications." *See, e.g., Alfani*, 227 N.Y. at 339. Among other things, lawyers must generally graduate from law school (or obtain equivalent instruction) and provide certification of the State Board of Bar Examiners that they have passed the bar examination. *See, e.g., Campbell v. Greisberger*, 865 F. Supp. 115, 120

11

(W.D.N.Y. 1994); N.Y. Jud. Law § 90(1)(a); 22 N.Y.C.R.R. § 520.3, *et seq.*

New York also imposes other guardrails to ensure competent representation. For example, the Rules of Professional Conduct require practicing attorneys to provide "competent representation" reflecting the necessary "legal knowledge, skill, thoroughness, and preparation." N.Y. Rules of Prof'l Conduct (22 N.Y.C.R.R. 1200.0), Rule 1.1 ("Rule 1.1").

Plaintiffs' program lacks these important safeguards.  For example, Plaintiffs do not allege they will require their nonlawyer advocates to possess <u>any</u> educational qualifications. During the oral argument on the initial motion for a preliminary injunction, Plaintiffs' counsel tacitly conceded that Upsolve will not even require its nonlawyer advocates to have a high school diploma.  Lawson Decl. Ex. B at 19.  Moreover, while Plaintiffs' Training Guide asserts that Upsolve will require its nonlawyer advocates to abide by certain ethical rules, *see* ECF 1-2 at pp. 2, 3, Rule 1.1, which requires competent representation, is not among them.

Plaintiffs have previously suggested that it is unnecessary to impose formal requirements as to education or competence because the Justice Advocates will have the benefit of Plaintiffs' purported "strict, expert-approved Training Guide."  *See* ECF 62 at 9.  But Plaintiffs' bare-bones Training Guide, which is only 18 pages long and is filled with errors, only underscores the harm that New Yorkers will face from Plaintiffs' program.  As an initial matter, Plaintiffs do not identify who drafted the Training Guide, and they do not claim that any part of that guide was drafted by a New York-licensed lawyer.[11]

---

[11]    While Plaintiffs assert that the Training guide was "reviewed" by Tashi Lhewa of the Legal Aid Society and Pamela Foohey of the Cardozo School of Law (who is herself unauthorized to practice law in New York), this is of little consolation here.  The referenced declarations of Mr. Lhewa and Ms. Foohey contain no meaningful analysis of the Training Guide and do not justify the conclusion that the guide would allow nonlawyers to render competent legal counsel.  *See* ECF 7-5, 7-6.

The Training Guide also contains fundamental errors that would not have been made by a New York lawyer experienced in debt collection matters. For example, the Training Guide misstates the statute of limitations for medical debt as six years, ECF 1-2 at 8, instead of three years, under CPLR § 213-d (as of April 2020). Other aspects of the Training Guide similarly appear to be confusing, problematic, or incorrect, as set forth in more detail above. *See* pp. 4-5, *supra.*

To make matters worse, Plaintiffs do not allege that the nonlawyer advocates will receive <u>any</u> instruction, supervision, or mentoring from actual, trained lawyers. For example, while the Training Guide provides that nonlawyer advocates will be required to attend a single "virtual training" session of unspecified duration, ECF 1-2 at 2, Plaintiffs do not allege this training will be led by a lawyer. And while Plaintiffs repeatedly state that their advocates will be "supervise[d]," they conspicuously omit any suggestion that this supervisory role will be performed by a lawyer. *See* Compl. ¶¶ 57, 79.

### 2. Plaintiffs' Program Lacks Meaningful Safeguards to Ensure Ethical Representation and Confidentiality

By limiting the practice of law to licensed attorneys, New York ensures, among other things, that practitioners adhere to rigorous ethical standards. For example, to practice law in New York, would-be lawyers must appear before a court-appointed Character and Fitness Committee, which must "carefully investigate the character and fitness" of each applicant to the bar. *Campbell,* 865 F. Supp. at 120 (quoting CPLR 9404). Further, after New York lawyers are admitted to the bar, they are subject to the New York Rules of Professional Conduct, the violation of which can lead to attorney discipline, including public censure, temporary suspension, and disbarment. *See, e.g.*, *Matter of Rosenberg*, 202 A.D.3d 1271 (3d Dep't 2022); *Matter of Barrett*, 170 A.D.3d 69 (2d Dep't 2019).

13

Additionally, lawyers are fiduciaries and must therefore adhere "to the fiduciary duties of loyalty and confidentiality owed by attorneys to their clients." *Lightman v. Flaum*, 97 N.Y.2d 128, 135 (2001) (citation and quotation marks omitted); *see* Rules of Prof'l Conduct, Rules. 1.6-1.18. Attorneys and clients also benefit from the attorney-client privilege, which preserves the confidentiality of the attorney's advice (as well as information communicated for the purposes of securing that advice). *See, e.g., Upjohn*, 449 U.S. at 389-90, 101 S.Ct. at 682-83.

In contrast, Plaintiffs' mechanisms for ensuring ethical representation and confidentiality are entirely inadequate. For example, Plaintiffs have never proposed any procedure for vetting the character and fitness of their nonlawyer advocates before they join Upsolve's team. And while the Training Guide asserts, in conclusory fashion, that nonlawyer advocates must comply with Rule 1.6 of the New York Rules of Professional Conduct (regarding confidentiality) as well as Rules 1.7, 1.8, and 1.9 of those rules (addressing conflicts of interest), ECF 1-2 at pp. 2-3, such requirements provide no reassurance here. Among other things, the Training Guide does not attach copies of these rules, and it certainly does not provide any guidance as to how they are to be interpreted. To make matters worse, Upsolve has never claimed that it will require any kind of formal conflict-checking process before its nonlawyer advocates undertake representation.

Equally important, since the prospective nonlawyer advocates will not be members of the bar, they would not be subject to any professional sanctions for violating these ethical rules—at most, they might be denied further opportunities to volunteer at Upsolve. And Plaintiffs notably do not propose to create a new "advocate-client" privilege that could serve in the place of the attorney-client privilege (which would obviously not apply to their program).

### 3.  Plaintiffs' Program Requires Clients to Waive
### Their Remedies for Negligent Advice and Other Harms

States, including New York, have a "substantial interest" in limiting the practice of law, including the "provision of legal advice," to practitioners "against whom clients have recourse." *See Polaski*, 759 F. Supp. 3d at 689.  To that end, clients who have been harmed by attorney negligence in New York can sue for legal malpractice—and thus obtain a remedy for their loss. *See, e.g., Rudolf v Shayne, Dachs, Stanisci, Corker & Sauer,* 8 N.Y.3d 438, 442 (2007).

In contrast, the clients who will receive advice under Plaintiffs' program will be required to <u>waive</u> their rights to recover in tort.  As Plaintiffs concede, Upsolve's clients will be "required to sign a User Agreement" that is "included in the Training Guide."  Compl. ¶ 68.  This User Agreement contains a broad liability waiver provision stating that "[n]either the American Justice Movement nor the Justice Advocates assume any liability regarding the outcome of your case."  ECF 1-2 at Ex. B ("User Agreement").

In the initial preliminary injunction decision, Judge Crotty noted that Justice Advocates are "warned" about potential civil liability in the Training Guide, and the court cited this warning as an example of how the State "retains many tools to mitigate" the harms at issue here. *Upsolve*, 604 F. Supp. 3d at 104, 119.  But that warning only anticipates civil liability for "unlawful or fraudulent" advice.  *See* ECF 1-2 at 3. With respect to ordinary negligence—the far greater risk here—Plaintiffs' clients may very well be left with no remedy at all.  Worse still, clients will be on their own in deciding whether to exchange this waiver for the advice of unlicensed advisors—no doubt at the urging of such advisors under the duress of a pending lawsuit.

Significantly, the flaws addressed above are just the beginning.  There are many more such flaws in Plaintiffs' program, as explained in detail in the 2022 *amicus curiae* brief filed in

the Second Circuit in this matter by a number of civil legal services and civil rights

organizations, consumer law and access-to-justice experts, and law school-based programs and

centers (the "Advocate Amici.")  *See* Lawson Decl. Ex. C (Advocate Amici brief).

### C.  The UPL Statutes Do Not Burden Substantially More Speech Than Necessary to Further State's Interests

The second prong of the intermediate scrutiny test requires a showing that the challenged

law "does not burden substantially more speech than necessary" to serve the State's interest.

*Brokamp*, 66 F.4th at 397.  To satisfy this requirement, the government must show that the law is

"narrowly tailored" to serve the interest in question.  *Id.*  But the tailoring inquiry in an

intermediate scrutiny case is significantly less onerous than it would be in the strict scrutiny

context.  In an intermediate scrutiny case, courts must afford the government "latitude" to

"design regulatory solutions to address content-neutral interests."  *See TikTok Inc. v. Garland*,

604 U.S. 56, 77, 145 S.Ct. 57, 71 (2025).  Consistent with such deference, a content-neutral

restriction will not be held unlawful simply because it is broader than necessary to achieve the

State's ends; rather, only measures that are "<u>substantially</u> broader than necessary" will run afoul

of the tailoring requirement.  *Id.* (emphasis added).

The UPL statutes are <u>not</u> substantially broader than necessary, particularly given the

profound harms they are designed to prevent.  There are also significant limits on the statutory

reach of provisions challenged here.  For example, under the UPL statutes, unlicensed persons

such as Plaintiffs are free to speak or write on legal matters, and even to give "generalized advice

to the public," so long as judgment is not exercised on behalf of a particular client.  *See Upsolve,*

604 F. Supp. 3d at 105; *see also El Gemayel*, 72 N.Y.2d at 706 (to constitute the practice of law

in New York, the "advice or services must be rendered to particular clients"); *Matter of Rowe*, 80

N.Y.2d 336, 342 (1992) (publishing an article that "present[ed] the state of the law" to the

16

general reading public did not constitute the practice of law); *see also Clementine Co., LLC v. Adams*, 74 F.4th 77, 88 (2d Cir. 2023) ("when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal.") (quoting *Hill v. Colorado*, 530 U.S. 703, 726, 120 S.Ct. 2480, 2494 (2000)).

Plaintiffs suggest, incorrectly, that New York has failed to consider "less restrictive" alternatives—*i.e.*, exemptions that might allow unlicensed practice under certain limited circumstances. *See* Pl. Br. at 5-6. By way of example, Plaintiffs point to a program adopted in South Carolina (but not New York) that permits unlicensed volunteers to provide advice on landlord-tenant issues in certain contexts. *Id.* at 4. But in fact, New York <u>has</u> considered—and even adopted—innovative alternatives to allow the provision unlicensed legal services under certain circumstances. For example, New York's legislature enacted statutory exemptions allowing law students who have completed "at least two semesters of law school," and who are "acting under the supervision of a legal aid organization" to provide legal services under certain circumstances—even though such students do not have a law license. N.Y. Jud. Law §§ 478(2), 484(2). Among other things, these exemptions have enabled a number of law school clinics to operate in New York State, including clinics that focus in whole or part on consumer law and debt collection defense (a subject area that Plaintiffs do not claim is addressed by the South Carolina program). The website for one such clinic, the "Consumer Justice for the Elderly" litigation clinic at St. John's University School of Law, thus reports that "[w]hen clients have been sued on a consumer debt, we defend them."[12]

---

[12]    https://www.stjohns.edu/law/academics/clinics/consumer-justice-elderly-litigation-clinic

Further, the fact that New York allegedly has not considered <u>Plaintiffs'</u> preferred list of "less restrictive" alternatives does not mean that intermediate scrutiny has not been satisfied.  In *TikTok*, for example, the petitioners "parade[d]" a whole "series" of unexplored alternatives they contended were less restrictive than the challenged measure—a "conditional ban" on the TikTok social media platform.  *TikTok*, 604 U.S. at 77, 145 S.Ct. at 71.  However, "[t]hose alternatives d[id] not alter" the Supreme Court's "tailoring analysis."  *Id.*  Citing the "latitude" courts must afford to the government in intermediate scrutiny cases, the Supreme Court reaffirmed that "[s]o long as the means chosen are not <u>substantially</u> broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 800, 109 S.Ct. 2746, 2758 (1989) (emphasis added)).

And as the above passage makes clear, the tailoring inquiry cannot be untethered from the substantial harms New York seeks to prevent.  Again, the question is not merely whether the UPL statutes are overbroad in a general sense, but whether they are "substantially" broader than necessary "to achieve the government's interest."  *TikTok*, 604 U.S. at 77, 145 S.Ct. at 71.  Given the profound flaws in Plaintiffs' ill-conceived program—as evidenced, *inter alia,* by Plaintiffs' error-ridden Training Guide, the apparent absence of any instruction or supervision by actual attorneys, and the near complete lack of accountability for negligent advice—New York's critically important interest in protecting the public would be fatally undermined if Plaintiffs'

program were permitted to proceed in <u>any</u> fashion.  No amount of additional "tailoring" could eliminate the potential for harm inherent in <u>this</u> particular program.[13]

 *Brokamp*—the Second Circuit decision whose underlying facts most resemble those present here—demonstrates that intermediate scrutiny has been satisfied in this case.  As discussed above, *Brokamp* involved a First Amendment challenge by a plaintiff who sought to provide talk therapy to New York clients even though she did not hold the required New York license.  66 F.4th at 380-82.  The Second Circuit assumed, without deciding, that the plaintiff's counseling services consisted "only of speech."  *Id.* at 392.  However, as in this case, the court found that the challenged licensing requirement was "content neutral"—thus triggering only intermediate scrutiny.  *Id.* at 392-97.  Relying solely on materials that could be considered on a motion to dismiss, the Second Circuit found that the challenged licensing requirement satisfied intermediate scrutiny.  *Id.* at 397-403.  In reaching this holding, the Court concluded, "as a matter of law," that:

> New York's license requirement for mental health counselors both (1) addresses a significant state interest in safeguarding and promoting public health, and (2) does so in a way—licensure based on specified standards of education, experience, and testing—long recognized by the Supreme Court directly and materially to alleviate concerns about ignorant, incompetent, and/or deceptive health care providers.

*Id.* at 399.  And far from requiring the extrinsic evidence of tailoring that Plaintiffs erroneously contend is necessary, the Second Circuit concluded that the challenged licensing requirement was narrowly tailored by examining "the statutory definition of 'mental health counseling' together with the statutory exemptions."  *Id.* at 402.  As set forth above, the UPL statutes also

---

[13] Given such flaws, it is no wonder that Plaintiffs do not claim to have presented New York's state legislature with any proposal to "re-tailor" New York's UPL statutes in the manner they claim is necessary here.

have significant limits on their reach, including "statutory exemptions," that confirm they are appropriately tailored.

In certain respects, the reasoning requiring dismissal in *Brokamp* applies with even greater force here.  The plaintiff who wanted to provide talk therapy *Brokamp* actually <u>did</u> hold a license to perform such therapy (albeit from a different state), and she also had a "doctoral degree," and a master's, in the same field (counseling).  *Id.* at 381-82.  As such, she could credibly argue that she "pose[d] no threat" to the interests the State sought to protect.  *Id. at* 401. In contrast, Plaintiffs here seek to rely exclusively on advocates with no license at all, and they will not require those advocates to have anywhere near the education or training that is required of practicing lawyers.  Such facts only underscore New York's strong interest in "protect[ing] the public" from "[legal] advice given by persons not trained, examined and licensed for such work.'"  *El Gemayel,* 72 N.Y.2d at 705.[14]

Moreover, aside from the vacated order in this case, Plaintiffs have never cited a single decision where a court upheld an unlicensed person's purported First Amendment right to offer legal advice, or otherwise practice law, without a license.  And Plaintiffs' opening brief on this motion tellingly ignores recent cases where courts have <u>rejected</u> such challenges—including cases that applied heightened scrutiny.  For example, in *Capital Associated Industries, Inc. v.*

---

[14]     And far from demonstrating improper tailoring, the South Carolina program upon which Plaintiffs rely only further emphasizes the severe flaws in their <u>own</u> program—and the harm Plaintiffs' program would cause to the public.  For example, when the South Carolina Supreme Court administratively approved the pilot program that Plaintiffs refer to, it expressly relied on the program's "training, safeguards, and lawyer supervision" requirements, including: (i) supervision of nonlawyer advocates by licensed attorneys; (ii) reporting requirements to enable judicial oversight of the program; (iii) a detailed 29-page training manual to guide nonlawyer advocates (iv) a twelve-hour, four-module educational program covering ethical, procedural, and substantive issues related to eviction matters; and (v) comprehension tests after each training module, plus a cumulative final examination.  *In re S.C. NAACP Hous. Advoc. Program*, 897 S.E.2d 691, 692-98 (S.C. 2024).  Plaintiffs' program conspicuously lacks these rigorous safeguards.

*Stein*, 922 F.3d 198, 202-210 (4th Cir. 2019) ("*CAI*"), the Fourth Circuit affirmed dismissal of a lawsuit challenging, on First Amendment grounds, certain unauthorized practice statutes that prohibited the plaintiff corporation from practicing law.  *Id.* at 203-210. Applying what the Fourth Circuit would later describe as a "loosened" or "relaxed" form of intermediate scrutiny,[15] the *CAI* panel held that "[b]ecause North Carolina has established a reasonable fit between its UPL statutes and a substantial government interest, the UPL statutes survive intermediate scrutiny."  *CAI*, 922 F.3d at 208-210.

And just last year, the Eastern District of North Carolina dismissed a case with facts strikingly similar to those present here*,* again applying the relaxed form of intermediate scrutiny articulated in *CAI*.  *See Polaski*, 759 F. Supp. 3d at 685-90.  Like Plaintiffs here, the plaintiffs in *Polaski* were nonlawyers who sought to render legal advice pertaining to the preparation of legal forms.  *Id.* at 685.  And like Plaintiffs here, they claimed that the prohibition on the unauthorized practice of law violated their free speech rights under the First Amendment.  *Id.*  The court held that the challenged UPL statutes satisfied intermediate scrutiny and dismissed the lawsuit for failure to state a claim.  *Id.* at 686-90.

In reaching this decision, the court reasoned, *inter alia*, that restricting the practice of law "to lawyers who have training, oversight, confidentiality restrictions, and against whom clients have recourse, plainly fits within the State's substantial interest in protecting its citizens."  *Id.* at 689.  The court also recognized that the unauthorized practice statutes did not wholly prohibit the plaintiffs from speaking on the relevant legal matters.  *Id.*  For example, the plaintiffs could "shar[e] and distribut[e] legal information," and they could even "assist clients with filling out

---

[15]    *See 360 Virtual Drone Servs. LLC v. Ritter*, 102 F.4th 263, 276 (4th Cir. 2024); *see also id.* at 271.

forms, provided there is appropriate supervision by an attorney." *Id.* And while some jurisdictions may permit nonlawyers to provide limited legal services, the court recognized that such policy judgments are properly left to the political process. *Id.* The court's reasoning in *Polaski* also applies here.[16]

Because the UPL statutes satisfy intermediate scrutiny, Plaintiffs cannot meet their burden to show a likelihood of success on the merits, and their motion to reinstate the preliminary injunction should be denied.

## II. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR FREEDOM OF ASSOCIATION CLAIM

Plaintiffs do not mention their second claim—a First Amendment freedom of association claim—in their motion to reinstate the injunction. In any event, that claim is not likely to succeed on the merits, as Judge Crotty correctly determined. *See Upsolve,* 604 F. Supp.3d at 110-11. The freedom of association claim should be dismissed for all the reasons set forth in Judge Crotty's decision, *see id.*, and in the Attorney General's brief in support of its motion to dismiss, which is being filed contemporaneously with this opposition brief.

## III. PLAINTIFFS FAIL TO SHOW THAT THE REQUESTED INJUNCTION IS IN THE PUBLIC INTEREST

A litigant seeking injunctive relief must show that the "injunction is in the public interest." *Winter v. Natural Res. Defense Council, Inc.,* 555 U.S. 7, 20, 129 S.Ct. 365, 374

---

[16]    Other recent decisions have similarly rejected First Amendment challenges to professional licensing statutes that allegedly burdened speech, albeit under standards less exacting than intermediate scrutiny. *See, e.g., Del Castillo v. Sec'y, Fla. Dep't of Health,* 26 F.4th 1214, 1216-26 (11th Cir. 2022) (affirming dismissal of First Amendment claims brought by "holistic health coach" who wished to give verbal dietary advice without possessing the required state license for practitioners of dietetics and nutrition, apparently under the rational basis standard); *Crownholm v. Moore,* No. 23-15138, 2024 WL 1635566, at **1-5 (9th Cir. Apr. 16, 2024) (affirming dismissal, under the rational basis standard, of a First Amendment challenge to statute requiring licensure of land surveyors).

(2008); *accord Upsolve*, 155 F.4th at 141. This requirement should not be taken lightly. Rather, as the Second Circuit emphasized in this case, "courts should pay <u>particular</u> regard for the public consequences in employing the extraordinary remedy of injunction." *Upsolve*, 155 F.4th at 140 (emphasis added); *see also id.* at 144 (instructing this Court to "assess" the public interest factor on remand).

Here, the requested injunction is decidedly <u>not</u> in the public interest. As discussed in detail above, Plaintiffs' program suffers from multiple flaws demonstrating the likelihood that it will harm consumers. Among other problems, Plaintiffs' program (i) imposes no meaningful educational requirements on its advocates; (ii) is based on an error filled Training Guide; (iii) anticipates no instruction, supervision, or mentoring by actual lawyers; (iv) lacks crucial safeguards to ensure competence, ethical representation, and confidentiality; and (v) requires Plaintiffs' clients to waive their right to recover for negligent advice. *See* Point I(B), *supra*; *see also* Lawson Decl. Ex. C (discussing further flaws in Plaintiffs' program).

Plaintiffs' arguments about the alleged public need for an injunction also miss the mark. As an initial matter, the relief requested here would not even address, let alone remedy, the primary concerns identified by the citizens who have submitted declarations for Plaintiffs in this case. For example, the requested injunction would not address "harassing calls from debt collectors," a particular focus of the community members that spoke with the Reverend Udo-Okon. Udo-Okon Decl. (ECF 7-2) ¶¶ 8, 13. Similarly, the requested injunction would not address the principal problem faced by William Evertsen and Liz Jurado, who report that they never received any notice that they were being sued in the first instance. Evertsen Decl. (ECF 7-7) ¶ 13; Jurado Decl. (ECF 7-8) ¶ 6.

Plaintiffs also fail to demonstrate that existing resources are inadequate to supply the limited legal advice contemplated here. There are—as Plaintiffs concede—qualified legal aid organizations that <u>already</u> provide free legal advice on debt collection matters in New York. *See* Compl. ¶ 44. Indeed, the Advocate Amici themselves include a number of these organizations, as discussed in the *amicus* brief they filed in this court. *See* ECF 57 at 5-6. Plaintiffs tellingly do not identify a single occasion in which any of these organizations turned away a New Yorker who simply wanted advice on filling out a pre-printed form Answer in a debt collection lawsuit—the sole advice that Plaintiffs claim the need to provide here.

Moreover, Plaintiffs do not articulate any realistic limiting principle for their arguments here—which appear to assume (erroneously) that, unless the State satisfies some ill-defined "high evidentiary burden," citizens have a virtually unlimited right to offer harmful, unlicensed advice in any professional discipline they choose. Applying this flawed reasoning here would have dangerous implications for the State's ability to protect the public in the context of numerous licensed professions—including not only law, but also medicine, engineering and many more.

In sum, the public interest considerations at issue here weigh strongly against the requested relief, and this fact alone would be sufficient to require denial of Plaintiffs' motion. *See Winter*, 555 U.S. at 23-24, 129 S.Ct. at 376 (declining to undertake a separate analysis of likelihood of success on the merits because "proper consideration" of public interest and equitable factors "alone require[d] denial of the requested injunctive relief").

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion to reinstate the preliminary injunction should be denied.

24

Dated: New York, New York.
        November 25, 2025

                                          LETITIA JAMES
                                          Attorney General
                                          State of New York

                                          By:


                                          */s/* Matthew J. Lawson
                                          MATTHEW J. LAWSON
                                          Assistant Attorney General
                                          28 Liberty Street
                                          New York, NY 10005
                                          Tel: (212) 416-8733
                                          matthew.lawson@ag.ny.gov

25

**CERTIFICATE OF COMPLIANCE UNDER LOCAL CIVIL RULE 7.1(c)**

Based on the "Word Count" feature of Microsoft Word, and excluding the caption, table of contents, table of authorities, signature blocks, and required certificates, this memorandum of law contains 7,666 words and therefore complies with the 8,750 word limitation set forth in Local Civil Rule 7.1(c).

*/s/* Matthew J. Lawson
MATTHEW J. LAWSON
