UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UPSOLVE, INC. and REV. JOHN UDO-
OKON,

                Plaintiffs,

      -v.-

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York,

                Defendant.

22-CV-00627 (LAK)


## DEFENDANT LETITIA JAMES'S MEMORANDUM OF LAW
## IN SUPPORT OF HER MOTION TO DISMISS


LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, NY 10005
Tel: (212) 416-8733


MATTHEW J. LAWSON
Assistant Attorney General
    *Of Counsel*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................iii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

    A.   The UPL Statutes ................................................................................................ 2

    B.   Plaintiffs' Program for Providing Unlicensed Legal Advice ........................................ 3

    C.   The Instant Lawsuit.............................................................................................. 6

ARGUMENT ....................................................................................................................... 7

I.    PLAINTIFFS' FREEDOM OF SPEECH CLAIM
    SHOULD BE DISMISSED BECAUSE THE UPL
    STATUTES WITHSTAND INTERMEDIATE SCRUTINY ........................................... 8

    A.   The UPL Statutes Advance Important Governmental
         Interests Unrelated to the Suppression of Free Speech .................................................. 9

    B.   New York's Interests in Enforcing the UPL Statutes Are
         Particularly Strong in the Context of Plaintiffs' Flawed Program .............................. 11

         1.   Plaintiffs Impose No Meaningful Educational
             Requirements on Their Nonlawyer Advocates, and Their
             Training Process and Training Guide Are Deeply Flawed .................................. 11

         2.   Plaintiffs' Program Lacks Meaningful Safeguards
             to Ensure Ethical Representation and Confidentiality ......................................... 13

         3.   Plaintiffs' Program Requires Clients to Waive
             Their Remedies for Negligent Advice and Other Harms..................................... 15

    C.   The UPL Statutes Do Not Burden Substantially More
         Speech Than Necessary to Further State's Interests .................................................... 16

II.   PLAINTIFFS FAIL TO STATE A
    FREEDOM OF ASSOCIATION CLAIM ...................................................................... 22

A.    The Right of Association Does Not Confer
a Right to Practice Law Without a License ................................................................. 22

B.    The UPL Statutes Easily Pass Muster
Under the Rational Basis Standard ........................................................................... 25

CONCLUSION ...................................................................................................................... 26

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                   **Page(s)**

*360 Virtual Drone Servs. LLC v. Ritter,*
   102 F.4th 263 (4th Cir. 2024) ............................................................................21

*Ashcroft v. Iqbal,*
   556 U.S. 662, 129 S.Ct. 1937 (2009) ...............................................................7, 8

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544,127 S.Ct. 1955 (2007) ...........................................................7, 8, 26

*Brokamp v. James*,
   66 F.4th 374 (2d Cir. 2023) ................................................................... *passim*

*Brotherhood of R.R. Trainmen v. Virginia ex rel. Va. State Bar*,
   377 U.S. 1, 84 S.Ct. 1113 (1964) ...................................................................23, 24

*Byfield v. New York City Dep't of Educ.,*
   No. 22-CV- 5869, 2023 WL 3293644 (S.D.N.Y. May 5, 2023) ......................4, 12

*Campbell v. Greisberger*,
   865 F. Supp. 115 (W.D.N.Y. 1994) ................................................................11, 13

*Capital Associated Industries, Inc. v. Stein,*
   922 F.3d 198 (4th Cir. 2019) .........................................................................20, 21

*Citizens United v. Schneiderman,*
   882 F.3d 374 (2d Cir. 2018) ................................................................................9

*Clementine Co., LLC v. Adams,*
   74 F.4th 77 (2d Cir. 2023) ............................................................................16, 17

*Crownholm v. Moore,* No. 23-15138,
   2024 WL 1635566 (9th Cir. Apr. 16, 2024) .........................................................22

*Del Castillo v. Sec'y, Fla. Dep't of Health,*
   26 F.4th 1214 (11th Cir. 2022*)* .........................................................................22

*Goldfarb v. Virginia State Bar*,
   421 U.S. 773, 95 S.Ct. 2004 (1975) ..............................................................9, 10

*Hill v. Colorado*,
   530 U.S. 703, 120 S.Ct. 2480 (2000) ..................................................................17

*Holder v. Humanitarian Law Project,*
   561 U.S. 1, 130 S.Ct. 2705 (2010) ..................................................................6, 7

*Jacoby & Meyers, LLP v. Presiding Justices of First, Second, Third, and Fourth Dep't,*
852 F.3d 178 (2d Cir. 2017) ...............................................................10, 24, 25, 26

*Jeffery v. City of New York,*
113 F.4th 176 (2d Cir. 2024) ...............................................................................9

*NAACP v. Button,*
371 U.S. 415, 83 S.Ct. 328 (1963) ..........................................................23, 24, 25

*Ohralik v. Ohio State Bar Ass'n,*
436 U.S. 447, 98 S.Ct. 1912 (1978) ....................................................................9

*Polaski v. Lee,*
759 F. Supp. 3d 683 (E.D.N.C. 2024) ............................................. 10, 15, 21, 22

*In re Primus,*
436 U.S. 412, 98 S.Ct. 1893 (1978) ........................................................23, 24, 25

*Roberts v. U.S. Jaycees,*
468 U.S. 609, 104 S.Ct. 3244 (1984) ................................................................22

*Sperry v. State of Fla. ex rel. Fla. Bar,*
373 U.S. 379, 83 S.Ct. 1322 (1963) ................................................................9, 10

*Tang v. App. Div. of New York Supreme Ct., First Dep't,*
373 F. Supp. 800 (S.D.N.Y. 1972) ...................................................................13

*TikTok Inc. v. Garland,*
604 U.S. 56, 145 S.Ct. 57 (2025) ................................................................16, 18

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622, 114 S.Ct. 2445 (1994) ...............................................................11

*United Mine Workers, Dist. 12 v. Illinois State Bar Ass'n,*
389 U.S. 217, 88 S.Ct. 353 (1967) ....................................................................23

*United Transp. Union v. State Bar of Mich.,*
401 U.S. 576, 91 S.Ct. 1076 (1971) ............................................................23, 24

*Upjohn Co. v. United States,*
449 U.S. 383, 101 S.Ct. 677 (1981) ...............................................................3, 14

*Upsolve, Inc. v. James,*
604 F. Supp. 3d 97 (S.D.N.Y. 2022),
*vacated and remanded,* 155 F.4th 133 (2d Cir. 2025) ...................................... *passim*

*Upsolve, Inc. v. James,*
 155 F.4th 133 (2d Cir. 2025) ...................................................................7, 8

*Ward v. Rock Against Racism,*
 491 U.S. 781, 109 S.Ct. 2746 (1989) ...........................................................18

**State Cases**

*El Gemayel v. Seaman,*
 72 N.Y.2d 701 (1988) ...................................................................3, 10, 20

*Lightman v. Flaum,*
 97 N.Y.2d 128 (2001) ...................................................................14

*Matter of Barrett,*
 170 A.D.3d 69 (2d Dep't 2019) ...................................................................14

*Matter of Rosenberg,*
 202 A.D.3d 1271 (3d Dep't 2022) ...................................................................14

*Matter of Rowe,*
 80 N.Y.2d 336 (1992) ...................................................................16

*Montana Supreme Ct. Comm'n on Unauthorized Prac. of L. v. O'Neil,*
 147 P.3d 200 (Mont. 2006) ...................................................................22, 23

*People v. Alfani,*
 227 N.Y. 334 (1919) ...................................................................10, 11

*Rudolf v Shayne, Dachs, Stanisci, Corker & Sauer,*
 8 N.Y.3d 438 (2007) ...................................................................3, 15

*In re S.C. NAACP Hous. Advoc. Program,*
 897 S.E.2d 691 (S.C. 2024) ...................................................................20

*Spivak v. Sachs,*
 16 N.Y.2d 163 (1965) ...................................................................3, 10

*State v. Niska,*
 380 N.W.2d 646 (N.D. 1986) ...................................................................23

*Wilmington Sav. Fund Soc'y, FSB v. Unknown Heirs at L. of Danny Higdon,*
 161 A.D.3d 1559 (4th Dep't 2018) ...................................................................5

**Statutes and Laws**

Ch. 165, 1898 N.Y. Laws 309 ...........................................................................2

N.Y.C. Civ. Ct. Act § 909 ..............................................................................5

N.Y. Jud. Law § 90(1)(a) .............................................................................11

N.Y. Jud. Law § 478 .......................................................................................2

N.Y. Jud. Law § 478(2) .................................................................................17

N.Y. Jud. Law § 484 .......................................................................................2

N.Y. Jud. Law § 484(2) .................................................................................17


**Regulations**

22 N.Y.C.R.R. § 520.3................................................................................3, 11

22 N.Y.C.R.R. 1200.0....................................................................................12


**Federal Rules**

Fed. R. Civ. P. 12(b)(6) ..........................................................................1, 7, 8


**State Rules**

CPLR § 213-d ...............................................................................................13

CPLR 3025 ......................................................................................................5

CPLR 3211 ......................................................................................................5

CPLR 3215 ......................................................................................................5

CPLR 9404......................................................................................................13

N.Y. Rule of Prof'l Conduct 1.1 ..................................................................12

N.Y. Rule of Prof'l Conduct 1.6 ..................................................................14

N.Y. Rule of Prof'l Conduct 1.7 ..................................................................14

N.Y. Rule of Prof'l Conduct 1.8 ..................................................................14

N.Y. Rule of Prof'l Conduct 1.9 ...................................................................................................14

New York State Attorney General Letitia James respectfully submits this memorandum of law in support of her motion to dismiss the complaint filed by Plaintiffs Upsolve, Inc., and the Reverend John Udo-Okon (ECF 1, the "Complaint" or "Compl.") pursuant to Federal Rule of Civil Procedure Rule 12(b)(6).[1]

## PRELIMINARY STATEMENT

Plaintiffs' lawsuit, which alleges that New York's unauthorized practice of law ("UPL") statutes unlawfully burden Plaintiffs' First Amendment rights of free speech and free association, is fatally flawed and should be dismissed as a matter of law.

Now that the Second Circuit has held that the UPL statutes impose a content-neutral regulation of speech, the principal remaining question on the merits is whether those statutes satisfy intermediate scrutiny. This determination "can be made on a motion to dismiss," *Brokamp v. James*, 66 F.4th 374, 397 (2d Cir. 2023), and it is clear, even at this early procedural posture, that the UPL statutes satisfy intermediate scrutiny as a matter of law.

The intermediate scrutiny standard inquires, in the first instance, into whether the challenged law advances important governmental interests, a showing that is easily satisfied here. Indeed, a long line of cases—including multiple cases from the U.S. Supreme Court—establishes that New York's licensure requirement furthers interests that are not merely important, but underlined compelling. As these cases recognize, UPL statutes serve both to protect the public from harm and to promote judicial integrity and efficiency. Moreover, New York's interests in enforcing its UPL statutes are particularly strong when viewed in the context of

---

[1] As used herein, "Lawson Decl." refers to the Declaration of Matthew J. Lawson in Opposition to Plaintiffs' Motion to Reinstate Preliminary Injunction and in Support of Defendant Letitia James's Motion to Dismiss, dated November 25, 2025, and submitted together with this brief.

Plaintiffs' flawed program for providing unlicensed legal advice to New Yorkers. Among other problems, Plaintiffs' program bypasses crucial safeguards necessary to protect clients and is based on an error-ridden training guide likely to result in inaccurate—and harmful—advice.

It is also clear that New York's UPL statutes do not burden substantially more speech than necessary. The UPL statutes are not unlimited in their reach. Nonlawyers, including Plaintiffs, remain free to speak or write on legal matters, and even to give generalized advice to the public, so long as judgment is not exercised on behalf of a particular client. And notwithstanding Plaintiffs' suggestion to the contrary, New York has considered—and even enacted—innovative alternatives that allow unlicensed practitioners to provide legal services in specific contexts, including statutory exemptions that have permitted the creation of multiple law school clinics across the state. Further, the tailoring inquiry cannot be untethered from the harms the UPL statutes seek to prevent. Given the profound flaws in Plaintiffs' program, there is no plausible "tailoring" that could allow that program to proceed without simultaneously undermining New York's critical interest in protecting the public.

Finally, and as Judge Crotty correctly recognized three years ago, Plaintiffs' freedom of association claim is meritless, and that claim should also be dismissed. Indeed, to the Attorney General's knowledge, every court that has ever considered the issue has concluded that the right of association under the First Amendment does <u>not</u> confer any right to practice law without a license. Accordingly, Plaintiffs' complaint should be dismissed in its entirety.

## STATEMENT OF FACTS

### A. The UPL Statutes

For well over a century, New York has required individuals who want to practice law to obtain and maintain a license. *See* Ch. 165, 1898 N.Y. Laws 309; *see also* N.Y. Jud. Law §§ 484, 478 (limiting the practice of law in New York to licensed attorneys). New York's UPL statutes

2

serve, *inter alia,* "to protect the public in this State from 'the dangers of legal representation and advice given by persons not trained, examined and licensed for such work.'" *El Gemayel v. Seaman*, 72 N.Y.2d 701, 705 (1988) (quoting *Spivak v. Sachs*, 16 N.Y.2d 163, 168 (1965)). By limiting the practice of law to licensed attorneys, New York ensures, among other things, that the individuals delivering legal advice to citizens: (i) will be properly trained and educated in the law;[2] (ii) will be subject to enforceable fiduciary and ethical duties;[3] (iii) can be held accountable for their negligence or legal malpractice;[4] and (iv) can supply their advice pursuant to the protections of the attorney client privilege.[5]

### B. Plaintiffs' Program for Providing Unlicensed Legal Advice

Plaintiffs Upsolve, Inc. and the Reverend John Udo-Okon object to New York's UPL statutes, which they contend have hindered their plans to move forward with the "American Justice Movement" ("AJM"), an initiative for providing unlicensed legal advice to individuals sued in debt collection lawsuits. *See* Compl. ¶ 57. As part of this initiative, Plaintiffs seek to recruit an unspecified number of nonlawyer "Justice Advocates," including the Reverend Udo-Okon himself, to advise debtor defendants on how to answer or otherwise respond to the particular lawsuit against them. *Id.* ¶¶ 57, 82. New York State has adopted a "fill-in-the-blank answer form" that individual defendants can use when responding to certain debt collection

---

[2] *See, e.g.,* 22 N.Y.C.R.R. § 520.3 *et seq.* (addressing educational requirements for lawyers).

[3] *See, e.g.,* N.Y. Rules of Prof'l Conduct (22 N.Y.C.R.R. 1200.0) (addressing attorneys' professional and ethical responsibilities).

[4] *See, e.g., Rudolf v Shayne, Dachs, Stanisci, Corker & Sauer,* 8 N.Y.3d 438, 442 (2007) (addressing attorney malpractice).

[5] *See, e.g., Upjohn Co. v. United States*, 449 U.S. 383, 389-90, 101 S.Ct. 677, 682-83 (1981) (addressing the attorney-client privilege).

lawsuits, *id.* ¶ 34 & Ex. A, and Plaintiffs assert that their nonlawyer advocates will advise clients, *inter alia*, on how to fill out that form. *Id.* ¶ 62.

Plaintiffs do not allege they will require their nonlawyer advocates to have any particular level of educational attainment (such as a high school diploma). Plaintiffs also do not allege that they will implement any procedure to assess the character and fitness of potential recruits. Despite these shortcomings, Plaintiffs contend that their program "minimizes the risk of unreliable or harmful advice" because, *inter alia*, the advice in question will be provided pursuant to an alleged "robust step-by-step Training Guide." Compl. ¶¶ 63-64. However, that Training Guide, which Plaintiffs attach to their complaint, is anything but "robust." It is only 18 pages long (including attachments), and it provides only cursory detail regarding the substantive legal matters about which the nonlawyer advocates will be providing advice to specific clients. *See* ECF 1-2.[6]

Plaintiffs do not disclose who drafted the Training Guide, and the guide contains fundamental errors that would not have been made by a New York lawyer experienced in debt collection matters. For example, the Training Guide misstates the statute of limitations for medical debt as six years, ECF 1-2 at 8, instead of three years, under CPLR § 213-d (as of April

_____

[6]     Because Plaintiffs attached their Training Guide to their Complaint, *see* ECF 1-2, the Court may properly consider that document without converting this motion into a motion for summary judgment. *See, e.g., Byfield v. New York City Dep't of Educ.,* No. 22-CV-5869, 2023 WL 3293644, at *1 (S.D.N.Y. May 5, 2023). Plaintiffs will no doubt claim that the Attorney General is relying on stale information, as Plaintiffs have allegedly "updated" their Training Guide. *See, e.g.,* ECF 89 (Plaintiffs' letter mentioning such an update). However, as of the date of this filing, Plaintiffs have never filed any such updated guide with the Court (or provided it to the Attorney General). Equally important, this motion tests the sufficiency of Plaintiffs' <u>pleading</u>, which attaches only the original guide, and refers only to that guide when attempting to justify the reliability of Plaintiffs' program. And of course, even if Plaintiffs had somehow managed to correct the multiple problems and errors in their Training Guide—a proposition for which there is no pleaded support—the fact that such problems escaped Plaintiff's notice in the first instance demonstrates the significant potential for consumer harm.

2020).  Further, the guide's initial question regarding a statute of limitations defense—"How

long has it been since you last made a payment[?]," ECF 1-2 at 8—incorrectly measures the

period between a client's last payment and his or her consultation with Upsolve, rather than the

period between the client's payment default (*i.e.*, missed payment) and the date on which the

action was commenced.[7]  Other aspects of the Training Guide similarly appear to be confusing,

problematic, or incorrect.  For example:

- The Training Guide initially asserts that Upsolve's program is limited to assisting debtors sued in New York City Civil Court, ECF 1-2 at 4.  A few pages later, however, the guide appears to ignore this limitation—and instructs the nonlawyer advocates to provide counsel to clients "sued in a county outside of New York City." *Id.* at 9.

- The guide states that a nonlawyer advocate can provide counsel only if the client "ha[s] been served with a Summons and/or Complaint," *id.* at 4, 12, but confusingly provides advice regarding potential defenses relating to failure to serve process.  *Id.* at 6-7.

- The guide instructs that it is always "in [the client's] interest to file an answer," "even if th[e] deadline has elapsed," *id* at 5, disregarding that there are circumstances in which filing an answer may be detrimental to a client's interests.[8]

- The guide indicates that a client with an insufficient-service defense should "probably" file a motion to dismiss, *id.* at 7, but does not supply advice regarding such a motion.  *See* CPLR 3211.

- The guide states that a nonlawyer advocate "cannot assist a client" if the client "ha[s] already filed an answer," *id.* at 12, but confusingly states that an advocate may assist a client with an amended answer.  *Id.* at 4. The guide does not address the rules governing amendment of pleadings, which often requires a motion.  *See See* N.Y.C. Civ. Ct. Act § 909; CPLR 3025.

---

[7]  *See, e.g.*, *Wilmington Sav. Fund Soc'y, FSB v. Unknown Heirs at L. of Danny Higdon*, 161 A.D.3d 1559 (4th Dep't 2018).

[8]  For example, the best strategy may be to decline to answer where the complaint has not been properly served, or where the period for obtaining a default judgment has passed. *See* CPLR 3215(a)-(c).

The Training Guide also anticipates that nonlawyer advocates will attend only one "virtual training" before advising clients. ECF 1-2 at 2. Plaintiffs do not specify the duration of this lone training session, and they do not claim the training will be led by a lawyer. Similarly, while Plaintiffs allege that their nonlawyer advocates will be "supervised," they do not allege that lawyers will perform any such supervision. *See* Compl. ¶¶ 57, 79.

The clients receiving advice under Plaintiffs' program will be "required to sign a User Agreement" that is "included in the Training Guide." Compl. ¶ 68. Under the terms of this User Agreement—which is also included in the materials attached to Plaintiffs' Complaint—clients must agree to a broad liability waiver provision stating that "[n]either the American Justice Movement nor the Justice Advocates assume any liability regarding the outcome of your case." *See* ECF 1-2 at Ex. B ("User Agreement").

### C. The Instant Lawsuit

Plaintiffs filed this lawsuit on January 25, 2022, along with a motion for a preliminary injunction. *See* ECF 1, 5. Plaintiffs' Complaint asserts two causes of action. "Count One" alleges that New York's UPL statutes, as applied to Plaintiffs, violate their First Amendment right to free speech. Compl. ¶¶ 103-07. "Count Two" alleges that the UPL statutes, as applied to Plaintiffs, violate their right of association under the First Amendment. *Id.* ¶¶ 108-112.

This Court (Crotty, J.) held a hearing on Plaintiffs' motion for a preliminary injunction, and it granted that motion on May 24, 2022, after determining, *inter alia,* that Plaintiffs' free speech claim was likely to succeed on the merits. *Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 111-121 (S.D.N.Y. 2022), *vacated and remanded,* 155 F.4th 133 (2d Cir. 2025).[9] Citing *Holder*

---

[9] Among other things, the resulting order enjoined the Attorney General from enforcing the UPL statutes as against Plaintiffs and their nonlawyer advocates to the extent such persons were providing advice subject to the limitations set forth in the Training Guide. *Id.* at 121.

*v. Humanitarian Law Project*, 561 U.S. 1, 28, 130 S.Ct. 2705, 2724 (2010), the Court found that, as applied to Plaintiffs, the "conduct triggering coverage" under the UPL statutes "consists of communicating a message." *Upsolve,* 604 F. Supp. 3d at 114. Based on this finding, the Court held that the UPL statutes impose a content-based restriction on speech, *id.*, and thus trigger strict scrutiny. *Id.* at 117. The Court then found that the UPL statutes "likely fail strict scrutiny" because the Court (i) deemed New York's interests in enforcing those statutes "less compelling" when viewed in the context of Plaintiffs' "narrow mission," and (ii) concluded that New York had not met the rigorous tailoring requirements required by strict scrutiny. *Id.* at 117-20. In contrast to the findings on the free speech claim, the Court held that Plaintiffs' right of association claim "likely lacks merit" and thus could not support an award of injunctive relief. *Id.* at 110-11.

The Attorney General appealed the preliminary injunction order, and the Second Circuit vacated that order. *Upsolve, Inc. v. James*, 155 F.4th 133, 144 (2d Cir. 2025). While the Second Circuit agreed that the UPL statutes regulate speech, it held that the restrictions imposed were "content neutral"—and not content-based, as this Court had previously found. *Id.* at 137. Accordingly, the Second Circuit held that the UPL statues are "subject only to intermediate scrutiny"—and not strict scrutiny. *Id.* The Second Circuit therefore remanded the case back to this Court to apply intermediate scrutiny, and to "assess whether the remaining factors— irreparable harm, the public interest, and the balance of the equities—support the grant of a preliminary injunction." *Id.* at 144.

## ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 570, 127 S.Ct. 1955, 1974 (2007)). A pleading that merely offers "labels and conclusions" does not satisfy these standards. *Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965). Instead, the plaintiff must plead sufficient "factual content [to] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1949 (citation omitted). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974.

## I. PLAINTIFFS' FREEDOM OF SPEECH CLAIM SHOULD BE DISMISSED BECAUSE THE UPL STATUTES WITHSTAND INTERMEDIATE SCRUTINY

Given the Second Circuit's determination that the UPL statutes are a content-neutral restriction on speech, the remaining question on the merits is whether those statutes withstand intermediate scrutiny. *Upsolve*, 155 F.4th at 137. A challenged restriction will withstand intermediate scrutiny if it "(1) advances important governmental interests unrelated to the suppression of free speech and (2) does not burden substantially more speech than necessary to further those interests." *Brokamp v. James*, 66 F.4th 374, 397 (2d Cir. 2023).

The Second Circuit's decision in *Brokamp* makes clear that this Court can decide the intermediate scrutiny question, and dismiss this case, even at this early procedural posture. While acknowledging that courts often "wait until the summary judgment stage of the litigation" to decide the intermediate scrutiny question, the Second Circuit emphasized that, in "some circumstances"—like in *Brokamp* itself—"the determination can be made on a motion to dismiss." *Brokamp*, 66 F.4th at 397-98. Applying these principles—and relying solely on a limited motion to dismiss record—the court in *Brokamp* affirmed the Rule 12(b)(6) dismissal of

8

a mental health counselor's lawsuit that claimed, *inter alia,* that the First Amendment gave her the right to practice "talk therapy" in New York without possessing the required license. *Id.* at 390-403.

Other decisions further reaffirm courts' discretion to decide intermediate scrutiny cases—and even strict scrutiny cases—on a motion to dismiss. *See Citizens United v. Schneiderman*, 882 F.3d 374, 380-85 (2d Cir. 2018) (affirming dismissal on the pleadings while applying intermediate scrutiny to a statute); *Jeffery v. City of New York*, 113 F.4th 176, 196 (2d Cir. 2024) (holding, on a motion to dismiss, that a curfew challenged on constitutional "right to travel" grounds satisfied <u>strict scrutiny</u> and concluding that that "the requisite narrow tailoring is demonstrated as a matter of law by the totality of the pleadings and judicially noticeable facts").

As set forth below, the UPL statutes satisfy intermediate scrutiny as a matter of law, and dismissal is therefore appropriate under Rule 12(b)(6).

### A. The UPL Statutes Advance Important Governmental Interests Unrelated to the Suppression of Free Speech

The first prong of the intermediate scrutiny test, which inquires into the existence of an "important governmental interest," is easily satisfied here. Indeed, as Judge Crotty previously acknowledged, New York's interest in enforcing the UPL statutes is not merely important—it is "compelling." *Upsolve*, 604 F. Supp. 3d at 117. This conclusion is supported by long line of cases, including *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792, 95 S.Ct. 2004, 2016 (1975), where the Supreme Court recognized that "states have a compelling interest in the practice of professions," including the practice of law, and "broad power to establish standards for licensing practitioners." *See also Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 460, 98 S.Ct. 1912, 1920 (1978) (describing the states' "strong" interests in "maintaining standards among members of the licensed professions" such as law and "protecting consumers"); *Sperry v. State of Fla. ex rel.*

*Fla. Bar*, 373 U.S. 379, 383, 83 S.Ct. 1322, 1325 (1963) (recognizing that "Florida has a substantial interest in regulating the practice of law within the State").

The UPL statutes serve "to protect the public in this State from 'the dangers of legal representation and advice given by persons not trained, examined and licensed for such work.'" *El Gemayel,* 72 N.Y.2d at 705 (quoting *Spivak* 16 N.Y.2d at 168). New York courts have stressed the importance of this interest for over a century. *See, e.g., People v. Alfani*, 227 N.Y. 334, 339 (1919) (reasoning, in an unauthorized practice of law case, that "preparatory study, educational qualifications, experience, examination and license by the courts are required" to "protect the public" from "ignorance, inexperience and unscrupulousness"); *accord Polaski v. Lee*, 759 F. Supp. 3d 683, 689 (E.D.N.C. 2024) ("Restricting the practice of law, including the provision of legal advice, to lawyers who have training, oversight, confidentiality restrictions, and against whom clients have recourse, plainly fits within the State's substantial interest in protecting its citizens").

And beyond the consumer protection justification, New York also has an interest in the UPL statutes' promotion of judicial integrity and efficiency, as lawyers are "officers of the courts." *See Goldfarb*, 421 U.S. at 792, 95 S.Ct. at 2016; *see also Jacoby & Meyers, LLP v. Presiding Justs. of the First, Second, Third & Fourth Departments*, 852 F.3d 178, 191 (2d Cir. 2017) (recognizing "New York State's well-established interest in regulating attorney conduct and in maintaining ethical behavior and independence among the members of the legal profession"). These fundamental interests are all "unrelated to the suppression of free speech," *see Brokamp,* 66 F.4th 398, and Plaintiffs have never attempted to claim otherwise.

### B. New York's Interests in Enforcing the UPL Statutes Are Particularly Strong in the Context of Plaintiffs' Flawed Program

Despite acknowledging the "compelling" nature of New York's interests as a general matter, Judge Crotty concluded that those interests "appear less compelling in the context of Plaintiffs' specific, narrow mission." 604 F. Supp.3d at 118. This conclusion was based on the erroneous application of strict scrutiny, however. As set forth below, there is no basis for any such conclusion under the intermediate scrutiny standard.

As an initial matter, intermediate scrutiny only requires the government to demonstrate "important" governmental interests (and not "compelling" ones, as in a strict scrutiny case). *See Brokamp,* 66 F.4th at 397. Moreover, under intermediate scrutiny, the government's interests may properly be "viewed in the abstract" and evaluated without regard to the particular plaintiffs' circumstances. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662-63, 114 S.Ct. 2445, 2469-70 (1994). Equally important, Judge Crotty's conclusion would be incorrect in any event because the multiple flaws in Plaintiffs' program only underscore the importance of applying New York's unauthorized practice prohibition to them.

### 1. Plaintiffs Impose No Meaningful Educational Requirements on Their Nonlawyer Advocates, and Their Training Process and Training Guide Are Deeply Flawed

By limiting the practice of law to licensed lawyers, New York ensures that legal advice is rendered only by those who possesses the required "educational qualifications." *See, e.g., Alfani*, 227 N.Y. at 339. Among other things, lawyers must generally graduate from law school (or obtain equivalent instruction) and provide certification of the State Board of Bar Examiners that they have passed the bar examination. *See, e.g., Campbell v. Greisberger*, 865 F. Supp. 115, 120 (W.D.N.Y. 1994); N.Y. Jud. Law § 90(1)(a); 22 N.Y.C.R.R. § 520.3, *et seq.*

New York also imposes other guardrails to ensure competent representation. For example, the Rules of Professional Conduct require practicing attorneys to provide "competent representation" reflecting the necessary "legal knowledge, skill, thoroughness, and preparation." N.Y. Rules of Prof'l Conduct (22 N.Y.C.R.R. 1200.0), Rule 1.1 ("Rule 1.1").

Plaintiffs' program lacks these important safeguards. For example, Plaintiffs do not allege they will require their nonlawyer advocates to possess <u>any</u> educational qualifications. During the oral argument on the initial motion for a preliminary injunction, Plaintiffs' counsel tacitly conceded that Upsolve will not even require its nonlawyer advocates to have a high school diploma. Lawson Decl. Ex. B at 19. Moreover, while Plaintiffs' Training Guide asserts that Upsolve will require its nonlawyer advocates to abide by certain ethical rules, *see* ECF 1-2 at pp. 2, 3, Rule 1.1, which requires competent representation, is not among them.

Plaintiffs have previously suggested that it is unnecessary to impose formal requirements as to education or competence because the Justice Advocates will have the benefit of Plaintiffs' purported "strict, expert-approved Training Guide." *See* ECF 62 at 9. But Plaintiffs' bare-bones Training Guide, which is only 18 pages long and is filled with errors, only underscores the harm that New Yorkers will face from Plaintiffs' program. As an initial matter, Plaintiffs do not identify who drafted the Training Guide, and they do not claim that any part of that guide was drafted by a New York-licensed lawyer.[10]

---

[10]    While Plaintiffs assert that the Training guide was "reviewed" by Tashi Lhewa of the Legal Aid Society and Pamela Foohey of the Cardozo School of Law (who is herself unauthorized to practice law in New York), this is of little consolation here. The referenced declarations of Mr. Lhewa and Ms. Foohey contain no meaningful analysis of the Training Guide and do not justify the conclusion that the guide would allow nonlawyers to render competent legal counsel. *See* ECF 7-5, 7-6. Since these declarations are referenced in, and integral to, the Complaint, the Court may consider them on this motion without converting it to a motion for summary judgment. *See Byfield,* 2023 WL 3293644, at *1; *see also* Compl. ¶¶ 64, 72, 94.

The Training Guide also contains fundamental errors that would not have been made by a New York lawyer experienced in debt collection matters. For example, the Training Guide misstates the statute of limitations for medical debt as six years, ECF 1-2 at 8, instead of three years, under CPLR § 213-d (as of April 2020). Other aspects of the Training Guide similarly appear to be confusing, problematic, or incorrect, as set forth in more detail above. *See* p. 5, *supra.*

To make matters worse, Plaintiffs do not allege that the nonlawyer advocates will receive <u>any</u> instruction, supervision, or mentoring from actual, trained lawyers. For example, while the Training Guide provides that nonlawyer advocates will be required to attend a single "virtual training" session of unspecified duration, ECF 1-2 at 2, Plaintiffs do not allege this training will be led by a lawyer. And while Plaintiffs repeatedly state that their advocates will be "supervise[d]," they conspicuously omit any suggestion that this supervisory role will be performed by a lawyer. *See* Compl. ¶¶ 57, 79.

## 2. Plaintiffs' Program Lacks Meaningful Safeguards to Ensure Ethical Representation and Confidentiality

By limiting the practice of law to licensed attorneys, New York ensures, among other things, that practitioners adhere to rigorous ethical standards. For example, to practice law in New York, would-be lawyers must appear before a court-appointed Character and Fitness Committee, which must "carefully investigate the character and fitness" of each applicant to the bar. *Campbell,* 865 F. Supp. at 120 (quoting CPLR 9404); *see also Tang v. App. Div. of New York Supreme Ct., First Dep't,* 373 F. Supp. 800, 802 (S.D.N.Y. 1972), *aff'd*, 487 F.2d 138 (2d Cir. 1973) (noting that "[i]nvestigations by 'character committees' and other licensing agencies are not intended to be perfunctory").

Further, after New York lawyers are admitted to the bar, they are subject to the New York Rules of Professional Conduct, the violation of which can lead to attorney discipline, including public censure, temporary suspension, and disbarment. *See, e.g.*, *Matter of Rosenberg*, 202 A.D.3d 1271 (3d Dep't 2022); *Matter of Barrett*, 170 A.D.3d 69 (2d Dep't 2019).

Additionally, lawyers are fiduciaries and must therefore adhere "to the fiduciary duties of loyalty and confidentiality owed by attorneys to their clients." *Lightman v. Flaum*, 97 N.Y.2d 128, 135 (2001) (citation and quotation marks omitted); *see* Rules of Prof'l Conduct, Rules. 1.6-1.18. Attorneys and clients also benefit from the attorney-client privilege, which preserves the confidentiality of the attorney's advice (as well as information communicated for the purposes of securing that advice). *See, e.g., Upjohn*, 449 U.S. at 389-90, 101 S.Ct. at 682-83.

In contrast, Plaintiffs' mechanisms for ensuring ethical representation and confidentiality are entirely inadequate. For example, Plaintiffs have never proposed any procedure for vetting the character and fitness of their nonlawyer advocates before they join Upsolve's team. And while the Training Guide asserts, in conclusory fashion, that nonlawyer advocates must comply with Rule 1.6 of the New York Rules of Professional Conduct (regarding confidentiality) as well as Rules 1.7, 1.8, and 1.9 of those rules (addressing conflicts of interest), ECF 1-2 at pp. 2-3, such requirements provide no reassurance here. Among other things, the Training Guide does not attach copies of these rules, and it certainly does not provide any guidance as to how they are to be interpreted. To make matters worse, Upsolve has never claimed that it will require any kind of formal conflict-checking process before its nonlawyer advocates undertake representation.

Equally important, since the prospective nonlawyer advocates will not be members of the bar, they would not be subject to any professional sanctions for violating these ethical rules—at

most, they might be denied further opportunities to volunteer at Upsolve.  And Plaintiffs notably do not propose to create a new "advocate-client" privilege that could serve in the place of the attorney-client privilege (which would obviously not apply to their program).

### 3. Plaintiffs' Program Requires Clients to Waive Their Remedies for Negligent Advice and Other Harms

States, including New York, have a "substantial interest" in limiting the practice of law, including the "provision of legal advice," to practitioners "against whom clients have recourse." *See Polaski*, 759 F. Supp. 3d at 689.  To that end, clients who have been harmed by attorney negligence in New York can sue for legal malpractice—and thus obtain a remedy for their loss. *See, e.g., Rudolf v Shayne, Dachs, Stanisci, Corker & Sauer,* 8 N.Y.3d 438, 442 (2007).

In contrast, the clients who will receive advice under Plaintiffs' program will be required to <u>waive</u> their rights to recover in tort.  As Plaintiffs concede, Upsolve's clients will be "required to sign a User Agreement" that is "included in the Training Guide."  Compl. ¶ 68.  This User Agreement contains a broad liability waiver provision stating that "[n]either the American Justice Movement nor the Justice Advocates assume any liability regarding the outcome of your case."

In the initial preliminary injunction decision, Judge Crotty noted that Justice Advocates are "warned" about potential civil liability in the Training Guide, and the court cited this warning as an example of how the State "retains many tools to mitigate" the harms at issue here. *Upsolve*, 604 F. Supp. 3d at 104, 119.  But that warning only anticipates civil liability for "unlawful or fraudulent" advice.  *See* ECF 1-2 at 3. With respect to ordinary negligence—the far greater risk here—Plaintiffs' clients may very well be left with no remedy at all.  Worse still, clients will be on their own in deciding whether to exchange this waiver for the advice of unlicensed advisors—no doubt at the urging of such advisors under the duress of a pending

lawsuit.

### C. The UPL Statutes Do Not Burden Substantially More Speech Than Necessary to Further State's Interests

The second prong of the intermediate scrutiny test requires a showing that the challenged law "does not burden substantially more speech than necessary" to serve the State's interest. *Brokamp*, 66 F.4th at 397. To satisfy this requirement, the government must show that the law is "narrowly tailored" to serve the interest in question. *Id.* But the tailoring inquiry in an intermediate scrutiny case is significantly less onerous than it would be in the strict scrutiny context. In an intermediate scrutiny case, courts must afford the government "latitude" to "design regulatory solutions to address content-neutral interests." *See TikTok Inc. v. Garland*, 604 U.S. 56, 77, 145 S.Ct. 57, 71 (2025). Consistent with such deference, a content-neutral restriction will not be held unlawful simply because it is broader than necessary to achieve the State's ends; rather, only measures that are "<u>substantially</u> broader than necessary" will run afoul of the tailoring requirement. *Id.* (emphasis added).

The UPL statutes are <u>not</u> substantially broader than necessary, particularly given the profound harms they are designed to prevent. There are also significant limits on the statutory reach of provisions challenged here. For example, under the UPL statutes, unlicensed persons such as Plaintiffs are free to speak or write on legal matters, and even to give "generalized advice to the public," so long as judgment is not exercised on behalf of a particular client. *See Upsolve,* 604 F. Supp. 3d at 105; *see also El Gemayel*, 72 N.Y.2d at 706 (to constitute the practice of law in New York, the "advice or services must be rendered to particular clients"); *Matter of Rowe*, 80 N.Y.2d 336, 342 (1992) (publishing an article that "present[ed] the state of the law" to the general reading public did not constitute the practice of law); *see also Clementine Co., LLC v. Adams*, 74 F.4th 77, 88 (2d Cir. 2023) ("when a content-neutral regulation does not entirely

foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal.") (quoting *Hill v. Colorado*, 530 U.S. 703, 726, 120 S.Ct. 2480, 2494 (2000)).

Plaintiffs suggest, incorrectly, that New York has failed to consider "less restrictive" alternatives—*i.e.*, exemptions that might allow unlicensed practice under certain limited circumstances. *See* ECF 110 at 5-6. By way of example, Plaintiffs point to a program adopted in South Carolina (but not New York) that permits unlicensed volunteers to provide advice on landlord-tenant issues in certain contexts. *Id.* at 4. But in fact, New York <u>has</u> considered—and even adopted—innovative alternatives to allow the provision unlicensed legal services under certain circumstances. For example, New York's legislature enacted statutory exemptions allowing law students who have completed "at least two semesters of law school," and who are "acting under the supervision of a legal aid organization" to provide legal services under certain circumstances—even though such students do not have a law license. N.Y. Jud. Law §§ 478(2), 484(2). Among other things, these exemptions have enabled a number of law school clinics to operate in New York State, including clinics that focus in whole or part on consumer law and debt collection defense (a subject area that Plaintiffs do not claim is addressed by the South Carolina program). The website for one such clinic, the "Consumer Justice for the Elderly" litigation clinic at St. John's University School of Law, thus reports that "[w]hen clients have been sued on a consumer debt, we defend them."[11]

Further, the fact that New York allegedly has not considered <u>Plaintiffs'</u> preferred list of "less restrictive" alternatives does not mean that intermediate scrutiny has not been satisfied. In

---

[11]     https://www.stjohns.edu/law/academics/clinics/consumer-justice-elderly-litigation-clinic

*TikTok*, for example, the petitioners "parade[d]" a whole "series" of unexplored alternatives they contended were less restrictive than the challenged measure—a "conditional ban" on the TikTok social media platform. *TikTok*, 604 U.S. at 77, 145 S.Ct. at 71. However, "[t]hose alternatives d[id] not alter" the Supreme Court's "tailoring analysis." *Id.* Citing the "latitude" courts must afford to the government in intermediate scrutiny cases, the Supreme Court reaffirmed that "[s]o long as the means chosen are not <u>substantially</u> broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 800, 109 S.Ct. 2746, 2758 (1989) (emphasis added)).

And as the above passage makes clear, the tailoring inquiry cannot be untethered from the substantial harms New York seeks to prevent. Again, the question is not merely whether the UPL statutes are overbroad in a general sense, but whether they are "substantially" broader than necessary "to achieve the government's interest." *TikTok*, 604 U.S. at 77, 145 S.Ct. at 71. Given the profound flaws in Plaintiffs' ill-conceived program—as evidenced, *inter alia*, by Plaintiffs' error-ridden Training Guide, the apparent absence of any instruction or supervision by actual attorneys, and the near complete lack of accountability for negligent advice—New York's critically important interest in protecting the public would be fatally undermined if Plaintiffs' program were permitted to proceed in <u>any</u> fashion. No amount of additional "tailoring" could eliminate the potential for harm inherent in <u>this</u> particular program.[12]

---

[12]    Given such flaws, it is no wonder that Plaintiffs do not claim to have presented New York's state legislature with any proposal to "re-tailor" New York's UPL statutes in the manner they claim is necessary here.

*Brokamp*—the Second Circuit decision whose underlying facts most resemble those present here—demonstrates that this Court <u>can</u> appropriately resolve the tailoring inquiry, and reject Plaintiffs' First Amendment challenge, on the record present here. As discussed above, *Brokamp* involved a First Amendment challenge by a plaintiff who sought to provide talk therapy to New York clients even though she did not hold the required New York license. 66 F.4th at 380-82. The Second Circuit assumed, without deciding, that the plaintiff's counseling services consisted "only of speech." *Id.* at 392. However, as in this case, the court found that the challenged licensing requirement was "content neutral"—thus triggering only intermediate scrutiny. *Id.* at 392-97. Relying solely on materials that could be considered on a motion to dismiss, the Second Circuit found that the challenged licensing requirement satisfied intermediate scrutiny. *Id.* at 397-403. In reaching this holding, the Court concluded, "as a matter of law," that:

> New York's license requirement for mental health counselors both (1) addresses a significant state interest in safeguarding and promoting public health, and (2) does so in a way—licensure based on specified standards of education, experience, and testing—long recognized by the Supreme Court directly and materially to alleviate concerns about ignorant, incompetent, and/or deceptive health care providers.

*Id.* at 399. And far from requiring the extrinsic evidence of tailoring that Plaintiffs erroneously contend is necessary, the Second Circuit concluded that the challenged licensing requirement was narrowly tailored by examining "the statutory definition of 'mental health counseling' together with the statutory exemptions." *Id.* at 402. As set forth above, the UPL statutes also have significant limits on their reach, including "statutory exemptions," that confirm they are appropriately tailored.

In certain respects, the reasoning requiring dismissal in *Brokamp* applies with even greater force here. The plaintiff who wanted to provide talk therapy *Brokamp* actually <u>did</u> hold a license to perform such therapy (albeit from a different state), and she also had a "doctoral degree," and a master's, in the same field (counseling). *Id.* at 381-82. As such, she could credibly argue that she "pose[d] no threat" to the interests the State sought to protect. *Id. at* 401. In contrast, Plaintiffs here seek to rely exclusively on advocates with no license at all, and they will not require those advocates to have anywhere near the education or training that is required of practicing lawyers. Such facts only underscore New York's strong interest in "protect[ing] the public" from "[legal] advice given by persons not trained, examined and licensed for such work.'" *El Gemayel,* 72 N.Y.2d at 705. [13]

Moreover, aside from the vacated order in this case, Plaintiffs have never cited a single decision where a court upheld an unlicensed person's purported First Amendment right to offer legal advice, or otherwise practice law, without a license. And Plaintiffs' recent motion to reinstate the injunction tellingly ignores recent cases where courts have <u>rejected</u> such challenges—including cases that applied heightened scrutiny. For example, in *Capital Associated Industries, Inc. v. Stein*, 922 F.3d 198, 202-210 (4th Cir. 2019) ("*CAI"),* the Fourth Circuit affirmed dismissal of a lawsuit challenging, on First Amendment grounds, certain

---

[13] And far from demonstrating improper tailoring, the South Carolina program upon which Plaintiffs rely only further emphasizes the severe flaws in their <u>own</u> program—and the harm Plaintiffs' program would cause to the public. For example, when the South Carolina Supreme Court administratively approved the pilot program that Plaintiffs refer to, it expressly relied on the program's "training, safeguards, and lawyer supervision" requirements, including: (i) supervision of nonlawyer advocates by licensed attorneys; (ii) reporting requirements to enable judicial oversight of the program; (iii) a detailed 29-page training manual to guide nonlawyer advocates (iv) a twelve-hour, four-module educational program covering ethical, procedural, and substantive issues related to eviction matters; and (v) comprehension tests after each training module, plus a cumulative final examination. *In re S.C. NAACP Hous. Advoc. Program*, 897 S.E.2d 691, 692-98 (S.C. 2024). Plaintiffs' program conspicuously lacks these rigorous safeguards.

unauthorized practice statutes that prohibited the plaintiff corporation from practicing law. *Id.* at 203-210. Applying what the Fourth Circuit would later describe as a "loosened" or "relaxed" form of intermediate scrutiny,[14] the *CAI* panel held that "[b]ecause North Carolina has established a reasonable fit between its UPL statutes and a substantial government interest, the UPL statutes survive intermediate scrutiny." *CAI*, 922 F.3d at 208-210.

And just last year, the Eastern District of North Carolina dismissed a case with facts strikingly similar to those present here*,* again applying the relaxed form of intermediate scrutiny articulated in *CAI. See Polaski*, 759 F. Supp. 3d at 685-90. Like Plaintiffs here, the plaintiffs in *Polaski* were nonlawyers who sought to render legal advice pertaining to the preparation of legal forms. *Id.* at 685. And like Plaintiffs here, they claimed that the prohibition on the unauthorized practice of law violated their free speech rights under the First Amendment. *Id.* The court held that the challenged UPL statutes satisfied intermediate scrutiny and dismissed the lawsuit for failure to state a claim. *Id.* at 686-90.

In reaching this decision, the court reasoned, *inter alia*, that restricting the practice of law "to lawyers who have training, oversight, confidentiality restrictions, and against whom clients have recourse, plainly fits within the State's substantial interest in protecting its citizens." *Id.* at 689. The court also recognized that the unauthorized practice statutes did not wholly prohibit the plaintiffs from speaking on the relevant legal matters. *Id.* For example, the plaintiffs could "shar[e] and distribut[e] legal information," and they could even "assist clients with filling out forms, provided there is appropriate supervision by an attorney." *Id.* And while some jurisdictions may permit nonlawyers to provide limited legal services, the court recognized that

---

[14]     *See 360 Virtual Drone Servs. LLC v. Ritter*, 102 F.4th 263, 276 (4th Cir. 2024); *see also id.* at 271.

such policy judgments are properly left to the political process.  *Id.*  The court's reasoning in *Polaski* also applies here.[15]  Accordingly, Plaintiffs freedom of speech law claim fails as a matter of law.

## II.    PLAINTIFFS FAIL TO STATE A FREEDOM OF ASSOCIATION CLAIM

Judge Crotty's conclusion that Plaintiffs' freedom of association claim "likely lacks merit," *Upsolve,* 604 F. Supp.3d at 110, was entirely correct, and that claim should therefore be dismissed at this time.

### A.  The Right of Association Does Not Confer a Right to Practice Law Without a License

The right of association under the First Amendment protects two distinct categories of activities.  First, individuals have a right to "enter into and maintain certain intimate human relationships [without] undue intrusion by the State." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18, 104 S.Ct. 3244, 3249 (1984).  Second, "the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts*, 468 U.S. at 618, 104 S.Ct. at 3249.

Plaintiffs fail to state claim under either of these categories because the First Amendment right of association does <u>not</u> include any right to practice law without a license.  *See Upsolve,* 604 F.Supp.3d at 110-11; *Montana Supreme Ct. Comm'n on Unauthorized Prac. of L. v. O'Neil,*

---

[15]    Other recent decisions have similarly rejected First Amendment challenges to professional licensing statutes that allegedly burdened speech, albeit under standards less exacting than intermediate scrutiny.  *See, e.g., Del Castillo v. Sec'y, Fla. Dep't of Health,* 26 F.4th 1214, 12116-26 (11th Cir. 2022) (affirming dismissal of First Amendment claims brought by "holistic health coach" who wished to give verbal dietary advice without possessing the required state license for practitioners of dietetics and nutrition, apparently under the rational basis standard); *Crownholm v. Moore,* No. 23-15138, 2024 WL 1635566, at **1-5 (9th Cir. Apr. 16, 2024) (affirming dismissal, under the rational basis standard, of a First Amendment challenge to statute requiring licensure of land surveyors).

147 P.3d 200, 214-15 (Mont. 2006) (rejecting nonlawyer advocate's argument that the application of Montana's UPL statutes to his conduct, which included the provision of unlicensed legal advice, violated his First Amendment rights of speech and association); *State v. Niska,* 380 N.W.2d 646, 650 (N.D. 1986) (rejecting nonlawyer advocate's argument that he had First Amendment "right of assembly" to "associat[e] with [a client] to give him legal advice").[16]

Plaintiffs have previously argued that the purported "right" alleged here arises from certain Supreme Court cases that, read together, establish that the First Amendment protects certain forms of "collective activity" undertaken to obtain "access to the courts." *See* ECF 6 at 12-13; *see also NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328 (1963)*; In re Primus*, 436 U.S. 412, 98 S.Ct. 1893 (1978) (together, the "*Button*" line of cases); *Brotherhood of R.R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1, 84 S.Ct. 1113 (1964), *United Mine Workers, Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 88 S.Ct. 353 (1967), *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 91 S.Ct. 1076 (1971) (collectively, the "Union" line of cases). Plaintiffs are wrong. Indeed, the *Button* and Union lines of cases have nothing to do with the practice of law (or the provision of legal advice) by unlicensed laypersons. Instead, in both lines of cases, the Supreme Court extended First Amendment protection to <u>entirely different</u> types of activities.

For example, in *Button* and *Primus*, the plaintiffs argued, and the Court found, that the First Amendment protected the right to refer or recommend an attorney in the context of potential civil rights litigation. *See Button*, 371 U.S. at 433-37, 83 S.Ct. at 338-340 (holding that a state antisolicitation statute was unconstitutional as applied to the NAACP's activities where

---

[16] Any claim under the first category articulated in *Jaycees* would also fail because Plaintiffs do not allege an intimate relationship—let alone the impairment of any such relationship.

that statute effectively proscribed any arrangement by which prospective litigants were advised to seek the assistance of a "particular attorney or group of attorneys"); *Primus,* 436 U.S. 412 at 416-439, 98 S.Ct. at 1896-1908 (holding that the First Amendment protected an attorney's decision to send a letter to a prospective litigant recommending free legal representation by the ACLU).

Similarly, the Union line of cases "recognizes that clients seeking legal representation—specifically in the context of union activity—have a right protected by the First Amendment to associate with each other to obtain legal representation and vindicate their rights effectively." *Jacoby,* 852 F.3d at 185 (addressing *Brotherhood of R.R. Trainmen, United Mine Workers,* and *United Transp. Union*).  Again, however, the Supreme Court was speaking of legal representation by <u>lawyers</u>—and not by laypersons.  Thus, as Judge Crotty recognized, both lines of Supreme Court cases involved a scenario where:

> "clients and *attorneys* [sought] each other out to pursue litigation." [*Jacoby,* 852 F.3d] at 185 (emphasis added). Here, by contrast, non-lawyers would seek out clients.  Accordingly, both the [*Button*] and the union lines of caselaw are fundamentally distinguishable: neither confronted a non-lawyer's purported associational right to represent a client. In that respect, no precedent, binding or otherwise, appears to support Plaintiffs' position.

*Upsolve,* 604 F. Supp.3d at 111 (italics in original).

In fact, Plaintiffs' allegations about their alleged "associational" right to represent clients in debt collection lawsuits would likely fail even if Plaintiffs <u>did</u> employ actual lawyers.  As the Second Circuit emphasized in *Jacoby*:

> The Supreme Court has never held . . . that attorneys have their *own* First Amendment right as attorneys to associate with current or potential clients, or their *own* right to petition the government for the redress of their clients' grievances when the lawyers are acting as advocates for others, and not advocating for their own cause.

*Jacoby*, 852 F.3d at 186. This reasoning applies with greater force where, as here, the persons "acting as advocates for others" are not even admitted to the bar.

Plaintiffs have also attempted to compare the facts here to *Primus* and *Button* in another respect. In particular, Plaintiffs argue that they—like the NAACP in *Button* and the ACLU in *Primus*—seek to promote important political and social goals. *See, e.g.,* ECF 6 at 13-15. But this purported comparison also falls short of the mark. As the Court has reasoned:

> This Court doubts . . . that the rationale of *Button* and *Primus* extends so far as to justify non-lawyer legal advice merely because doing so would express a political belief. The lawyers in those non-profit cases sought to vindicate constitutional rights, such as equal protection against discriminatory laws, because such causes "implicate[d] expressive values" for both the lawyers and their clients. [*Jacoby,* 852 F.3d] at 185–86. Here, Plaintiffs would express their belief in ending cycles of poverty by assisting their clients in debt collection cases. But the only constitutional right they seek to vindicate is their *clients'* right to access the courts. Promoting access to the courts—a right shared by every client— would allow any non-lawyer, so long as they do not charge a fee, to bootstrap a right to practice law. . . . Clients in any type of civil lawsuit would thus enjoy the right to full non-lawyer representation. The Court declines to endorse this broad associational theory to warrant a preliminary injunction.

*Upsolve,* 604 F. Supp. 3d at 111.

And, to the extent Plaintiffs seek to rely on their clients' alleged associational rights (and not their own), they have never alleged—let alone demonstrated—that they have the requisite third-party standing to pursue such claims. *Id.* at 111 n.5 (noting that Plaintiffs "risk creating a third-party standing problem by asserting constitutional rights on behalf of hypothetical clients"). Plaintiffs' freedom of association claim should therefore be dismissed.

### B. The UPL Statutes Easily Pass Muster Under the Rational Basis Standard

Since Plaintiffs' pleaded allegations fail to state a plausible claim for violation of their associational rights, the right of association claim can simply be dismissed without further

analysis.  *See, e.g., Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974 (a complaint must "state a claim to relief that is plausible on its face").  But the right of association claim also fails for the independent reason that the challenged statutes easily withstand scrutiny under the rational basis standard.

In a freedom of association case, rational basis review is appropriate where, as here, "no First Amendment right . . . is even implicated by the challenged regulations, much less substantially burdened by them."  *Jacoby*, 852 F.3d at 191.  Under the rational basis standard, the challenged government action need only be "rationally related to a legitimate government interest."  *Id*.  The UPL statutes easily meet this standard.  Indeed, as documented above, those statutes easily clear the bar under the higher, intermediate scrutiny standard.  *See* Point I, supra.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint, with prejudice, and enter judgment in the Attorney General's favor.

Dated:  New York, New York.
          November 25, 2025

LETITIA JAMES
Attorney General
State of New York

By:

*/s/* Matthew J. Lawson
MATTHEW J. LAWSON
Assistant Attorney General
28 Liberty Street
New York, NY 10005
Tel: (212) 416-8733
matthew.lawson@ag.ny.gov

## CERTIFICATE OF COMPLIANCE UNDER LOCAL CIVIL RULE 7.1(c)

Based on the "Word Count" feature of Microsoft Word, and excluding the caption, table of contents, table of authorities, signature blocks, and required certificates, this memorandum of law contains 8,259 words and therefore complies with the 8,750 word limitation set forth in Local Civil Rule 7.1(c).

*/s/* Matthew J. Lawson
MATTHEW J. LAWSON