UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UPSOLVE, INC, and REV. JOHN UDO-OKON, <br> *Plaintiffs,* <br><br> v. <br><br> LETITIA JAMES, in her official capacity as Attorney General of the State of New York, <br><br> *Defendant.* | Civil Case No. 1:22-cv-00627-LAK |

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Robert J. McNamara*
Elizabeth (Betsy) Sanz*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
rmcnamara@ij.org
*Attorneys for Plaintiffs*
*Admitted *pro hac vice*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

FACTS .................................................................................................................... 1

    I.    New York Debt Collection Actions and the Access to Justice Crisis ........... 1

    II.    The American Justice Movement's Solution ................................................ 4

    III.    New York's Regulation of the Unauthorized Practice of Law ..................... 8

STANDARD OF REVIEW ...................................................................................... 9

ARGUMENT ......................................................................................................... 9

    I.    This is an as-applied challenge ................................................................. 10

    II.    The government cannot carry its burden on a motion to dismiss ............. 11

    III.    The complaint also states a free-association claim .................................... 16

CONCLUSION ...................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*360 Virtual Drone Servs. LLC v. Ritter,*
    102 F.4th 263 (4th Cir. 2024), *petition for certiorari filed* Sept. 9, 2024.............. 15

*Bery v. City of New York,*
    97 F.3d 689 (2d Cir. 1996).......................................................................... 16

*Brokamp v. James,*
    66 F.4th 374 (2d Cir. 2023) ................................................................... 12, 13

*Cap. Associated Indus., Inc. v. Stein,*
    922 F.3d 198 (4th Cir. 2019) ................................................................... 19

*Citizens United v. Schneiderman,*
    882 F.3d 374 (2d Cir. 2018)...................................................................... 13

*Cornelio v. Connecticut,*
    32 F.4th 160 (2d Cir. 2022) ...................................................................... 11

*Deegan v. City of Ithaca,*
    444 F.3d 135 (2d Cir. 2006)................................................................. 11, 16

*Holder v. Humanitarian Law Project,*
    561 U.S. 1, 130 S. Ct. 2705 (2010) .......................................................... 10

*In re Primus,*
    436 U.S. 412, 98 S. Ct. 1893 (1978) ........................................................ 16

*Jacoby & Meyers, LLP v. Presiding Justices,*
    118 F. Supp. 3d 554 (S.D.N.Y. 2015) ...................................................... 16

*Jacoby & Meyers, LLP v. Presiding Justices,*
    852 F.3d 178 (2d Cir. 2017)................................................................. 16, 19

*Jeffery v. City of New York,*
    113 F.4th 176 (2d Cir. 2024) .............................................................. 13, 14

*McCullen v. Coakley,*
    573 U.S. 464, 134 S. Ct. 2518 (2014) ..................................................... 14

*NAACP v. Button,*
    371 U.S. 415, 83 S. Ct. 328 (1963) .................................................................. 17, 19

*NIFLA v. Becerra,*
    585 U.S. 755, 138 S. Ct. 2361 (2018) ...................................................................... 15

*Riley v. Nat'l Fed'n of Blind of N.C., Inc.,*
    487 U.S. 781, 108 S. Ct. 2667 (1988) ...................................................................... 14

*Roberts v. U.S. Jaycees,*
    468 U.S. 609, 104 S. Ct. 3244 (1984) ................................................................ 15, 16

*Sherman v. Town of Chester,*
    752 F.3d 554 (2d Cir. 2014) ...................................................................................... 9

*Slattery v. Hochul,*
    61 F.4th 278 (2d Cir. 2023) .............................................................................. 16, 19

*TikTok Inc. v. Garland,*
    604 U.S. 56, 145 S. Ct. 57 (2025) ............................................................................ 14

*Upsolve, Inc. v. James,*
    155 F.4th 133 (2d Cir. 2025) ................................................................................... 10

*Upsolve, Inc. v. James,*
    604 F. Supp. 3d 97 (S.D.N.Y. 2022) ....................................................................... 17

**Rules and Statutes**

Fed. R. Civ. P. 12(b)(6) ................................................................................................... 4

N.Y. Jud. Law § 476-a ..................................................................................................... 9

N.Y. Jud. Law § 478 ........................................................................................................ 9

N.Y. Jud. Law § 484 ........................................................................................................ 9

N.Y. Jud. Law § 485 ........................................................................................................ 9

N.Y. Jud. Law § 750 ........................................................................................................ 9

N.Y. Jud. Law § 753 ........................................................................................................ 9

N.Y. Penal Law § 20.00 ................................................................................................... 9

**Other Authorities**

The Legal Aid Society et al.,
    *Debt Deception: How Debt Buyers Abuse the Legal System to Prey on Lower-Income
    New Yorkers* (May 2010), https://tinyurl.com/Debt-Deception ...................... 1, 2, 4

## INTRODUCTION

This case is a narrow, as-applied challenge to New York's unauthorized-prac-tice-of-law (or UPL) rules, which make it flatly illegal for Plaintiffs (a nonprofit or-ganization and a New York-based pastor) to provide any one-on-one advice to people about their individual legal circumstances. As the Second Circuit has already held, this is a restriction on Plaintiffs' protected speech that is subject to intermediate scru-tiny. Despite that holding, Defendant urges this Court to dismiss the entire case on the pleadings, dispensing with the normally fact-intensive intermediate-scrutiny analysis altogether. For the reasons discussed below, this Court should not do so, and Defendant's motion should be denied in full.

## FACTS

### I.    New York Debt Collection Actions and the Access to Justice Crisis

This case also involves an area of the law where New Yorkers desperately need legal advice—debt collection actions. Debt collection actions are extremely common in New York, accounting for at least a quarter of all lawsuits in the State's court system. Compl. ¶ 18. There is a reason for this overabundance—more than a third of them are clearly meritless, with the debts being the result of mistaken identity or identity theft or having already been paid or discharged, or the claims being beyond the statute of limitations. *Id.* ¶¶ 21–22, 31–32. Rather, "debt buyers—a relatively new and fast-growing segment of the debt collection industry"—are responsible for these frivolous lawsuits. The Legal Aid Society et al., *Debt Deception: How Debt Buy-ers Abuse the Legal System to Prey on Lower-Income New Yorkers*, at 1 (May 2010),

https://tinyurl.com/Debt-Deception (cited at Compl. ¶ 21 n.1). Debt buyers purchase defaulted debts like cell phone bills, medical bills, and student loans "for pennies on the dollar," and then try to aggressively collect whatever they can from whomever they can. *Id*. at 3, 5. Meanwhile, the effects of an adverse judgment, even one regarding a small dollar debt, are devastating: wage garnishment, eviction, automobile repossession, bank seizure, and lasting damage to personal credit. Compl. ¶¶ 23–24.

But despite the frequent, crippling, and baseless nature of debt collection actions, New Yorkers are notoriously bad at defending against them. For example, the vast majority of them—70 to 95 percent—lose through default judgments. *Id*. ¶¶ 18–19, 29. No wonder. Over 90% of defendants go without representation, up against what the State's own Permanent Commission on Access to Justice has called "overzealous plaintiff attorneys." *Id*. ¶¶ 47, 50. A default judgment typically occurs just because the defendant, who is usually a low-income individual who cannot afford a lawyer, lacks the knowledge or support to respond to the lawsuit. *Id*. ¶¶ 41–42. And when New Yorkers fail to show up in court, debt buyers win big no matter the merits of their claims. For example, in a two-year span, "debt buyers extracted more than $1 billion in judgments against New York residents." *Debt Deception*, *supra*, at 1. This despite the fact that debt collection defendants often have legitimate defenses. Compl. ¶¶ 29 n.5, 32.

Legal assistance, even access to basic advice, makes a big difference. *Id*. ¶ 26. Defendants who have assistance don't just get their day in court: They can win. *Id*. ¶ 26. But legal representation is unaffordable for many defendants, and there are not

enough free lawyers to meet the need. *Id.* ¶¶ 28, 46. For instance, the leading non-profit program in New York City for debt collection defense is only able to assist fewer than 2% of all individuals sued on a debt. *Id.* ¶ 44. As a result, over 90% of debt collection defendants go without representation. *Id.* ¶ 47. When over 90% of defendants in 25% of New York's court cases go unassisted against sophisticated debt collectors, to devastating effect, that is nothing short of a widespread and severe access to justice crisis. *Id.* ¶ 17.

Even so, default judgments (and windfalls to debt buyers) should not be happening at such an alarming rate. Responding to a debt collection lawsuit in New York is typically straightforward and does not require significant specialized legal training. *Id.* ¶ 33. Instead, New York provides a one-page, check-the-box answer form. *Id.* ¶¶ 34–35; Ex. A. It includes 24 boxes that defendants can check to challenge service, raise defenses, and even include counterclaims. *Id.* The form is not a mystery inside an enigma only to be divined by lawyers and law students. Rather, it is meant for average people, offered by the State of New York itself in recognition that *responding is important. Id.* ¶¶ 36, 101.

Still, average people need a little help. Navigating this form requires some measure of familiarity with the legal system and specialized terminology. *Id.* ¶ 40. For instance, to accurately complete the standardized form, a defendant must understand basic legal concepts like service, unconscionability, statutes of limitations, unjust enrichment, and laches. *Id.* So, with a little guidance, New Yorkers can easily complete and file the answer form themselves, which instantly catapults their success

rate against debt collection actions—after all, the biggest part of success in these cases is just showing up. *See Debt Deception*, *supra*, at 17 (explaining that debt buyers "often walk away from cases rather than fight" once a defendant responds). In other words, the most important advice New Yorkers need—and apparently are not getting—is just to contest the case at all.

## II.    The American Justice Movement's Solution[1]

The American Justice Movement (AJM) provides New Yorkers with the meaningful advice they need to respond to debt collection actions—specifically, advice on how to fill out New York's debt collection answer form. Compl. ¶¶ 66, 78–79. AJM is part of a larger nonprofit based in New York, Plaintiff Upsolve, Inc., which is dedicated to helping Americans access their civil legal rights for free. *Id*. ¶¶ 10–12. Upsolve started by providing free bankruptcy-related resources, and now provides free online education on topics such as debt collection defense, student loans, wage garnishment, repossession, foreclosures, and evictions, serving over 150,000 individuals per month. *Id*. Upsolve guides pro se debtors through Chapter 7 bankruptcies, which has resulted in over $400 million in debt relief. *Id*.

With its successes, Upsolve wanted to expand its free legal resources. And helping New Yorkers respond to debt collection actions was a natural fit. Upsolve thus

---

[1] For clarity: As to facts pleaded related to the American Justice Movement, where the complaint speaks in future tense, this 12(b)(6) response speaks in present tense. This is because Plaintiffs initially won the preliminary injunction after the complaint was filed and they were, to a measure, able to proceed with their plans for the American Justice Movement. However, they are all the same facts, and for 12(b)(6) purposes, the question is whether the original complaint alleges enough to state a claim. (It does.)

created AJM, a program designed to provide free legal advice on responding to a debt collection lawsuit. *Id.* ¶ 57. To provide this advice, AJM trains and supervises "Justice Advocates"—i.e., volunteers who are public-interest professionals, but not lawyers. *Id.* AJM has prepared a robust step-by-step Training Guide to train Justice Advocates, who in turn provide narrowly circumscribed legal advice to clients. *Id.* ¶¶ 62–63, 65; *see generally* Ex. B (Training Guide). All they do is talk to defendants about how to fill out the State's form. *Id.* ¶ 66.

The Training Guide has been independently reviewed by third-party experts in consumer law and debt collection defense. *Id.* ¶¶ 63–64, 72. Those experts not only confirm that the program minimizes the risk of unreliable or harmful advice but believe that with AJM's carefully tailored, circumscribed assistance, low-income New Yorkers will be substantially better off than they are now—which is fending for themselves, with no advice at all. *Id.*

At its core, the Training Guide provides practical questions and explanations to help clients navigate (and decide whether to check) each box on the State's standardized answer form. *Id.* ¶ 66. Take box number 10: "Statute of limitations (the time has passed to sue on this debt)." *Id.*, Ex. A at 8. Without some help, a defendant may have no idea what this means or whether to assert this defense. But if a Justice Advocate is involved, he will walk the client through the relevant analysis (by asking several questions) and help decide whether the client should check the box (depending on the type of debt, when the client last made a payment, and whether the applicable statute of limitations has passed). *Id.* ¶ 66.

5

Justice Advocates also provide other ancillary advice, such as advising the client whether it is in their interest to answer the lawsuit against them, and if it is, explaining how and where to file and serve the answer themselves. *Id.* ¶ 62. Justice Advocates are also trained about the limits of their advice. For example, they promise, among other things, not to request or receive any compensation for their advice, to adhere to the Training Guide, and to comply with the New York State Rules of Professional Conduct related to conflicts of interest, informed consent, and confidentiality. *Id.* ¶¶ 60–71. Justice Advocates are also trained to recognize the limits of what they know and to refer clients to lawyer organizations if those client's needs exceed the scope of the advice authorized by the Training Guide. *Id.* And if any Justice Advocate violates these limitations, AJM will terminate its relationship. *Id.*

AJM tells its clients about the same limitations. They are told that Justice Advocates "are not lawyers and not employees of the court," but rather, just volunteers providing "limited, free legal advice about whether and how to respond to your debt collection lawsuit." *Id.*, Ex. B at 15. Clients are also told that AJM will *not* represent them—so the client must still represent themselves in court. *Id.* And if the client's "legal problems are too complicated," they are warned that the Justice Advocate "may decline to provide you with advice." *Id.*

Armed with its Training Guide, AJM began recruiting candidates to become Justice Advocates. The first was Plaintiff Reverend John Udo-Okon—a pastor in the South Bronx. *Id.* ¶ 83. Reverend Udo-Okon and his congregation provide services to people in need, a path by which he believes that he can preach the gospel. *Id.* Many

members of his community face credit issues and debt collection lawsuits, have suffered credit damage, and even loss of their homes. *Id.* ¶ 86. However, they cannot afford lawyers. *See id.* ¶ 13. They are also simply intimidated by the complexity of it all. *Id.* ¶ 84. They want to get advice from Reverend Udo-Okon on how to respond to these debt collection lawsuits, and, as any good pastor would, Reverend Udo-Okon wants to talk to them about it, too. *Id.* ¶¶ 83–87. But he is not a lawyer. *Id.* ¶ 85. So, the only option was to refer these individuals to outside agencies offering free legal assistance. *Id.* But the agencies are more often than not overwhelmed with requests, and folks in Reverend Udo-Okon's community are frequently put on long waiting lists. *Id.* With time sensitive actions, the wait alone can mean the loss of rights. *Id.* Reverend Udo-Okon wants to help his community members respond to debt collection actions by teaming up with Upsolve and the AMJ as a Justice Advocate. *Id.* ¶¶ 3, 56, 86–87.

In its motion, Defendant resists all of these allegations and insists that the proposed volunteer program will *not* help people. Even setting aside the procedural impropriety of having this fight at the pleading stage, Defendant is wrong. It identifies only one legal error in the training guide attached to the complaint—a statute of limitations that has been amended by the legislature.[2] MTD at 4–5, 13. Other than that, it largely resorts to rhetoric and exaggeration. A perfectly normal waiver in which Upsolve's volunteers notify the people they're helping that they are not

---

[2] The training guide attached to the complaint is, of necessity, several years out of date. *See* ECF 90 (authorizing Upsolve to implement its volunteer program with an updated training guide).

responsible for the ultimate outcome of their case becomes, in Defendant's view, a sweeping waiver of any liability for negligence. MTD 15. But the waiver (on its face) just says something obviously true: That Upsolve's volunteers (like anyone else) cannot promise how any given lawsuit will come out.

The same is true of Defendant's other factual disputes. Defendant complains that Upsolve's volunteers will not be subject to rigorous character-and-fitness review or to the same conflict rules that govern attorneys. *Id*. 13–14. But this is a feature, not a bug: The entire point of the volunteer program is that lawyer licensing is prohibitively expensive and that much of the access-to-justice gap can be filled by allowing laypeople to give narrow, targeted advice.

At bottom, though, the complaint alleges that AJM will provide people with helpful advice and that experts in the field have reviewed the related training materials and opined that they would empower volunteers to give useful advice. That advice, though limited, would be better than nothing—which is the only thing New York law allows far too many New Yorkers to get. Defendant may disagree with those allegations—and it will be free, in discovery, to explore the advice people have actually received under the AJM program—but those allegations are controlling.

### III.    New York's Regulation of the Unauthorized Practice of Law

The one-on-one advice that AJM provides is forbidden as the unauthorized practice of law (UPL) in New York. Compl. ¶¶ 88–89. Even though it involves drafting no documents, filing no papers, and never appearing in court, and even though this advice would advance the very interests underlying the rules, New York's UPL rules would punish Plaintiffs (or any other New Yorker) with crimes and civil penalties

merely for communicating one's opinion about a legal matter. *See Id.* ¶¶ 89, 100–01. *See also* N.Y. Jud. Law §§ 476-a, 478, 484, 485, 750, 753. And because New York imposes criminal liability for "solicit[ing], request[ing] . . . . or intentionally aid[ing]" in unlawful conduct, N.Y. Penal Law § 20.00, even debt collection defendants risk punishment under New York's UPL rules if they solicit advice from Plaintiffs. Compl. ¶ 93. Because they cannot afford a lawyer, cannot find free counsel, and cannot solicit advice from a non-lawyer, they are left to go it alone. *Id.* And, as study after study shows, going it alone the vast majority of defendants are never entering the courthouse door. *Id.* ¶¶ 19, 29.

## STANDARD OF REVIEW

To survive a motion to dismiss, a complaint need only "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Sherman v. Town of Chester*, 752 F.3d 554, 560 (2d Cir. 2014). A reviewing court must "accept[] as true all allegations in the complaint and draw[] all reasonable inferences in favor of the nonmoving party." *Id.*

Defendant's motion, which cites liberally to websites and its attorney's declaration, is hard to square with this standard. Taking the allegations of the complaint as true, however, the motion to dismiss must be denied.

## ARGUMENT

Despite the somewhat apocalyptic tone of Defendant's motion to dismiss, this case is not a broadside challenge to the regulation of the practice of law—it is a narrow, as-applied challenge to New York's blanket prohibition on laypeople ever, in any

context, giving individualized spoken advice about the law. That narrow challenge cannot be resolved on a motion to dismiss because restrictions on speech must be justified by evidence, and the government can offer none. Finally, the complaint also states a claim that this blanket speech restriction violates Plaintiffs' associational rights. Defendant's motion to dismiss should therefore be dismissed in its entirety.

## I.      This is an as-applied challenge.

Much of the government's brief (and many of the cases it cites in support) seems to assume that this case is a challenge to New York restrictions on "the practice of law." It is not. As the Second Circuit has already held, this case is much like the Supreme Court's decision in *Holder v. Humanitarian Law Project*. *Upsolve, Inc. v. James*, 155 F.4th 133, 141 (2d Cir. 2025) (citing *Holder*, 561 U.S. 1, 28, 130 S. Ct. 2705 (2010)). In *Holder*, the plaintiffs challenged a law that broadly restricted *conduct* (a prohibition on providing material support to designated terrorist groups) but argued that it violated the First Amendment *as applied* to them because it prevented them from providing expert advice to those groups. *Holder*, 561 U.S. at 25, 130 S. Ct. at 2722. The Supreme Court agreed: *As applied* to the plaintiffs' proposed conduct, the law forbade them from conveying information derived from "specialized knowledge" but allowed them to impart "general or unspecialized knowledge." *Id.* at 27, 130 S. Ct. at 2724.

So too here. *See Upsolve*, 155 F.4th at 141. New York's restrictions on the practice of law generally restrict conduct—appearing in court, drafting binding documents, and the like. This lawsuis challenges them only to the extent they also prohibit

talking. Like the plaintiffs in *Holder*, they are allowed to convey *generalized* infor-mation about the law, but they would be committing a felony if they provided *specific* advice about a particular person's circumstances. That is a restriction on their speech.

And understanding the nature of this challenge makes the government's case much harder. To be sure, the government has an interest in regulating *the practice of law*. But New York regulates all sorts of important occupations. It licenses counse-lors—but it doesn't require a license to have conversations about particular individ-uals' feelings. It licenses engineers—but it doesn't require a license to talk about a particular bridge. It licenses doctors—but it doesn't require a license to talk to some-one about their personal health. The government's burden, then, is to explain why the law (alone) requires this blanket restriction on unlicensed individualized advice. As demonstrated below, it cannot.

## II.    The government cannot carry its burden on a motion to dismiss.

Because New York's licensing requirement for all legal advice infringes on Plaintiffs' free-speech rights, "the government bears the burden of showing that its restriction of speech is justified under the traditional 'narrowly tailored' test." *Deegan v. City of Ithaca*, 444 F.3d 135, 142 (2d Cir. 2006). For that reason, "the norm is to wait until the summary judgment stage of the litigation" to evaluate whether the government can carry that burden. *Cornelio v. Connecticut*, 32 F.4th 160, 172 (2d Cir. 2022) (citation omitted). Granting judgment in a free-speech case "will rarely, if ever, be appropriate at the pleading stage." *Id.* (citation omitted). This case is not the rare exception.

In arguing otherwise, Defendant relies on a handful of factually distinct cases that *were* the rare exception or, alternatively, asks this Court to abandon Second Circuit law and instead apply the Fourth Circuit's brand-new, reduced "intermediate scrutiny" test for occupational-licensing laws. Neither argument is correct.

Start with the government's in-circuit cases. The first (and the case on which the government places the most weight) is *Brokamp v. James*, 66 F.4th 374 (2d Cir. 2023). *Brokamp* is different from this case both because the law challenged there was narrower and because the law imposed nearly no practical burdens on the plaintiff's speech. There, the Second Circuit made clear that the plaintiff (a Virginia-licensed counselor) did not have standing to challenge New York's licensing requirement for counselors. Instead, she only had standing to challenge New York's "streamlined requirement for licensure by endorsement" that applied to counselors licensed out of state. *Id.* at 389. As the panel noted, this restriction was not "seriously burdensome" in light of the fact that the plaintiff herself could "easily make [the necessary] showing" for licensure. *Id.* at 402. Nothing of the sort is true here: The complaint alleges that Plaintiffs have only two choices if they want to give advice about the law: Go to law school, or commit a felony. Compl. ¶¶ 88–92.

But *Brokamp* also matters because the panel there focused on the fact that the statute on its face was narrowly drawn, applying *only* to counseling conversations that happened in the context of a formal counseling session meant to provide medical treatment. In other words, most individualized conversations about mental-health problems were unregulated, and the licensing requirement applied narrowly to "those

circumstances where persons are most likely to present as professional mental health counselors in order to gain client trust[.]" *Id.* at 401. But that cuts *against* the government here. Counseling, just like law, implicates significant governmental interests. But New York allows all manner of individualized advice about emotional disorders—so long as they are not offered in narrow circumstances "where persons are most likely to present as professional mental health counselors in order to gain client trust[.]" *Id.* Why can New York not regulate conversations about the law in a similarly narrowly tailored way—allowing individualized conversations so long as the speaker makes clear they are only a layperson, not an attorney offering representation? Defendant's motion does not say—and so Defendant's motion cannot be granted.

Defendant fares no better with its other in-circuit 12(b)(6) cases. It's true that the Second Circuit dismissed a free-speech claim on the pleadings in *Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018). But there, the panel simply found that the complaint had failed to plausibly allege anything other than a "small extent of speech chilling" that was swamped by the government's compelling interest in charitable disclosures. *Id.* at 384. The same is not true here, where the complaint squarely alleges both a legitimate chill on plaintiffs' speech and that the regulations are both overbroad and, in practice, fail to advance the government's interests. Compl. ¶¶ 88–102. And the intermediate scrutiny in *Jeffery v. City of New York* could take place on the pleadings because the complaint in that case expressly alleged the justification for the challenged curfew, which included "severe instances of criminal behavior" and

13

"property destruction, vandalism, and looting." 113 F.4th 176, 179 (2d Cir. 2024). Defendant does not attempt to identify any similar allegations in the complaint here.

The only other binding authority Defendant can point to in support of the idea that this intermediate-scrutiny case can be dismissed on the pleadings is *TikTok Inc. v. Garland*, 604 U.S. 56, 145 S. Ct. 57 (2025). But *TikTok* does not control. To begin, the Supreme Court's opinion in *TikTok* begins with an admonition that its reasoning is "narrowly focused in light of" the circumstances of the case. 604 U.S. at 62, 145 S. Ct. at 62–63. In other words, the Court—operating on a compressed timeline—expressly cautioned lower courts not to read the case too broadly or as establishing a rule for other contexts. And, in any event, it does not say that laws can survive intermediate scrutiny on the government's say-so: It says that "*[o]n this record*, Congress was justified in specifically addressing its TikTok-related national security concerns." *Id.* at 76; 145 S. Ct. at 70 (emphasis added). It would be error to read the *TikTok* opinion as establishing a new, evidence-free rule for intermediate scrutiny of restrictions on more ordinary speech. After all, the reason the Supreme Court demands a record is to "prevent[] the government from too readily 'sacrific[ing] speech for efficiency.'" *McCullen v. Coakley*, 573 U.S. 464, 486, 134 S. Ct. 2518, 2534–35 (2014) (quoting *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 795, 108 S. Ct. 2667, 2676 (1988)). And courts make that determination with facts—asking whether the government has too readily silenced speech when it could have taken a less-speech-restrictive path to the same place. The complaint alleges that New York has done exactly that here, and that means Defendant's motion should be denied.

14

Finally, Defendant urges this Court to look to the Fourth Circuit as a guide for how to conduct the intermediate-scrutiny inquiry. As Plaintiffs have already explained (ECF 125), the Fourth Circuit's intermediate-scrutiny caselaw cannot be squared with the law of the Second Circuit (or the Supreme Court). In the Fourth Circuit, there are two forms of intermediate scrutiny: "the traditional intermediate-scrutiny test" that relies on actual evidence and asks whether the government can show that less-restrictive alternatives would not work and then a "loosened intermediate-scrutiny test for professional-conduct-focused regulations." *360 Virtual Drone Servs. LLC v. Ritter*, 102 F.4th 263, 276 (4th Cir. 2024), *petition for certiorari filed* Sept. 9, 2024.[3] This new, fact-free version of intermediate scrutiny applies to some, but not all, challenges to professional-licensing laws based on a "non-exhaustive list of factors." *Id.* at 278. Under the Fourth Circuit's test, speech in public receives greater First Amendment protection than speech in private, while the government has a freer hand to regulate speech on some topics (like medicine) than others (like history). *Id.* at 274–75. Neither the Fourth Circuit's new intermediate-scrutiny test nor the hodgepodge of distinctions that underly it have any basis in the Supreme Court's cases. Indeed, to the extent it posits a new test for "professional-conduct-focused regulations" it has simply re-invented exactly the reduced protection for occupational-licensing laws that the Court has already expressly rejected. *Cf. NIFLA v. Becerra*, 585 U.S. 755, 773, 138 S. Ct. 2361, 2375 (2018) (rejecting the professional-

---

[3] The petition for certiorari in *Drone Services* has been pending at the Supreme Court for over a year. The Court appears to be holding the case pending the outcome in *Chiles v. Salazar*, No. 24-539 (argument held Oct. 7, 2025).

speech doctrine and cautioning against rules that "give[] the States unfettered power to reduce a group's First Amendment rights simply by imposing a licensing requirement"). The Second Circuit's law is different: The Second Circuit follows Supreme Court precedent in this area and therefore (also unlike the Fourth Circuit) recognizes only one intermediate-scrutiny test: "the traditional 'narrowly tailored' test." *Deegan*, 444 F.3d at 142. This Court therefore should not—and cannot—follow Defendant's out-of-jurisdiction cases.

*    *    *

The allegations of the complaint claim that New York's UPL restrictions prevent them from engaging in one-on-one speech who want to listen to them; that (as applied) these restrictions are actually contrary to the government's asserted interests in consumer protection; and that far narrower restrictions could protect the public without creating a monopoly on who is allowed to talk about the law. Those allegations describe a regulation that "is too sweeping to pass constitutional muster[.]" *Bery v. City of New York*, 97 F.3d 689, 697 (2d Cir. 1996). Defendant's motion should therefore be denied.

## III.    The complaint also states a free-association claim.

Plaintiffs have also sufficiently pleaded that New York's UPL rules, as applied to them, violate their First Amendment associational rights. The First Amendment protects the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition[.]" *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 104 S. Ct. 3244 (1984). "This right, also called a 'right of

16

expressive association,' protects, among other things, 'the freedom of individuals to associate for the purpose of engaging in protected speech.'" *Jacoby & Meyers, LLP v. Presiding Justices*, 118 F. Supp. 3d 554 (S.D.N.Y. 2015) (footnotes omitted). This right of expressive association, which includes the right to associate to access court, is a fundamental right. *In re Primus*, 436 U.S. 412, 426, 98 S. Ct. 1893, 1901 (1978) ("[C]ollective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." (citation omitted)).

To properly plead a First Amendment expressive association claim, Plaintiffs need only show that they are engaging in expressive association, and that a law severely burdens that right. *Slattery v. Hochul*, 61 F.4th 278, 287 (2d Cir. 2023). If it does, this Court "appl[ies] 'strict scrutiny, in which case the restriction survives only if it is narrowly drawn to advance a compelling state interest.'" *Id.* (quoting *Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178, 191 (2d Cir. 2017)). Plaintiffs have more than met that standard here.

Plaintiffs have pleaded facts that plausibly allege First Amendment expressive association. They seek to provide free advice to debt collection defendants to empower them to respond using New York's response form, the whole goal of the association being that defendants may "obtain meaningful access to the courts." *In re Primus*, 436 U.S. at 426. Plaintiffs freely concede that some courts have found that attorneys and non-attorneys do not have a First Amendment right to associate with clients. *See* MTD at 22; *Jacoby & Meyers*, 852 F.3d at 186. But this case is on a different footing than *Jacoby & Myers* and others cited by Defendant because this case is only about a

17

narrow, nonprofit association of people offering each other advice about how to access the courts. *See* MTD at 22–23. Plaintiffs do not argue that their First Amendment right of association allows them to "any" right to practice law without a license, *contra* MTD at 22, to advertise themselves as attorneys, represent anyone in court, or even draw up papers. Rather, Plaintiffs bring an as-applied challenge to New York's bar to their ability to associate for narrowly circumscribed purposes under narrow circumstances—free advice about how to fill out a form provided by the State—to individuals who currently receive no help, against a backdrop of a well-documented and acute access to justice crisis.

For that reason, the rationale of *NAACP v. Button*, 371 U.S. 415, 83 S. Ct. 328 (1963), applies. There, Virginia prohibited organizations from retaining attorneys to represent third parties, and the Supreme Court found that the law infringed on the rights of the NAACP and its members "to associate for the purpose of assisting persons who seek legal redress for infringements of their . . . rights." *Id.* at 428, 83 S. Ct. at 335. To be sure, as Judge Crotty noted, in *Button* it was clients and attorneys desiring to associate, not clients and non-attorneys, as here. *See Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 111 (S.D.N.Y. 2022). But the Court's decision in *Button* did not rest on that fact; it rested on the fact that the law at issue "prohibit[ed] every cooperative activity that would make advocacy of litigation meaningful." *Button*, 371 U.S. at 437–38, 83 S. Ct. at 340. And the fact that "no monetary stakes [were] involved" only underscored the expressive, cooperative nature of that association. *Id.* at 443, 83 S. Ct. at 343. So too here.

18

The Fourth Circuit's opinion in *Capital Associated Industries, Inc. v. Stein*, 922 F.3d 198 (4th Cir. 2019) is instructive. There, the court rejected a free-association challenge brought by a trade association that wanted to provide legal services to its members need not satisfy strict scrutiny. That claim failed for three reasons: "First, what [the trade association] seeks to accomplish would be for commercial ends[;] . . . [s]econd, it would not facilitate access to the courts[;] [a]nd third, it would pose ethical concerns not present in the *Button* cases." *Id.* at 206. This case is the opposite of that on all fronts: AJM is a non-profit, its entire mission is facilitating access to courts, and it presents no "serious danger . . . of professionally reprehensible conflicts of interest." *Button*, 371 U.S. at 443, 83 S. Ct. at 343; *see also Jacoby & Meyers*, 852 F.3d at 188 (finding no associational right when the plaintiffs were not non-profit organizations, but were "engaged in the practice of law as a business" for the purpose of commercial gain). In short, while some courts have rejected the idea that private businesses have an associational right to practice law, none has rejected the idea the private citizens have a right to band together in a nonprofit setting to give each other advice about how to access the courts. That claim—the claim Plaintiffs have actually brought here—remains perfectly viable.

Finally, there is no question that New York's rules "severely burden[]" Plaintiffs' right to engage in their expressive association. *Slattery*, 61 F.4th at 288. As alleged in the complaint, New York law entirely prohibits Plaintiffs' proposed association with each other and debt collection defendants, no matter how well trained AJM's Justice Advocates are, no matter how helpful the advice might be, and no

matter that the advice is free. Strict scrutiny applies, Plaintiffs have sufficiently pleaded a violation of their associational rights, and their claim should go forward.

## CONCLUSION

The motion to dismiss should be denied.

Dated: December 9, 2025

Respectfully submitted,

/s/ Robert J. McNamara

Robert J. McNamara*
Elizabeth (Betsy) Sanz*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
rmcnamara@ij.org
*Attorneys for Plaintiffs*
*Admitted *pro hac vice*
