Ex. 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UPSOLVE, INC., and
REV. JOHN UDO-OKON,

                 Plaintiffs,

     -against-

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York,

              Defendant.

No. 1:22-cv-00627-LAK

**BRIEF OF *AMICI CURIAE* CONSUMER LAW EXPERTS, CIVIL LEGAL SERVICES ORGANIZATIONS, AND CIVIL RIGHTS ORGANIZATIONS IN OPPOSITION TO PLAINTIFFS' MOTION TO REINSTATE PRELIMINARY INJUNCTION**

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
One Rockefeller Plaza, 8th Floor
New York, New York 10020

*Counsel for Advocate Amici*

# TABLE OF CONTENTS

**PAGE NO(s):**

TABLE OF AUTHORITIES ..................................................................................... ii

I. INTERESTS OF AMICI CURIAE .......................................................................... 1

II. SUMMARY OF ARGUMENT ............................................................................. 2

III. BACKGROUND ...............................................................................................3

    A. Plaintiffs implemented their legal-advice program following the Court's granting of the Preliminary Injunction in May 2022. ................................................................4

        1. Plaintiffs' implementation of their legal advice program was deeply flawed. ...........4

        2. Plaintiffs' legal-advice program as implemented deviated from, and fell short of, their representations to the Court. ......................................................................7

        3. Plaintiffs' description of their legal-advice program as implemented suggests an information and referral model that would not run afoul of unauthorized practice of law rules. ..............................................................................................12

    B. Developments in the access to justice movement have resulted in various models designed to address unmet legal needs. ..........................................................12

        1. Some access-to-justice models involving non-lawyers are authorized by state courts. .........................................................13

        2. Some states sponsor community-based justice worker programs. .......................................................17

        3. Other countries have non-attorney access-to-justice

        4. models. ......................................................................19

        5. Access-to-justice programs should prioritize the prevention of harm to low-income communities. .................................................20

        6. Access-to-justice programs exist in New York. .........................20

IV. ARGUMENT ..................................................................................................21

    A. Plaintiffs' Motion to Reinstate Preliminary Injunction should be denied given that they will not prevail on the merits, as the UPL statutes will withstand intermediate scrutiny...................................................................................................21

1. The UPL statutes advance the important government interests of protecting New Yorkers from harmful legal advice. ...........................................................................21

2. New York's UPL statutes do not burden substantially more speech than necessary to protect New Yorkers from harm. ...............................................................................22

B. Plaintiff's motion should be denied because a preliminary injunction that allows Upsolve's legal-advice model to operate is not in the public interest...............................23

CONCLUSION ..........................................................................................................................24

APPENDIX

# TABLE OF AUTHORITIES

**Page No(s)**:

**Cases**

*18 Int'l Ltd. v. Interstate Exp., Inc.*,
    116 Misc. 2d 66, 455 N.Y.S.2d 224 (Sup. Ct. 1982)........................................ 22

*Amoco Production Co. v. Gambell*,
    480 U.S. 531 (1987) ...................................................................................... 23

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ...................................................................................... 23

*El Gemayel v. Seaman*,
    72 N.Y.2d 701 (1988) .................................................................................... 22

*In Re: South Carolina NAACP Housing Advocate Program, et al.*,
    2023-001608 (Sup. Ct. S.C. 2023)................................................................ 15

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018)............................................................................ 21

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015)........................................................................... 21

*People v. Alfani*,
    227 N.Y. 334 (1919) ...................................................................................... 22

*Polaski v. Lee*,
    759 F. Supp. 3d 683 (E.D.N.C. 2024)............................................................ 22

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ...................................................................................... 23

**Statutes:**

Arizona Jud. Code Adm. § 7-210(E)(7)) ............................................................. 15

Arizona Jud. Code Adm. § 7-210(E)(8)) ............................................................. 15

Arizona Jud. Code Adm. § 7-210(F) .................................................................... 15

Arizona Jud. Code Adm. § 7-210(G) ................................................................... 15

Arizona Jud. Code Adm. § 7-210(I) ..................................................................... 15

Arizona Jud. Code Adm. § 7-210(J) ..................................................................... 15

Ariz. Jud. Code Adm. § 7-210(B); (E)(1) ..................................................................... 15

Ariz. Jud. Code Adm. § 7-210(B); (E)(2) ..................................................................... 15

Ariz. Jud. Code Adm. § 7-210(B); (E)(3) ..................................................................... 15

Ariz. Jud. Code Adm. § 7-210(B); (E)(5) ..................................................................... 15

**Other Authorities:**

Waivers to Engage in the Limited Practice of Law for Non-Lawyers Trained and Supervised by
Alaska Legal Services Corporation)), *available at*: https://www.alsc-law.org/cjw/ ........ 17

(Wash. State Bar Assoc., Sunset of LLLT Program (updated Mar. 31, 2023), *available at*:
https://www.wsba.org/for-legal-professionals/join-the-legal-profession-in-wa/limited-
license-legal-technicians/decision-to-sunset-lllt-program ................................................. 14

A Statement of Principles for Civil Legal Services, *available at*:
https://www.nlada.org/sites/default/files/pictures/Legal-Practitioners-A-Statement-of-
Principles-for-Civil-Legal-Services.pdf ............................................................................ 20

Citizens Advice, Supporting Volunteers at Citizens Advice website, *available at*:
https://www.citizensadvice.org.uk/about-us/information/supporting-volunteers-at-
citizens-advice/ ................................................................................................................... 19

*Justice Fellow*, https://www.weil.com/weil-legal-innovators/2024-2025-nonprofit-
partners/upsolve/upsolve-job-1 ............................................................................................ 8

Legal Hand website, *available at*: https://www.legalhand.org/ (last visited Dec. 16, 2025) ....... 12

Oregon State Bar, Oregon Licensed Paralegals, *available at*: https://www.osbar.org/lp ............. 16

Oregon State Supreme Court Rules for Licensing Paralegals, *available at*:
https://www.osbar.org/_docs/rulesregs/RulesforLIcensingParalegals.pdf (effective Jan. 1,
2025) ................................................................................................................................... 16

Resolution 1-2025 In Support of Exploring Access to Justice Through Authorized Justice
Practitioner Programs (July 30, 2025), *available at*: https://ccj.ncsc.org/resources-
courts/support-exploring-access-justice-through-authorized-justice-practitioner-programs
............................................................................................................................................. 13

The Diverse Landscape of Community-Based Justice Workers (Feb. 22, 2024), *available at*:
https://iaals.du.edu/blog/diverse-landscape-community-based-justice-workers .............. 17

Utah State Courts, Licensed Legal Practitioner, *available at*:
https://www.utcourts.gov/en/about/miscellaneous/legal-community/lpp.html ............... 16

**Rules:**

Alaska Bar Rule 43.5(1) ........................................................................................ 17

Alaska Bar Rule 43.5(2) ........................................................................................ 17

Alaska Bar Rule 43.5(3) ........................................................................................ 17

Arizona Code J. Admin § 7-211(A) ........................................................................ 18

Arizona Code J. Admin § 7-211(B) ........................................................................ 18

Arizona Code J. Admin § 7-211(E)(3) .................................................................... 18

Arizona Code J. Admin § 7-211(E)(4)(g) ............................................................... 18

Arizona Code J. Admin § 7-211(G) ........................................................................ 18

Arizona Code J. Admin §§ 7-211(G), (K), (L), (N) and (M) ................................... 18

Arizona Code J. Admin. § 7-211(C) ....................................................................... 18

Colo. R. Civ. Proc. 207 (2025) .............................................................................. 16

Utah Code Jud. Admin. Rule 14-802(c) ................................................................. 16

## I.    INTERESTS OF *AMICI CURIAE*

*Amici curiae* are civil legal services and civil rights organizations, consumer law and access-to-justice experts, and law school-based programs and centers located in New York State and elsewhere ("Advocate *Amici*"). Advocate *Amici* include: Access Justice Brooklyn, CAMBA Legal Services, District Council 37 Municipal Employees Legal Services, Fordham Law School's Feerick Center for Social Justice, Legal Services NYC, Mobilization for Justice, New Economy Project, New York Legal Assistance Group, Public Good Law Center, St. Vincent De Paul Legal Program, Inc., TakeRoot Justice, and Western New York Law Center. Organizational statements are attached as Appendix A to this brief. Advocate *Amici* include a robust array of limited-scope legal assistance providers, including organizations that operate and assist the Civil Legal Advice and Resource Office (CLARO) and the Volunteer Lawyer for the Day (VLFD) programs, both of which help New Yorkers to proceed *pro se* in debt collection lawsuits.

Advocate *Amici* provide the vast majority of the free civil legal services that are available in the area of consumer law to residents of New York State with low and moderate incomes. These free legal services range from limited-scope legal assistance—including legal advice and assistance preparing *pro se* papers—to full representation in consumer debt collection lawsuits and affirmative litigation. Advocate *Amici* share the common goal of promoting economic justice in New York's low-income communities and communities of color, including by helping the people in those communities defend themselves against abusive debt collection and financial exploitation.

Advocate *Amici* are acutely aware of the limited availability of civil legal services for people sued in debt collection lawsuits and have led innovations in consumer debt collection defense for years, frequently in partnership with the New York State courts. As access-to-justice

1

innovators, social justice advocates, and consumer law experts who work in and with New York's low-income communities and communities of color, Advocate *Amici* collectively have many decades of experience with debt collection litigation practices and abuses. (In fact, Upsolve lists many of the Advocate *Amici* in their Training Guide as "Alternative Sources of Assistance" to offer a client whom an Upsolve Justice Advocate cannot help. ECF No. 1-2 at 17.) They have a substantial interest in ensuring that access-to-justice models do not put unrepresented New Yorkers facing consumer debt collection litigation at risk of undue or unintended harm.[1]

## II.    SUMMARY OF ARGUMENT

Advocate *Amici* submit this brief in opposition to Plaintiffs' Motion to Reinstate Preliminary Injunction ("PI Reinstatement Motion") to "re-start the American Justice Movement" (Plaintiffs' Memorandum of Law ("Pl. MOL") at 2) and allow Plaintiff Upsolve's non-attorney volunteers (called "Justice Advocates" in the first round of PI briefing, but not the second) to provide legal advice to unrepresented New Yorkers and help them prepare *pro se* answers to consumer debt collection lawsuits.[2] Pl. MOL at 3-4.

Advocate *Amici* seek to provide helpful information to the Court on Upsolve's implementation of its legal-advice program following the grant of the PI on May 24, 2022, and to provide the Court with background on access-to-justice programs generally and on developments within the access-to-justice movement since Plaintiffs filed this action in January 2022.

---

[1] Many of the same Advocate Amici previously submitted an Amicus Brief in the district court during Plaintiffs' first Motion for Preliminary Injunction (ECF No. 57) and an Amicus Brief to the Second Circuit in support of Defendant Office of the Attorney General's appeal of the PI. Case 22-1345, Doc. 76 ("2d Cir. Amicus Brief"), attached as Exhibit C to Def. Opp.

[2] As explained in Advocate Amici's prior amicus briefs (Doc. 76 2d Cir. Amicus Brief at 21-22 (citing ECF No. 57 at 15-17)), Plaintiffs rely on the faulty premise that lack of legal assistance is the primary driver of default judgments, the problem that Plaintiffs purport to want to solve with Upsolve's legal-advice program.

Advocate *Amici* submit this brief to explain why Plaintiffs' PI Reinstatement Motion should be denied. Plaintiffs seek an exemption from New York's unauthorized practice of law (UPL) statutes so that Upsolve may operate a program where non-attorney volunteers provide legal advice to New Yorkers, without any attorney supervision or other meaningful guardrails to ensure that the non-attorney volunteers' legal advice is correct and is in New Yorkers' best interests. The Court should deny Plaintiffs' PI Reinstatement Motion because New York's UPL statutes will withstand intermediate scrutiny and Upsolve's program, as proposed and as implemented, is not in the public interest.

## III.    BACKGROUND

Plaintiffs seek an exemption from New York State's UPL statutes in order to operate a legal-advice program where unlicensed and uncertified non-attorney volunteers, without attorney supervision or other meaningful guardrails in place, may provide legal advice to and prepare answer forms for unrepresented defendants in consumer debt collection lawsuits. Comp. ¶¶ 1-9. Advocate *Amici*'s prior *amicus* brief before the Court addressed concerns with the then-hypothetical program that Upsolve would launch once Plaintiffs were assured that they would not be prosecuted for engaging in the practice of law without a license. *See* ECF No. 57. Advocate *Amici* now raise concerns with the actual program that Upsolve unveiled (and which it claims to have quickly shuttered once the Second Circuit vacated the order granting the preliminary injunction). Declaration of Jonathan Petts in Support of Plaintiffs' PI Reinstatement Motion ("Petts Decl.") ¶ 9.

Plaintiffs describe their proposal as "a modest, but genuinely helpful volunteer program that assisted some people and hurt no one." Plaintiff Reply ("Pl. Reply") at 1. Advocate *Amici* share below the experience of a New Yorker, who received erroneous legal advice from one of Upsolve's Justice Advocates. Advocate *Amici* also describe initiatives by various states and

courts to address the unquestionably unmet needs of *pro se* litigants over time, along with certain developments in the access-to-justice movement since Plaintiffs obtained their preliminary injunction, to offer the Court context for comparing Upsolve's legal-advice model with legal-advice models developed with more deliberation and thought.

### A.  Plaintiffs implemented their legal-advice program following the Court's granting of the Preliminary Injunction in May 2022.

#### 1.  Plaintiffs' implementation of their legal advice program was deeply flawed.

In their previous *amicus* briefs addressing Plaintiffs' original Motion for a Preliminary Injunction before this Court and before the Second Circuit, Advocate *Amici* detailed extensive concerns about Upsolve's proposed legal-advice program—in particular, their concern over the lack of guardrails to help ensure that Upsolve would adequately train and supervise its non-attorney volunteers and that those volunteers would give New Yorkers correct legal advice. ECF No. 57 at 23-25; Doc. 76 2d Cir. Amicus Brief at 18-31. When the Court asked Plaintiffs' counsel how Upsolve would know if their volunteers "gave inappropriate advice," Plaintiffs' counsel assured the Court that Upsolve would track "every encounter" with a New Yorker receiving legal advice, and that Upsolve would follow up with each such New Yorker "to ensure that the advice was provided pursuant to the terms of the guide." ECF No. 66 at 20; 4-7; *see also* ECF No. 1-2 at 6 ("You must also input yours and the client's information on the **American Justice Movement Website Web-Form** . . . which tracks all advice-giving encounters and allows us to follow up with clients to confirm that the advice they received is fully consistent with the terms of this guide.") (emphasis in text). Plaintiffs also assured the Court that the legal advice rendered would be "subject to strict training, regulation, and supervision" and would be "reliably in the client's best interest." ECF No. 66 at 3:24-4:1.

4

Despite any such tracking or follow-up Upsolve may have done, at least one low-income New Yorker received erroneous legal advice from Upsolve—advice that put her at risk of defaulting on a motion that a debt collector had filed against her, as described below. In 2023, one of Advocate *Amici*, New Economy Project (NEP), a nonprofit organization that runs a free legal assistance hotline for low-income New York City residents aggrieved by financial justice issues, received a call on its hotline from a low-income New York City resident, referred to herein as Ms. A. Declaration of Susan Shin ("Shin Decl.") ¶¶ 5, 7, attached as Appendix B. Upon reviewing Ms. A's documents and doing a case search in the New York State courts' NYS Courts Electronic Filing (NYSCEF) system, NEP confirmed that Ms. A was the defendant in a debt collection lawsuit that had been filed in Supreme Court of the State of New York ("NYS Supreme Court"). Shin Decl. ¶ 8. NEP further determined that Ms. A had inadvertently defaulted in appearing in the lawsuit months earlier. Shin Decl. ¶ 9. Upon reviewing the case filings listed in NYSCEF, NEP determined that the plaintiff in Ms. A's debt collection lawsuit had filed a motion for a default judgment, which was pending. *Id.*

NEP also reviewed several emails regarding Ms. A's lawsuit from someone whose email signature identified themselves as an "Upsolve Justice Advocate." Shin Decl. ¶ 10. The emails from the Upsolve Justice Advocate, dated about a week before Ms. A contacted NEP's legal hotline, included an attached answer for Ms. A and instructions to take the answer to "the courthouse." Shin Decl. ¶ 11; Ex. A to Shin Decl.

NEP identified significant errors in the legal advice contained in the emails from the Upsolve Justice Advocate. Shin Decl. ¶ 12. First, and most disturbingly, the emails advised Ms. A to file an answer in the debt collection case against her, even though the plaintiff's motion for a default judgment against Ms. A had been pending for at least a month. Shin Decl. ¶ 13. In the

opinion of NEP's Legal Director, Susan Shin, based on her 19 years of experience advising low-income New York City residents on debt collection lawsuits, an answer is never the appropriate document to file in a case where a motion for a default judgment is pending. Shin Decl. ¶ 14. Second, even if an answer had been the correct document to file, the answer prepared by the Upsolve Justice Advocate contained a host of issues. Shin Decl. ¶ 15; *see* Ex. A to Shin Decl. For example, the Upsolve Justice Advocate had left the caption section of the answer form entirely blank, without filling out the name of the court or county, the name of the plaintiff or defendant, or the index number. *Id.* They had also checked off both of the service defenses on the answer form—"I did not receive a copy of the Summons and Complaint" and "I received the Summons and Complaint, but service was not correct as required by law"—even though the two service defenses contradicted each other. *Id.* The Upsolve Justice Advocate had also checked off the box for "Counterclaim(s)," but left both of the fillable fields for that box—for the amount of the counterclaim(s) and the "Reason"—blank. *Id.* They had also checked off two other boxes on the answer form, but left the fillable fields for those boxes blank as well. *Id.*

Third, even if an answer had been the correct document to file, the emails from the Upsolve Justice Advocate directed Ms. A to file her answer in the wrong courthouse—a Civil Court of the City of New York ("NYC Civil Court") courthouse, even though Ms. A's lawsuit was in NYS Supreme Court. Shin Decl. ¶ 16.

Ms. A informed NEP that she had attempted to file the answer emailed by the Upsolve Justice Advocate, but that the court clerk's office had rejected her answer. Shin Decl. ¶ 17. The NYSCEF record for Ms. A's case confirms that no answer was filed in her lawsuit either around the date of the emails from the Upsolve Justice Advocate or thereafter. *Id.* NEP counseled Ms. A regarding her lawsuit and helped facilitate a referral to a legal services organization for full

representation. Shin Decl. ¶ 18. In Shin's opinion, Upsolve's erroneous legal advice put Ms. A at risk of defaulting in responding to the plaintiff's motion for a default judgment against her and at risk of having a default judgment—enforceable under New York State law for at least 20 years—entered against her. Shin Decl. ¶ 19. Notably, the User Agreement that Upsolve would have required her to sign, as a condition of receiving its legal advice, includes the statement, "Neither the American Justice Movement nor the Justice Advocates assume any liability regarding the outcome of your case." ECF No. 1-2 at 15; *see also id.* at 6 ("before advising the client, you should have them read and sign the **User Agreement**, which is attached to this Training Guide as Exhibit B.") (emphasis in text).

### 2. Plaintiffs' legal-advice program as implemented deviated from, and fell short of, their representations to the Court.

Upsolve's legal-advice program as implemented, including its conduct with respect to Ms. A, is at odds with, and falls short of, Plaintiffs' representations to the Court regarding the implementation of Upsolve's legal-advice program, including Plaintiffs' claim that Upsolve "launched the program as it had been described in [Plaintiffs'] preliminary-injunction filings." Petts Decl. ¶ 4. For example, Plaintiffs assured the Court that Upsolve would hire "someone with a track record of consumer-rights advocacy, a commitment to social justice, and a deep familiarity with the legal system" (ECF No. 7-1 at 20) "to vet, train, and supervise Justice Advocates (ECF No. 6 at 12) and "ensur[e] that the advice being provided is advancing the interest of the public and consumers." ECF No. 7-1 at 20. However, in or around August 2022, about three months after Plaintiffs had secured its PI, Upsolve published an online job posting for "a full-time Justice Fellow," which listed neither experience in consumer-rights advocacy nor deep familiarity with the legal system as a job qualification. Shin Decl. ¶ 20; *see* Ex. B to Shin Decl. The job's only requirements, according to the posting, were that the Justice Fellow "have a

commitment to social justice, be comfortable using technology, be able to start full-time in September 2022, have a strong sense of organization, have a high degree of personal autonomy, and have a bias towards action." *Id.*

Copied on the emails from the Upsolve Justice Advocate regarding Ms. A's lawsuit was an email address identified as belonging to a "Divya Vatsa" at "divya@upsolve.org." Shin Decl. ¶ 21. On or around March 24, 2023, Shin conducted an online search for the name "Divya Vatsa" and obtained a result on LinkedIn for a "Divya Vatsa," which indicated that she had been an "American Justice Movement Fellow" since September 2022 and continued to hold that position as of March 24, 2023. Shin Decl. ¶ 22; *see* Ex. C to Shin Decl. According to this LinkedIn result, Ms. Vatsa's prior experience at that point included eight years as a freelance graphic designer and multiple internships in the healthcare field, but nothing demonstrating "a track record of consumer-rights advocacy, a commitment to social justice, and a deep familiarity with the legal system." *Id.* It appears to be this Ms. Vatsa who, in her position as an American Justice Movement Fellow, was copied on the emails from the Upsolve Justice Advocate containing erroneous legal advice regarding Ms. A's lawsuit. Shin Decl. ¶ 23.

Upsolve's current online job posting for a full-time Justice Fellow seeks neither consumer-rights advocacy nor deep familiarity with the legal system and lists as "desired skills" only "[s]trong research skills," "[a]bility to write clearly and concisely," "[s]trong attention to detail," "[t]echnologically proficient," "[s]trong communication skills, both written and verbal," and "[e]mpathetic and passionate about serving low-income individuals." Shin Decl. ¶ 24; Weil, Gotshal & Manges LLP, *Justice Fellow*, https://www.weil.com/weil-legal-innovators/2024-2025-nonprofit-partners/upsolve/upsolve-job-1 (last visited Dec. 16, 2025) ("Justice Fellow Posting").

Upsolve's current job posting also notes that the job location for the Justice Fellow—who would be working with New York residents—is Cambridge, MA. Shin Decl. ¶ 24; Justice Fellow Posting ("You will be responsible for serving low-income New York residents who need help with debt collection lawsuits.").

Plaintiffs also represented to the Court that Upsolve would be "providing limited person-to-person advice pursuant to the strict terms of the training guide." ECF No. 66 at 4:20-22; 5:22-23; and 15:9-11. These terms included that Upsolve would render legal advice only to defendants in debt collection lawsuits filed in NYC Civil Court, not in NYS Supreme Court.[3] ECF No. 1-2 at 5. ("This Training Guide is designed to empower you to assist only clients who are defendants in a debt collection lawsuit in New York Civil Court [sic]." and "To confirm that a potential client is eligible for your services, please confirm that they have been served with a Summons and/or Complaint in New York Civil Court [sic] . . . . If the client's papers reflect that they have been used in Supreme Court, please let them know that you are unable to advise them and direct them to the alternative resources in Exhibit D."). The Upsolve Justice Advocate who prepared Ms. A's answer either received inadequate training on this threshold question of eligibility for Upsolve's legal-advice program or disregarded this restriction set forth in the Training Guide, without any apparent correction to the Upsolve Justice Advocate's conduct by the supervising Upsolve Justice Fellow.

In at least one respect, the Upsolve Justice Advocate's legal advice to Ms. A was incorrect precisely because it echoed incorrect legal advice recommended by Upsolve's Training Guide. Upsolve's Training Guide states, "If the client has not yet filed an answer, you should advise them that it is in their interest to file an answer . . . Ordinarily, a defendant has either 20 or

---

[3] Plaintiffs do not include an updated version of their Training Guide in their PI Reinstatement Motion, though they represented to the Court that they did update it. ECF No. 89.

30 days from when they are served to file an answer, depending on how they were served. But you should advise clients that they should answer their lawsuits even if that deadline has elapsed." ECF No. 1-2 at 6. In Ms. A's case, however, though her deadline to answer the lawsuit had elapsed by the time the Upsolve Justice Advocate gave legal advice to Ms. A, the plaintiff in Ms. A's lawsuit had already filed a motion for a default judgment, which was pending. Shin Decl. ¶ 13. At that point, the proper document for Ms. A to file was therefore an affidavit or affirmation opposing the plaintiff's motion for a default judgment, not an answer. Shin Decl. ¶ 14.

The apparently "small-scale" nature of Upsolve's legal-advice program as implemented (*see* Petts Decl. ¶ 8) also suggests that Plaintiffs' representations to the Court as to how their particular breed of legal-advice program could fill the urgent need for legal advice were disingenuous. Plaintiffs' PI Reinstatement Motion  offers no statistics regarding the number of volunteers who served as Justice Advocates through Upsolve's legal-advice program or the number of people who received legal advice through the program. This lack of data is striking in light of Plaintiffs' insistence that there was, at the time of their original motion for a preliminary injunction, "a critical and immediate need for legal advice on how to respond to debt collection lawsuits within [Plaintiff Reverend John Udo-Okon's] community." ECF No. 7-2; *see also* ECF No. 1-2, Ex. 2A ("Petition of 100+ Bronx residents who want to receive free legal advice"); ECF No. 66 at 18:1-3; 22:12-14. Despite this "critical and immediate need," Plaintiffs are silent as to the number of people in Reverend Udo-Okon's community who received legal advice through Upsolve's program; nor do Plaintiffs address why their concern over the status of their preliminary injunction should have impeded Reverend Udo-Okon from proceeding to "provide valuable, important, and free legal advice to his community under the American Justice

Movement starting immediately" (ECF No. 6 at 7), given their claims of urgency. Despite these claims, Plaintiffs also appear to have delayed the implementation of their legal-advice program for at least three months following the grant of their preliminary injunction in May 2022. Though Plaintiffs do not disclose in their renewed motion when they began their program, Plaintiffs appear to have published a job posting for a supervising "Justice Fellow" only in August 2022, with the position to start in September 2022, *see* Shin Decl. ¶ 20, even though Upsolve noted that they had "already raised $100,000 to fund one full-time [American Justice Movement] staff member" as of January 2022. ECF No. 7-1 at 20.

Plaintiffs are also silent as to other aspects of their legal-advice program that could help courts or other stakeholders measure the program's effectiveness, including whether their Justice Advocates underwent any training—even if only the single, virtual training that Plaintiffs touted to the Court (ECF No. 1-2 at 4); whether the Justice Advocates were required to take any test to assess their comprehension of the material in either the single virtual training or the Training Guide; the nature of the Justice Fellow's supervision of the Justice Advocates; whether the Justice Advocates received any attorney supervision throughout the operation of Upsolve's legal-advice program; how many people they were unable to provide legal advice to because those people's circumstances put them outside the bounds of Upsolve's Training Guide (ECF No. 1-2 at 50); and how many people they referred to the legal services providers listed in their Training Guide. Plaintiffs also have not shared with the Court any new version of their Training Guide, though they represented to the Court, in December 2022, that they had produced a new version of the Training Guide "to reflect changes or updates in the law." ECF No. 89.

### 3. Plaintiffs' description of their legal-advice program as implemented suggests an information and referral model that would not run afoul of unauthorized practice of law rules.

What Plaintiffs do reveal about their legal-advice program as implemented is that they apparently provided a benefit to people doing something they could have done all along, without running the risk of engaging in the unauthorized practice of law—namely, providing "more general advice or a referral or just commiseration." Petts Decl. ¶ 6. Plaintiffs claim that "we would not have been able to offer help or referrals to any of them without the protection of our preliminary injunction." Petts Decl. ¶ 6. An example of a longstanding nonprofit organization that essentially does just that is Legal Hand, whose website states that "[a]t Legal Hand, our highly trained Volunteers, who are not lawyers, provide free legal information, assistance and referrals to help you resolve issues that affect your life in areas like housing, family, consumer debt, immigration, domestic violence, public benefits, employment and many more." Legal Hand website, *available at*: https://www.legalhand.org/ (last visited Dec. 16, 2025). Nevertheless, Plaintiffs suggest that they had no choice but to cease providing even information and referrals once the Second Circuit vacated the district court's decision granting the preliminary injunction. Petts Decl. ¶ 9.

### B. Developments in the access to justice movement have resulted in various models designed to address unmet legal needs.

As noted in Plaintiffs' PI Reinstatement Motion, the access-to-justice movement—which Plaintiffs identify themselves to be part of—has seen several developments, even in the past year.[4] *See* Petts Decl. ¶¶ 12-13. Advocate *Amici* address these models in turn.

---

[4] In fact, Upsolve takes credit for other entities emulating the design of its American Justice Movement program, which it describes as "a success as an inspiration." Petts Decl. ¶ 11.

1.  **Some access-to-justice models involving non-lawyers are authorized by state courts.**

State courts, civil legal services advocacy organizations, scholars, and commentators have extensively documented and commented on the civil access-to-justice crisis in the United States and responded with calls for innovation, including carveouts of unauthorized practice of law provisions to enable nonlawyers to improve access to legal information and legal services. Just this year, the Conference of Chief Judges encouraged its members to explore "authorized justice practitioner" programs ("CCJ Resolution 1-2025"). Conference of Chief Judges, Resolution 1-2025 In Support of Exploring Access to Justice Through Authorized Justice Practitioner Programs (July 30, 2025), *available at*: https://ccj.ncsc.org/resources-courts/support-exploring-access-justice-through-authorized-justice-practitioner-programs.

CCJ Resolution 1-2025 identified two categories of authorized justice programs: Allied Legal Professional (ALP) Programs and Community-Based Justice Worker (CBJW) Programs. *Id.* In promoting exploration and innovation, the Conference of Chief Judges urged states to "establish clear guidelines and regulations that define the scope of practice" for authorized justice practitioners, "develop certification programs and training opportunities" that reduce barriers to entry "while maintaining the necessary legal knowledge and ethical standards," "monitor and evaluate the impact" of new programs, "develop best practices," and "engage in rigorous evaluation." *Id.*

Throughout the country, states are adopting ALP and CBJW programs that seek to "improve the accessibility, affordability, and quality of legal services while ensuring necessary and appropriate protections for the public." *Id.* Washington State established the nation's first ALP program in 2012, called the Limited Licensed Legal Technician ("LLLT") program. Washington's LLLT regime included a board that oversaw grievances and discipline over

LLLTs; approved forms used by LLLTs; established "Rules of Professional Conduct" and "Rules of Enforcement of LLLT Conduct;" and provided continuing legal education to LLLTs. *See* Wash. State Court Rule Limited License Technical Legal Technicians Rules of Professional Conduct, *available at*:

https://www.courts.wa.gov/courtrules/rulesforLLLTRPC.cfm?Rule=Limited%20License%20Legal%20Technician%20Rules%20of%20Professional%20Conduct%20(LLLT%20RPC)&fileName=GA_LLLTRPC.pdf&link=https://www.courts.wa.gov/court_rules/pdf/LLLTRPC/GA_LLLTRPC.pdf; Wash. APR 28 § D. The LLLT framework circumscribed and clearly set out LLLTs' scope of authorized practice, limited to only specific aspects of domestic relations law, an area of high unmet civil legal services need. Wash. APR 28 § E. Requirements included continuing legal education, maintaining professional liability insurance, and licensure. *Id.* at § I. Although possibly too ambitious, given that the Washington State Supreme Court decided to sunset the LLLT Program in 2020 (Wash. State Bar Assoc., Sunset of LLLT Program (updated Mar. 31, 2023), *available at*: https://www.wsba.org/for-legal-professionals/join-the-legal-profession-in-wa/limited-license-legal-technicians/decision-to-sunset-lllt-program), the program and its requirements—which included continuing legal education, maintaining professional liability insurance, and licensure—provided a model for other states. Wash. APR 28 § E.

Since 2012, other states have established ALPs with the "necessary and appropriate protections for the public" required by CCJ Resolution 1-2025. Several of them came into effect just this year. Arizona's Legal Paraprofessional Program carves out an exception to the state's unauthorized practice of law statute, but only for individuals who obtain a license in specified and limited practice areas, which requires an examination and qualifications, including "character and fitness," and education and/or experience. Ariz. Jud. Code Adm. §§ 7-210(B);

(E)(1); (E)(2); (E)(3); and (E)(5). Arizona's Legal Professionals also must demonstrate "Substantive Law-Related Experience" and take a professionalism course. *Id.* at §§ 7-210(E)(7) and (E)(8). Arizona's regime also clearly outlines the authorized scope of practice and prohibited areas of practice; adopts the Arizona Supreme Court Rules governing complaints; mandates continuing legal education; and incorporates a code of conduct. *Id.* at §§ 7-210(F), (G), (I), and (J).

The South Carolina pilot program that Plaintiffs cite in support of their motion as "an American Justice Movement-style program" (Petts Decl. ¶ 11) in fact includes many more guardrails, including attorney supervision and review of non-lawyer advocates' work, than Upsolve's model. The court order approving the pilot program noted that to become certified under the program as "Advocates" who could provide limited assistance to tenants facing eviction in South Carolina magistrate courts, nonlawyer volunteers would be required to "complete a training program with four modules that last between two to four hours each, for a total of twelve hours of training" and "pass a test after each module and also pass a cumulative final examination." *In Re: South Carolina NAACP Housing Advocate Program, et al.,* 2023-001608 (Sup. Ct. S.C. 2023), Order at 6, *available at*: http://fingfx.thomsonreuters.com/gfx/legaldocs/xmvjrnaayvr/Order%20-%202024-02-08%20-%20SC%20Supreme%20Court.pdf. The court also noted that the petitioners indicated that they would "continuously review the modules and testing to ensure the efficacy of their assessments and training and periodically update the training manual, modules, and assessments" (*id.* at 7); "conduct user-testing and survey Advocate to ensure concepts are taught effectively" (*id.*); "collect various data to determine the efficacy of the Program;" and "share information with the Court," including "the number of trained Advocates and their identities;" "the number of tenants

who contact the Program for assistance;" "the number of tenants the Program assists;" "the number of tenants the Program is unable to assist;" and "the number of tenants referred to legal services." *Id.* at 8.

Noting that the purpose of the courts' duty to regulate the legal profession "is to protect the public from the potentially severe economic and emotional consequences which may flow from the erroneous preparation of legal documents or the inaccurate legal advice given by persons untrained in the law" (*id.* at 10), the South Carolina court found that "there appears to be sufficient lawyer involvement and supervision to ensure that Advocates are appropriately trained and supervised" and "sufficient safeguards in place in the form or periodic lawyer review of each Advocate's work to ensure that Advocates provide only limited, competent, and nonfrivolous guidance to tenants." *Id.* at 16.

Similarly, other states' ALP programs involve extensive oversight and regulation, including at times supervision by attorneys. *See*, *e.g.*, Colo. R. Civ. Proc. 207 (2025); Minn. Judicial Branch, Legal Professional Program, authorized by Minnesota Supreme Court (effective Jan. 1, 2025) ("The Program permits legal paraprofessionals, under the supervision of a Minnesota licensed attorney, to provide legal advice in select legal matters and, in some cases, represent a client in court in select case types."), *available at*: https://mncourts.gov/help-topics/Legal-Paraprofessional-Program; Oregon State Bar, Oregon Licensed Paralegals, *available at*: https://www.osbar.org/lp, and Oregon State Supreme Court Rules for Licensing Paralegals, *available at*: https://www.osbar.org/_docs/rulesregs/RulesforLicensingParalegals.pdf (effective Jan. 1, 2025); and Utah Code Jud. Admin. Rule 14-802(c) and Utah State Courts, Licensed Legal Practitioner, *available at*:

https://www.utcourts.gov/en/about/miscellaneous/legal-community/lpp.html.

### 2. Some states sponsor community-based justice worker programs.

A number of states have adopted or are considering adopting CBJW programs, which, according to one definition, involve "training and certifying individuals working at community-based organizations to offer legal advice and services in certain types of cases." Institute for the Advancement of the American Legal System, The Diverse Landscape of Community-Based Justice Workers (Feb. 22, 2024), *available at*: https://iaals.du.edu/blog/diverse-landscape-community-based-justice-workers. A common theme of these more recent access-to-justice innovations is that they include guardrails to promote quality legal services and consumer protections.

Drawing on the experience of earlier legal navigator programs, in 2019, Alaska established the Community Justice Worker program, which operated within existing unauthorized practice of law provisions, and leveraged community members to assist Alaskans in securing SNAP benefits, which involve administrative proceedings where nonlawyers have long been permitted to appear. *Id.* Alaska Bar Rule 43.5 now permits "comprehensively train[ed] qualified non-lawyer volunteers" to assist with more practice areas, including "unemployment benefits, debt collection defense, estate planning, domestic violence protection order advocacy, and Indian Child Welfare Matters." Alaska Legal Servs. Corp., Community Justice Worker Program (citing Alaska Bar Rule 43.5 ("Waivers to Engage in the Limited Practice of Law for Non-Lawyers Trained and Supervised by Alaska Legal Services Corporation")), *available at*: https://www.alsc-law.org/cjw/. Alaska's CBJW Program requires non-lawyers to complete required training offered by the Alaska Legal Services Corporation ("ALSC"), including on rules of professional conduct and substantive areas of law; to be supervised by ALSC; and to be either full- or part-time ALSC employees or ALSC volunteers. Alaska R. 43.5(1), 43.5(2), and 43.5(3).

17

Arizona also established a CBJW Program in 2019 "intended to protect the public and to result in the effective administration of [CBJW] programs." Arizona Code J. Admin. § 7-211(C). The CBJW program was adopted by Administrative Order effective this year on March 19, 2025. § 7-211. Arizona's CBJW framework establishes two categories of non-attorney statuses as carveouts to the unauthorized practice of law. *Id.* at § 7-211(B). The first category, an "'authorized community justice worker' means an individual, supervised by an approved legal services organization licensed attorney, who is authorized under this section to provide specified legal assistance and legal advice in one or more approved areas of law to a participant client of an approved legal services organization." *Id*. at § 7-211(A). The second category, a "certified community legal advocate" refers to a certified individual who is mentored by volunteer attorneys admitted to practice in Arizona, including attorneys admitted to practice in Arizona for at least five years "with subject-matter expertise," who can "provide specified legal assistance and legal advice in one or more approved areas of law to a participant client of an approved community-based organization." *Id.*

Arizona's CBJW Program includes detailed qualifications for authorized community justice workers and certified community legal advocates, including education requirements; the demonstration of good moral character; and completion of training. *Id.* at §§ 7-211(E)(3), (E)(4). Certified community legal advocates must be mentored by a qualified instructor or attorney. *Id.* at § 7-211(E)(4)(g). The CBJW Program also delineates the scope of authorized and unauthorized legal services. *Id.* at § 7-211(G). Additional consumer protections include written disclosures and consent; procedures for complaints, investigations, and disciplinary proceedings; continuing legal education; reporting and audits; and a code of conduct. *Id.* at §§ 7-211(G), (K), (L), (N) and (M).

Other states' emerging CBJW models similarly contain consumer protections. *See*, *e.g.*, Supreme Court of the State of Utah, Standing Order No. 16 (Amended) (Eff. Mar. 23,2023, Am. May 15, 2025) (creating a carveout of the state's UPL regime to permit trained and certified staff of authorized community-based organizations to provide legal services in tenant defense), *available at*: https://legacy.utcourts.gov/rules/urapdocs/16.pdf; Supreme Court of the State of Arizona, In re Authorizing a Housing Stability Legal Advocate Pilot Program, Admin. Order No. 2024-34 (Feb. 7, 2024) (establishing pilot program of certified advocates who must meet eligibility requirements and be mentored by required course instructors or volunteer attorneys with subject matter expertise), *available at*:

https://www.azcourts.gov/Portals/0/22/admorder/Orders24/2024-34.pdf?ver=_oX3FvQafoxtt-9UdSjrrA%3d%3d.

### 3. Other countries have non-attorney access-to-justice models.

Proponents of Upsolve's model tout non-attorney access-to-justice models found outside of the United States. *See* Sandefur Amicus Br. Pt. II.A (noting that in the United Kingdom the "most well-known are 'Citizens Advice' offices, lay-staffed community advice offices throughout the country"). Importantly, these models contain quality-control structures that seek to support non-attorney volunteers. For example, the United Kingdom's Citizen Advice Bureau ("CAB") reports that "the full advisor training can take over 6 months to complete." Citizens Advice, Supporting Volunteers at Citizens Advice website, *available at*:

https://www.citizensadvice.org.uk/about-us/information/supporting-volunteers-at-citizens-advice/. In addition, CAB's "[v]olunteers are fully supported and supervised throughout their time at Citizens Advice," and "an advice session supervisor" is on duty at each advice session to guide and support volunteer advisors. *Id.*

19

### 4. Access-to-justice programs should prioritize the prevention of harm to low-income communities.

Recognizing that many states have already implemented or are considering programs that allow nonattorneys to provide legal help in certain circumstances, the National Legal Aid and Defenders Association (NLADA) decided to develop certain principles ("NLADA Principles") to inform the creation of such programs. *See* NLADA, Legal Practitioners: A Statement of Principles for Civil Legal Services, *available at*:

https://www.nlada.org/sites/default/files/pictures/Legal-Practitioners-A-Statement-of-Principles-for-Civil-Legal-Services.pdf. The NLADA Principles address concerns about the lack of input by those with expertise and personal experience in the development of access-to-justice programs and recommend engaging legal aid organizations and client communities in "decision-making throughout the design, implementation and evaluation of reforms." NLADA Principles at 1. The NLADA Principles also point out how critical "oversight and discipline structures" and supervision is to providing high-quality services. *Id.* at 3. The NLADA Principles also emphasize that "[d]ata collection and reporting should be transparent," and should "include clients served," and ensure "rigorous evaluation and iteration." *Id.* at 4. Any person or entity creating an access-to-justice program would be well served by reviewing and adhering to these thoughtfully crafted guidelines.

### 5. Access-to-justice programs exist in New York.

New York has not yet established comprehensive or statewide legal-advice models. But as explained in Advocate *Amici*'s prior amicus briefs (Doc. 76 Advocate *Amici* 2d Cir. Brief at 25-26 (citing ECF No. 57 at 10-12)), New York has supported limited-scope legal assistance programs in the consumer debt field—CLARO and VLFD—which are staffed by both non-attorneys and experienced attorneys who are admitted to practice in New York and trained in

20

consumer debt defense. These programs provide unbundled services that help low-income New

Yorkers with answers, advise and prepare *pro se* litigants for their court appearances, and

generally help litigants navigate the legal system. Though they in no way offer a complete

solution to the needs of the many New Yorkers who face debt collection lawsuits, the VLFD and

CLARO programs work in concert with each other and with other legal services providers to

ensure that many unrepresented defendants in debt collection lawsuits have access to support,

advice, and holistic services.

## IV.    ARGUMENT

To prevail on a motion for preliminary injunction, a movant must show: "(1) irreparable

harm; (2) either a likelihood of success on the merits or both serious questions on the merits and

a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction

is in the public interest." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883

F.3d 32, 36-37 (2d Cir. 2018) (citing *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d

638, 650 (2d Cir. 2015)). Advocate *Amici* address the second and third prongs below.

### A.    Plaintiffs' Motion to Reinstate Preliminary Injunction should be denied given that they will not prevail on the merits, as the UPL statutes will withstand intermediate scrutiny.

A challenged restriction will withstand intermediate scrutiny if it "(1) advances important

governmental interests unrelated to the suppression of free speech and (2) does not burden

substantially more speech than necessary to further those interests." *Brokamp v. James*, 66 F.4th

374, 397 (2d Cir. 2023).

#### 1.    The UPL statutes advance the important government interests of protecting New Yorkers from harmful legal advice.

As articulated in the Opposition Brief by Defendant Attorney General, UPL statutes

protect the public from the provision of legal advice by people without the necessary training,

21

education qualifications, or experience. *See* AG Brief at 10 (citing *El Gemayel v. Seaman*, 72 N.Y.2d 701, 705 (1988); *People v. Alfani*, 227 N.Y. 334, 339 (1919); and *Polaski v. Lee*, 759 F. Supp. 3d 683, 689 (E.D.N.C. 2024)); *see also*, *e.g.*, *18 Int'l Ltd. v. Interstate Exp., Inc.*, 116 Misc. 2d 66, 67, 455 N.Y.S.2d 224, 225 (Sup. Ct. 1982) ("The purpose of this prohibition against the practice of law by one who is not a duly licensed New York attorney is to protect citizens against the dangers of legal representation and advice given by those not trained, examined and licensed for such work.").

In seeking an exemption from New York's UPL statutes, Plaintiffs seek to avoid any accountability for harmful advice they dispense to unwitting New Yorkers. As explained in Section A of the Background section above, such harms are not ephemeral. By assisting a New Yorker who was facing a pending default judgment motion with an answer (an answer that lacked a caption or index number and that included contradicting defenses, among other deficiencies, raising serious questions of judgment), Plaintiffs put a consumer directly in harm's way. Exempting Plaintiffs from the UPL statutes even though their legal-advice model does not require adequate training, qualifications, or experience runs counter to New York State's substantial interest in protecting its citizens.

### 2. New York's UPL statutes do not burden substantially more speech than necessary to protect New Yorkers from harm.

Plaintiffs will also not succeed on the merits of their case because the UPL statutes withstand the second prong of intermediate scrutiny: they do not burden speech more than necessary. New York's UPL statutes prohibit non-attorneys from providing legal advice, but they do not prohibit non-attorneys from providing legal information. Plaintiffs concede that some of their clients did not need legal advice, and that the Upsolve volunteers provided a "referral," which is not legal advice, or "more general advice," which could be construed as legal

information.[5] Petts Decl. ¶ 6. Plaintiffs' own examples of the speech they engaged in as part of their legal assistance program prove that the UPL statutes do not burden substantially more speech than is necessary.

### B. Plaintiff's motion should be denied because a preliminary injunction that allows Upsolve's legal-advice model to operate is not in the public interest.

To obtain a preliminary injunction a plaintiff must prove "that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–313 (1982); *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987)). Here, the public interest would be disserved by the granting of a preliminary injunction that would allow Plaintiffs' misguided experiment as executed to begin operating again.

As detailed in Section A of the Background and in Section A(1) in the Argument above, New Yorkers sued in debt collection cases could easily be harmed by Plaintiffs' program, which allows insufficiently trained and inadequately supervised non-attorneys to provide legal advice to *pro se* defendants sued in debt collection cases. In fact, Plaintiffs' poorly designed program previously harmed a member of the public after the initial PI was granted. *See* Shin Decl. ¶¶ 7-19. Ms. A's experience underscores the unreliability of any supposed guardrails in Upsolve's legal-advice program, both as designed and as implemented. Access-to-justice programs that are in the public interest are ones that have safeguards and oversight, including the thoughtfully designed model in South Carolina that includes attorney supervision, training and examinations of non-attorney advocates, regular reviews and evaluations, and the collection of data to determine the efficacy of the program. *See* discussion in Section B(1), *supra*. Upsolve's program

---

[5] The UPL statutes certainly do not prohibit non-attorneys from commiserating (Petts Decl. ¶ 6) with other people, even about the legal field.

also cannot be said to be in the public interest when compared to the well-established and robust

CLARO and VLFD programs that already exist in New York and that have measurable positive

results.  As described in Section B of the Background, legal assistance programs, including any

such programs developed in New York, should be crafted in accordance with NLADA Principles

and modeled on ALP and CBJW programs, with strict standards and possibly licensing schemes,

and should, at the very least, incorporate mandatory training, oversight, and accountability.

Upsolve's program has none of those safeguards.

## V.    CONCLUSION

For the above reasons, Plaintiffs' Motion should be denied.

Dated:  December 19, 2025
        New York, New York

                                    EMERY CELLI BRINCKERHOFF
                                    ABADY WARD & MAAZEL LLP

                                    By: _____/s/_____
                                    Matthew D. Brinckerhoff

                                    One Rockefeller Plaza, 8th Floor
                                    New York, New York 10020
                                    212-763-5000
                                    mbrinckerhoff@ecbawm.com

                                    *Counsel for Advocate Amici*

## APPENDIX: *AMICI CURIAE* ORGANIZATIONAL STATEMENTS

**Access Justice Brooklyn** partners with compassionate pro bono attorneys and cross-industry professionals to provide high-quality, civil legal services that help ensure equal access to the legal system. The organization's approach prioritizes the most basic, essential elements and experiences of human life, including housing, family stability, and subsistence income. Its proven pro bono model—recruit, train, supervise, and support—also provides flexibility to address new legal issues as they emerge. Everyone, whether an attorney or not, has a role to play in expanding access to justice.

**CAMBA Legal Services** is a community based non-profit legal services provider located in the Flatbush neighborhood of Brooklyn. CAMBA provides legal services in the areas of housing, immigration, foreclosure, and consumer law. Since its inception 18 years ago, the CAMBA Consumer Law Project works to assist working poor New Yorkers with a broad spectrum of consumer law issues including: representing defendants in collection actions filed in New York City Civil Court; assisting pro se defendants draft legal papers; and helping consumers facing debt collection abuse. The chief goal of the Consumer Law Project is to help our clients achieve self-sufficiency.

**District Council 37 Municipal Employees Legal Services** (MELS) is committed to providing poor and working New Yorkers equal access to justice. Our office offers free legal services to over 125,000 workers covered under District Council 37's collective bargaining agreements with municipal agencies and another 50,000 retirees. Our clients are among the working poor of New York State. Our Consumer/Debt/Bankruptcy Unit's staff of 16 attorneys and legal assistants defend against debt collection lawsuits in New York City and Nassau, Suffolk, Westchester and Rockland Counties and initiate bankruptcy proceedings to afford clients straddled with unsurmountable debt a fresh start.

**Fordham Law School's Feerick Center for Social Justice** promotes the rights of and addresses the problems facing marginalized and low-income individuals seeking humanitarian relief, including asylum-seeking families and unaccompanied immigrant children. The Feerick Center links the social justice community serving those in need to Fordham and engages the Fordham community in service of national and local social justice initiatives. The Center provides high-quality free, direct civil limited-scope legal assistance, conducts community education, works in partnership with a broad array of stakeholders, helps lead coalitions, advances access-to-justice initiatives, and engages in policy advocacy. The Feerick Center has operated the Civil Legal Assistance and Resource Office (CLARO) Programs in the Bronx, Manhattan, and Staten Island beginning in 2008, 2009, and 2010, respectively, and established the Remote CLARO Program in 2020. CLARO Programs provide limited-scope legal advice and assistance to New Yorkers sued in debt collection lawsuits, primarily in New York City Civil Court. The Feerick Center's CLARO Programs have facilitated over 26,500 consultations since 2008. The Feerick Center has also helped coordinate a variety of efforts in connection with the CLARO Programs, including

advocacy campaigns, volunteer recruitment and training, and development of litigation and training resources.

**Legal Services NYC** ("LSNYC") is the nation's largest provider of free civil legal services to the poor. For more than 50 years, LSNYC has provided expert legal assistance and advocacy to low-income residents of New York City. Each year, LSNYC's neighborhood offices across New York City serve tens of thousands of New Yorkers, including homeowners, tenants, the disabled, immigrants, the elderly, and children. LSNYC provides both pro se assistance and full representation to low-income New Yorkers facing consumer debt issues in both New York State and federal courts, including affirmative litigation to stop abusive or deceptive debt collection practices, assistance with identity theft, and assistance with student loan discharges or income-based repayment plans. LSNYC also provides training to community groups on consumer issues.

**Mobilization for Justice**'s (MFJ) mission is to achieve justice for all. MFJ prioritizes the needs of people who are low-income, disenfranchised, or have disabilities as they struggle to overcome the effects of social injustice and systemic racism. We provide the highest-quality free, direct civil legal assistance, conduct community education and build partnerships, engage in policy advocacy, and bring impact litigation. We assist more than 14,000 New Yorkers each year, benefitting over 24,000. MFJ's Consumer Rights Project regularly provides legal advice and assistance to low-income New Yorkers sued in debt collection lawsuits.

**New Economy Project** works to promote economic justice and to eliminate discriminatory economic practices that perpetuate inequality and poverty. Since 2005 we have operated a free legal assistance hotline through which we have helped thousands of low-income New York City residents resolve legal issues stemming from debt collection lawsuits, credit reporting problems, unfair banking practices, and more. We effectively combine our direct legal services with cutting-edge impact litigation, policy advocacy, coalition-building, and applied research to secure vital policy changes to curb the extraction of wealth from New York City's low-income neighborhoods and neighborhoods of color.

Founded in 1990, **New York Legal Assistance Group** (NYLAG) is a leading civil legal services organization that combats economic, racial, and social injustice by advocating for New Yorkers experiencing poverty or in crisis. Our work includes comprehensive, free civil legal services, financial empowerment, impact litigation, policy advocacy, and community partnerships. NYLAG exists because wealth should not determine who has access to justice. We aim to disrupt systemic racism by serving individuals and families whose legal and financial crises are often rooted in racial inequality. NYLAG goes to where the need is, providing services in more than 150 community sites in New York and in our Mobile Legal Help Center. NYLAG's Consumer Protection Unit Project (CPU) represents and advises consumer debtors in debt collection lawsuits, and assists them in challenging abusive debt collection practices, combating identity theft, and repairing credit. As part of a program conducted in partnership with the Unified Court System, CPU also supervises the Volunteer Lawyer for a Day – Consumer Credit Project in

Bronx County, Queens County, and Richmond County Civil Courts, through which NYLAG and volunteer attorneys assist and represent thousands of pro se consumer debtors at court appearances each year.

**Public Good Law Center** is a public interest organization dedicated to fairness and justice in the courts and in the marketplace. Through cases of particular significance for the protection of consumers—especially low-income consumers—Public Good seeks to ensure that legal protections and the system of justice remain available to everyone. Public Good has participated as amicus in consumer protection cases around the state and the nation, including numerous matters where, like this one, consumers' financial well-being and access to justice are at stake.

The **St. Vincent de Paul Legal Program, Inc.** ("SVDPLP") is a 501(c)(3) non-profit corporation that provides free legal services to persons with limited means. The SVDPLP is the non-profit law firm through which St. John's University School of Law operates its in-house law school clinics, including the Consumer Justice for the Elderly:Litigation Clinic (CJELC), whose work relates to the subject matter of this lawsuit. CJELC has a dual mission: to provide free legal assistance to low income, older residents of Queens County who would not otherwise have access to legal representation, and to guide law students in the development of their lawyering skills and professional identities, emphasizing the duty to practice ethically and in the service of justice. Because senior citizens are particularly vulnerable to loss of home ownership, financial abuse, and consumer deception, CJELC focuses its representation of seniors in cases involving foreclosure, deed fraud, home improvement contractor fraud, and consumer debt litigation. In addition, CJELC's attorneys and law student interns volunteer for the Volunteer Lawyer for the Day Program ("VLFD") in the Consumer Credit Part of the New York City Civil Court for Queens County. VLFD is a partnership of the New York State Office of Court Administration, legal services providers, and law schools which provides limited scope legal representation just for the day to any consumer defendant with a matter in the Consumer Credit Part. CJELC has successfully advocated for legal reform, based on systemic problems observed in its collective work for individual clients, including consumer debt litigation. Thus, the issues raised in this lawsuit are of vital interest to CJELC's clients.

**TakeRoot Justice**, formerly the Community Development Project, was founded in 2001 as part of the Urban Justice Center. TakeRoot Justice became an independent organization in July of 2019. TakeRoot Justice provides legal, participatory research, and policy support to strengthen the work of grassroots and community-based groups in New York City to dismantle racial, economic and social oppression. TakeRoot Justice's partners take the lead in determining the priorities and goals for our work, and advance our understanding of justice. We believe in a theory of change where short-term and individual successes help build the capacity and power of our partners, who in turn can have longer-term impact on policies, laws and systems that affect their communities. TakeRoot Justice's Consumer Practice provides legal counsel and representations to low-income New Yorkers in a variety of consumer issues, such as consumer debts lawsuits, credit reporting, residential rent arrears cases, and identity thefts. TakeRoot

Justice also partners with community-based organizations in legislative and regulatory advocacy campaigns to support positive and sustainable change in the consumer landscape.

The **Western New York Law Center** (the "Law Center") is a nonprofit legal services provider in Buffalo, New York. Founded in 1996, the Law Center exists to promote human and civil rights with an overarching vision of economic justice for all. To further that mission, the Law Center works in a variety of areas including housing, consumer debt, public benefits, and combating discrimination. The Law Center's work in these areas includes providing legal services to low-income and underserved Western New Yorkers through direct representation, impact litigation, administration of volunteer attorney programs including limited-scope representation clinics and attorney-of-the-day programs, public consciousness-raising, and lobbying campaigns. The Law Center provides direct legal services benefiting over 4,000 Western New Yorkers annually. The Law Center administers the CLARO-Buffalo consumer debt law clinic, which since 2012 has helped thousands of Western New Yorkers resolve millions of dollars in alleged consumer debts, primarily by helping consumers challenging consumer debt judgments or assert defenses to consumer debt lawsuits. In 2024 the program helped 1,181 consumers avoid $2.2 million in judgments and obtain $159,000 in direct monetary benefits such as refunds.